# COPY

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

SEP 7 - 2001

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. *1.01 CR 45* |
| ) | |
| V.                       ) | |
| ) | |
| ) | |
| ROBERT B. BURNS, JR.      ) | **Conspiracy** |
| ) | **(18 U.S.C. § 371)** |
| WILLIAM C. FILCHECK, JR.  ) | |
| ) | **Health Care Fraud** |
| SCOTT G. TAYLOR, AND      ) | **(18 U.S.C. §§ 1347 and 2)** |
| ) | |
| RONALD L. HALSTEAD        ) | **Laundering of Monetary Instruments** |
| ) | **(18 U.S.C. § 1956(a)(1)(A)(i)and (h))** |
| ) | |
| ) | **Asset Forfeiture** |
| ) | **(18 U.S.C. § 982)** |
| ) | |

## INDICTMENT

### COUNT 1

**(Conspiracy, 18 U.S.C. §§ 371 and 2)**
**(Defendants Burns, Filcheck, Taylor, and Halstead)**

The grand jury charges that at all times material to this indictment:

### General Allegations

### Chiropractors

1.      Chiropractors are licensed to provide certain types of treatments and services

involving the spinal column, joints and soft tissues by the states in which they practice.  A

chiropractor is not a medical doctor and cannot provide many of the treatments and services that a

- 1 -

licensed medical doctor can provide.

### Robert B. Burns, Jr.

2.       Defendant Robert B. Burns, Jr. D.C. ("Burns") was a chiropractor licensed to practice in the states of West Virginia and Pennsylvania.

3.       Between 1985 and 1996, Defendant Burns owned and operated a chiropractic clinic known as Mountaineer Chiropractic ("Mountaineer") in Morgantown, West Virginia.  Mountaineer billed various health care benefit programs within the dollar limits the programs set for chiropractic services.

4.       In 1994, Defendant Burns caused the formation of Priority One Medical Associates, P.C. ("Priority One"), a professional medical corporation organized  under the laws of the State of West Virginia.  Priority One operated at the same location as Mountaineer. Beginning in 1994, Defendant Burns caused chiropractic patients of Mountaineer Chiropractic, Inc. to be transferred to Priority One.

5.       In 1994, Defendant Burns also formed West Virginia Health Care Management, Inc. ("Health Care Management").  Through a series of leases and other contractual agreements, Burns managed and maintained control over both Priority One and Mountaineer.

6.       In the State of West Virginia, a professional medical corporation must be owned by a licensed medical doctor and cannot be owned by a licensed chiropractor.  Between 1994 and 1998,  the stock of Priority One was held in the name of Dr. "A," a licensed medical doctor who was hired and paid a salary by Defendant Burns to work at Priority One.  One purpose of this arrangement was to enable Defendant Burns to comply with the West Virginia State requirement that professional medical corporations must be owned by medical doctors.  Beginning in 1994,

when Dr. "A" began working at Priority One, and continuing until 1997, Priority One employed one or more chiropractors who performed tests and other chiropractic treatments on Priority One patients, and submitted claims for payments for those services to various health care benefit programs in the name of Dr. "A" or Dr. "B," another licensed medical doctor.

7.      Between 1994 and 1997, Priority One billed  health care benefit programs in the name of a medical doctor for chiropractic and medical services, test and procedures for which it claimed reimbursement.

### William C. Filcheck, Jr.

8.      Defendant William C. Filcheck, Jr., D.C. ("Filcheck") was a chiropractor licensed to practice in the state of West Virginia.   Defendant Filcheck was hired by Defendant Burns in 1994, and worked for Mountaineer Chiropractic Center until 1996.  From 1995 until 1998, he was employed by Priority One.

### Scott G. Taylor

9.      Defendant Scott G. Taylor, D.C. ("Taylor") was a chiropractor licensed to practice in the state of West Virginia.  Defendant Taylor was hired by Defendant Burns in 1991 and worked for Mountaineer Chiropractic Center until 1996.  From 1995 until 1998 he was employed by Priority One.

### Ronald L. Halstead

10.      Defendant Ronald L. Halstead, D.C. ("Halstead") was trained as a chiropractor but, from in or about 1985 to the present, was not engaged in providing chiropractic services. Halstead owned and operated a company which provided management consulting services to chiropractors through seminars and personal in-office visits to chiropractic clinics throughout the

United States.

11.    Defendant Halstead's management consulting services included, among other things, advice with respect to marketing chiropractic services, and obtaining reimbursement from health care benefits programs for chiropractic and other medical services.

12.    Between 1993 and 1997, Defendant Halstead was retained to provide management consulting services to Defendant Burns and his companies.

### Medical Doctors at Priority One

13.    In or about May 1994, Defendant Burns hired Dr. "A" to be the medical doctor at Priority One.  In or about December 1995 Dr. "A" retired as the medical doctor of Priority One.

14.    In or about 1996,  Defendant Burns hired Dr "B" to be the medical doctor at Priority One.  In or about February 1997 Dr. "B" resigned from Priority One.

### Health Care Benefit Programs

15.    All services, including diagnostic tests, provided by medical doctors or doctors of chiropractic medicine must be medically necessary.  In considering whether to reimburse for a particular diagnostic test or treatment, health care benefit programs relied on letters of medical necessity and other documents and information furnished by the health care providers.

16.    The following are health care benefit programs:

a.    Medicare Part B ("Medicare") was a federal government health insurance program for persons who were over 65 years of age and for certain disabled persons.  The Health Care Financing Administration ("HCFA") was a federal agency within the United States Department of Health and Human Services ("HHS"), which administered the

Medicare program through its contractors.  Medicare providers, including licensed medical

doctors and chiropractors, forwarded HCFA Form 1500s to the designated heath insurance

contractors, in this case to Nationwide Insurance in Columbus, Ohio for review, approval

and payment.   Medicare claims for West Virginia residents, including patients "PB",

"HS," "RN," and "ND," named herein, were administered by Nationwide Insurance in

Columbus, Ohio.

 (1) Medicare paid for only those services that were determined by the

treating  physician to be medically necessary and that were actually rendered.

