IN THE UNITED STATES DISTRICT COURT **FILED**

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MAR 9 – 2004**

UNITED STATES OF AMERICA,       )

                 Plaintiff,  )

    Vs.            ) CRIMINAL ACTION NO. 1:01CR45

ROBERT B. BURNS. JR., ET AL.,)

               Defendants.  )

**U.S. DISTRICT COURT
CLARKSBURG, WV  26301**

    Testimony of William C. Filcheck, Jr. and Scott G. Taylor had in the Trial of the above styled action on January 28, 29 and 30, 2003, before Honorable Irene M. Keeley, Chief Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE GOVERNMENT:     ROBERT F. ADAMS, ESQUIRE
                              PATRICK DONLEY, ESQUIRE
                              U.S. Department of Justice
                              1400 New York Avenue, NW
                              Washington, DC   20038
                              202-305-7413

FOR DEFENDANT FILCHECK: JAMES B. ZIMAROWSKI, ESQUIRE
                              265 High Street
                              Morgantown, West Virginia  26505
                              304-292-7492

FOR DEFENDANT TAYLOR:    JEFF HARRIS, ESQUIRE
                              P.O. Box 4522
                              Morgantown, West Virginia   26504
                              (304) 292-4357

FOR DEFENDANT HALSTEAD: RICHARD A. JAFFE, ESQUIRE
                              5 Greenway Plaza – Suite 1710
                              Houston, Texas   77046
                              713-626-3550

Proceedings recorded by stenomask, transcript produced by official court reporter.



LINDA L. BACHMAN, CCR, CVR
U.S. COURT REPORTER
P.O. BOX 969
CLARKSBURG, WEST VIRGINIA   26302-0960
(304) 622-0177

2

## INDEX

| DEFENDANT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William C. Filcheck, Jr. | 3 | 72 | | |
| | | 109 | | |
| | | 183 | | |
| | | 211 | | |
| Scott G. Taylor | 214 | 309 | | |
| | | 350 | | |
| | | 423 | | |
| | | 444 | | |

January 29, 2003 - Page 108
January 30, 2003 - Page 349

| EXHIBITS | MARKED: | ADMITTED: |
|---|---|---|
| Defendant Filcheck Number 2 | 6 | 6 |
| Defendant Taylor Number 2 | | 235 |
| Defendant Taylor Number 3 | | 235 |
| Defendant Taylor Number 4 | | 235 |
| Defendant Taylor Number 5 | | 235 |
| Defendant Taylor Number T-6 | 299 | |
| Government Number 1-424 | | 312 |
| Government Number 1-127 | | 412 |

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Filcheck - Direct                                              3

1              P R O C E E D I N G S

2        01-28-2003, 2:00 o'clock p.m., defendants present)

3        (TESTIMONY OF DEFENDANTS, WILLIAM C. FILCHECK, JR. AND

4    SCOTT TAYLOR)

5             MR. ZIMAROWSKI:  The defense will call Bill

6    Filcheck, Your Honor.

7             THE COURT:  All right.  Mr. Filcheck, would you

8    please come before the--or Doctor Filcheck, would you please

9    come before the clerk, who will administer the oath to you

10   before you take the witness stand?

11            WILLIAM C. FILCHECK, JR., DEFENDANT, SWORN

12            THE CLERK:  Thank you.  You may take the witness

13   stand.  The witness is William C. Filcheck, Jr., last name,

14   F-i-l-c-h-e-c-k.

15                    DIRECT EXAMINATION

16   BY MR. ZIMAROWSKI:

17   Q.  All right, Bill, this is--I guess we'll start from the

18   beginning.  Where were you born and raised?

19   A.  I was born in Uniontown, Pennsylvania in 1968, raised

20   there and went to high school there.

21   Q.  Okay.  And, Bill, do you now reside in--I believe you now

22   reside in Morgantown, West Virginia?

23   A.  Yeah, Morgantown, West Virginia.

24   Q.  Okay.  And that's with your wife?

25   A.  Yes, Tammy.

1   Q.  Okay.  Well, let's talk a little bit about your

2   background here.  We've already heard mention that in

3   Uniontown you obviously went to the public school system

4   there and the like?

5   A.  Yes, I did.

6   Q.  Okay.  And did you participate as being an Eagle Scout, I

7   believe?

8   A.  Yes, I was an Eagle Scout.

9   Q.  Okay.  What--just, for any of the jury members that may

10  be unacquainted with that, it's part of the Boy Scouts of

11  America, correct?

12  A.  That's correct.

13  Q.  And what are some of the requirements for being an Eagle

14  Scout?

15  A.  You have to have twenty-one merit badges on different

16  topics from agriculture to--back then in the '80's computer

17  science was just starting and tying knots and canoeing and

18  swimming, just a whole bunch of different ones.  I think I

19  had fifty overall and you also have to do a service project.

20  I did mine with the Division of Forestry at Fort Necessity.

21  We had to plant three separate sets of trees and in one set

22  of trees there was a fence around it and another set of trees

23  they sprayed it with some anti-deer repellant and the third

24  set of trees, nothing was done to it and over the summer, I

25  think it was a course of four months, you identify which

Filcheck - Direct                                        5

1   trees the deers damage and made graphs and things like that

2   and turned it into the Forest Service.

3   Q.  Actually, Bill, that might be of interest.  Which of the

4   three categories of trees were best to keep deer from chewing

5   on?

6   A.  You know, I don't recall.  We were talking about that the

7   other day and I don't recall.

8   Q.  All right.  Don't know if the deer repellant or the fence

9   was--

10  A.  I think the fence did best, but it was so expensive it

11  wasn't worthwhile.

12  Q.  Okay.  Can you call up 1-403?  This has not been

13  admitted, Judge.  1-403.  And, Judge, this is a two-page

14  exhibit.  I don't believe the Government has any objection,

15  at least from earlier statements they do not.

16      MR. DONLEY:  No objection.

17      THE COURT:  All right.  Do you want to go through

18  having him identify it and move it or are you just going to

19  move it?

20      MR. ZIMAROWSKI:  Yes.  We just move it into

21  evidence, Your Honor.

22      THE COURT:  All right.  Then without objection, the

23  Court admits Government Exhibit--I'm sorry, Defendant

24  Filcheck's Exhibit, which is--

25      MR. ZIMAROWSKI:  Actually, Your Honor, it's a

FORM CSR - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

Filcheck - Direct                                                    6

1    Government Exhibit 1-403.

2           THE COURT:  But it's coming in in your case-in-chief

3    so it should be renumbered as Defendant Filcheck Exhibit 2.

4           MR. ZIMAROWSKI:  That's fine, Your Honor.

5       (Defendant Filcheck Exhibit 2 marked and admitted)

6    BY MR. ZIMAROWSKI:

7    Q.  Bill, let's--actually that's just simply a letter to

8    Doctor Burns inquiring about some form of employment?

9    A.  Yes, it is.

10   Q.  Okay.  Can you blow up the text?  Thank you.  Since we're

11   all reading these things, why don't you read that please?

12   A.       "Please accept my enclosed resume as an expression

13            of interest in associating with your practice.  I

14            will be taking the West Virginia State Chiropractic

15            Board exam on May 19th.  I'm an enthusiastic, eager,

16            and aggressive person who loves treating people with

17            chiropractic care.  I am athletic and experienced in

18            baseball, running, skiing, and hiking.  I am well-

19            rounded person with a broad personality that allows

20            me to relate to a wide variety of people.  I feel

21            this to be a great asset as I relate to my colleagues

22            and patients.  I consider myself to have a good moral

23            character and excellent work ethic.  For more

24            information and a chance to talk in person, please

25            call me at area code 412-437-7166.  I look forward to

Filcheck - Direct                    7

1           hearing from you."

2    Q.   All right.  Bill, you're looking for a job, are you not?

3    A.   Yeah, that's correct.

4    Q.   All right.  Let's go to page two of this exhibit, please.

5    And that was a resume, which we'll get to in a minute, that

6    was sent with your letter of inquiry?

7    A.   That's correct.

8    Q.   Let's--let's speed this up.  Let's bring the lights up

9    but leave that on the screen if we could, please.  Thank you.

10   Bill, let's go back now.  Where'd you go to school?

11   A.   College?

12   Q.   Yes.

13   A.   University of Pittsburgh.

14   Q.   Okay.  And what was your major?  We'll forgive you for

15   that, but what was your major?

16   A.   Behavioral Neuroscience.

17   Q.   All right.  And did you have any jobs in school or did

18   you go on student loans or a combination of the two?

19   A.   In the summer I worked scrubbing floors and stripping wax

20   off floors for the University in the summer, but during

21   school I didn't work any jobs until the end.  I worked for a

22   chiropractor in order to get a recommendation to go to

23   chiropractic school, for six months or so before I graduated.

24   Q.   And that was the Squirrel Hill Chiropractic Clinic, which

25   is identified on your resume there?

Filcheck - Direct                                        8

1    A.  Yeah, that's correct.

2    Q.  And when and where did you work?  What time frame are we

3    talking about?

4    A.  It was probably the--I started the summer before I

5    graduated, which would have been Summer 1989 and probably

6    worked there until the Spring of '90.

7    Q.  Okay.  Up on the board you put Squirrel Hill Chiropractic

8    Center from your resume?

9    A.  That's correct.

10   Q.  Okay.  You identified yourself as a Chiropractic

11   Assistant?

12   A.  That's correct.

13   Q.  Okay.  What'd you do there, Bill?

14   A.  A little bit of everything.  They would do therapy on

15   patients, ultrasound, electric stim--stimulation and put data

16   into the computers for them.

17   Q.  Okay.  Says worked on data entry and the processing of

18   insurance claims?

19   A.  Yes.

20   Q.  Did you have experience in billing?

21   A.  No, we just put whatever they got that day into the

22   computer.

23   Q.  Okay.  So it was more data entry?

24   A.  Yeah.

25   Q.  Okay.  And this was prior to your chiropractor school,

Filcheck - Direct                                                    9

1   correct?

2   A.   That's correct.

3   Q.   And you said--you indicated you needed a letter of

4   reference or--

5   A.   Yeah, you needed a letter of recommendation from a

6   licensed chiropractor to go along with the application to the

7   chiropractor school so in order to get that, I didn't know of

8   any chiropractors at the time so I volunteered initially for

9   this chiropractor and then they hired me on the last eight or

10  nine months after I volunteered for four or five months, just

11  filling in whenever I could for my college studies.

12  Q.   And, again, what was your undergraduate degree in?

13  A.   Behavioral neuroscience.

14  Q.   And that sounds like an odd major.   What is behavioral

15  neuroscience?

16  A.   It used to be the Department of Psychology at Pitt, then

17  it spun off and it did a lot with like anatomy of the brain,

18  physiology of the brain, going over blind studies and a

19  little bit of psychology but most of it was nerve based,

20  nerve physiology, brain anatomy, that type of thing.

21  Q.   Were you contemplating medical school, dental school or

22  some other?

23  A.   At the time, you know, I knew I wanted to do something in

24  medicine.   My mom's a nurse and I thought about dental school

25  and medical school a little bit but my father's a runner and

Filcheck - Direct                                               10

1    I saw how much chiropractic helped him without the drugs or

2    surgery and kept him, you know, pretty much injury free in

3    running, so I looked more into that and talked to the health

4    care advisor about chiropractor school and that's how I kind

5    of got involved in it.