 (2) Medicare's coverage for chiropractic services was generally limited

to twelve visits per year and generally only covered treatment for subluxation of

the spine.  No other services, including x-rays, diagnostic tests or other therapeutic

services furnished by a chiropractor, or under his/her order were covered by

Medicare.

 (3) Medicare provided coverage for some services provided by non-

physician personnel  when such services were "incident to" the medical doctor's

treatment and when such services were under the "direct personal supervision" of

the medical doctor, were an integral part of the physician's professional services

and were billed under the supervising medical doctor's identification number,

which is known as the Provider Identification Number.   For Medicare purposes,

"direct personal supervision" means that the non-physician personnel must be

employed by the medical doctor or a clinic which employs them both, and the

medical doctor must be physically present in the clinic and available to render

immediate assistance at the time of the service.

b.      Blue Cross Blue Shield of Western Pennsylvania, Inc. ("Pennsylvania BCBS") was a private insurance company providing medical insurance for persons residing in Western Pennsylvania. Some Pennsylvania BCBS policies, including those of patients "JH," "AW," "PW," and "VL" named herein, provided no coverage for chiropractic treatment. In addition, Pennsylvania BCBS paid for only those services that were determined by the treating physician to be medically necessary. Claims against Pennsylvania BCBS for any treatment rendered in West Virginia were administered by Mountain State Blue Cross and Blue Shield, Inc.

c.      The West Virginia Public Employees Insurance Agency ("PEIA") was an agency of the state of West Virginia responsible for administering a self-funded medical benefit plan for eligible employees and retirees of the State, county boards of education, local government entities and others specifically authorized by statute. PEIA provided coverage only for those services that were determined by the treating physician to be medically necessary. For the years 1996 and 1997, PEIA's coverage for chiropractic services, including but not limited to "LM," "SW," "JD," and "LC," was limited to $1,000 per year. Between 1994 and 1997, claims under the PEIA medical benefit plan were administered by Mountain State Blue Cross and Blue Shield, Inc.

d.      Accordia National was a private insurance company located in Charleston, West Virginia. Some Accordia National policies, including but not limited to that of patient "CH" named herein, provided no coverage for chiropractic treatment. In addition, Accordia National would pay for only those services that are determined by the treating

- 6 -

physician to be medically necessary.

e.     Railroad Maintenance and Industrial Health and Welfare Fund located in Springfield, Illinois, provided health insurance coverage for its eligible members and their families, including but not limited to patient "MM" named herein. Patient "MM's" Railroad Maintenance and Industrial Health and Welfare Fund insurance policy limited chiropractic coverage in 1996 to $500.00 per calendar year, including any x-rays and physical therapy. The policy also provided coverage only for those services that were determined by the treating physician to be medically necessary.

**Billing Health Care Benefit Programs for Medical Services and Procedures**

17.     Providers bill for services using a standard form known as a HCFA 1500. Among other things, the HCFA 1500 requires the provider to identify the dates on which services were rendered, the specific services provided, identified by CPT Code, and the identity of the provider performing the services.

18. The *Physicians' Current Procedural Terminology Manual* (the "CPT Manual"), a publication of the American Medical Association, contained a listing of descriptive terms and identifying codes for reporting and billing medical services and procedures, which had to be included in each claim to designate the particular service provided to a patient on a particular date. The CPT Manual provided a uniform language of medical services to allow reliable nationwide communication among providers, patients and insurers. It assigned numeric codes, commonly known as CPT codes, for virtually all medical, surgical and diagnostic services.

19. In order to obtain reimbursement, Priority One was required to place the CPT code for each service provided on the HCFA 1500 which was then submitted to the health care benefit

programs such as Medicare and  private insurance companies ("insurers"), which relied on those CPT codes when paying the claims.

### The Conspiracy

20.   Beginning in approximately September 1993, and continuing thereafter through May 1997, in the Northern District of West Virginia, and elsewhere, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck,  Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

together with others known and unknown to the grand jury, knowingly combined, conspired, confederated and agreed together and with each other to commit the following offenses against the United States:

a.   To knowingly and willfully devise and intend to devise a scheme and artifice to defraud health care benefit programs, and to obtain by means of materially false and fraudulent pretenses representations, and promises, money owned by and under the custody and control of health care benefit programs, in connection with the delivery of, and payment for, health care benefits, items and services, in violation of Title 18 U.S.C. § 1347, and

b.   To knowingly and willfully devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property from various health care benefit programs by means of materially fraudulent and misleading pretenses, representations and promises, and to use the United States Postal Service and private and commercial interstate carriers,  in violation of Title 18 U.S.C. § 1341.

### Manner and Means of the Conspiracy

It was part of the conspiracy that:

21.     Defendants Burns, Filcheck, Taylor and Halstead billed and caused to be billed health care benefit programs in the name of medical doctors for more than $2.8 million for tests, treatments, and other services provided by chiropractors.

### Corporate Structure

22.     Defendants Burns and Halstead caused the formation of Priority One for the purpose of billing in the name of a medical doctor for services rendered by chiropractor Defendants Burns, Filcheck and Taylor and others.

23.     Defendants Burns and Halstead caused the formation of Health Care Management in order to use Health Care Management to control Priority One through a management contract, real estate and equipment leases and other means.

24.     Defendants Burns and Halstead caused the hiring of a medical doctor by Priority One who would be compliant in lending his name to bills submitted to health care benefit programs.

25.     Defendants Burns, Filcheck, Taylor, and Halstead caused employees working at Priority One to support and assist their efforts to increase the frequency and number of treatments ordered for patients whenever possible, without regard to their medical needs.

26.     Defendants Burns, Filcheck, Taylor, and Halstead routinely reported and caused employees at Priority One to report false and fraudulent information on HCFA claims forms regarding the identity of the person performing the services for which the claims were being submitted.  Such false and fraudulent information included, but was not limited to the following:

- 9 -

a. Reporting that services had been performed by the named medical doctor when, in truth and in fact, the named doctor was not practicing at Priority One when the services were performed.

b. Reporting that a medical doctor had examined and ordered treatments when, in truth and in fact, one or more chiropractors had examined the patients and ordered the treatments.