6    Q.  So the answer to the question why chiropractic medicine

7    is because of the runner?

8    A.  Yeah.  It helped my--

9    Q.  You're a runner as well?

10   A.  I'm a runner but not as good as my dad.

11   Q.  Your brother is also a--

12   A.  My brother's probably the best of us, yeah.

13   Q.  Okay.  So what is his chosen field?

14   A.  He's a foot doctor.  He's a Podiatrist.  Doctor of

15   Podiatry Medicine.

16   Q.  Okay.  And I believe--when you say "runner", that's kind

17   of--sort of misleading.  Is this where they are marathon

18   runners?

19   A.  Yeah.  My brother run the Pittsburgh Marathon this last

20   year.  My dad hasn't run a marathon in quite a few years;

21   he's getting older.

22   Q.  And you ran marathons too?

23   A.  I ran one in 1993 and that was enough for me.

24   Q.  Well, let's tell people a little bit, if they don't know,

25   the difference between the afternoon jogger and a marathon.

1    What's the--is there a difference between a person that jogs

2    and runners that run marathons?

3    A.  I've always heard that the only difference between a

4    jogger and a runner is a race entry form, because when you

5    run a marathon at my level you're mostly just jogging the

6    whole way whereas my father and brother, you know, all

7    running the whole way, but I wasn't up to that level but it

8    takes a lot of dedication, you know, a lot of putting your

9    mind at something to finish it through to the end.

10   Q.  And the marathons are rather long?

11   A.  Yeah, twenty-six point two miles.

12   Q.  Okay.  And you have to be in to, as someone once told me,

13   you have to be the full body--pain, some pain?

14   A.  Yeah.

15   Q.  During marathons?

16   A.  Yeah.

17   Q.  Okay.  Bill, you went to chiropractor school, did you

18   not?

19   A.  Yeah, that's correct.

20   Q.  And where did you go to school?

21   A.  At that time it was called National College of

22   Chiropractic outside of Chicago, in Lombard, Illinois and I

23   think two years ago they changed the name to National

24   University of Health Sciences because they offer massage

25   therapy and chir assistance and acupuncture there now too.

1   Q.  And you performed a clinic at that school?

2   A.  Yeah, the last two semesters, which is the last eight

3   months, you're in a clinic with a head intern and a teacher

4   that goes over adjusting and diagnosis and history and

5   physical exam.  You have to have so many before you can

6   graduate from school.

7   Q.  Bill, I want to get how many--I'm assuming that the

8   chiropractic college was a three-year program year round,

9   correct?

10  A.  Yeah.  Ten--they called it ten trimesters but three

11  years, four months year round.

12  Q.  Okay.  Now the--in chiropractic school how many classes

13  did you take regarding the business aspects of chiropractic

14  treatment performance?

15  A.  We had one class that was mainly on just how to set up a

16  practice, not so much--you know, how to put up your sign and

17  how to market, how to advertise, one three credit class over

18  the three years and four months' time.  They were too busy--

19  they also trained you to be a doctor and that took most of

20  the time.  They really couldn't train you to be a

21  businessman, you know.

22  Q.  Okay.  Is it fair to state then that when you got out of

23  chiropractor school that outside of the data entry and the

24  one three credit class that you had no base, a knowledge

25  base, as far as the business aspects of a chiropractic

Filcheck - Direct                                                    13

1    clinic?

2    A.  I didn't have any at all.  No, I didn't have anything.

3    Q.  Did you have any particular training in billing or know

4    anything about billing codes and CPT Codes and the like?

5    A.  No, I didn't.

6    Q.  Okay.  Bill, there's been some comments raised about the

7    difference in types of chiropractors.  We have straight

8    chiropractors or mixer chiropractors.  In your college of

9    chiropractor, what was it, a straight or a mix?

10   A.  It was mixer.  I mean, you did all type of therapy,

11   ultrasound, electric stim, hot packs, cold packs, paraffin

12   wax, diathermy, just--micro gold, all kind of different

13   therapies.

14   Q.  Now the--your resume up on the screen says National

15   College of Chiropractic.  Are those some of the honors that

16   you achieved while you were there?

17   A.  Yeah, that's correct.

18   Q.  Okay.  Any of those involving billing or running a

19   clinic?

20   A.  No.

21   Q.  It says "Sanders Scholarship".  Did you go through your

22   chiropractor college on a scholarship or by student loans?

23   A.  No, it was student loans.  There was actually a--I think

24   it was two hundred fifty dollars.  It was actually Colonel

25   Sanders.  I guess he liked chiropractic and he'd donate--he

Filcheck - Direct                                    14

1   donated a trust and every semester they give money away but I

2   thought Sanders sounded better than Colonel Sanders.

3   Q.  All right.  Now you said you--did you get student loans

4   to go to school?

5   A.  Yeah, student loans.

6   Q.  How much was your student debt, if you recall?

7   A.  I believe it's fifty-five thousand dollars.

8   Q.  Okay.  And when you came out looking for a job from this

9   letter of application, you were fifty-five thousand dollars

10  in debt?

11  A.  Yeah.  When you got out of school you had--I got out in

12  December.  You had a six-month grace period and then you had

13  to start repaying the loans back.

14  Q.  Okay.  And how old were you when you got out of

15  chiropractor school?

16  A.  I was twenty-five years old.

17  Q.  And how old were you when you began to interview with and

18  be employed by the Burns Clinic?

19  A.  Twenty-five years old.

20  Q.  Okay.  Let's do one last thing, if we could.  Go to the

21  additional information section block.  Bill, the additional

22  information, we've already talked about the Eagle Scout.

23  What are some of those words that are after it?  Are those

24  some sort of honors?

25  A.  Yeah, Ad Altare Dei is Latin for To the Altar of God.

Filcheck - Direct                                    15

1    That's a religious award for Boy Scouts and Pope Pius XII is

2    another religious award for Boy Scouts, both of them

3    Catholic.

4    Q.  Okay.  And then it indicates you're a runner, skier, and

5    mountain biking, right?

6    A.  Yeah.

7    Q.  Okay.  You can--lights back up please.  Let's talk about

8    how you become a licensed chiropractor, Bill.  What does it

9    take to become a licensed chiropractor?

10   A.  At that time, you--for undergrad college you needed sixty

11   credits, mostly maths and sciences and physics and things

12   like that.  Now you do a four-year degree.  I got a four-year

13   degree.  Then you need, you know, recommendations we talked

14   about and you apply to chiropractor school and chiropractor

15   school takes three years and four months to complete, if you

16   go straight through.  Then when you get out--while you're

17   there you take a series of Boards, National Boards, Part 1

18   and Part 2.  Part 1 is halfway through and that's the

19   clinical or--not the clinical stuff, the anatomy, the

20   physiology type basic stuff and the second half is more

21   clinical, dealing with patients and treating patients and

22   treating disease.  Then after you pass those Board scores--

23   Q.  Let me stop you for a second.  Did you take the Boards in

24   more than one state?

25   A.  The National Boards you just take overall but the State

1    Boards I took in West Virginia, Ohio and Pennsylvania.

2    Q.  Okay.  Looking for a job, right?

3    A.  Yeah, uh-huh.

4    Q.  All right.  And I guess we could say, did you pass the

5    Boards in Ohio, Pennsylvania and West Virginia?

6    A.  Yes, I did.

7    Q.  Okay.  Let me drop back one point.  On your chiropractor

8    college, were there certain certifications for certain types

9    of activities that you could perform?

10   A.  Yeah.  We got certificates for like internship,

11   dissection of human body, physio-therapeutics, which is

12   modalities and rehab.

13   Q.  X-rays?

14   A.  X-rays.  There was like five or six of them.

15   Q.  I believe the only one you didn't get was acupuncture?

16   A.  Yeah.  Acupuncture, I didn't take the class at that time

17   because I was from Pennsylvania and in Pennsylvania you

18   can't--you can only use a needle for diagnostic reasons, that

19   is to draw blood, not therapy, which is, acupuncture is more

20   therapeutic but in West Virginia you can but I didn't know

21   that I would end up here so I didn't take the class.

22   Q.  Okay.  Bill, with the Court's permission I want you to

23   step down and use a model here if you could.

24        THE COURT:  He may step down.

25   Q.  All right, Bill.  I want--in about three minutes I want

1    you to give us the Reader's Digest version of what

2    chiropractor medicine theory is all about, using the model.

3    A.   Okay.

4         THE COURT:   Doctor Filcheck, just to make sure that

5    the court reporter can hear you, I know you want to speak to

6    the jury but you need to keep your voice toward her as well.

7         THE WITNESS: Okay.  Here?

8         THE COURT:   That's better probably.

9    A.   We'll start big and go small.  This is the spine, which

10   is made up of seven neck or cervical vertebrae, twelve

11   thoracic vertebrae and five lumbar vertebrae.  These are the

12   movable vertebrae and down below you have the sacrum, which

13   has five segments fused and the lowest one is the sacrum.

14   Now each of these units move independent of each other.

15   Q.   Which way do they move, Bill?

16   A.   They rotate.

17   Q.   Laterally, horizontally, vertically?

18   A.   They rotate back and forth, distance to those bones and

19   the distance to the cartilage.  What happens is the bone--

20   there's ligaments on the front and the back that prevent it

21   from moving too much forward, one side, laterally.  The only

22   way the bone moves freely is from side to side like that.

23   Here's the foramen that Doctor Halstead was talking about.

24   This is where the nerves come out and what happens is that

25   someone will twist, pinch or irritate on a nerve and that

1   will cause pain and inflammation.  Wherever that nerve goes

2   in the neck you get pain, tingling just not in the neck, down

3   your arms, your fingers, it's in your low back, clear down

4   your legs to your toes or sometimes it affects organs in the

5   body, upset stomach or things like that depending on what it

6   affects.  You get tingling, numbness, depending on how much

7   of the nerve is pinched.

8   Q.  Bill, I want you to step back and talk a little bit but I

9   need you to be more specific.  The theory behind chiropractic

10  medicine is the spine controls the body?

11  A.  The body.  Yeah.  All the nerves--all the nerves that

12  come out of the spinal cord go to every organ and every

13  muscle in your body so the theory behind chiropractic is if

14  you have a muscle pain or sometimes even organ pain, but

15  instead of just taking medicine, which blocks the pain, such

16  as pain killers or muscle relaxants, it will block the

17  feeling out here but then once the drugs wear off you still

18  have a problem.  So what chiropractic does, you take the

19  pressure off the nerve.  We work the muscles with the

20  modalities like the electric stim and ultrasound to relax the

21  muscles and keep that bone set.  Now it doesn't happen

22  overnight.  We've had people that have injuries for years so

23  it's not going to take one or two visits, you know, it takes

24  a series of treatments to reset the muscles or specifically

25  the quadratus lumborum, which is part of the muscles that

Filcheck - Direct                                          19

1   gets reset.