27.     Defendants Burns, Filcheck, Taylor, and Halstead submitted and caused others to submit claims to Medicare and to other health care benefit programs under a medical doctor's name for services provided by a chiropractor and when there was no medical doctor on the premises at the time the services were provided.

28     In order to facilitate the Conspiracy, Defendant Burns retained a office manager to carry out his and Defendant Halstead's instructions regarding the services and treatments to be provided to the patients and billed to the health care benefit programs.

29.     Defendants Burns and Halstead directed and caused the office manager at Priority One to oversee the day-to-day operation of the clinic and make certain that the chiropractors and the other Priority One employees were carrying out the instructions of Defendants Burns and Halstead.

30.     Defendant Burns directed and caused the office manager of Priority One to consult with Defendant Halstead about billing and documentation of the services provided at Priority One to the patients, including but not limited to a letter dated April 30, 1996.

31.     Defendant Burns directed and caused the office manager of Priority One to prepare monthly operating statistics of Priority One.

- 10 -

32.     Defendant Burns directed and caused the office manager of Priority One to send the monthly operating statistics of Priority One to Defendant Halstead.

33.     Defendant Burns and Defendant Halstead reviewed the monthly operating statistics of Priority One.

34.     Defendants Burns, Filcheck, and Taylor acting on the advice of Defendant Halstead fraudulently billed health care benefit programs in the name of a medical doctor for services, tests and procedures provided by Defendants Burns, Filcheck, and Taylor when the services, tests, and procedures were not medically necessary and were not provided and supervised by a medical doctor.

35.     Defendants Burns and Halstead periodically reviewed the documentation in patients' files, and caused and attempted to cause Dr. "A" and Dr. "B" to retroactively sign forms in the files to falsely give the appearance that a medical doctor had ordered, provided and supervised the treatment of the patients.

**Billing for Chiropractic Services in the Name of a Medical Doctor**

36.     To conceal from the health care benefit programs, including those who provide limited or no chiropractic coverage, that the services and treatments billed were actually provided by chiropractor Defendants Burns, Filcheck and Taylor,  Defendants Burns and Halstead created a system to bill insurance companies and health care benefit programs by fraudulently listing  Dr. "A" or  Dr. "B" as the provider of all the services billed.

37.     Defendants Burns, Filcheck, Taylor, and Halstead and others, caused false and fraudulent letters of medical necessity to be sent to health care benefit programs in the medical doctor's name and without the medical doctor's knowledge when, in fact, the medical doctor did

- 11 -

not determine that the procedures and services rendered were medically necessary.

## Recruitment and "Conversion" of Patients

38.     Defendants Burns and Halstead caused Priority One employees to engage in marketing efforts, including telemarketing, offers of free dinners, and free initial examinations and x-rays to individuals with "quality" insurance coverage in order to induce prospective patients to use Priority One chiropractic services.

39.     Defendants Burns, Filcheck, and Taylor studied, reviewed and utilized a set script and procedure created by Defendant Halstead when examining prospective new patients that was designed:   (1) to persuade the patients that they had serious spinal conditions, even if they did not; (2) to persuade the patients that their "conditions" could be effectively treated by chiropractic manipulation and other means; and (3) to overcome any objections the prospective patients had to the type, frequency, length and cost of the proposed treatments.

40.     Defendants Burns, Filcheck, and Taylor, and others would and did waive or agree not to collect patient co-payments in order to overcome any objections to the cost of the treatments, and as a means to allow them to keep billing health care benefit programs for the maximum amount possible.

## Medically Unnecessary Treatment Based on Insurance Coverage

41.     Defendants Burns, Filcheck, Taylor, and Halstead and other employees of Priority One  provided and ordered treatment for patients pursuant to protocols devised by Defendant Halstead.  These protocols based  patients' treatments on the scope of their medical insurance coverage and not on the patients' actual physical conditions and needs.

42.     Defendants Burns, Filcheck, Taylor and Halstead and other employees of Priority

One ordered, performed and billed for diagnostic tests treatments and therapies on Priority One patients when such tests and therapies were not medically necessary.

43.   Defendants Burns and Halstead caused Health Care Management to purchase expensive diagnostic equipment through Defendant Halstead to be used in the diagnostic tests and treatments described above.

### Services Not Provided as Billed

44.   To further fraudulently increase payments from health care benefit programs, Defendants Burns, Filcheck, Taylor, and Halstead and other employees of Priority One caused "up-coded" bills to be submitted to the health care benefit programs which then paid for a higher level of service than was actually provided, including services for "attended" therapies.

45.   To further fraudulently increase payments from health care benefit programs, Defendants Burns, Filcheck, Taylor, and Halstead and other employees of Priority One caused bills to be submitted to health care benefit programs which billed for services which had not been provided as described, including billing for "Activities for Daily Living."

46.   To further fraudulently increase payments from health care benefit programs, Defendants Burns, Filcheck, Taylor, and Halstead and other employees of Priority One caused bills to be submitted to health care benefit programs, which "unbundled" services by charging for two separate services when only one integral service was provided, including bills for both an evaluation and management service (e.g., an office visit) on the same day as other procedures encompassing that service were provided when, in fact, no separate evaluation and management service was provided.

## Facilitation and Concealment of the Conspiracy

47.     To conceal the conspiracy, Defendants Burns, Taylor, and Filcheck and others created fraudulent documents which were then placed in the patients' files, including "Case Study" forms and "Physician Referral" forms provided by Defendant Halstead, which falsely gave the appearance that Dr."A" or Dr. "B" had determined the individual patient's treatment plan and the medical necessity of the health care services, and that Dr. "A" and  Dr. "B" were providing and supervising the patients' treatment when, in fact, the treatment plan was determined and supervised by Defendants Burns, Taylor, Filcheck, and Halstead and others who were not medical doctors.

48.     In order to maximize payments from insurers, Defendants Burns, Taylor and Filcheck performed treatments and diagnostic tests which were billed in the name of the medical doctor before the medical doctor even saw the patient.