2       And once it's reset, the muscles are reset, if you don't

3   do stretches or exercises, the bone will just move back out

4   again.  So once you have it reset and back to center, you

5   have the patient strengthen the muscle so the bones don't

6   move any more and they should be fine after that, as long as

7   they don't have a car accident or some major trauma that

8   could cause, you know, another injury like that again.

9       So it's bone, muscle and nerve.  Those are the three

10  things you really work on as chiropractic treatment.

11  Q.  Now what's this concept of subluxation?

12  A.  Subluxation is bones pinching on the nerve.  It's when

13  the bone is twisted, pinching on a nerve.  It's--you've heard

14  of dislocation.  This is sub--sub, which means below a

15  dislocation, smaller than a dislocation or subluxation.

16  That's the definition of it, just a small dislocation of the

17  bone.

18  Q.  Okay.  Now, Bill, let's focus--why don't you stay right

19  there because--since you're staying down there, let's just

20  bring you down once.  There has been some evidence in this

21  case regarding a ten-point exam and how that impacts upon

22  your model here and I want to get you focused on the snippets

23  of--selective snippets of tape that were played dealt with

24  three ten-point exams, did they not?

25  A.  Yes, they did.

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Filcheck - Direct                                    20

1    Q.  And did they--I think they all identified three different

2    areas of the spine.  I think--can you take us through one,

3    two and three and explain to us what you meant?

4    A.  Yeah.  The areas of--I read through them again.  I think

5    actually two of them were the low back and one of them was

6    the neck and I believe one was the mid-back but one was the

7    neck and I think there were two in the low back.

8    Q.  Well, tell us about the one that was the upper neck, a

9    ten-point examination and let me ask you this question first.

10   Did you ever tell or would you ever tell a patient that they

11   had a problem when in fact they were completely better?

12   A.  No.  And all those patients in the snippets of the ten-

13   point exam they all had--they all had problems.  Now they

14   were all different areas, different ages, different jobs and

15   in the snippets I think one of the women was low back and I

16   said twelve visits and--

17   Q.  Bill, we'll get to that again, but I want to hit upon

18   something else first and that is--let's talk about how people

19   age, how humans have walked on two legs.  There's been some

20   testimony that over time the older you get the more likely

21   you are to have some form of spinal problems.  Is that an

22   accurate statement and how does that--why is that?

23   A.  The older you get, gravity takes its effect.  These disks

24   in between are filled with water and there's kind of a

25   cushion of the spine.  In between there's--it's like a jelly

Filcheck - Direct                              21

1    donut.  The outside of it's real fibrous, the inside's like

2    jelly and what happens, when you walk it cushions, cushions,

3    cushions.  Well, over the years all that water keeps seeped

4    out of there and these two bones start to fuse together and

5    come together.  That's what you hear, osteoarthritis,

6    arthritis or chipping or spurring.  The spine will start to

7    fuse together there.  Also people that are younger with these

8    disks, they have what's called slipped disks, is a layman's

9    term, disk bulge or disk herniation.  A lot of times when

10   you're shoveling snow, twisting and bending, it will cause

11   the inside of that jelly donut and that disk to pop out and

12   it will--I think you can see here, this part here, it pops

13   out and it puts pressure on the nerves and causes pain,

14   pressure on the nerve that way without the bone twisting,

15   just that gel--gelatinous material comes out and pinches on

16   the nerve so traction will help that sometimes.  Sometimes

17   people go in and get surgery and get that cut off to take the

18   pressure off the nerves.

19   Q.  Okay.  Now let's go back to this ten-point examination.

20   Did you learn a ten-point examination when you were in

21   chiropractor school?

22   A.  We didn't call it a ten-point exam.  We just called it

23   education, education about chiropractic, history, physical

24   exam but not a ten-point exam per se.

25   Q.  But you were looking for the same things in chiropractor

Filcheck - Direct                                           22

1    school as you were looking when you got out in practice, were

2    you not?

3    A.  Yeah, that's correct.

4    Q.  And that was looking at x-rays and looking at injuries,

5    correct?

6    A.  That's correct.

7    Q.  And, again, did you ever tell a patient they had a

8    problem when actually they didn't?

9    A.  No.  No, I did not.

10   Q.  Now there were three selected snippets of tapes.  Did the

11   Burns Clinic record all the ten-point exams?

12   A.  At that time, yes, we did, per my notes from Doctor

13   Halstead.  I guess they wanted to review them and see how we

14   were doing talking to patients and making sure--Doctor Burns

15   was making sure, you know, what we said, so there's about a

16   dozen or fifteen tapes and we would tape on them, you know,

17   say our name, myself and Doctor Taylor and then turn them in

18   and then we'd tape over them and just a series of things and

19   they would critique us on it, didn't say this, you should

20   have said this, you know.  You should have--listened to how

21   we were describing things in layman's terms to people.

22   Q.  Have you examined the medical records of any of those

23   people or have you been provided the medical records by the

24   Government to tie those ten-point exams?

25   A.  No.  I don't know who they are.  I just know by the first

Filcheck - Direct                                    23

1   names that was on the snippets.  I don't know who they are.

2   Q.  And you can hear some of the comments, correct?

3   A.  That's correct.

4   Q.  Let's take it through one at a time.

5   A.  Okay.

6   Q.  Let's start with the ten-point examination of the neck.

7   What do you recall from your reviewing of the tape and the

8   transcript--by the way, that tape is in evidence is it not?

9   The tape of the three-point--of the ten-point exam?  Yes.

10  A.  Yes, I believe so.

11  Q.  In fact, the entire tape is in evidence?

12  A.  Yes.

13  Q.  Not just the snippets but the entire tape?

14  A.  That's correct.

15  Q.  So the jury, if they so desire in deliberations, could

16  play the entire tape?

17  A.  That's correct.

18  Q.  Tell us about the one, we'll start at the top and work

19  our way down, the neck injury.  What do you recall and what

20  can you tell the jury about that ten-point exam?

21  A.  I remember--the neck injury, I remember was one of the

22  two men and it was--I don't remember whether it was twenty or

23  twenty-five visits.

24      MR. DONLEY:  I'm sorry.  I'm having trouble hearing

25  the doctor.

Filcheck - Direct                                    24

1          THE COURT:  Yes, Doctor.  Can he move to the--back

2     to the witness box?

3          MR. ZIMAROWSKI:  That's fine, Your Honor.  I think

4     we can work it that way.  He can just point.  Bill, drink

5     some water too.

6          THE WITNESS:  All right.

7          MR. DONLEY:  Also, Your Honor, could we have the

8     witness addressed by his surname rather than his first name?

9          THE COURT:  I think that's the choice of Mr.

10    Zimarowski.

11    BY MR. ZIMAROWSKI:

12    Q.  All right.  Bill, let's relate to the individual that had

13    the ten-point examination related to the neck.

14    A.  Right.

15    Q.  What did she, I believe it was a she, what did she

16    complain of?

17    A.  I believe it was neck pain and headaches and pain right

18    under the skull area.

19    Q.  And did you take x-rays?

20    A.  Yes, that's what I was reviewing on the tape.

21    Q.  And what--piece it together.  What did you tell this

22    woman?

23    A.  I believe she had a, what we call flattening of the

24    cervical lordosis, which in layman's terms, your neck should

25    have a curve going to the front.  Hers was straight back or

Filcheck - Direct                                                    25

1    on the tape jammed backwards and what happens is when that

2    gets jammed backwards it pinches on those nerves of the

3    spine.  You see it a lot of times in whiplash injury and I

4    don't remember if she's the one that said she had a slip and

5    fall or Worker's Comp. or worked at Long John Silver's or,

6    you know, they all kind of--I'm not sure which one was which

7    but that bone gets jammed backwards and it pinches on the

8    nerves all through the cervical spine so what we try to do is

9    bring that curve back in and it takes the pressure off the

10   nerves.

11   Q.   Is there a one size fit all treatment protocol that

12   everyone that comes in gets twelve treatments?

13   A.   No.

14   Q.   This case, how many treatments do you recall you

15   recommended to her?

16   A.   I believe it was twenty.

17   Q.   Okay.  Now what adjectives did you use to try to

18   communicate to the patient what her condition was?  Did you

19   just use--

20   A.   I think I used jammed, you know, bones being pushed

21   backwards, pinching on the nerves, I might have used pinching

22   too on that.  I think maybe twisting, I'm not sure.

23   Q.   Did you use severely twisted?

24   A.   On that one, yes.

25   Q.   Now the adjective severely is a rather subjective term.

Filcheck - Direct                                    26

1   What did you mean to communicate when you used that term?

2   A.  I believe on her there was three bones that were twisted

3   and one of them was more severely than the other two so I

4   said the one is--when I say severely, it means it's causing

5   the problem.  It was causing the cervical neuropathy.  It was

6   pinching on the nerve.

7   Q.  Now I'm going to hand you this demonstrative exhibit.  I

8   think we can do it with this little one here.  That's part of

9   the spine, correct?

10  A.  That's correct.

11  Q.  Now just--when you say severely twisted, you don't mean

12  that you can--how many degrees we talking about, I guess, of

13  twist or out of place movement?  Are we talking slight,

14  great, what?

15  A.  Probably slight, seven degrees maybe.  I mean, it's not a

16  lot.

17  Q.  Okay.  Because the bones can't move very far or what?

18  A.  Yeah, lots of ligaments hold them in place and, you know,

19  musculature and tendons that--the area they can move as

20  restricted.

21  Q.  So if I walked up to your model and tried to turn it, you

22  know, ten, fifteen, twenty, thirty degrees, in a real patient

23  that probably kills them?

24  A.  Right.  Uh-huh.  Yeah, especially in the neck, yeah.

25  Q.  Severe the spinal column and the person would die?

Filcheck - Direct                                    27

1    A.  Right.

2    Q.  So when we're talking about twisted, we're talking about

3    very minor deviations from the straight and narrow?

4    A.  Yeah, that's correct.

5    Q.  All right.  What about number two on your ten-point

6    examination?  These are the lower back.

7    A.  Yeah, these was the lower back and I think that one was,

8    she had or he had a severely twisted bone there and I think

9    it was ten visits.  Now I don't know anything on, more than

10   what you do reading the exam and her age or what her job was

11   or--you know, I think or his job was, I don't remember, but

12   those are all variables, what they do and how bad their x-

13   rays are arthritis-wise and their age.

14   Q.  Okay.  Are you saying that the probability of needing

15   treatment of the spine is directly proportionate to the age

16   of the patient?

17   A.  Yes, uh-huh.  And I mean, two people--

18   Q.  The older you get, the more likely you're going to need

19   treatment?

20   A.  Yeah.  If two people are different ages in the same car

21   accident, you know, same amount of damage, someone that's

22   older is going to take longer to get better than someone

23   that's younger.

24   Q.  Okay.  And what was--and did that second person on the

25   ten-point examination, did they have any verbalization of any

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Filcheck - Direct                                              28

1   pain or complaints?

2   A.  I know all of them did, yes.  I think it was just--the

3   final two were just low back pain, complaining of low back

4   pain.  I believe one of the gentlemen just wanted it fixed.

5   Q.  That was number three?

6   A.  Number three, yeah.

7   Q.  He said just fix it?

8   A.  Just fix it.  Doesn't sound too hard, just fix it.

9   Q.  Okay.  Is that an uncommon response of some of your

10  patients?