49.     In order to maximize payments from insurers, Defendant Halstead provided pre-printed rolodex cards on which Defendant Burns caused Priority One employees to write the tests and treatments each patient was to receive.  These rolodex  cards created a "tickler" system to remind Defendants Filcheck, Taylor and other Priority One employees which tests and treatments the patients were to receive, and the frequency at which they were to receive such tests and treatments.

50.     Defendants Burns and Halstead caused Priority One employees to use printed "Travel Cards" which were designed to facilitate the flow of the increased volume of patients through the office by among other things: (1) eliminating the need for the chiropractors to write reports justifying their treatment; and (2) providing a one page summary of the patient's

treatment.

51.    Defendant Halstead provided business management software, which enabled Defendants Burns, Filcheck, Taylor and Priority One employees to create and send to the health care benefit programs false letters of medical necessity in the name of the medical doctor, without the medical doctor's knowledge or consent.  Defendant Halstead also provided Defendants Burns, Filcheck and Taylor and others with pre-printed forms for letters of medical necessity.

52.    Defendants Burns, Filcheck, Taylor and others caused "Activities for Daily Living" forms, which were provided by Defendant Halstead, to be inserted in Priority One patient files to provide the false appearance that the "Activities for Daily Living" service for which the insurance companies were billed was actually provided as described  by the CPT code. In fact, the form was completed by the patient and the requisite level of  service was not provided.

## OVERT ACTS

53.    In furtherance of the conspiracy and to effect the objects of the conspiracy, the defendants committed and caused to be committed the following overt acts, among others, in the Northern District of West Virginia, and elsewhere:

### Formation of Corporations

54.    In or about February 1994,  Defendant Burns caused Priority One to be incorporated.

55.    In or about February 1994, Defendant Burns caused Health Care Management to be incorporated.

56.    In or about February 1994, Defendant Burns caused Priority One to enter into a real property lease with Health Care Management for the premises at 918 Chestnut Ridge Road,

- 15 -

Morgantown, West Virginia

57.    In or about February 1994, Defendant Burns caused Priority One to enter into an equipment lease with Health Care Management for certain equipment used by Priority One.

58.    In or about February 1994,  Defendant Burns caused Priority One to enter into a management agreement with Health Care Management.

### In Office Visit Meetings and Reports

59.    On or about the dates set forth below, Defendant Halstead held multi-day meetings with Defendant Burns and others and gave instructions regarding the operations and billing at Priority One.  Defendant Halstead also prepared a written report for each visit reflecting some of his instructions.

A.    September 16, 1993

B.    November 16, 1993

C.    January 25, 1994

D.    April 19, 1994

E.    August 4, 1994

F.    November 30, 1994

G.    October 18, 1995

H.    February 1, 1996

I.    March 28, 1996

J.    June 20, 1996

K.    August 9, 1996

L.    February 4, 1997

- 16 -

**Defendant Halstead Seminars**

60.     On or about the dates set forth below Defendant Burns and/or other Priority One

employees attended seminars given by Defendant Halstead.

   A.  July 16, 1994

   B.  January 7, 1995

   C.  January 14, 1995

   D.  June 10, 1995

   E.  October 7, 1995

   F.  June 27, 1996

   G.  August 17, 1996

   H.  September 14, 1996

   I.  September 28, 1996

   J.  October 5, 1996

   K.  October 26, 1996

**Letters of Medical Necessity**

61.     On or about the dates set forth below, Defendants Burns, Filcheck, Taylor, and

Halstead and others caused letters of medical necessity to be created in the name of Dr. "A" MD.

   A.  January 15, 1995

   B.  January 18, 1995

   C.  January 20, 1995

   D.  February 3, 1995

   E.  March 30, 1995

- 17 -

F.      April 3, 1995

G.      May 1, 1995

H.      July 17, 1995

I.      October 4, 1995

J.       November 22, 1995

K.      December 5, 1995

L.      December 13, 1995

M.      December 26, 1995

N.      January 4, 1996

O.      January 8, 1996

P.      January 29, 1996

Q.      February 15, 1996

R.      February 26, 1996

S.      February 28, 1996

T.      May 14, 1996

U.      December 26, 1996

V.      January 8, 1997

W.      January 21, 1997

X.      January 30, 1997

Y.       February 5, 1997

Z.      February 6, 1997

## Case Study Forms

62.    On or about July 24, 1996,  Defendant Burns approved a Case Study treatment plan for patient "CH".

63.    On or about September 24, 1996,  Defendant Burns approved a Case Study treatment plan for patient "JD".

64.    On or about September 24, 1996,   Defendant Burns approved a Case Study treatment plan for patient "MM".

65.    On or about November 7, 1996,  Defendant Burns approved a Case Study treatment plan for patient "VL".

66.    On or about October 15, 1996,  Defendant Burns approved a Case Study treatment plan for patient  "AW".

67.    On or about November 5, 1996,  Defendant Burns approved a Case Study treatment plan for patient "PW".

68.    In or about  February 1997,  Dr. "A" signed multiple Case Study treatment plans.

69.    In or about February 1997, Dr. "B" was asked by Defendants Burns and Halstead to retroactively sign numerous Case Study treatment plans.

70.    On or about January 25, 1995, Dr. "A" provided medically unnecessary services to a patient.

## Submission of Claims

71.    The grand jury realleges and incorporates Counts 2 through 15 below as additional overt acts.

72.    On or about January 25, 1995 Dr. "A" caused a HFCA 1500 claim form to be

submitted to Mountain State Blue Cross and Blue Shield.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 THROUGH 5

### (Health Care Fraud, 18 U.S.C. §§ 1347 and 2)
### (Burns, Filcheck, Taylor, and Halstead)
### (Medicare)

73.    Paragraphs 1 through 19 of the general allegations and paragraphs 21 through 52,

constituting the scheme and artifice to defraud, of Count 1 of this Indictment are realleged and

incorporated herein in these Counts of the Indictment.

74.    Beginning in approximately, September 1993, and continuing thereafter

through May 1997, in the Northern District of West Virginia, and elsewhere, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck, Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully executed and attempted to execute, a scheme and artifice to

defraud a health care benefit program, Medicare, and to obtain by means of materially false and

fraudulent pretenses, representations, and promises, money owned by and under the custody and

control of Medicare, in connection with the delivery of, and payment for, health care benefits, items

and services.