11  A.  No, I think, when we explain it to them, we try to

12  explain things in simplistic terms.  You know, bones popped

13  out, bones twisted, you know and so they don't go--when they

14  tell someone what's wrong with them, they don't go, I've got

15  cervical lumbar neuropathy or, you know--well, I guess people

16  know sciatic, so, you know, and you explain how long they've

17  had it and how long it will take to get it back.  So a lot of

18  times they say just pop it back in place, which you can do a

19  little bit but it's not, it will pop right back out because

20  the muscles will spasm up and pull the bone right back out.

21  Q.  Did all three of those patients exhibit treatable

22  conditions or conditions that required treatment?

23  A.  Yes, they did.  Yes, they did.

24  Q.  Okay.  Did all three of those patients in the snippets of

25  the ten-point examination; did they all get the same

Filcheck - Direct                                                    29

1   recommendation for number of therapies, the number of

2   treatments?

3   A.   No.  No, they didn't.

4   Q.   Did you use numerous terms or just use the one term to

5   describe the condition that they were suffering from?

6   A.   I used several different terms.

7   Q.   Okay.  And what was your purpose in using several

8   different terms?

9   A.   To try to convey to them what was going on in layman's

10   terms that maybe they understood one word better than another

11   word as far as jammed, you know, twisted, pop back in.  You

12   know, I didn't want to go in there and act like I'm a

13   highfalutin doctor and throw out all these, you know, fifty-

14   cent words that no one understands.

15   Q.   Okay.  All right.  Thank you.  Let's call up 1-055.  It's

16   already in evidence, Judge.

17          THE COURT:  Yes, I know.

18   Q.   Bill, this is that letter from the Chiropractic Board

19   regarding training.

20   A.   Yes.  Yes, it is.

21   Q.   Okay.  And you've read it?

22   A.   Yes.

23   Q.   And it makes reference to certain West Virginia statutes

24   and Chiro Board regulations?

25   A.   Yes, it does.

Filcheck - Direct                                30

1    Q.  Let's call up 1-193 please.  And go to page four, please.

2    Okay.  Bill, have you read these chiropractic regs?

3    A.  Yes, I have.

4    Q.  Is this the one that references 4-1-14, The Scope of

5    Practice?

6    A.  Yes, it is.

7    Q.  Would you read that for the jury?

8    A.        "In the conduct of the practice of chiropractic, no

9              chiropractor shall perform any service that is beyond

10             the scope of his education, training and experience.

11             The practice of chiropractic will include and permit

12             the use of such diagnostic and treatment procedures

13             as taught by Board approved chiropractic colleges,

14             except as prohibited by law and/or the rules and

15             regulations of this Board and according to Section

16             12, Article 16, Chapter 30 of the West Virginia

17             Code."

18   Q.  Was your--was the National College of Chiropractic, a

19   Board approved chiropractor college?

20   A.  Yes, it's approved by the Council of Chiropractic

21   Education.

22   Q.  All right.  Let's go to page sixteen, please, of this

23   exhibit.  And could you read that for the jury please?

24   A.        "Any chiropractor who is compiled with the provision

25             of this Article may use any instrument and procedure

Filcheck - Direct                                31

1           for the purpose of diagnosis and analysis of disease

2           or abnormalities provided such instruments are used

3           in a school approved by the American Chiropractic

4           Association, the International Chiropractic

5           Association or their successors."

6    Q.   Okay.  And let's go to page seventeen please.  And could

7    you read that for the jury, please?

8    A.         "No chiropractor shall be permitted to prescribe any

9           medicine or drugs now or hereafter, including in

10          materia medica or to administer any such medicine or

11          drugs and no chiropractor shall perform any minor or

12          major surgery, practice obstetrics or practice

13          osteopathy unless duly licensed to do so by the laws

14          of this State in addition to his license to practice

15          chiropractic, nor shall any chiropractor use any

16          physiotherapeutic devices in his practice until he

17          has--until he has certified to the Board that he has

18          completed at least ninety classroom hours in the use

19          of these procedures."

20   Q.   And when we talk about training and the scope--could you

21   bring up the lights please.  Training and the scope of the

22   practice of chiropractic medicine, this is what governs you,

23   correct?

24   A.   That's correct.

25   Q.   Now there's also, like most professions, a continuing

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Filcheck - Direct                                    32

1   education requirement, is there not?

2   A.  Yes, there is.

3   Q.  And I believe in 1993 to '97 it was twelve continuing

4   education hours?

5   A.  It was twelve hours then, yes.

6   Q.  And now it's what?

7   A.  Eighteen hours.

8   Q.  Okay.  Is your license and certification--your license

9   current?

10  A.  Yes, it is.

11  Q.  And we talked about some of your certificates from the

12  chiropractor college that said you have everything to certify

13  except acupuncture, correct?

14  A.  That's correct.

15  Q.  Bill, when you--let's get on this issue real fast here.

16  The tests that were conducted or done at the Burns Clinic,

17  first off, who ordered the tests?

18  A.  They were ordered by Doctor Burns and Bill Twigg per the

19  protocol.

20  Q.  The tests were ordered by Doctor Burns, the senior

21  chiropractor?

22  A.  That's correct.

23  Q.  And Mr. Twigg acting on behalf of Doctor Burns, the

24  senior chiropractor?

25  A.  That's correct.

Filcheck - Direct                                       33

1   Q.   There's been several tests that have been mentioned by

2   name.   I want to know which tests did you administer to

3   patients, if any?

4   A.   The temperature gradient test.

5   Q.   There's been something called a nerve conductivity test.

6   Did you administer any of those to patients?

7   A.   No, I did not.

8   Q.   There's been diagnostic ultrasound.   Did you administer

9   diagnostic ultrasound to patients?

10  A.   No, I did not.

11  Q.   By the way, when the diagnostic ultrasound was

12  administered, were the results read on site?

13  A.   No.   They were sent off sent off to, I believe, it was

14  Kentucky or Tennessee.   There was a neurologist there, Doctor

15  Anderson, that worked at a neurology group.   We sent the

16  film--the little films out to him and he sent us a report

17  back.

18  Q.   So basically the bottom line is the only diagnostic test

19  which is at issue, I guess, in this case is the temperature

20  gradient test?

21  A.   That's correct.

22  Q.   And let's get to the heart of the matter, Bill, you

23  didn't think much about the tests, did you?

24  A.   No, I did not.

25  Q.   Why?

Filcheck - Direct                                            34

1    A.  I didn't see the use for most of it.

2    Q.  Why?

3    A.  It just--it didn't seem like a test that I would use in

4    my own practice.

5    Q.  Did you have a class in temperature gradient test

6    instruments?

7    A.  No.  I've heard of thermography and I know at the school

8    we did research and there was teachers that did research in

9    thermography, which was heat into the extremities in people

10   that smoked that had Raynaud Syndrome and not a lot of heat

11   in the extremities, but I don't know if they used the

12   temperature gradient there.  I think it was more like

13   photogenic to see the different disbursal of heat throughout

14   the body and the spine.

15   Q.  Did you voice your opinion regarding the temperature

16   gradient test and its usefulness to, well, let's go by the

17   numbers, Doctor Burns?

18   A.  Yes, I did.

19   Q.  To Mr. Twigg?

20   A.  Yes, I did.

21   Q.  To Doctor Halstead?

22   A.  Yes, I did.

23   Q.  To Doctor Price?

24   A.  Yes, I did.

25   Q.  Well, let's take it by the numbers.  What was Doctor

Filcheck - Direct                                        35

1   Burns' response when you questioned the usefulness of the

2   temperature gradient test and these other tests?

3   A.  He said that it was, you know, part of the protocol, the

4   Halstead protocol to use the test and, you know, instructed

5   us on what it did as far as derivative of temperature from

6   each side of the body and in the fingers and when we, you

7   know, questioned it further, he said, you know, this is my

8   practice, it isn't your practice.  I'm the doctor here and

9   we'll do it on these people.

10  Q.  Okay.  Did he make reference to your age and inexperience

11  in that conversation?

12  A.  Yeah.  I mean it was--this was over several different

13  conversations on things that I questioned.  It was, you know,

14  you're just out of school.  You don't know how a business is

15  run, that's why you're, you know, you're working here to

16  learn how business is run.  You didn't learn about business

17  in school and this is how, you know, you run a business.

18  Q.  Well, actually I skipped over this but let's go back to

19  when you were hired by the Burns Clinic you signed a

20  contract, did you not?

21  A.  Yes, I did.

22  Q.  A contract for three years?

23  A.  Yeah, three years.

24  Q.  Was there a promissory no penalty clause in there?

25  A.  Yeah, it was fifty thousand dollars and then I think he

Filcheck - Direct                                              36

1    cut it down to fifteen thousand dollars if I left early.

2    Q.  And his argument contained, I believe--I'm not sure which

3    Government Exhibit it is but it's already in evidence, is

4    that he was, just as you said, he's training you and

5    educating you and if you up and left him that he should get

6    some compensation for his training and educating you, right?

7    A.  For my training.

8         MR. DONLEY:  Objection, Your Honor.  Could we have

9    the witness testify instead of Mr. Zimarowski?

10        THE COURT:  Yes, Mr. Zimarowski, I sustain the

11   objection to the leading.

12        MR. ZIMAROWSKI:  I understand, Your Honor.

13   BY MR. ZIMAROWSKI:

14   Q.  The--what was your understanding of Doctor Burns'

15   rationale for a fifteen thousand dollar penalty?

16   A.  It was that, you know, if I worked there a year and a

17   half or two years and learned everything I needed to learn

18   and he taught me for those two years and got me up to speed,

19   if I left right after that he wouldn't be able to use me to

20   my full potential for that final year.  It wouldn't do him

21   any good for just train me, train me, train me, and then I

22   leave.  He needed some payoff for his training and if I

23   decide to leave then I would have to pay him back that money.

24   Q.  How long was your contract for?

25   A.  Three years.

Filcheck - Direct                                        37

1    Q.   And when did you sign this contract?

2    A.   June 1st of 1994.

3    Q.   Okay.  And there was also what we call a non-compete

4    clause in law?

5    A.   Yeah, it's you can't open a practice or be associated

6    with a practice for, I believe mine was two years and twenty-

7    five mile radius from his clinic.

8    Q.   And that's to restrict competition as well, right?

9    A.   Yeah.  So you don't open up across the street after your

10   contract's done and take the patients.

11   Q.   Okay.  And you said June of 1994, correct?

12   A.   Yeah, that's correct.

13   Q.   And your contract was to expire when?

14   A.   June of 1997.

15   Q.   All right.  We'll get to that in a little bit.  Were

16   there any other contract terms--well, let me back up.  Let me

17   ask you this question.  In evidence there was played another

18   snippet of a tape regarding a staff meeting.  Do you recall

19   that?

20   A.   Yeah, I recall that.

21   Q.   Do you recall the date of that staff meeting as being

22   June of 1994?

23        MR. DONLEY:  I'm sorry, Your Honor, I missed the

24   year of that question.

25        THE COURT:  Sustained.

Filcheck - Direct                                          38

1            MR. ZIMAROWSKI:  Sustained?

2            THE COURT:  Sustained.

3    Q.  What do you recall as the month and the date--the month

4    and the year of that particular staff meeting?