75.    It was further part of the scheme and artifice to submit numerous fraudulent

claims to Medicare on form HCFA 1500 in connection with services provided to patients,

including but not limited to patients "PB," "HS," "RN," and "ND," from July 1996 through May

1997. Each HCFA 1500 claimed that a specific service was provided on a specific date, and falsely

claimed that the service had been provided by a specified medical doctor, was medically necessary

- 21 -

and was performed in accordance with the CPT Manual.

## Execution of the Scheme

76.    For the purpose of executing the aforesaid scheme and artifice to defraud, and

attempting to do so, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck,  Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and  willfully caused the  HCFA 1500 claim forms described in Counts 2

through 5 to be submitted to Medicare, and thereby obtained monies owned by and under the

custody and control of Medicare, in connection with the delivery of, and  payment for the health

care benefits, items and services identified below:

| COUNT | DATE OF CLAIM | MEDICARE PATIENT | SERVICES AND DATES OF SERVICE CLAIMED ON HCFA 1500 |
|-------|---------------|------------------|-----------------------------------------------------|
| 2 | 11/23/96 | "PB" | Service 76536 (diagnostic ultra sound) on 7/23/96. |
| 3 | 12/28/96 | "HS" | Services 93740 (temperature gradient test) and 95851 (range of motion test) on 10/11/96 |
| 4 | 09/24/96 | "ND" | Service 99214 (detailed office visit) on  09/11/96, and Service 99212 (focused office visit) 09/12/96 and 9/13/96. |
| 5 | 12/28/96 | "RN" | Service  99212 (focused office visit) on 07/11/96, 07/19/96, 07/22/96, 07/23/96 and 07/24/96. |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 6 THROUGH 9

**(Health Care Fraud, 18 U.S.C. §§ 1347 and 2)**
**(Burns, Filcheck, Taylor, and Halstead)**
**(Pennsylvania BCBS)**

77.    Paragraphs 1 through 19 of the general allegations and paragraphs 21 through 52, constituting the scheme and artifice to defraud, of Count 1 of this Indictment are realleged and incorporated herein in these Counts of the Indictment.

78.    Beginning in approximately, September 1993, and continuing thereafter through May 1997, in the Northern District of West Virginia, and elsewhere, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck, Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully executed and attempted to execute, a scheme and artifice to defraud a health care benefit program, Pennsylvania BCBS, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Pennsylvania BCBS, in connection with the delivery of, and payment for, health care benefits, items and services.

79.    It was further part of the scheme and artifice to submit numerous fraudulent claims to Pennsylvania BCBS on form HCFA 1500 in connection with services provided to patients, including but not limited to patients "JH," "AW," "PW," and "VL," from July 1996 through May 1997. Each HCFA 1500 claimed that a specific service was provided on a specific date, and falsely claimed that the service had been provided by a specified medical doctor, was medically necessary and was performed in accordance with the CPT Manual.

- 23 -

## Execution of the Scheme

80.     For the purpose of executing the aforesaid scheme and artifice to defraud, and

attempting to do so, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck, Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully caused the HCFA 1500 claim forms described in Counts 6

through 9, and others, to be submitted to Pennsylvania BCBS, and thereby obtained monies owned

by and under the custody and control of Pennsylvania BCBS, in connection with the delivery of,

and payment for, the health care benefits, items and services listed below:

| COUNT | DATE OF CLAIM | PA BCBS PATIENT | SERVICES AND DATES OF SERVICE CLAIMED ON HCFA 1500 |
|-------|---------------|-----------------|----------------------------------------------------|
| 6 | 01/09/97 | "JH" | Service 93740 (temperature gradient test) on 01/10/97. |
| 7 | 10/11/96 | "AW" | Service 99211 (limited office visit) on 10/11/96. |
| 8 | 11/01/96 | "PW" | Service 95900 (neurometer test) on 11/01/96. |
| 9 | 10/15/96 | "VL" | Services 93740 (temperature gradient test) and 95851(range of motion test) on 10/15/96. |

All in violation of Title 18, United States Code, Sections 1347 and 2.

- 24 -

## COUNTS 10 THROUGH 13

**(Health Care Fraud, 18 U.S.C. §§ 1347 and 2)**
**(Burns, Filcheck, Taylor, and Halstead)**
**(West Virginia Public Employees Insurance Agency)**

81.     Paragraphs 1 through 19 of the general allegations and paragraphs 21 through 52,

constituting the scheme and artifice to defraud, of Count 1 of this Indictment are realleged and

incorporated herein in these Counts of the Indictment.

82.     Beginning in approximately, September 1993, and continuing thereafter

through May 1997, in the Northern District of West Virginia, and elsewhere, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck, Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully executed and attempted to execute, a scheme and artifice to

defraud a health care benefit program, PEIA, and to obtain by means of materially false and

fraudulent pretenses, representations, and promises, money owned by and under the custody and

control of PEIA, in connection with the delivery of, and payment for, health care benefits, items and

services.

83.     It was further part of the scheme and artifice to submit numerous fraudulent

claims to PEIA on form HCFA 1500 in connection with services provided to patients, including but

not limited to patients "LM," "SW," "JD," and "LC," from at least July 1996 through May 1997.

Each HCFA 1500 claimed that a specific service was provided on a specific date, and falsely

claimed that the service had been provided by a specified medical doctor, was medically necessary

and was performed in accordance with the CPT Manual.