5    A.  I believe it was June, 1994.  I don't specifically

6    remember but I remember Doctor Hornsby was there and he was

7    the doctor that I took over practice, so it would have to be

8    very early on because she left in the beginning of August

9    1994.

10   Q.  How long had you been employed at the Burns Clinic when

11   this staff meeting was recorded and a snippet played for the

12   jury?

13   A.  A month, couple weeks.

14   Q.  Now let's go back to your voicing of some complaints.

15   You say you voiced some complaints or questioned the

16   usefulness of certain tests to Mr. Twigg?

17   A.  That's correct.

18   Q.  And what was Mr. Twigg's response?

19   A.  Mr. Twigg's response was, you know, 'cause we used to

20   call him on, well, you're not a doctor and he'd say well,

21   Doctor Burns is a doctor.  He wants these tests done, give

22   him a call and he'll order them, you know, or he'll do them

23   or have them done and then we'd have to go get lectured by

24   Doctor Burns why we weren't doing the tests that he wanted

25   done.

Filcheck - Direct                                     39

1   Q.   Doctor Burns was still calling the shots?

2   A.   Yeah, uh-huh.

3   Q.   All right.  Did you have similar conversations with

4   Doctor Halstead?

5   A.   I did talk with Doctor Halstead because we didn't see him

6   too much, maybe the last couple hours he was there, we would

7   question the testing and the rehab protocols and Thorn and

8   Watkins, we'd question the protocols and he'd assure that

9   they're all researched and everything is researched and okay.

10  Q.   Did he cite you any research?  I mean, what the research

11  was.

12  A.   I believe with the temperature gradient we questioned

13  about that and it was, you know, the Turk studies, I guess

14  research on that and Thorn Watkins, he told us about research

15  on those and the rehab is what I specifically remember.

16  Q.   How old were you during these conversations, Bill?

17  A.   Anywhere, you know, twenty-five to twenty-seven, twenty-

18  eight.

19  Q.   And this was your first job?

20  A.   Yes.

21  Q.   Outside of probably summer jobs?

22  A.   Yeah, in high school I worked at Hardee's, you know.

23  Q.   Okay.  So you really hadn't had any type of employment?

24  A.   No.

25  Q.   Did Doctor Halstead point out your youth and experience

Filcheck - Direct                                        40

1   as well as Doctor Burns?

2   A.   I don't specifically remember him pointing it out.   I

3   remember, you know, talking--when we talked to Doctor Burns

4   about it, we would question things and he would say this is

5   the way Halstead wants them to be done and, you know,

6   Halstead has two hundred practices all over the United

7   States, who are you to question, you know, what's going on at

8   this clinic and it's not even your clinic.

9   Q.   And I believe you mentioned Doctor Price.   Did you have a

10  similar conversation with Doctor Price?

11  A.   Yeah, I questioned her about it, about the testing and

12  she said talk to Doctor Burns.   I think most of the

13  complaints to her were how myself and Doctor Taylor were

14  treated in the, you know, fifty-six hours a week we worked

15  and eight to two on Saturdays, we had those type of

16  camaraderie complaint sessions.

17  Q.   Okay.   The chain of command at the Burns Clinic was what?

18  What was the chain of command, Bill?

19  A.   We would report to Bill Twigg and Bill Twigg would report

20  to Doctor Burns.

21  Q.   And who did you get your orders from, or did you?

22  A.   Bill Twigg.

23  Q.   And Doctor Burns?

24  A.   And Doctor Burns.

25  Q.   Did you have any, call it line authority to give orders?

Filcheck - Direct                                                41

1    A.  No, not without Bill Twigg's okay.

2    Q.  But you did put your hands on patients, right?

3    A.  Yes, that's correct.

4    Q.  You did treat patients?

5    A.  Yes.

6    Q.  But you didn't order treatment for patients?

7    A.  We just followed the protocol.  We didn't order any

8    treatment.

9    Q.  Did you have any involvement on any of the billing areas?

10   A.  No.  I remember specifically one time I walked in there

11   to say hi to the ladies in the morning and they saw me on the

12   camera in Doctor Burns' office and I got a talking to, what

13   are you doing in there.  You don't need to be in there.

14   Q.  Let's back up one second.  Were they security conscious?

15   A.  Very, very, very much.

16   Q.  Explain that.  What do you mean by security conscious?

17   A.  Well, cameras everywhere.  You know, they can see what's

18   going on.  There was also--the cameras didn't have audio on

19   them but in each room, there was--on the ceiling was an audio

20   thing where he can hear what you were saying and if he wanted

21   to talk to you, he'd press the button and talk to you but he

22   could hear.  You wouldn't be aware that he was--what he was

23   hearing so you're always paranoid to talk to each other about

24   complaints because he might be overhearing you.

25   Q.  All right.  Let's talk about a couple of the other

Filcheck - Direct                                    42

1    issues.  There's been some mention of these IOV's and I'm

2    sure the jury knows what an IOV is by now.  Were those IOV's

3    ever shared with you and Doctor Taylor?

4    A.  No.  No.

5    Q.  Did you see them?

6    A.  No.

7    Q.  Did you know they existed prior to--

8    A.  Two or three years ago, no.  Not till after the case, no.

9    Q.  Did any of those statistics that were brought into the

10   courtroom, any of those, shared with you?

11   A.  No.

12   Q.  Shared with Doctor Taylor?

13   A.  Doubtful.

14   Q.  Did you ever see any of those?

15   A.  No.

16   Q.  Were they ever discussed with you?

17   A.  No.  I mean, some of them, you know, the patient visit

18   average, that stuff was discussed with us but not the other,

19   the monetary statistics, no.

20   Q.  Did you have any input into how things were billed or

21   what was billed?

22   A.  No.  We were told what to bill and what codes to mark on

23   the super bill and no input at all.

24   Q.  Well, when you said you were told what to bill, did you

25   actually do any of the billing or you just simply--

Filcheck - Direct                                               43

1   A.  No, marked the super bill.

2   Q.  Marked the blocks?

3   A.  Yeah.

4   Q.  And who did the billing?

5   A.  A woman in the insurance office, which I believe most of

6   the time Alma Parkinson was in there the majority of the--of

7   my tenure there.

8   Q.  Was there any security in the billing office?

9   A.  They had a camera, same thing, camera and they could

10  listen to you talking and there was a glass door that locked

11  and another wooden door that was locked and there's no music

12  in there because he didn't want--you know, through the rest

13  of the office there was music but he didn't want music in

14  there so they can concentrate on numbers and billing and

15  there was a glass door so you can see what was going on in

16  there, you know, just by walking by but it, you know, was

17  pretty much sound proof.

18  Q.  Okay.  Was there ever any doubt as to who was in charge

19  of this clinic?

20  A.  No, not in my mind at all.

21  Q.  Well, let's talk about--you said that you complained, in

22  addition to the usefulness of certain testing, about working

23  conditions and pay, correct?

24  A.  That's correct.

25  Q.  And you commiserated with Doctor Price on that issue?

Filcheck - Direct                                              44

1   A.   Yes.

2   Q.   And Doctor Taylor?

3   A.   And Doctor Taylor too, yeah.

4   Q.   All right.  What--how were you compensated?

5   A.   We were paid, I believe at that time just once a month,

6   six dollars a patient, up to six hundred for the month, then

7   if we did from six to seven hundred we got seven dollars a

8   patient for those patients from 601 to 699 or 700, you know

9   we got an extra dollar.

10  Q.   When you say "per patient", what did you have to do to a

11  patient in order to get your six dollars?

12  A.   Adjust the patient.

13  Q.   Did you get any extra money if you did a temperature

14  gradient or x-ray or anything else?

15  A.   No.  No.  If it was a new patient consult, we'd get an

16  extra six dollars.  Usually with the temperature gradient or

17  therapies there was always technicians that do the testing

18  and put people on therapy.

19  Q.   So the technicians were the ones who administered tests?

20  A.   Yes.

21  Q.   In the calendar year 1994, approximately how much money

22  did you make at the Burns Clinic?

23  A.   I think eighteen five.  I started in June.

24  Q.   Okay.  And in--how many hours were you working then?

25  A.   That's--I think the Halstead--we used to be off Thursdays

Filcheck - Direct                                         45

1   but in that August the Halstead came in and we were open

2   eight to eight and eight to two on Saturday and myself, we'd

3   work anywhere fifty-four, fifty-six hours a week.

4   Q.  Eight to eight Monday through Friday?

5   A.  Yeah, but it was, like some days I'd be there ten to

6   eight and the other--Doctor Taylor would be there eight to

7   six and we'd switch back and forth and we'd alternate the

8   Saturdays but it--it became either fifty-four or fifty-six

9   hours, depending on whether you worked the Saturday.

10  Q.  Okay.  Were there--well, let me go through this.  In 1995

11  approximately how much money did you earn at the Burns

12  Clinic?

13  A.  I believe that was like thirty-seven thousand.

14  Q.  Okay.  And in 1996?

15  A.  I want to say forty-seven five.

16  Q.  And 1997?

17  A.  About the same, forty-seven five.

18  Q.  Okay.  What did you earn your money on?

19  A.  Long hours.  I mean, we were there--you know, we got paid

20  per patient and how many patients came in.  I remember that

21  Summer of '95 was a real slow summer so he laid some people

22  off so that's why it was, you know, our money was less then,

23  the salary was less.

24  Q.  There's been some talk about a bonus program.  Was there

25  a regular administered bonus program?

1    A.   You know, I didn't even ever remember getting a bonus

2    until I saw a sheet that Doctor Taylor and I had once, one

3    month, got two hundred and fifty dollars and I remember the

4    patient visit average, which was like the number of patient

5    visits divided by the number of new patients and he had that

6    program one and one month, the first month Doctor Taylor and

7    I didn't get it, which is kind of normal because they always

8    set it so high and the next month, lo and behold we got it.

9    I think I would have got twelve hundred dollar bonus and

10   Doctor Taylor would have got six or seven hundred dollars.

11   Well, Doctor Burns came--you know, we knew it was too good to

12   be true.  Doctor Burns came back, you know, I can't afford to

13   pay you that and this bonus program isn't working.  We can't

14   do that so we ended up getting that bonus program and he

15   scrapped it or he'd raise the levels that were out of our

16   reach and you don't even want to try when they're that high

17   so, you know, it didn't--it's just the way he worked.

18   Q.   Were there bonus programs for other employees?

19   A.   Yeah, they were for us too.  If you referred someone in

20   from outside, you got a hundred dollars but they had to come

21   so many visits, five visits.  The Clinic had to make enough

22   money to cover the hundred dollars and if you referred a

23   friend of a patient I think you got fifty dollars.  That was

24   for us as for the rest of the staff too.

25   Q.   Did you get--there's been some reference made about

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Filcheck - Direct                                      47

1   dinners.

2   A.   Uh-huh (yes).

3   Q.   Were you required to attend dinners?

4   A.   Yeah, I hated those.  I mean, it was--you worked all day

5   till six and you went to the--you went to the Stone Crab Inn

6   out Cheat Lake and you'd, you know, be there till the dinner

7   and everything, which was eight and then talk to people and

8   you'd have to close up, get everything and put it away and

9   you'd be there till nine, nine-thirty.  At that time I was

10  living in Uniontown, so you drive home at ten and be back to

11  work at eight or nine so it was just--it wasn't worth a free

12  dinner.