- 25 -

## Execution of the Scheme

84.   For the purpose of executing the aforesaid scheme and artifice to defraud, and

attempting to do so, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck,  Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully caused the HCFA 1500 claim forms described in Counts 10

through 13 to be submitted to PEIA, and  thereby obtained monies owned by and under the  custody

and control of PEIA, in connection with the delivery of, and payment for, the health care benefits,

items and services listed below:

| COUNT | DATE OF CLAIM | PEIA PATIENT | SERVICES AND DATES OF SERVICE CLAIMED ON HCFA 1500 |
|---|---|---|---|
| 10 | 12/21/96 | "LM" | Services  97265 (joint mobilization), 97250 (myofascial release), 97010 (moist heat), and two units of 97032 (attended electric stimulation) on 12/13/96. |
| 11 | 11/12/96 | "SW" | Service 95851 (orthopedic exam) on 11/04/96. |
| 12 | 11/01/96 | "JD" | Service 76000 (video fluroscopy) on 10/01/96. |
| 13 | 11/01/96 | "LC" | Service  99211 (limited office visit) |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 14

**(Health Care Fraud, 18 U.S.C. §§ 1347 and 2)**
**(Burns, Filcheck, Taylor, and Halstead)**
**(Railroad Maintenance and Industrial Health and Welfare Fund)**

85.    Paragraphs 1 through 19 of the general allegations and paragraphs 21 through 52,

constituting the scheme and artifice to defraud, of Count 1 of this Indictment are realleged and

incorporated herein in these Counts of the Indictment.

86.    Beginning in approximately, September 1993, and continuing thereafter

through May 1997, in the Northern District of West Virginia, and elsewhere, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck, Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully executed and attempted to execute, a scheme and artifice to

defraud a health care benefit program, Railroad Maintenance and Industrial Health and Welfare

Fund, and to obtain by means of materially false and fraudulent pretenses, representations, and

promises, money owned by and under the custody and control of Railroad Maintenance and

Industrial Health and Welfare Fund, in connection with the delivery of, and payment for, health care

benefits, items and services.

87.    It was further part of the scheme and artifice to submit numerous fraudulent

claims to Railroad Maintenance and Industrial Health and Welfare Fund on form HCFA 1500 in

connection with services provided to patients, including but not limited to patient "MM," from at

least July 1996 through May 1997. Each HCFA 1500 claimed that a specific service was provided

on a specific date, and falsely claimed that the service had been provided by a specified medical



doctor, was medically necessary and was performed in accordance with the CPT Manual.

### Execution of the Scheme

88.    For the purpose of executing the aforesaid scheme and artifice to defraud, and

attempting to do so, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck,  Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and  willfully caused the HCFA 1500 claim form described below to be

submitted to Railroad Maintenance and Industrial Health and Welfare Fund, and thereby obtained

monies owned by and under the custody and control of Railroad Maintenance and Industrial Health

and Welfare Fund, in connection with the delivery of, and payment for, health care benefits, items

and services identified below:

| COUNT | DATE OF CLAIM | RRM&IHWF PATIENT | SERVICES AND DATES OF SERVICE CLAIMED ON HCFA 1500 |
|-------|---------------|------------------|----------------------------------------------------|
| 14 | 10/14/96 | "MM" | Services 95900 (neurometer test), 72050 (X-ray), 72070 (X-ray), and two units of 72020 (X-ray) 10/14/96. |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 15

### (Health Care Fraud, 18 U.S.C. §§ 1347 and 2)
### (Burns, Filcheck, Taylor, and Halstead)
### (Accordia National)

89.    Paragraphs 1 through 19 of the general allegations and paragraphs 21 through 52, constituting the scheme and artifice to defraud, of Count 1 of this Indictment are realleged and incorporated herein in this Count of the Indictment.

90.    Beginning in approximately, September 1993, and continuing thereafter through May 1997, in the Northern District of West Virginia, and elsewhere, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck, Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and willfully executed and attempted to execute, a scheme and artifice to defraud a health care benefit program, Accordia National, and to obtain by means of materially false and fraudulent pretenses representations, and promises, money owned by and under the custody and control of Accordia National, in connection with the delivery of, and payment for, health care benefits, items and services.

91.    It was further part of the scheme and artifice to submit numerous fraudulent claims to Accordia National on form HCFA 1500 in connection with services provided to patients, including but not limited to patient "CH," from at least July 1996 through May 1997. Each HCFA 1500 claimed that a specific service was provided on a specific date, and falsely claimed that the service had been provided by a specified medical doctor, was medically necessary and was performed in accordance with the CPT Manual.

- 29 -

## Execution of the Scheme

92.    For the purpose of executing the aforesaid scheme and artifice to defraud, and

attempting to do so, Defendants

> Robert B. Burns, Jr.,
> William C. Filcheck,  Jr.,
> Scott G. Taylor, and
> Ronald L. Halstead

and others, knowingly and  willfully caused the  HCFA 1500 claim form described below to be

submitted to Accordia National, and thereby obtained monies owned by and under the custody and

control of Accordia National, in connection with the delivery of, and payment for the health care

benefits, items and services listed below:

| COUNT | DATE OF CLAIM | Accordia National PATIENT | SERVICES AND DATES OF SERVICE CLAIMED ON HCFA 1500 |
|--------|--------|--------|--------|
| 15 | 02/19/97 | "CH" | Service 99211 (limited office visit)on 02/19/97. |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 16
### (Conspiracy to Launder Monetary Instruments, 18 U.S.C. § 1956(h))
### (Defendants Halstead and Burns)

93.     Paragraphs 1 through 19 of this Indictment are realleged and incorporated herein in this Count of the Indictment.

94.     From on or about January 14, 1994, and continuing until at least on or about May 20, 1997, in the Northern District of West Virginia and elsewhere, Defendants

Robert B. Burns, Jr. and
Ronald L. Halstead

and others known and unknown to the Grand Jury, did unlawfully and knowingly combine conspire, confederate and agree among themselves and each other, to conduct and cause to be conducted financial transactions, which involved the proceeds of a specified unlawful activity (to wit, mail fraud, in violation of 18 U.S.C. § 1341, and health care fraud, in violation of 18 U.S.C. § 1347) that is, the scheme and artifice to defraud as set forth in paragraphs 21 through 52 of this indictment, and the defendants did so knowing that the money involved in the financial transactions, which affected interstate and foreign commerce, represented the proceeds of some form of unlawful activity, and was designed to promote the carrying on of the scheme and artifice to fraud; in violation of Title 18, United States Code, Sections 1956(a)(1) (A)(i).