13  Q.   I guess my question, what were you paid?  What were you

14  compensated on that basis?

15  A.   I mean, you were given a dinner, plus the promises.

16  You're paid per patient so the more patients you get, the

17  more money you'll make, so, you know, the more you work

18  outside, the more dinners you do, people will come in and

19  you'll get paid that way.

20  Q.   Okay.

21       THE COURT:  Mr. Zimarowski, are you moving on to

22  another area?

23       MR. ZIMAROWSKI:  I am, Your Honor.  It's a good time

24  to break.

25       THE COURT:  All right.  I think it's a good time to

1    give the jury their afternoon recess.

2        Ladies and Gentlemen of the jury, please be prepared to

3    return at three-fifteen and do not discuss the case among

4    yourselves during the recess.  Thank you for your attention.

5    Leave your notebooks face down on your chairs.

6        (Jury Out)

7            THE COURT:  All right, Doctor Filcheck, you may step

8    down and please be prepared to return to the stand at three-

9    fifteen.

10       This Court stands in recess until three-fifteen.

11       (Recess from 3:00 p.m. until 3:16 p.m.)

12           THE COURT:  Can I bring the jury in?  All right.

13   Thank you.

14       (Jury In)

15           THE COURT:  Please be seated.  As far as I know on

16   the weather, you're safe and if there's going to be any

17   change in that, Court Security is going to let me know.

18   Okay.  All right.  Mr. Zimarowski.

19           MR. ZIMAROWSKI:  Thank you, Your Honor.

20   BY MR. ZIMAROWSKI:

21   Q.  Bill, there's been a couple other concepts that have been

22   discussed in this case and by using letters, LMN which is

23   what, letter of medical necessity?

24   A.  Letter of medical necessity, yeah.

25   Q.  Okay.  The letters of medical necessity, did you draft

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Filcheck - Direct                                      49

1   those or some of those?

2   A.  Yes, uh-huh.

3   Q.  Okay.  Did you also draft work excuses?

4   A.  Yes, I did.

5   Q.  Now on the screen that was shown earlier on in this case

6   where they flashed a whole lot of documents that were

7   prepared under Doctor Medina's name?

8   A.  Yes, I remember that.

9   Q.  Did you prepare some of those?

10  A.  Yes, I did.

11  Q.  What were you told those were for?  Well, first off, were

12  all those medical necessity or were some of them work

13  excuses?

14  A.  I think one or two was a work excuse but the other ones

15  were letters of medical necessity.

16  Q.  Okay.  And who--how did you come about drafting those

17  particular documents?

18  A.  Usually the letters of medical necessity, Bill Twigg

19  would tell us when a test was done, you know, to type up this

20  letter, treatment plan and--or what change in therapy and why

21  they needed the test, we would type up a letter.

22  Q.  And how--how were those letters formed or drafted, was it

23  a form letter?

24  A.  Some of there were and some of them there weren't.  We

25  got a computer program later on but I think the ones before

Filcheck - Direct                                                    50

1    were just drafted by hand; there was no computer program.

2    Later on we got one, which was like a check box program where

3    you check things and the letter was printed out.

4    Q.  And what was your information and from whom regarding

5    what was to be done with those letters of medical necessity,

6    the drafts that you did?

7    A.  You mean after we typed the letters?

8    Q.  After you did the draft, what was supposed to--what was

9    the flow, who did they go to?

10   A.  After we prepared a letter of medical necessity, they

11   went to mostly Bill Twigg to check over them and then they

12   were supposed to go to the medical doctor to get reviewed or

13   signed.  That was the big space on the letters so Doctor

14   Medina, you know, we left a space for his signature and after

15   we gave them to Bill Twigg, he was supposed to give them to

16   the medical doctor to sign.

17   Q.  All right.  Let's break it down.  Doctor Medina.  Now

18   you're not going to tell the jury that you thought that

19   Doctor Medina was reading and studying all these letters, are

20   you?

21   A.  No.  He was sleeping.

22   Q.  He was what?

23   A.  Sleeping.

24   Q.  Okay.  But it was your information that he was basically

25   approving those letters?

Filcheck - Direct                                              51

1    A.  Yes, it was.

2    Q.  Now there was some evidence that came in regarding Doctor

3    Medina going down to Florida.

4    A.  That's correct.

5    Q.  Did you receive any information as to what was happening

6    to Doctor Medina's letters--

7    A.  We were told at that time that he was still the medical

8    director, the President of the company, so he was still

9    authorized to sign the letters and they were being sent down

10   to him, either by FAX or FedEx, I'm not sure which one, but

11   he was still seeing those letters.

12   Q.  So the bottom line really is that you--well, I'll ask it

13   this way since I don't want to draw an objection.  Did--what

14   was your understanding of what Doctor Medina was doing with

15   the letters, just seeing them?

16   A.  He was seeing them, yes.

17   Q.  But he was rubberstamping them, right?

18   A.  Yes, uh-huh.

19   Q.  Now let's go to Doctor Price.  Were your letters of a

20   similar type of drafts of letters prepared for Doctor Price's

21   review?

22   A.  I didn't see any in that batch and I think by that time

23   we had received--we had the computer program, which we, you

24   know, marked the check boxes and there was no space for a

25   signature or anything so we would, you know, do the check box

Filcheck - Direct                                            52

1    and give them to Bill Twigg, thinking that he would show them

2    to her before they were sent out to insurance.

3    Q.  All right.  What was your understanding of whether or not

4    they were actually shown to Doctor Price?

5    A.  Could you ask that again?

6    Q.  What was your understanding as to if they were actually

7    shown and reviewed by Doctor Price?

8    A.  I thought they were shown to her, yes.

9    Q.  Okay.  Why?  Why did you not think that of Medina but did

10   of Doctor Price?

11   A.  I guess because she was more with it than Medina, you

12   know.  She carried more weight.  Did better exams.  Seemed to

13   be cognizant of her surroundings.

14   Q.  There was a sign on the four phases of care that Doctor

15   Price identified, do you recall that?

16   A.  Yeah, I remember that well.

17   Q.  Did you have that up by your computer?

18   A.  No.

19   Q.  Is there--

20   A.  If we would have had that up, we would have been, to use

21   Bill Twigg's word, verbally berated, you know.  The only sign

22   that we did have up and it showed on some of those pictures,

23   was after Bill Twigg went to a seminar put on by Medicare to

24   document everything and everything had to be documented,

25   which is probably just good general policy with any medical

1   clinic.  Those signs were up by your desk, document.

2   Q.  Okay.  Bill, there's been also some mention regarding

3   protocol.  I think you've even used the term in your direct

4   testimony.

5   A.  That's correct.

6   Q.  And I think you said there was a Burns/Halstead protocol?

7   A.  Yes.

8   Q.  Did you have any input in those creations of those

9   protocols?

10  A.  No.  Never.

11  Q.  Were they in writing or were they just--how were

12  protocols formed and communicated to you?

13  A.  From what I remember, we were told that by Doctor Burns

14  and Bill Twigg and then the last visit there when I saw the

15  notes from Doctor Halstead's last meeting, I remembered how--

16  that's how they were--those protocols were verbally put

17  towards us by Doctor Halstead.

18  Q.  Okay.  But that was February of 1997, correct?

19  A.  Yeah, that's correct.

20  Q.  There were no Burns/Halstead protocols prior to February

21  of 1997?

22  A.  Yeah, there were protocols.  That was the first time that

23  I remember us sitting down and writing it down but there were

24  Burns/Halstead protocols as far as what testing needs to be

25  done what week and when to do re-x-rays and when they need to

1   see the medical doctor and when to do an orthopedic test and

2   everything.

3   Q.  Let's pause on that a moment and get some paper flow.

4   It's been testified by several witnesses that the only thing

5   that went with a patient is the--what's called a travel card.

6   A.  That's correct.

7   Q.  Where was the patient's file?

8   A.  The chart was up front in a container or a big shelf that

9   had a closure on the front.

10  Q.  Okay.  Did you review the patient's file before you saw

11  the patient on any given day?

12  A.  No.  Usually we just had the travel card and looked at

13  the travel card.  That carried a lot of the information on

14  it.

15  Q.  Did you know if a particular test was called for in any

16  particular day from any documents?

17  A.  Just by Bill--Bill Twigg had a sticky note on there or

18  they talked about the tickler Rolodex system.  That's how we

19  were notified that a test was to be done that day.

20  Q.  Let me ask then.  Is Bill Twigg--how--what was your

21  understanding of how he would come to put these sticky notes

22  on these travel cards?

23  A.  Honestly, I mean, I was surprised that some of it even

24  coincided with the protocol or treatment plan.  My

25  understanding was every morning he just called Doctor Burns

Filcheck - Direct                                           55

1    and they went through the charts and, you know, whatever

2    testing they deemed necessary they put a sticky on there and

3    that test was done.   Sometimes when we worked until--we

4    didn't start working until ten, you know, the patient might

5    be there early at nine-thirty.   If there was nothing going on

6    the patient would get the test before the chiropractor even

7    got there.

8    Q.   But the sticky note on the test was never compared to the

9    patient's medical record, was it?

10   A.   No.

11   Q.   So you had to rely upon what Burns and Twigg said had to

12   be done?

13   A.   Right.

14   Q.   And you already testified, I believe, that it was the

15   technicians that administered the tests?

16   A.   Yes.

17   Q.   Bill, did you ever get any paper bags full of cash from

18   Halstead or Burns or anything of that nature?

19          MR. DONLEY:   Objection.

20          THE COURT:   Sustained.

21   Q.   Were there ever any secret meetings where you conspired

22   with Burns and Twigg and Halstead on how to defraud insurance

23   companies?

24   A.   No.

25          MR. DONLEY:   Objection.

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Filcheck - Direct                                        56

1        THE COURT:  I'll overrule that one.

2   Q.  Let's come in to some of the substantive counts of the

3   indictment.  You understand there's a whole lot of counts in

4   this indictment, correct?

5   A.  Yes, I do.

6   Q.  Okay.  And I believe Counts 2 through 15 are what we have

7   been calling substantive counts.  Do you understand what I

8   mean by that?  Those are substantive acts of fraud?

9   A.  Yes.

10  Q.  Okay.  Now on all those counts, some of those refer to

11  patients that were not your patients, correct?

12  A.  That's correct.  They were Doctor Taylor's patients.

13  Q.  And you didn't touch them or treat them or lay any hands

14  on them whatsoever?

15  A.  No.

16  Q.  Bill, I want to focus upon the patients that were your

17  patients on those substantive counts and we have a P.B.,

18  Patricia Burns, correct, she was one of yours?

19  A.  Pat Brown?

20  Q.  Yes.  I will try to be a bit more accurate.  Patricia

21  Brown?

22  A.  Patrick.

23  Q.  Patrick Brown?

24  A.  Yes.

25  Q.  Pat Brown.  Did you review the medical records on Pat

Filcheck - Direct                                        57

1    Brown?

2    A.  Yes.

3    Q.  Can you tell us whether or not there was a condition that

4    required treatment on Pat Brown?