### Purpose of the Conspiracy

95.     It was a purpose of the conspiracy to enrich Defendants Halstead and Burns through such monetary transactions by transferring to them proceeds from the scheme and artifice to defraud described in paragraphs 21 through 52 of this indictment.

- 31 -

### Object of the Conspiracy

96.    It was an object of the conspiracy to promote and facilitate the scheme and artifice

to defraud described in paragraphs 21 through 52 of this indictment through such monetary

transactions in violation of 18 U.S.C. § 1956 (a)(1) (A)(i).

### Manner and Means

97.    It was part of the manner and means of the conspiracy that Defendants

Halstead and Burns created real property and equipment leases, and a management agreement

between Priority One and Health Care Management to conceal the true ownership and control of

Priority One.

98.    It was further part of the manner and means of the conspiracy, that Defendants

Halstead and Burns caused the transfer of proceeds of the scheme and artifice to defraud from the

accounts of Priority One to the accounts of Health Care Management, through  lease payments,

management fees, and other payments.

99.    It was further part of the manner and means of the conspiracy, that Defendants

Halstead and Burns caused further transfers of the proceeds of the scheme and the artifice to

defraud from the accounts of Health Care Management to the personal accounts of Defendant

Burns.

100.    It was further part of the manner and means of the conspiracy that Defendants

Halstead and Burns caused transfers of the proceeds of the scheme and the artifice to defraud from

the accounts of Health Care Management to the accounts of Defendant Halstead's company.

### OVERT ACTS

101.    In furtherance of the conspiracy and to achieve the objects and purposes thereof,

- 32 -

Defendants Halstead and Burns, committed and caused to be committed the following overt acts in the Northern District of West Virginia and elsewhere:

102.    In or about February 1994, Defendant Burns caused Priority One to enter into a real property lease with Health Care Management for the premises at 918 Chestnut Ridge Road, Morgantown, West Virginia

103.    In or about February 1994, Defendant Burns caused Priority One to enter into an equipment lease with Health Care Management for certain equipment used by Priority One.

104.    In or about February 1994,  Defendant Burns caused Priority One to enter into a management agreement with Health Care Management.

105.    In or about the Spring of 1994, Defendants Halstead and Burns met with the accountant for Defendant Burns and his companies.

106.    Between February 1994 and May 1997, Defendant Burns caused checks from health care benefit programs payable to Priority One for services rendered to beneficiaries of the health care benefit programs to be transported from Hopwood, Pennsylvania to Morgantown, West Virginia.

107.    Between February 1994 and May 1997, in Morgantown, West Virginia, Defendant Burns caused endorsements to be affixed to checks from health care benefit programs payable to Priority One for services rendered to beneficiaries of the health care benefit programs, and bank deposit slips to be prepared.

108.    Between February 1994 and May 1997, Defendant Burns caused checks from health care benefit programs payable to Priority One for services rendered to beneficiaries of the health care benefit programs and deposit slips to be transported from Morgantown, West Virginia to

Pittsburgh, Pennsylvania.

109.    On or about the dates set forth below,  Defendant Burns caused Priority One to transfer by check the amounts indicated to Health Care Management:

  A. September 30, 1994-- $70,000

  B. December 12, 1994-- $75,000

  C. February 4, 1995-- $50,000

  D. December 11, 1995--$50,000

  E. January 28, 1996--$30,000

  F. December 31, 1996--$65,000

  G. January 24, 1997--$60,000

  H. March 2, 1997--$80,000

110.    On or about the dates set forth below,  Defendant Burns caused Health Care Management to transfer by check the amounts indicated to Defendant Burns:

  A. December 31, 1994--$70,000

  B. April 19, 1995--$40,000

  C. December 11, 1995--$49,855.60

  D. April 29, 1996--$40,000

  E. December 21, 1996-- $3,525

  F. March 3, 1997--$16,790.70

111.    On or about the dates set forth below,  Defendant Burns caused Health Care Management to transfer by check the amounts indicated to Defendant Halstead's company Practice Systems:

- 34 -

A.    December 6, 1994--$3,620.68

B.    January 16, 1995--$3,255

C.    November 17, 1995--$7,583

D.    August 15, 1996--$5,241.29

E.    November 23, 1996-- $3,000

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 17 through 26

### (Laundering of Monetary Instruments, 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2)
### (Defendant Burns)

112.    Paragraphs 1 through 19 of the general allegations and 21 through 52, constituting the scheme and artifice to defraud, of this Indictment are realleged and incorporated herein in these Counts of the Indictment.

113.    On or about the dates listed below, in the Northern District of West Virginia and elsewhere, Defendant

Robert B. Burns, Jr.

knowing that the property involved in the financial transactions (withdrawal of funds by check), set forth below represented the proceeds of some form of unlawful activity, did knowingly and unlawfully conduct and attempt to conduct the financial transactions, as set forth below, which affected interstate commerce, and which in fact involved the proceeds of specified unlawful activity, to wit: health care fraud (in violation of Title 18, United States Code, Section 1347) and mail fraud (in violation of Title 18, United States Code, Section 1341) with the intent to promote the carrying on of the specified unlawful activity:

| COUNT | PRIORITY ONE PNC BANK ACCOUNT NO. | DATE | CHECK NUMBER | AMOUNT | PAYEE |
|-------|-----------------------------------|------|--------------|--------|-------|
| 17 | 1000478674 | 11/24/96 | 1535 | $75,000 | Health Care Management |
| 18 | 1000478674 | 12/31/96 | 1545 | $65,000 | Health Care Management |

- 36 -

| COUNT | PRIORITY ONE PNC BANK ACCOUNT NO. | DATE | CHECK NUMBER | AMOUNT | PAYEE |
|---|---|---|---|---|---|
| 19 | 1000478674 | 01/24/97 | 1554 | $60,000 | Health Care Management |
| 20 | 1000478674 | 03/02/97 | 1578 | $80,000 | Health Care Management |
| COUNT | HEALTH CARE MGMT PNC BANK ACCOUNT NO. | DATE | CHECK NUMBER | AMOUNT | PAYEE |
| 21 | 1000479706 | 09/22/96 | 2999 | $3,000 | Practice Systems |
| 22 | 1000479706 | 10/26/96 | 3129 | $3,000 | Practice Systems |
| 23 | 1000479706 | 11/23/96 | 3207 | $3,000 | Practice Systems |
| 24 | 1000479706 | 10/26/96 | 3111 | $4,376.60 | Robert Burns |
| 25 | 1000479706 | 12/21/96 | 3299 | $3,525 | Robert Burns |
| 26 | 1000479706 | 03/03/97 | 3531 | $16,790.70 | Robert Burns |

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

## COUNT 27

**(Laundering of Monetary Instruments, 18 U.S.C. §§ 1956(a)(2)(B)(i).) and 2)**
**(Defendant Burns)**

114.    Paragraphs 1 through 19 of the general allegations and 21 through 52, constituting the scheme and artifice to defraud, of this Indictment are realleged and incorporated herein in this Count of the Indictment.