5    A.  Yeah.  From what I see he started on the 16th of '96 and

6    complained of neck pain and headaches and--

7    Q.  You have to speak up so we can hear you.

8    A.  I'm sorry.  He complained of neck pain and headaches and

9    on the travel card we have them, for the subjective, rank

10   from zero to ten, ten being the worse pain, zero being no

11   pain and they mark the number on the travel card and he was,

12   I believe ten out of ten for the neck pain, neck stiffness

13   and ten and eight for the headaches from time to time on that

14   first day.

15   Q.  And was there treatment rendered to Pat Brown?

16   A.  Yeah, I believe he got chiropractic treatment and I

17   believe some modalities.

18   Q.  Okay.  Did you have any input as to how it was billed for

19   Pat Brown?

20   A.  No.

21   Q.  You just laid hands on Pat Brown to provide treatment for

22   some of his complaints, right?

23   A.  That's correct?

24   Q.  Did Pat Brown have a treatable condition?

25   A.  Yes, he did.

1   Q.  And did he get better?

2   A.  I believe he went from a ten to ten subjective to two and

3   two for neck pain and headaches but it took awhile.  I think

4   that was from July '96 to February '97, he went to.

5   Q.  Bill, do all chiropractic patients always get better?

6   A.  No.

7   Q.  And what would necessarily prevent them from being

8   better?

9   A.  Sometimes it's their condition, if they have bad

10  arthritis or if their condition's so bad that, you know, the

11  bones are fused together enough and can really fix it.  It

12  might be what they call palliative, which means taking care

13  of the pain but not correcting the problem and then they

14  would be good for a week or so and then it just comes back

15  again so they never really get fixed per se, but it helps

16  their pain a little bit.

17  Q.  Are pain issues addressed more by a medical doctor than

18  by a chiropractor?

19  A.  They're addressed--I mean, I guess a medical doctor

20  addresses it with, you know, medication.

21  Q.  Medicine?

22  A.  Yes.

23  Q.  We have a J.H., Mr. Harman?

24  A.  Yes.

25  Q.  Was he one of your patients?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Filcheck - Direct                                    59

1   A.  Yes, he was.

2   Q.  Okay.  And what was Mr. Harman's--the nature of his

3   complaints, if you recall?

4   A.  He was neck pain and neck stiffness and mid-back pain and

5   mid-back stiffness and at the start of care he was ten out of

6   ten for both of those.

7   Q.  Did he have a treatable condition?

8   A.  Yes, he did.

9   Q.  And did he get better?

10  A.  I'm not sure on him.  He only came for, from what I see,

11  a few weeks, so I'm not sure.

12  Q.  Okay.  What about a, I think it's Art Webber, A.W.?  What

13  were Mr. Webber's complaints?

14  A.  He had pain in his hip and low back pain for three weeks

15  and loss of grip strength in his hands.

16  Q.  And did he have a treatable situation?

17  A.  Yes, he did.

18  Q.  Did you treat him?

19  A.  Yes, I did.

20  Q.  Did you have anything to do with Mr. Webber's billing?

21  A.  No, not at all.

22  Q.  Did Mr. Webber get better?

23  A.  I believe he got somewhat better, yeah.

24  Q.  Linda Moore?

25  A.  She had neck pain, mid-back pain and low-back pain,

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Filcheck - Direct                                          60

1    everything.

2    Q.  And what was her scale on ten to ten for pain and

3    discomfort?

4    A.  She was--in neck pain she was ten and the neck stiffness

5    was two and all the rest, the mid-back and low back were ten

6    out of ten.

7    Q.  And did she require treatment?

8    A.  Yeah.  She was--I think she--she mainly got adjusted with

9    other modalities and she came from 12, '96 to I see February

10   '97.  She was one out of one for neck pain and neck stiffness

11   and one out of two for mid-back pain, mid-back stiffness and

12   one out of one for low back pain, low back stiffness.

13   Q.  The number you're giving us, to me as a layperson

14   indicates she got better?

15   A.  She got better, yeah.

16   Q.  One out of one sounds like you're--

17   A.  Minimal.  Yeah, it's minimal problems, if any at all.

18   Q.  And did you have anything to do with her billing at the

19   Burns Clinic?

20   A.  No, I did not.

21   Q.  I believe we have Sandra Wotring, S.W.

22   A.  Yeah, she had low back pain and shoulder pain and neck

23   pain.  And I think she had some dizziness too.

24   Q.  Did she have a treatable condition?

25   A.  Yes, she did.

1   Q.  And did you treat her?

2   A.  Yes, I did.

3   Q.  And did she get better?

4   A.  I believe her shoulder pain got better but her low back

5   pain and neck pain didn't seem to come along as expected.

6   Q.  Did you have anything to do with her billing?

7   A.  No, I did not.

8   Q.  Lee Ann Crawford, L.C.

9   A.  Yes.  She had neck pain, mid-back pain and low back pain.

10  Q.  Did she have a treatable condition?

11  A.  Yes, she did.

12  Q.  And was she treated?

13  A.  Yes, she was treated.  It looks like her mid-back pain

14  and low back pain got better but her neck pain was still

15  there.  It was like a five out of five.

16  Q.  Sounds like some of these patients get better, some of

17  them don't get better.  Some of them get better partially?

18  A.  Right.

19  Q.  Is that normal?

20  A.  That's pretty normal, yeah.

21  Q.  Did you have anything to do with Ms. Crawford's billing?

22  A.  No, I did not.

23  Q.  All right.  And the last one, I believe, is a Charles

24  Horn.

25  A.  Yes.  He suffered from, I believe, low back pain and

1   headaches and he--I don't have numbers on him when he began

2   but at the end he was zeros, one's and two's, so he got

3   better also.

4   Q.  And did you treat him?

5   A.  Yes, I did.

6   Q.  And were you involved in the submission of any bills on

7   Mr. Horn?

8   A.  No, I wasn't.

9   Q.  Bill, were you involved with submission of any of the

10  billings on these patients that you identified in these

11  substantive counts?

12  A.  No, I wasn't at all.

13  Q.  The--by the way, which--we probably should have done this

14  as we were going through but were all these patients treated

15  or overseen by Doctor Medina or Doctor Price or a combination

16  of the two?

17  A.  I really don't know.  You know, I'm trying to set time

18  frames in my mind and I think most of them were Medina but

19  there could have been some Medina overlap with Price or both.

20  I'm not sure.

21  Q.  All of these patients were Doctor Burns' patients were

22  they not?

23  A.  That's correct.

24  Q.  And Doctor Burns was the senior chiropractor?

25  A.  Yes, that's correct.

Filcheck - Direct                                           63

1   Q.  Bill, I want to bring us up to the February of 1997 and

2   Doctor Price's resignation.

3   A.  Okay.

4   Q.  I believe one of the exhibits and I know you saw it, was

5   Doctor Price's letter to the staff.

6   A.  Yes.

7   Q.  Did she give a verbal copy of that letter to the staff?

8   A.  She gave this letter--letter to the staff and I remember

9   her saying she was going to be all right because she had a CD

10  that she was going to cash out, financially, because--that's

11  all I remember her saying was that because I know her and her

12  husband had just bought two new cars and she was going to be

13  all right for a while even though she was quitting because

14  she had that CD she was going to use.

15  Q.  Let's back up a little bit.  You had conversations with

16  Doctor Price regarding complaints about working conditions at

17  the clinic, right?

18  A.  Yeah, that's correct.

19  Q.  Okay.  What was the nature of those complaints?  Did it

20  have anything to do with her resignation?

21  A.  The complaints that we brought to her were mainly our

22  complaints about the cameras, our complaints about, you know,

23  long hours we worked and the sign she put up.  I don't know

24  if it was mentioned previously about the pay raise.  The

25  national average was three percent and no one got a pay raise

1    at Priority One.  Those type of complaints.

2    Q.  All right.  Did--you saw in the body of her memo to the

3    staff, however, that she had, I think she said ethical

4    concerns of Doctor Burns?

5    A.  Yes.

6    Q.  Did you have similar ethical concerns of Doctor Burns?

7    A.  Yes, I did.

8    Q.  Did you raise those ethical concerns with Doctor Burns?

9    A.  Yes, I did.

10   Q.  Do you recall the specific line in Doctor Price's letter

11   to the staff that she says she's not saying anything illegal

12   is going on?

13   A.  I do recall that.

14   Q.  Did she countermand that or contradict that by saying

15   different when she was talking to you personally?

16   A.  No, just about the--cashing out the CD.  That's all she

17   said to us.

18   Q.  By the way, Bill, is there evidence that Doctor Price was

19   moving out prior to February 1997?

20   A.  Yeah, beforehand, you know, she didn't leave that day and

21   take boxes out.  She had photocopies of her diplomas on the

22   wall.  She didn't have the actual diplomas and she took them

23   down and I remember we were talking.  Doctor Burns was there

24   and he asked where her diplomas were and she said she took

25   them out to get framed.  In, you know, retrospect she

Filcheck - Direct                                          65

1    wouldn't frame the photocopies, she'd frame the actual but

2    she was slowly moving the stuff out so when she did leave,

3    there wouldn't have to be a big rigmarole about hauling boxes

4    out and going back to get stuff.

5    Q.  Did she--what was your understanding of the length of her

6    contract?

7    A.  I thought it was one year, December to December.

8    Q.  December of 1996 was the expiration of one year?

9    A.  Yeah.

10   Q.  Was she under a contract, to your knowledge, at that

11   point in February of 1997?

12   A.  I didn't know if she signed a new one but I figured since

13   she was still there she was under a new contract.

14          THE COURT:  Is this an exhibit that's already been

15   admitted, Mr. Zimarowski?

16          MR. ZIMAROWSKI:  Yes, Your Honor.

17          MR. DONLEY:  What's the exhibit number, Your Honor?

18          THE COURT:  He hasn't said yet.

19          MR. ZIMAROWSKI:  Filcheck 1.

20          THE COURT:  You said this was already admitted.

21          MR. ZIMAROWSKI:  It's already admitted, Your Honor.

22   Don't have that many exhibits, so I tried to keep track.

23   BY MR. ZIMAROWSKI:

24   Q.  Bill, this is an email that's already been admitted into

25   evidence and it purports to come from you.  Did it come from

Filcheck - Direct                                                66

1    you?

2    A.  Yes, it did.

3    Q.  Okay.  And this was sent to Doctor Price?

4    A.  Yes, it was.

5    Q.  Okay. Now there's a reference to having ninety-seven days

6    left.

7    A.  Yeah, I was very disgruntled and that was just the

8    countdown to my June 1st, 1997, till my contract was up.

9    Q.  And you were intending to leave then?

10   A.  Yeah.  They actually had a doctor that was replacing me.

11   He was coming in, a Doctor Green and I believe Doctor Burns

12   and his wife and Doctor Green and his wife had went out to

13   Nemacolin and had dinner and I believe, you know, he was all

14   but hired except he didn't have his Boards--Boards done.

15   Q.  And you said you were disgruntled?

16   A.  Well, I didn't want to work there any more.  I was

17   unhappy.