115.    On or about May 13, 1997, in the Northern District of West Virginia and elsewhere, Defendant

Robert B. Burns, Jr.

transferred $200,000 by wire transfer from Smithfield State Bank in Smithfield, Pennsylvania to an account in the name of Blackstone Financial Limited at Barclays Bank, PLC in Tortola, BVI, knowing that the funds represented the proceeds of an unlawful activity, and knowing that the transfer was designed in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of a specified unlawful activity, to wit: a scheme and artifice to defraud in violation of Title 18, United States Code, Sections 1341 and 1347.

All in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) and 2.

## COUNT 28

### (Laundering of Monetary Instruments, 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2)
### (Defendant Burns)

116. Paragraphs 1 through 19 of the general allegations and 21 through 52, constituting the scheme and artifice to defraud, of this Indictment are realleged and incorporated herein in this Count of the Indictment.

117. On or about May 13, 1997, in the Northern District of West Virginia and elsewhere, Defendant

Robert B. Burns, Jr.

transferred $113,387.93 by wire transfer from National City Bank in Uniontown, Pennsylvania to an account in the name of Blackstone Financial Limited at Barclays Bank, PLC in Tortola, BVI, knowing that the funds represented the proceeds of an unlawful activity, and knowing that the transfer was designed in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of a specified unlawful activity, to wit: a scheme and artifice to defraud in violation of Title 18, United States Code, Sections 1341 and 1347.

All in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) and 2

## COUNT 29

### (Laundering of Monetary Instruments, 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2)
### (Defendant Burns)

118.    Paragraphs 1 through 19 of the general allegations and 21 through 52, constituting the scheme and artifice to defraud, of this Indictment are realleged and incorporated herein in this Count of the Indictment.

119.    On or about May 20, 1997, in the Northern District of West Virginia and elsewhere, Defendant

Robert B. Burns, Jr.

transferred $100,000 by wire transfer from First Federal Savings and Loan Association of Green County in Uniontown, Pennsylvania to an account in the name of Blackstone Financial Limited at Barclays Bank, PLC in Tortola, BVI, knowing that the funds represented the proceeds of an unlawful activity, and knowing that the transfer was designed in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of a specified unlawful activity, to wit: a scheme and artifice to defraud in violation of Title 18, United States Code, Sections 1341 and 1347.

All in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) and 2.

## COUNT 30

### (Asset Forfeiture, 18 U.S.C. §§ 982(a)(1) and (7)
### (Defendants Burns, Filcheck, Taylor, and Halstead)

120.   Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant

who is convicted of one or more of the offenses set forth in Counts 1 through 29 shall forfeit to the

United States the following property:

a.   All right, title, and interest in any and all property involved in each offense in

violation of Title 18, United States Code, Section 1956, or conspiracy to commit such

offense, for which the defendant is convicted, and all property traceable to such property,

including the following: (1) all money or other property that was the subject of each

transaction, transportation, transmission, or transfer in violation of Section 1956(a)(1); (2)

all commissions, fees, and other property constituting proceeds obtained as a result of those

violations; and (3) all property used in any manner or part to commit or to facilitate the

commission of those violations.

b.   All right title and interest in real or personal property that constitutes or is

derived, directly or indirectly, from gross proceeds traceable to the commission of violations

of Title 18, United States Code, Section 1347.  This includes, without limitation,  the

following:  (1) a piece of real property located at 10 Meadow Lane, Uniontown,

Pennsylvania; (2) a piece of real property consisting of 59.633 acres in South Union

Township, U.S. 119 and Chadville, parcel #34-27-03-99; 6.648 acres in Georges Township,

State route 857 and Chadville, parcel #14-10-00-39, Pennsylvania formerly known as the

"Shoaf Farm"; (3) payments to Health Care Management pursuant to an Agreement dated

- 41 -

March 13, 1998 between Health Care Management and First Priority Healthcare

Management Group; (4) all machinery, equipment, furniture and fixtures transferred to First

Priority Healthcare Management Group pursuant to a an Agreement dated March 13, 1998

between Health Care Management and First Priority Healthcare Management Group.

      c.      A sum of money equal to the total amount of money involved in each

offense, or conspiracy to commit such offense, for which the defendant is convicted.  If

more than one defendant is convicted of an offense, the defendants so convicted are jointly

and severally liable for the amount involved in such offense.

121.    If any of the property described above as being subject to forfeiture pursuant to Title

18, United States Code, Section 982, as a result of any act or omission of the defendants

      (a) cannot be located upon the exercise of due diligence;

      (b) has been transferred or sold, or deposited with a third
          person;

      (c) has been placed beyond the jurisdiction of the Court;

      (d) has substantially diminished in value; or

      (e) has been commingled with other property which cannot be
          subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and

(b)(1)(A) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of defendants up to the value of the above forfeited property.

A TRUE BILL

FOREPERSON
UNITED STATES GRAND JURY

CLERK
DATE:_____

PATRICK  M. FLATLEY
UNITED STATES ATTORNEY

By_____

I hereby certify that the annexed instrument
is a true and correct copy of the original filed
in my office.
ATTEST: Dr. Wally Edgell
Clerk, U.S. District Court
Northern District of West Virginia

By:_____
        Deputy Clerk

- 43 -