18   Q.  All right.  And is it fair to--well, let me--why did you

19   stay?  Why did you stay till--why were you there in March of

20   1997 when the State Police came in?  Why were you still

21   there?

22   A.  You mean after they came in or when they came in?

23   Q.  When they came in?

24   A.  Well, when they came in I still had a contract and I

25   didn't have fifteen thousand dollars to pay them to break the

Filcheck - Direct                                                67

1    contract.

2        After--you know, after they came in we had more control

3    over the treatment plan with our patients.  Everything was

4    how it should be.

5    Q.  Okay.  Well, let me--let me ask that.  Did the State

6    Police coming in to the clinic change Robert Burns' conduct

7    or business at the clinic?

8    A.  Yeah, he was everyone's best friend now.  You know, he

9    wanted--

10   Q.  What do you mean now?  When did Doctor Burns become

11   everyone's best friend?

12   A.  The day after they came in, he was in the office telling

13   everyone nothing was done wrong and not to worry and, you

14   know, cooperate and, you know, we're going to stick together

15   and we'll get through this and then he was--I remember he was

16   looking--talking to everyone else too.

17   Q.  This was, I believe it's March 11th of 1997?

18   A.  Yes.

19   Q.  You were there that morning when the State Police came

20   in?

21   A.  Yes, I was.

22   Q.  And I believe you talked to Trooper Hudson on that day,

23   correct?

24   A.  Yeah, that's correct.

25   Q.  And I believe that there's been testimony you spoke with

Filcheck - Direct                                    68

1   the authorities two more times after that?

2   A.  Yeah, like two weeks after that and then April of 2000.

3   Q.  And you talked to them of your own free will?

4   A.  Uh-huh, yeah.

5   Q.  Well, why did you talk to them on March 11th?

6   A.  I wanted to help them out.  I didn't do anything wrong.

7   Q.  Did you think you did anything wrong?

8   A.  No.

9   Q.  Do you think you did anything wrong even now?

10  A.  No, I do not.

11  Q.  You heard that Trooper--you were interviewed by a Trooper

12  Hudson, correct?

13  A.  That's correct.

14  Q.  And one other individual?

15  A.  Yeah.  Huggins, is it Huggins?  It's the one from Blue

16  Cross/Blue Shield.

17  Q.  And you also, I believe, heard testimony that Trooper

18  Huggins--Trooper Hudson, excuse me, violated protocol by

19  taking a taped statement from you?

20  A.  That's correct.

21          MR. DONLEY:  Objection.

22          THE COURT:  Overruled.

23  Q.  Did you know that he was violating protocol by taking a

24  taped statement from you?

25  A.  No, because I--I mean I'd seen stuff on TV where they

Filcheck - Direct                                    69

1   videotaped, you know, statements and audiotape, I didn't

2   know, no.

3           MR. ZIMAROWSKI:  Your Honor, at this time, I'd like

4   to play, I believe it's Government's Exhibit 256.  Your

5   Honor, I believe Mr. James is going to assist me and--

6           THE COURT:  Mr. who?

7           MR. ZIMAROWSKI:  I believe the tape is already in

8   evidence.  He's going to get the report.

9           THE COURT:  All right.  And we're talking about what

10  exhibit?

11          MR. ZIMAROWSKI:  I believe it's--I want to say it's

12  256, Your Honor.  It's the tape.

13          THE COURT:  I think we better be certain.  Did you

14  pull it ahead of time, Mr. Zimarowski?

15          MR. ZIMAROWSKI:  256, Your Honor, and I believe we

16  have it in both the large cassette and the small cassette.  I

17  think it's 256A and 256B and I'm not sure which tape--

18          THE COURT:  I think you need to know which one

19  you're playing so that I can make sure we've got a correct

20  record on that.

21          MR. ZIMAROWSKI:  Your Honor, this is Government's

22  Exhibit 1-256, no designation A or B, it's the larger

23  section.

24          THE COURT:  Thank you.

25          MR. ZIMAROWSKI:  And, Your Honor, I have made copies

Filcheck - Direct                                      70

1    of transcripts of this tape and I'd like to distribute them

2    to the jury so they can read along as the tape is being

3    played.

4         THE COURT:  All right.  You may hand them to the

5    Court Security Officer.  The Court Security Officer should

6    distribute them to the members of the jury.

7         Ladies and Gentlemen of the jury, you've seen transcripts

8    before and this is a transcript, which I understand as we go

9    into it, may have errors in it so remember that the

10   transcript is not the exhibit.  The tape is the exhibit and

11   if what you hear on the tape and what you see on the

12   transcript are not the same; you should rely on what you hear

13   on the tape because that is the exhibit that's in evidence.

14   The transcript is merely an aid to your understanding.

15        May I have a copy please?  Thanks.

16        MR. ZIMAROWSKI:  Are you ready, Your Honor?

17        THE COURT:  I'm ready, yes.

18   (Government Exhibit 1-256 was played for the jury)

19        THE COURT:  Would the Court Security Officer please

20   pick up the transcripts?  If everybody will just pass them

21   down to the Court Security Officer.  Thank you.

22   BY MR. ZIMAROWSKI:

23   Q.  Bill, just a couple final questions.  There is a lot of

24   discussion on this tape about the ethical versus the illegal.

25   Did you think anything was illegal going on at the Burns

Filcheck - Direct                                      71

1   Clinic?

2   A.   At that time I was under the impression it was illegal if

3   you billed for it and didn't do it and everything that we

4   billed for we did.  I didn't agree with the protocol but it

5   was done.  You know, that wasn't our call.  The treatment

6   plan wasn't our call.

7   Q.   So you had ethical problems but not legal problems?

8   A.   Yeah, with the treatment plan, right.

9   Q.   All right.  Let's bring it full circle back.  You're

10  charged with conspiring to commit medical fraud and commit

11  mail fraud and other things?

12  A.   Yes.

13  Q.   Did you join in or conspire with Burns and Halstead and

14  Scott Taylor to commit medical fraud?

15  A.   No, I did not.

16  Q.   In some of the substantive counts, I believe Counts 2

17  through 15, now you've already testified that you only saw

18  about half of those patients in half of those counts,

19  correct?

20  A.   That's correct.

21  Q.   Did you aid and abet Burns and Halstead and Scott Taylor

22  in any illegal activity or illegal intent to commit medical

23  fraud?

1    A.  No, I did not.

2         MR. ZIMAROWSKI:  Pass the witness, Your Honor.

3         THE COURT:  Thank you.  All right, Mr. Donley.

4                    CROSS EXAMINATION

5    BY MR. DONLEY:

6    Q.  Good afternoon, Doctor, I believe you already know my

7    name and you know who I represent.

8    A.  Yes.  Mr. Donley for the United States.

9    Q.  You indicated, I believe, on direct that you didn't know

10   anything about billing procedures.  Is that correct?

11   A.  That's correct.

12   Q.  Can I have 1-0--excuse me, 1-403 on the screen please?

13   This has already been admitted.  It's been--I think it was

14   renumbered as the--as Filcheck 2, I believe, Your Honor.

15        THE COURT:  All right.

16   Q.  This is your application to get a job with Doctor Burns?

17   A.  That's correct.

18   Q.  Okay.  And can I have page two please?  Would you magnify

19   the section towards the bottom that has Squirrel Hill

20   Chiropractor Care and the area underneath that please?  All

21   right.  Now the last entry under when you worked at the

22   Squirrel Hill Chiropractic Care indicates that you worked on

23   data entry and the processing of insurance claims, is that

24   correct?

25   A.  That's correct.

Filcheck - Cross                                                    73

1    Q.   Okay.  When you say data entry, what did you mean?

2    A.   We put what the patients got done in the computer and put

3    new patients in the computer, their addresses and diagnosis

4    and that type of thing.

5    Q.   Okay.  And when you said the processing of insurance

6    claims, what did you mean?

7    A.   When you put those codes into the computer, those went to

8    the insurance claims and they printed up on the insurance

9    claims whatever you did that day, whatever was done that day

10   by the chiropractor.

11   Q.   So you did the data entry from the super bill into the

12   computer that generated the HCFA-1500?

13   A.   I did that, yes.

14   Q.   And so you--that's what you did?  You took the number

15   from the super bill of the medical procedure that the

16   chiropractor did and you inputted that number?

17   A.   I put the number on the super bill into the computer,

18   yes.

19   Q.   Yes.  If I could have Exhibit 2-03 up please.  If you

20   would magnify any one of the checked items on that page for

21   Doctor Filcheck please.  And this would be similar to the

22   kind of super bill you would have been working off of when

23   you were in school, is that correct?

24   A.   I don't recall exactly, but similar, yes.

25   Q.   Similar.  And the little x, that would have been what you

FORM CSR-LASER  REPORTERS PAPER & MFG. CO  800-626-6313

1   would have identified as the doctor had done that procedure

2   and that, therefore, you needed to enter that into the

3   computer to generate the bill?

4   A.  Yeah, whatever that code was; whatever that number is.

5   Q.  That one happens to be that we have magnified, 97703, is

6   that correct?

7   A.  Yes.

8   Q.  And what does PT EVL mean?

9   A.  I guess it's a physical therapy evaluation.

10  Q.  Thank you.  Now I believe that one of the people that you

11  spoke to was Sergeant Finkenbinder.  Is that correct?

12  A.  That's correct.

13  Q.  And that would have been on 3/17/97, is that correct?

14  A.  Yes, I believe so.

15  Q.  That would have been--that would have been the interview

16  following the taped one we just heard played?

17  A.  Yeah.  They called me and I went down to the State Police

18  Barracks.

19  Q.  At that interview did you tell Sergeant Finkenbinder--or

20  strike that.  Isn't it true that at that interview you told

21  Sergeant Finkenbinder that the temperature gradient was

22  billed at a hundred and sixty-seven dollars per nerve?

23  A.  That's correct.

24  Q.  And isn't it true that at that interview with Sergeant

25  Finkenbinder you told him that Halstead, Burns and Twigg told

Filcheck - Cross                                      75

1    you that if the insurance would not pay for the service that

2    you could perform the service and pay for it yourself?

3    A.   Yeah, even with like electric muscle stim, if it didn't

4    pay for it, they said if we thought the patient needed it

5    then we can pay for it ourselves, you know, and of course we

6    try and back in, we'll pay for the electricity that's used

7    and, no, you had to pay for the whole service.

8    Q.   Isn't it true that when you spoke to Sergeant

9    Finkenbinder, you told him that Halstead, Burns and Twigg

10   told you that if the insurance company would pay for the

11   service, you should perform and bill it?

12   A.   I don't recall that.

13   Q.   Isn't it true you told Sergeant Finkenbinder that the

14   temperature gradient was to be billed every four weeks as

15   long as the insurance companies would pay for it?

16   A.   That was the protocol or until there's a negative test

17   result.

18   Q.   And was that Doctor Halstead's protocol?

19   A.   That's the protocol that was told to us by Doctor

20   Halstead on the last visit, February 4th, through Doctor Burns

21   and Bill Twigg.

22   Q.   You were all there together?

23   A.   I believe so.  I don't really recall that, you know,

24   until I saw the notes.  I don't remember who was there.  I

25   didn't even remember what went on at that meeting until I saw