Taylor - Cross                                      376

1   A.   That was the day the woman first came in.

2   Q.   This is the very first date the patient was there, is

3   that correct?

4   A.   Yes.

5   Q.   Or maybe the next date?

6   A.   Correct.

7   Q.   And that was the way it was always done at your clinic,

8   the chiropractors, either you or Doctor Filcheck, filled out

9   this form either the day the patient came in or the next

10  date, is that correct?

11  A.   Right.   Upon reviewing our initial findings based on the

12  protocols.

13  Q.   Now I believe, if you'll magnify this section down here

14  for the doctor, please, these are the various procedures that

15  you were ordering for this patient, is that correct?

16  A.   As per the protocols of the clinic.

17  Q.   And that was the protocol set up by Doctor Halstead and

18  Doctor Burns?

19  A.   Correct.

20  Q.   Now I believe, if you would look, I believe you are

21  ordering a nerve conduction test under diagnosis, the third

22  one down I believe?   Would you highlight that for the doctor,

23  please?

24  A.   That says nerve conduction.

25  Q.   Okay.   And it's your handwriting to the right of the

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Taylor - Cross                                    377

1   printed words nerve conduction?

2   A.  Correct.

3   Q.  Okay.  2W means what?

4   A.  Two weeks.

5   Q.  That's when it was to be done?

6   A.  Correct.

7   Q.  Okay.  And then further to the right it has some more

8   writing, is that also yours?

9   A.  Correct.

10  Q.  And what does that say?

11  A.  It says two and then there's an open parenthesis, 6W,

12  closed parenthesis and an S with a circle around it.

13  Q.  Okay.  What does the two mean?

14  A.  It means it should be performed two more times within a

15  six week period with a stop at the end of that time.

16  Q.  That's an S, not a five?

17  A.  I believe it's an S.

18  Q.  Okay.  So you were going to have how many nerve

19  conduction tests for this patient?

20  A.  Two within a six-week period.

21  Q.  And the first one?

22  A.  No, I believe that--the way I interpret it is two within

23  the six-week period.

24  Q.  Okay.  And by a nerve conduction test, did you mean a

25  neurometer?

FORM CSR  LASER  REPORTERS PAPER & MFG. CO.  800-626-6313



Taylor - Cross                                    378

1    A.  Yes.

2    Q.  All right.  If you would remove the magnification,

3    please.  If I could have up 4-002, please.  And do you

4    recognize your own handwriting on this?

5    A.  Yes, I do.

6    Q.  Just like the handwriting expert said, this is yours?

7    A.  Correct.  Well, mostly mine.

8    Q.  Mostly yours?

9    A.  Correct.

10   Q.  All right.  Do you--would you magnify this section across

11   there for the doctor, please?  And tell--can you identify any

12   treatment dates where the patient was seen by an M.D.?

13   A.  Well, I see one here.  I can't read the date but it's on

14   seventeen.

15   Q.  Okay.  Do you see any others?

16   A.  I can't see from that.  It's pretty blurry but, again,

17   also if the patient saw say, for example, the medical doctor

18   on the first visit, that might not also be on the card.

19   Q.  Okay.

20   A.  That would be in the patient file.

21   Q.  Sure.  Let's go ahead and remove the magnification,

22   please.  Would you highlight the column seventeen in yellow,

23   please?  Now, let's go back up and see if we can--magnify the

24   area above column seventeen, see if we can pick up some of

25   the dates for the doctor, please.  Can you read any of the

Taylor - Cross                                                    379

1    dates there, Doctor?

2    A.   It might be October or November.

3    Q.   Okay.

4    A.   It says M.D.

5    Q.   Can you see like around number fifteen, it looks like

6    October and number eighteen sort of looks like November?

7    A.   No, but I might be able to look up Doctor Price's, if I

8    might have to look at the chart for that day, that might

9    help.

10   Q.   All right.

11   A.   Is that okay?

12   Q.   Go right ahead, please.  We'll call it up for you.  If I

13   could have up--if you would put this on the right-hand side

14   of the screen, please.

15   A.   I found it, sir.

16   Q.   We're going to get it up for the jury also.

17   A.   Okay.

18   Q.   And would you put on the other side of the screen, 4-008,

19   please?  Magnify the date in the upper right-hand corner,

20   please.  And that date was?

21   A.   10/29/96.

22   Q.   Okay.  Would you remove magnification and remove--go back

23   to a single screen with the travel card.  That would indicate

24   that visit would have been 10/29/96, is that correct?

25   A.   Correct.

Taylor - Cross                                    380

1    Q.  Okay.  Now if I can have--if you would remove that--keep

2    the highlighting on it but remove the document and let's go

3    to 4-001, please.  And would you magnify the services and the

4    dates on the bottom, please.  This indicates that this is a

5    billing for what kind of services, Doctor?

6    A.  For three different dates.  For 9/11, 9/12, 9/13,

7    different office visits.

8    Q.  Three kinds of office visits?

9    A.  Right.

10   Q.  Or two kinds of office visits but on three different

11   dates?

12   A.  Correct.

13   Q.  Okay.  Remove the magnification, please.  And would you

14   put that on one side of the screen, please?  And bring up on

15   the other side the travel card, which is 4-002.  And would

16   you put the highlighting back on the M.D. visit column,

17   please?  Would you magnify this section of the screen for the

18   doctor?  Doctor, do you see the dates that were on the HCFA-

19   1500 as the first three visits for this patient?

20   A.  Correct.

21   Q.  Okay.  Would you highlight each of those visits in green

22   please?  Could we go back to just have the travel card as a

23   single screen please?  4-002.  Would you highlight the first

24   three visits, please?  And those were the services that were

25   billed, sixteen visits before the patient saw the M.D.?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                    381

1    A.  For those dates.

2    Q.  Is that correct?

3    A.  On those three dates, yes.

4    Q.  Okay.  And those were office visits with you, would that

5    be correct?

6    A.  Correct.

7    Q.  Now each time you would see the patient, you would see

8    the travel card?

9    A.  Yes, I would.

10   Q.  And each time when you would see the patient and you

11   would see the travel card, did you notice that there was no

12   visit with the M.D. noted on the travel card?

13   A.  As I said, on the first visit, sometimes it wasn't but

14   after that I would notice.

15   Q.  Okay.  So you noticed on each of these the patient had

16   not seen the M.D. as far as you could tell from the travel

17   card?

18   A.  Correct.

19   Q.  Did you go running down to Mr. Twigg and say, Mr. Twigg,

20   I've got a patient who hasn't seen the doctor yet?  Did you

21   go down and do that?

22   A.  No.  I was not in charge of M.D. schedule.

23   Q.  Did you go to Doctor Burns and say, Doctor Burns, our

24   captain's not seeing this patient?

25   A.  No, I did not.  Again, I was not in charge of M.D.

Taylor - Cross                                                382

1    schedule.

2    Q.  Who was in charge of this patient's treatment on these

3    first three visits?

4    A.  I was.

5    Q.  Okay.  All the way through treatment number sixteen?

6    A.  Yes, except for one date where she cancelled, yes.

7    Q.  Okay.  Everything that was done to this patient was

8    yours, was it not?

9    A.  I worked on the patient and, yes.

10   Q.  Okay.  And even after the M.D. saw this patient on visit

11   seventeen, this patient remained your patient and you were

12   the treating physician, were you not?

13   A.  Correct.  The medical doctor recommended continued spinal

14   manipulation.

15   Q.  Okay.  And that was critical to you at that time, right?

16   A.  Well, critical to me and the patient.  The patient needed

17   the care.

18   Q.  Did you ever see the doctor's notes?

19   A.  Not routinely.

20   Q.  Did you--you would not see the doctor's notes routinely?

21   A.  Again, these were placed in the patient chart, which was

22   up front or in her office.

23   Q.  Didn't you tell the jury on direct that the medical

24   doctor was directing the treatment of these patients?

25   A.  I said in most cases, I believe.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                          383

1    Q.  How would you know what the medical doctor was directing

2    if you were not looking at the medical doctor's records?

3    A.  I would not.

4    Q.  Let's go to 4-010, please.  And would you magnify the

5    text portion of this, please?  Would you read that for the

6    jury?

7    A.  Sure.       "I have been notified by my physician that he

8                    believes that in my case Medicare is likely to

9                    deny payment for the service identified below

10                   for the reason stated.  If Medicare denies

11                   payment, I agree to be personally and fully

12                   responsible for payment.  Reason:  Medicare

13                   does not usually pay for this many visits or

14                   treatments."

15   Q.  Okay.  Now this--would you remove magnification, please?

16   Would you magnify the date on the bottom?  What's the date?

17   A.  9/16/97.

18   Q.  And according to the travel card, if my memory is right,

19   the first time you saw this patient was 9/11/97?

20   A.  Correct.

21   Q.  You already knew you were going to go over the Medicare

22   limits, right?

23   A.  On this she was seen before the travel card was

24   implemented.

25   Q.  You already knew that she was going to go over the

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                            384

1    Medicare limits by 9/16/97 for chiropractic treatment.   Is

2    that correct?

3    A.   No, I don't believe I knew that.   There was a time where

4    before the travel cards we had charts.

5    Q.   All right.

6          MR. ZIMAROWSKI:   Your Honor, may I voice an

7    objection?   This is 9/16/97, which is outside the scope;

8    therefore it's not relevant and what Mr. Donley has done is

9    he's added another year on the analysis of Mr. Taylor so Mr.

10   Taylor's record is entirely appropriate since it's six months

11   after the conspiracy allegedly ended.

12         THE COURT:   Mr. Harris?

13         MR. DONLEY:   I'll move on.

14         THE COURT:   Well, I think that this all has been

15   outside the scope of the indictment and ladies and gentlemen,

16   to the extent that you've seen any exhibits or heard any

17   testimony that relate to a period of time after May of 1997,

18   the Court orders you to ignore it because it's outside the

19   scope of the conspiracy.

20   BY MR. DONLEY:

21   Q.   Would you remove the magnification, please?   All right.

22   Let's go to Exhibit 4-011 and would you magnify the top

23   portion of this for the doctor, please?   And this is a

24   portion of DOV, is that correct?

25   A.   It appears to be.

Taylor - Cross                                385

1   Q.  Okay.  And this is payment for the three services that

2   were on the HCFA-1500 that's been identified as 4-001, dates

3   of service being 9/11, 12 and 13, is that correct?

4   A.  Correct.

5   Q.  Remove the magnification, please.  At some point during

6   the patient's treatment, this patient's treatment, did you

7   have to do a letter of medical necessity, is that correct?

8   A.  I assume, yes.

9   Q.  Okay.  Can we go to 4-009?  It's a little hard to read.

10  Would you magnify the first couple paragraphs of the

11  document, please?  Does that help you a little bit, Doctor?

12  A.  Yes, it does.

13  Q.  This appears to be a letter of medical necessity?

14  A.  Yes, but I don't believe I wrote that particular one.

15  Q.  Okay.  First date on this is September 11, '96, is that

16  correct?

17  A.  Yes, correct.

18  Q.  Would you remove the magnification and would you go down

19  and magnify the next couple paragraphs for the doctor?  This

20  one is for some treatment on September 12?

21  A.  Yes, '96, yes.

22  Q.  Remove the magnification.  And the next one, would you

23  magnify that section for the doctor?  And this is--

24          MR. HARRIS:  Your Honor, I'm going to object.  He

25  said he didn't write this letter.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                    386

1          THE COURT:  I understand that.  Mr. Donley, what's

2    the relevance to this witness?

3          MR. DONLEY:  I'll get to it in a moment, I believe,

4    Your Honor.

5          THE COURT:  All right.  All right.  I'll permit you-

6    -if you say you're going to link it up, I'll permit further

7    questioning.

8    BY MR. DONLEY:

9    Q.  This one is dated September 13, is that correct?

10   A.  Correct.

11   Q.  Okay.  And this is again just reviewing what happened to

12   the patient, is that right?

13   A.  Yes.

14   Q.  Okay.  Now do you know who wrote this one?

15   A.  I believe Doctor Frank Novak.

16   Q.  Okay.  And do you know why he would be writing one of

17   these for your patients?

18   A.  It was his job to write medical necessity letters and do

19   various correspondence.

20   Q.  Did you review it?

21   A.  I might have.  I can't recall seven years later.

22   Q.  Okay.  And the purpose of the letter of medical necessity

23   was to report all the relevant factors that had happened to

24   the patient to the insurance company, is that correct?

25   A.  Yes.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                                387

1   Q.   Okay.  Can we go to--remove the magnification, we'll go

2   to page three.  Will you magnify the bottom section down

3   there?  And, again, we're now moving up through September the

4   27th, is that correct?

5   A.   Excuse me?  I couldn't hear you, I was coughing.

6   Q.   We've now, in this letter of medical necessity, we're up

7   through September the 27th, is that correct?

8   A.   Correct, 1996, yes.

9   Q.   Remove the magnification and go to page four, please.

10  And, again, it's very hard to read, but would you magnify the

11  section right at the bottom for the doctor?  And this is the

12  October 17th summary of what happened to the patient?

13  A.   Correct.

14  Q.   Okay.  Would you go to the next page, please, and magnify

15  the upper section there, please?  And this is a continuation

16  from the October the 17th on the previous page, is that

17  correct?

18  A.   Yes, it appears correct.

19  Q.   Okay.  Would you remove the magnification, please and go

20  down one more, please?  And this is--I'm sorry, two more.

21  October the 22nd and then this is--would you magnify that

22  area, please?  October the 24th?

23  A.   Correct.

24  Q.   Keep going please.  And this is October the 29th?

25  A.   Correct.

Taylor - Cross                                    388

1  Q.  Okay.  This doesn't report, Doctor, actually saw an M.D.

2  on that date, does it?

3  A.  It appears not.  I didn't read the whole note though.

4  Q.  Okay.

5  A.  Would you like me to?

6  Q.  Please.  Read it to yourself.

7  A.  It says the patient was examined by the medical doctor on

8  this visit.

9  Q.  It doesn't report anything about what the medical doctor

10  did, does it?

11  A.  No, it does not.

12  Q.  Okay.  And that's because it wasn't important at this

13  clinic as to what the medical doctor did?

14  A.  I don't believe that's true.

15  Q.  Okay.  Let's go to 5-002.  Again this is your--a

16  superbill for your patient?

17  A.  Correct.

18  Q.  And this is billing for various services, is that

19  correct?

20  A.  Yes.

21  Q.  Okay.  Let's go to 5-001, please.  And would you magnify

22  the CPT Codes and the dates at the bottom, please?  Okay.

23  These were all services performed by you on the dates

24  indicated?

25  A.  Yes.

Taylor - Cross                                      389

1  Q.  Okay.  These were all office visits?

2  A.  Correct.

3  Q.  Okay.  Now remove the magnification, please.  Those

4  dates--may I have that on the left side of the screen, please

5  and on the right-hand, remove that magnification, I'll have

6  up 1-301, please.  It's been admitted, Your Honor.  And may I

7  have up page two of 301, please?  If you would go back and

8  magnify these dates of service for us, please.  Okay.  The

9  first date of service on the HCFA-1500 is 7/11/96, is that

10  correct?

11  A.  Yes, on the HCFA, yes.

12  Q.  Would you magnify in yellow 7/11/96 on Exhibit 301,

13  please?  7/11/96.  Would you highlight that please?  And the

14  next one is dated 7/15--sorry, 7/19/96, is that correct?

15  A.  On the HCFA, yes.

16  Q.  Okay.  Would you highlight 7/19/96 on the exhibit 301?

17  And the next date of service was 7/23/96, is that correct?

18  A.  Yes, that's correct.

19  Q.  Would you highlight that on 301, please?  7/23/96.  And

20  the last date of service was 7/24/96, is that correct?

21  A.  On that HCFA form, yes.

22  Q.  Okay.  And would you highlight that for the Doctor,

23  please on 301?  Okay.  And would you go back to the original-

24  -remove the magnification on 301, please?  And what is the

25  caption on the top of this exhibit, if you can read it to the

Taylor - Cross                                    390

1    jury?

2    A.   On top of the one on the right.

3            "Days Doctor Rebecca Price was not in the offices of

4            Priority One based upon time cards and upon my

5            book."

6    Q.   Okay.  I believe, Doctor, I skipped over 7/22/96.  Would

7    you highlight that, please?  Would you agree that this was

8    billing for services on days Doctor Price was not in the

9    office?

10   A.   It appears so from that chart, yes.

11   Q.   Would you remove the magnification on the HCFA-1500,

12   please?  Would you magnify the provider's name in the lower

13   left-hand corner?  This is Rebecca A. Price, is that correct?

14   A.   Correct, M.D.

15   Q.   Okay.  And you knew that this patient was a Medicare

16   patient, did you not?

17   A.   Yes, I did.

18   Q.   Remove the exhibits please.  Could I have up 1-131

19   please?  You recognize this, do you not, Doctor?

20   A.   Yes, I do.

21   Q.   Okay.  It's a letter you wrote?

22   A.   Yes.

23   Q.   Okay.  Would you magnify the "looking for testing"

24   paragraph for the doctor, please?  You wrote this to Doctor

25   Burns at about what time period?

Taylor - Cross                                391

1    A.  Sometime while Doctor Medina was employed and before

2    Doctor Price; somewhere in that time frame.

3    Q.  Doctor Medina testified that he left in November of 1995,

4    is that correct?

5    A.  Right, in late November, I believe.

6    Q.  All right.  Now looking for testing, is that what you

7    wrote down?

8    A.  Yes, I did.

9    Q.  That means you have to look for reasons to test patients,

10   is that not what that means?

11   A.  Well, again, the protocols set up different parameters,

12   how often the patient should have a particular test.

13   Q.  Does it not mean that you had to look for reasons to test

14   the patients?

15   A.  No, it does not.

16   Q.  Remove the magnification please.  Would you magnify the

17   bottom paragraph, please?  And would you highlight "it's not

18   good enough to get the patient well"?  This is a complaint

19   you had while you were working at the clinic, is it not?

20   A.  Yes, but there is additional notes on there, yes.

21   Q.  Okay.  And would you highlight "but I'm penalized when

22   they don't stay for thirty-six visits"?  Is--was this a

23   complaint you had while you were at the clinic?

24   A.  Yes.  Again, I was talking about the different treatment

25   programs. There was usually twelve in relief, twelve in

Taylor - Cross                                                              392

1    correction and twelve in stabilization or support, so that's

2    what the thirty-six meant.

3    Q.  And if they didn't stay for thirty-six visits, you didn't

4    get your bonus?

5    A.  Well, that's not exactly true.  As I said yesterday, the

6    patient visit average started at twenty-four.

7    Q.  If they didn't stay beyond twenty-four, you wouldn't get

8    your bonus?

9    A.  Anything less than twenty-four, no, I would not.

10   Q.  And it was important to you to get a bonus?

11   A.  Well, if it was appropriate, yes.  I like to get paid for

12   my services just like you.

13   Q.  And you didn't want to be penalized just because the

14   patient didn't want to come back any more?

15   A.  Well, Doctor Burns made a point that I wasn't being

16   penalized, I just didn't get the bonus.

17   Q.  You wanted to get your bonus even though the patient

18   didn't want to come back any more?

19   A.  I wanted to get a bonus if the patient had legitimate

20   complaints and needed the care.  If they got better quicker,

21   as I said yesterday, I suggested we get paid a bonus for

22   patients getting better quicker.  Doctor Burns didn't seem to

23   like that much.

24   Q.  Would you highlight the words no complaints?  Isn't it

25   true that when you were talking--when you were writing this

Taylor - Cross                                      393

1   letter to Doctor Burns, you were talking about patients who

2   had no complaints?

3   A.  I was talking about generalized patients, the whole gamut

4   of patients and I was very upset when I wrote the letter.

5   Q.  You talk about patients getting burned out, don't you?

6   A.  Well, sure.  Most people don't like to go to the doctor.

7   Q.  They get tired of going?

8   A.  Yeah.  These people get tired of going to the doctor.

9   Q.  Particularly if they don't have any complaints, is that

10  not true?

11  A.  Well, again, no complaints doesn't mean that they don't

12  have problems.

13  Q.  But they get tired of coming if they don't have any

14  complaints?

15  A.  As in their interpretation of no complaints.  Objective

16  testing actually verifies testing that shows positive for

17  complaints.

18  Q.  And the patients get tired of coming if they don't have

19  any complaints.  Is that true?

20  A.  I guess.  If you're implying--they can discontinue care

21  whenever they want.  I didn't hogtie or make anybody come in

22  if they didn't want to.

23  Q.  Isn't that what it says that patients get tired of coming

24  when they don't have any complaints?

25  A.  That's what it says, but you're taking it out of context

Taylor - Cross                                              394

1   I believe.  I previously explained that, numerous times.

2   Q.  We're taking your words, patients--they get burned out,

3   especially if they have no complaints, out of context.  Is

4   that what you're telling the jury?

5   A.  Correct.  You're taking one sentence out of that--one

6   paragraph out of four pages worth of text.

7   Q.  I'm sorry, how many pages?

8   A.  Four.

9   Q.  I only have two pages, Doctor.  Are there two more pages?

10  Do you have two more pages?

11  A.  There was the stress we outlined and then there was

12  another two pages.

13  Q.  But it was another document?

14  A.  Correct.

15  Q.  Okay.  We'll get to that in a minute.

16  A.  Okay.  I'm sorry.

17  Q.  There's only two pages for this document, is that

18  correct?

19  A.  Correct.

20  Q.  Okay.  So we're taking your words out of context by

21  reading them like you said?

22  A.  Yeah, looking at it this way, most definitely.

23  Q.  Okay.  You were complaining to the doctor that you

24  weren't getting paid enough for keeping patients around.  You

25  wanted to start getting paid more for keeping them around.

Taylor - Cross                                            395

1    Is that what you were saying to the doctor?

2    A.  No, that's not what I was saying at all.

3         MR. HARRIS:  I'm going to object, Your Honor.  He's

4    already asked that question and it's been answered.

5         THE COURT:  Sustained.

6         THE WITNESS:  Numerous times.

7         THE COURT:  Doctor Taylor, please--

8         THE WITNESS:  I apologize.  I'm sorry.

9         THE COURT:  Thank you.

10   BY MR. DONLEY:

11   Q.  May I--remove magnification, please.  Let's go to page

12   two.  Would you magnify the first paragraph please?  Would

13   you highlight the first sentence for the doctor, please?  In

14   this sentence that I have highlighted, "if people don't come

15   back because they see the prices on their bill, I get

16   penalized."

17   A.  Meaning if they didn't come back because even though they

18   thought they needed care, they were afraid that they might

19   have a substantial bill; might not come back to the office.

20   Q.  This is because you were getting complaints from the

21   patients because the bills were too high, is that not true?

22   A.  Some patients complained of that but they also complain

23   when they go to hospitals as well, about prices.

24   Q.  Okay.  Would you remove magnification, please?  In this

25   paragraph are you not complaining about the work hours?

1   A.  Yes, I am.

2   Q.  And you're complaining about you're not making enough

3   money?

4   A.  Well, I said I was making the same or less than I did

5   before, yes.

6   Q.  That was a complaint to Doctor Burns that you wanted more

7   money?

8   A.  Well, yes.  Doesn't everybody?

9   Q.  Would you remove the magnification, please?  Would you go

10  down to the next paragraph, please, and magnify that?  Would

11  you highlight the first two lines of the paragraph, please?

12  These two lines say:

13          "Instead of doing more to get patients better

14          quicker, I must spend a big part of my day checking

15          to see if insurance is paying."

16  Is that correct?

17  A.  Well, that was one of many things listed in that

18  paragraph.  Of course, you focus on that one particular area

19  and I didn't routinely do that on every patient.  If they

20  expressed some concern about their bill, I would ask Bill

21  Twigg.  He would usually say, you know, it was covered or not

22  to put the patient's mind at ease.

23  Q.  So you were checking on some of the insurance coverage

24  for some of your patients?

25  A.  When they asked me to.

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                    397

1   Q.  You were checking on some of the insurance coverage for

2   some of your patients?

3   A.  I believe I just answered that.

4   Q.  Is that a yes?

5   A.  Yes, on a few cases, yes.

6           THE COURT:  Doctor Taylor, I must advise you that

7   when a question calls for a yes or no answer, you must first

8   answer yes or no.

9           THE WITNESS:  I'm sorry.

10  BY MR. DONLEY:

11  Q.  Would you remove the magnification, please and blank the

12  screen?  Doctor Taylor, were you present when we played the

13  tape of the Priority One staff meeting?

14  A.  Yes, I was.

15  Q.  Okay.  You were present for that meeting?

16  A.  I just said that, yes.

17  Q.  You were present at the meeting, not when we played the

18  tape?  I thought just when we played the tape.

19  A.  I was present at the meeting and I was present here when

20  we played the tape, yes.

21  Q.  At the time that this meeting occurred Doctor Medina had

22  not been at Priority One very long, had he?

23  A.  Again, based on what Bill Twigg connotated the staff

24  meeting to be, I suppose, yes.

25  Q.  The general topic that was discussed in the staff meeting

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                           398

1    was how good Doctor Medina was for the practice, how he was

2    going to be helpful, is that not true?

3    A.   That was Doctor Burns' comments, yes.

4    Q.   Okay.  You were present for that?

5    A.   Yes, I was.

6    Q.   Okay.  So based upon that, you would also place this tape

7    as having occurred very early in the time period that Doctor

8    Medina worked at Priority One?

9    A.   I guess if that's when he started fairly early.

10   Q.   Okay.  Now along with yourself being present at this

11   Priority One staff meeting, Doctor Filcheck was there also,

12   was he not?

13   A.   Correct.

14   Q.   Okay.  And you heard the laughter on that tape when

15   Doctor Burns was talking about Doctor Medina being pliable,

16   did you not?

17   A.   Correct.

18   Q.   Did you laugh while--

19   A.   That could have been me laughing.

20   Q.   Pardon?

21   A.   That could have been me laughing.

22   Q.   Okay.  Did you hear on the tape Doctor Burns suggesting

23   that Doctor Medina was a real gem to have in the practice?

24   A.   Yes, I did.

25   Q.   Did you agree with that?

1   A.  I didn't necessarily agree, but I didn't hire him.

2   Q.  Okay.  Did you hear the part about Doctor Burns wanted

3   Doctor Halstead to work with Medina?

4   A.  Yes, I did.

5   Q.  And did you hear the part where Doctor Burns was saying

6   that Medina was good for the practice?

7   A.  Yes, I did.

8   Q.  Did you hear the part where Doctor Burns said make sure

9   you don't list anything as mild?  Everything is to be

10  aggravated, severe, or badly degenerated?

11  A.  That's what Doctor Burns said, yes.

12  Q.  Okay.  Were you present when those words were spoken?

13  A.  Yes.

14  Q.  Okay.  Did you make any protests at that point?

15  A.  No, I did not.

16  Q.  Okay.  Were you present when Doctor Burns said if we

17  don't have it documented, we have to put something in there?

18  Make up something to put in there because if you don't we

19  don't--we won't get paid?

20  A.  That's what he said.

21  Q.  Okay.  Did you jump up and say, wait a minute, Doctor

22  Burns, that's wrong?

23  A.  No, I did not.

24  Q.  You knew it would be wrong just to make up things for

25  medical records, didn't you?

Taylor - Cross                                    400

1    A.   If it was made up.

2    Q.   That's what Doctor Burns was saying at your meeting?

3    A.   That was his expression, yes.

4    Q.   Okay.

5    A.   I also remember discussing about--

6              MR. DONLEY:   Objection, Your Honor, nothing before

7    the witness.

8              THE COURT:   Sustained.

9    Q.   Now part of this program involved marketing of your

10   practice, did it not?

11   A.   Yes, it did.

12   Q.   Okay.  And as part of your job you went to these various

13   marketing dinners?

14   A.   On some, yes.

15   Q.   And you--part of your job was to attempt to get people to

16   come to the clinic?

17   A.   Well, we were doing a lay lecture on chiropractic and

18   medical offices and we offered them a complimentary screening

19   if they wanted to come in and see if they had a problem and

20   explore a problem further, they could come in.

21   Q.   Part of your job was to get people to come to the clinic,

22   is that not true?

23   A.   Yes, Doctor Burns stressed that.

24   Q.   Okay.  And then once at the clinic you would give them a

25   ten-point exam?

Taylor - Cross                                                401

1   A.   Yes.

2   Q.   You were attempting to get them to become patients at the

3   clinic so you could bill their insurance companies for these

4   services, is that not true?

5   A.   Are you asking a yes/no question because I can't answer

6   that in a yes/no fashion?

7   Q.   You were attempting to get them to become patients, is

8   that not true?

9   A.   Yes.

10  Q.   Okay.  And once they become patients, you were going to

11  bill their insurance company, is that not true?

12  A.   If they decide to come under care, yes.

13  Q.   Regardless of whether they needed the services or not?

14  A.   That's absolutely false.

15  Q.   Okay.  Were you present on the date of the search?

16  A.   Yes, I was.

17  Q.   And at that date you spoke to Sergeant Finkenbinder, did

18  you not?

19  A.   Yes, I did.

20  Q.   Three days after the search, March 14th, there was another

21  dinner, was there not?

22  A.   I don't recall.  You mentioned that yesterday.  I did not

23  recall that.

24  Q.   Okay.  If there was another dinner, would you have gone?

25  A.   Either myself or Doctor Filcheck.

Taylor - Cross                                                         402

1    Q.  Okay.  There was also one on March 17th?

2    A.  Again, as I said, I don't recall any of those dinner

3    workshops.

4    Q.  You would have gone to one or the other, would you have

5    not?

6    A.  Most likely.  A lot of them I stayed and worked on

7    patients in the clinic.

8    Q.  And if you went, you would have done the same thing as

9    you did before the search, is that not true?

10   A.  Correct.

11   Q.  May I have up--

12          THE COURT:  Mr. Donley, since you're about to move

13   into another area of inquiry, I'm scheduled for a conference

14   call at ten-thirty and at this time I'd like to give the jury

15   their mid-morning recess.

16      Ladies and gentlemen of the jury, I'd ask that you take

17   your recess at this time and be prepared to return to the

18   courtroom at ten till ten.  I think I should be finished by

19   that time.  Please don't discuss the case among yourselves--

20   sorry, ten till eleven, during that recess and please leave

21   your notebooks face down on your chairs.  Thank you for your

22   attention.

23      (Jury out at 10:30)

24          THE COURT:  Doctor Taylor, you may step down.

25   Please don't discuss your testimony with anyone during the

Taylor - Cross                                403

1    recess.

2        The Court stands in recess until ten till eleven.

3        (Recess 10:31 a.m. to 10:55 a.m.)

4            THE COURT:  Welcome back, ladies and gentlemen.

5    Thank you for your patience.  Mr. Donley, you may continue.

6            MR. DONLEY:  Thank you, Your Honor.

7    BY MR. DONLEY:

8    Q.  May I have up 1-122, please?  Would you magnify the top

9    portion of this document for the doctor?  This is a copy of

10   some notes that you took, is that correct?

11   A.  Yes.

12   Q.  I'm sorry, Doctor, I couldn't hear you.

13   A.  Yes, they are.

14   Q.  Okay.

15   A.  I'm having a little audio problem.

16   Q.  All right.  This was--these are notes from a meeting that

17   you had with Doctor Halstead, is that correct?

18   A.  Correct.

19   Q.  And this would have been a meeting at the clinic, is that

20   my understanding?

21   A.  Yes.

22   Q.  I'm sorry.  Is that your understanding?

23   A.  Yes, it is.

24   Q.  And do you know the circumstances how this meeting came

25   about?

Taylor - Cross                                      404

1    A.  Well, I believe Doctor Halstead was on an in-office visit

2    at the clinic and I believe he had like a half hour before he

3    had to go to the airport and he pulled all the doctors into

4    the office and he wanted to show us how to do a ten-point

5    exam.

6    Q.  Okay.  By "all the doctors", to whom are you referring?

7    A.  Doctor Price was there, Doctor Filcheck, myself and I

8    believe Bill Twigg, the Office Manager.

9    Q.  And Mr. Twigg is, of course, not a doctor?

10   A.  No, he's not.

11   Q.  Okay.  Would you remove the magnification and place that

12   on the left side of the screen, please?  And on the right

13   side of the screen would you call up 1-044?  1-044 are some

14   other notes that you took of a meeting with Doctor Halstead?

15   A.  Yes, they are.

16   Q.  And are these two different meetings?

17   A.  Yes, they are.

18   Q.  Two different days?

19   A.  Correct.

20   Q.  Okay.  If we could go back to a single screen with 1-22

21   please and can you, from your recollection, tell us

22   approximately when this meeting was with Doctor Halstead?

23   A.  No, I can't recall.

24   Q.  Okay.  Do you know what the topic was that Doctor

25   Halstead was instructing you on at this meeting that is

Taylor - Cross                                              405

1    reflected in your notes in 1-22?

2    A.   It was a sample going through the ten-point examination

3    procedure.

4    Q.   I'm sorry, I didn't call up the document. Can I have 1-

5    122 on the screen, please?  I believe I was asking you,

6    Doctor, if you could tell us when this meeting occurred?

7    A.   I can't recall the exact date.

8    Q.   Okay.  Can you give us a time frame?

9    A.   Probably roughly when--shortly after Doctor Halstead

10   might have become the clinic consultant.

11   Q.   Okay.  And would you magnify this bottom section please?

12   Now, these are your notes of what Doctor Halstead was telling

13   you, is that correct?

14   A.   Correct.

15   Q.   Okay.  And it's your recollection that these notes were

16   as close as you could get to what Doctor Halstead was saying?

17   A.   Correct.

18   Q.   Okay.  And what was your understanding of the purpose of

19   this meeting?  Why would you being instructed on how to do

20   ten-point exams?

21   A.   Well, it was a sample of what the ten-point exam

22   consisted of, what points to cover with the patient and this

23   was just an example of how to do one of those.

24   Q.   And were you supposed to start doing ten-point exams

25   after this lecture by Doctor Halstead?

Taylor - Cross                                              406

1    A.  I assume probably after that, yes.

2    Q.  Okay.  This was to teach you how to do it?

3    A.  Yeah, it was an educational tool.

4    Q.  And would you highlight the section right above that?

5    And did you write "these bones are severely twisted out of

6    position"?

7    A.  Yes, I did.

8    Q.  Okay.  Is that because those are the words that Doctor

9    Halstead spoke on the day you were having this meeting with

10   him?

11   A.  Correct, as an example he used that, yes.

12   Q.  And were you supposed to say the patients, these bones

13   are severely twisted out of position?

14   A.  I don't believe so.  I think he was just using that as an

15   example.  Here he just--he happened to use the word severely

16   twisted, a common layman's term that most people would

17   understand.

18   Q.  And so everybody was supposed to get severely twisted

19   bones, is that what you were supposed to tell them?

20   A.  That's not what I said.

21   Q.  Okay.  Could you remove the magnification please?  Put

22   that on the left side of the screen.  May I have up 120 on

23   the right--1-120 on the right screen, please?  And this is a

24   copy of Doctor Halstead's ten-point exam procedure, is that

25   correct?

Taylor - Cross                                                        407

1    A.  Yes, I believe from a manual he has.

2    Q.  Okay.  And you have seen it while you were there at the

3    clinic, is that correct?

4    A.  I assume, yes.

5    Q.  Okay.  And you've read it while even--while it's been up

6    on the screen several times, have you not?

7    A.  Correct.  Yes, I have.

8    Q.  Okay.  Can I go to page two of 1-120, please?  And would

9    you magnify this portion?  The lecture that Doctor Halstead

10   gave you that's reflected in your notes is almost exactly the

11   same as the typewritten ten-point exam that you saw at the

12   office, is that correct?

13   A.  Yes.

14   Q.  Do you see the words "this is the only dialogue that

15   should be used!?

16   A.  Correct.

17   Q.  Okay.  You're saying that Doctor Halstead did not tell

18   you that?

19   A.  He was just using that as an example, was my

20   understanding at that visit.

21   Q.  Okay.  Go ahead and remove the magnification please and

22   may I have up--you may blank the screen and may I have up 1-

23   126, please?  Do you recognize this form, Doctor?

24   A.  Yes, it's a case study form.

25   Q.  Your handwriting?

Taylor - Cross                                                 408

1   A.   It's a little light but it appears to be mine.

2   Q.   And this was the case study form that was on your desk at

3   the time of the search, was it not?

4   A.   I'm unaware.

5   Q.   You don't remember Sergeant Finkenbinder's testimony

6   about what was on your desk on the day of the search?

7   A.   I can't recall; it's been a long trial.

8   Q.   May I have--remove magnification please.  Put that on the

9   left-hand side and bring up on the right side 1-289, please.

10  And do you see--would you highlight Exhibit 1-126 going

11  across on this line?  Do you see the highlighted portion?

12  A.   Yes.

13  Q.   And this Exhibit 1-126 was found in your office, is that

14  correct?

15  A.   Correct.

16  Q.   Would you go back to a single screen with 126 please and

17  would you magnify the portion down at the--and this is what

18  you were ordering for this patient?

19  A.   Well, this was a sample form, I believe.  I didn't see a

20  patient name on top.

21  Q.   Okay.  And this was a sample that you were supposed to be

22  following?

23  A.   Yes.

24  Q.   A guide sheet to show you how to fill out the case study

25  forms, is that correct?

Taylor - Cross                                              409

1    A.  Correct.

2    Q.  Where did you get the information to put onto this guide

3    sheet?

4    A.  I believe we might have had a brief lunch meeting with

5    Doctor Halstead and Doctor Burns and Doctor Filcheck and we

6    might have went over briefly how to fill out that form.

7    Q.  Okay.  And these are instructions that Doctor Halstead

8    was giving you on how to fill out this form?

9    A.  Correct.

10   Q.  Okay.  And under diagnosis, there's a VF right after it.

11   What does that stand for?

12   A.  I believe that refers to video-fluoroscopy.

13   Q.  Okay.  And then the numbers that were written off to the

14   side.  Is that how often that test was to be run?

15   A.  You know, if there's an arrow pointing to the muscle

16   test, I believe.

17   Q.  All right.  Under nerve--after nerve conduction there is

18   a printed word that looks like neuro, is that correct?

19   A.  Correct.

20   Q.  And that's supposed to be how often the neurometer is to

21   be run, is that correct?

22   A.  Correct.

23   Q.  Okay.  Would you remove the magnification, please?  And

24   would you magnify this section?  Under referrals has an

25   indication that you were supposed to be referring the patient

Taylor - Cross                                                    410

1    to Doctor Price how frequently?

2    A.  It says--well, should I read what it says and then tell

3    you what it meant?

4    Q.  Sure.   Sure.

5    A.  It says four, open parenthesis, 1 W, closed parenthesis.

6    Q.  Okay.  What did that mean?

7    A.  That would mean you would see the medical doctor the

8    first month of care, once a week for four weeks, and you

9    would do that for a period of two months.

10   Q.  Okay.  And remove magnification.  And all the handwriting

11   on this page is yours, is that not true?

12   A.  It appears to be.  The top is a little light.

13   Q.  Okay.  May I have page three of this document, please?

14   All right.  We'll go on to something else.  Would you magnify

15   the top portion for the doctor, please?  Is this again your

16   handwriting?

17   A.  Yes, it is.

18   Q.  This is again the scheduling of various testing

19   procedures?

20   A.  Correct.

21   Q.  As given to you by Doctor Halstead?

22   A.  Correct.

23   Q.  Now this is a different visit than the visit that we just

24   discussed where you got the ten-point exam nudge, is that

25   correct?

Taylor - Cross                                411

1   A.   I believe it is.  It's not dated.

2   Q.   And this is a different visit than the exhibit that you

3   actually had a date on, is that correct?

4   A.   I believe so.

5   Q.   All right.  So we have three different meetings with

6   Doctor Halstead so far, is that correct?

7   A.   Correct.  Brief meetings, yes.

8   Q.   Okay.  And you may go ahead and remove the magnification,

9   please and blank the screen.

10          MR. DONLEY:  Your Honor, I need to call up an

11   exhibit for identification.

12          THE COURT:  All right.

13   Q.   May I have 1-127?  Do you recognize what this document

14   is, Doctor?

15   A.   That's a sample case study form that somebody wrote guide

16   sheet on top.

17   Q.   Okay.  Do you recognize any of the handwriting on this?

18   A.   I believe, I'm not sure, but I believe it might be Bill

19   Twigg's, the Office Manager.

20   Q.   Okay.  And I believe the testimony is that this document

21   was on your desk on the day of the search, is that correct?

22   A.   I don't recall.

23   Q.   Would you put that on the left for the doctor?  And may I

24   have up--and would you do it in a different color?  Highlight

25   the 1-127 for the doctor.  You indicate--document 1-1--excuse

1   me 1-289 indicates that Exhibit 1-127 was found on your desk

2   the day of the search, is that correct?

3   A.  That's what it says there.

4   Q.  Do you have any reason to doubt it?

5   A.  No, but I don't know why Bill's handwriting would be on

6   my desk.

7   Q.  Okay.  You don't know why the document was found on your

8   desk?

9   A.  I don't believe--I don't know why Bill Twigg's was on my

10  desk.

11  Q.  And this indicates it's another guide sheet that was in

12  use at the office?

13  A.  Correct.

14          MR. DONLEY:  Your Honor, I would offer 1-127.

15          THE COURT:  Is there any objection, Mr. Harris?

16          MR. HARRIS:  No, Your Honor.

17          THE COURT:  All right.  1-127 is admitted.  The jury

18  may view the exhibit.

19      Government Exhibit Number 1-127 was admitted.

20  BY MR. DONLEY:

21  Q.  And this is the guide sheet you were just testifying

22  about, is that correct?

23  A.  Yes, it is.

24  Q.  Would you magnify this section for the doctor?  And

25  according to this guide sheet the Workers' Comp. patients--

Taylor - Cross                                      413

1    every Workers' Comp. patient was to get a cervical or a

2    lumbar support, is that correct?

3    A.   That's what it says right there, yes.

4    Q.   Okay.  Remove the magnification.  May I have up 1-044?

5    Okay.  This is another meeting with Doctor Halstead that

6    we've referred to before, is that correct?

7    A.   Correct.  And this time it's on February, I believe

8    that's a 4, '97.

9    Q.   Okay.  And that would have been Doctor Halstead's last

10   visit to the clinic, is that correct?

11   A.   I believe so.

12   Q.   All right.  And who was present for this meeting with

13   Doctor Halstead?

14   A.   I believe Doctor Filcheck, myself, Doctor Burns and Bill

15   Twigg most likely was there as well, plus Doctor Halstead.

16   Q.   Okay.  The M.D., Doctor Price, was not present?

17   A.   I don't recall her being there, no.

18   Q.   Okay.  The first section deals with a bunch of rehab

19   scheduling and therapy scheduling, is that correct?

20   A.   Correct.

21   Q.   Can we go to page two, please?  Again, these are notes

22   that you took of what Doctor Halstead was telling you, is

23   that correct?

24   A.   Yes.

25   Q.   And he was telling you that this is the new protocol, is

FORM CSR - LASER  REPORTERS PAPER & MFG CO  800-626-6313

Taylor - Cross                                             414

1    that correct?

2    A.  Yes.

3    Q.  And the new protocol, according to Doctor Halstead called

4    for, if you would magnify this section right here for the

5    doctor and would you highlight this?  TG stands for what,

6    Doctor?

7    A.  Temperature gradient.

8    Q.  And so according to the Halstead protocol that was given

9    you on 2/4/97, you were to order a temperature gradient test

10   of the patients in the first week, is that correct?

11   A.  Correct.

12   Q.  Okay.  Remove that highlighting and then highlight the

13   second week, please.  And according to what Doctor Halstead

14   was telling you at this meeting, that the new protocol called

15   for a neurometer test during the second week of the patient's

16   treatment, is that correct?

17   A.  Correct.

18   Q.  Okay.  Would you remove that?  And then on the third week

19   calls for some different types of treatment for the patient,

20   is that correct?

21   A.  Correct, rehabilitation treatment on the third week.

22   Q.  And some range of motion testing, muscle testing?

23   A.  Correct.

24   Q.  And an initial ADL?

25   A.  Yes.

Taylor - Cross                                              415

1   Q.  That's what Doctor Halstead was instructing on how to do?

2   A.  Yes.

3   Q.  At this meeting on 2/4/97?

4   A.  Correct.

5   Q.  Okay.  Would you remove that magnification and go down

6   here and according to Doctor Halstead's instructions at the

7   clinic, you were to start tape recording the ten-point exams,

8   is that correct?

9   A.  Correct.

10  Q.  And there was supposed to be a cassette on the clipboard

11  with every patient, is that correct?

12  A.  Correct.

13  Q.  And then you were to just put that in the file as part of

14  the record, is that correct?

15  A.  From what it says there, yes.

16  Q.  You wrote down what Doctor Halstead said, didn't you?

17  A.  Correct.

18  Q.  And did you start doing ten-point exams on the patients

19  and recording them?

20  A.  I believe we did.

21  Q.  May I have up on the screen 1-133, please?  Do you

22  recognize this?

23  A.  Yes, I do.

24  Q.  Okay.  And what is this again?

25  A.  The letter that I wrote to Doctor Burns about things that

Taylor - Cross                                                    416

1    bother me lately.

2    Q.   Okay.  Would you magnify this paragraph?  And would you

3    highlight the first sentence please?  You wrote this to

4    Doctor Burns, is that correct?

5    A.   Correct.

6    Q.   And you said talk of ethics than just testing for money-

7    No, capitalized, other reason.  Is that what you wrote?

8    A.   Correct, when I was angry when I wrote the letter, yes.

9    Q.   Okay.  You were complaining to Doctor Burns that you were

10   testing just for money.  Is that what you were doing?

11   A.   Well I was complaining about more generalized testing.  I

12   wanted the care to be more case specific, tailored for the

13   individual needs of the patient, more generalized approach to

14   the testing.

15   Q.   Were you complaining to Doctor Burns about the testing

16   just for money?

17   A.   In that sentence, yes.

18   Q.   You were complaining to Doctor Burns about just testing

19   for money, no other reason, is that true?

20   A.   Yes, again, as we went through the various testing

21   parameters, I also wasn't very trained on some of those so I

22   did not feel comfortable ordering them at that particular

23   time.

24   Q.   Okay.  Now would you remove that highlighting, please and

25   would you highlight this section?  Were you complaining to

Taylor - Cross                                    417

1    Doctor Burns that the testing shouldn't be done just to pay

2    for an expensive piece of equipment?

3    A.   Yes.

4    Q.   I believe you testified on direct that it wasn't actually

5    twenty-five percent ownership that you were being offered by

6    Doctor Burns but it was a twenty-four and a half percent

7    ownership?

8    A.   Correct.

9    Q.   And so that you and Doctor Filcheck together could have

10   owned only forty-nine percent of the business?

11   A.   Correct.

12   Q.   And Doctor Burns would still own fifty-one percent of the

13   business?

14   A.   Yes, he would have retained fifty-one percent controlling

15   interest.

16   Q.   And you didn't want to be just a part owner, you wanted

17   to have a bigger share, is that correct?

18   A.   Well, I didn't want to be just another employee like I

19   was without owning twenty-four and a half percent.

20   Q.   If Doctor Burns was willing to let you be more than just

21   another employee, than that would have been okay with you?

22   A.   At that time, no, because I didn't really think the price

23   that he was asking was reasonable.

24   Q.   The price was too high but if the price was right, you

25   would have been willing to be an owner of this clinic, is

Taylor - Cross                                                    418

1    that correct?

2    A.  No.

3    Q.  Am I misconstruing your language here again?  I feel like

4    I would be just another employee who happened to own twenty-

5    five percent?

6    A.  That's what I said.

7    Q.  Could I have page two, please?  When you wrote this to

8    Doctor Burns you said I don't like lying to patients why they

9    need a particular test.  Is that correct?

10   A.  I wrote that in there but I explained why yesterday.

11   Q.  Okay.  Were you lying to patients about why they needed a

12   test?

13   A.  Well, I was uncomfortable ordering, per the protocol,

14   testing that I wasn't trained on either in chiropractic

15   school.  Doctor Burns never sent me or offered to send me to

16   any seminars to learn them.

17   Q.  Doctor, did you use the word lying or did you use the

18   word uncomfortable?

19   A.  I said lying but, again, as I said, I was very angry when

20   I wrote this letter.

21   Q.  Are you saying that you were lying when you said you were

22   lying to the patients?

23   A.  As I said uncomfortable.  If you want to construe that as

24   lying, that's your prerogative.

25   Q.  Okay.  So you didn't mean the words that you wrote on

Taylor - Cross                                                    419

1    this, is that what you're saying, you meant something else?

2    A.  As I said, I wrote it in the heat of anger and I typed

3    all the stuff very quickly.  I probably could have used

4    better terminology, yes.

5    Q.  Okay.  Did you not say especially when they have no

6    complaints that would indicate such a test?

7    A.  I did say that in the letter but, again, I also explained

8    I didn't really understand the testing either.

9    Q.  You didn't understand what complaints mean?

10   A.  No, I didn't understand the SEP.

11   Q.  You are saying, are you not, that the patients had no

12   complaints that would indicate such a test?

13   A.  As, in terms of that particular piece of a quarter and I

14   used that as an example, yes.  I didn't understand the test.

15   Q.  What does no complaints mean to you, Doctor?

16   A.  Well, if you take no complaints by itself, it means the

17   patient did not complain of anything on that day or they said

18   they had no pain or any dysfunction.

19   Q.  And what do the words "indicate such a test" mean to you

20   in this sentence, Doctor?

21   A.  It would be the appropriate use of that test, I guess

22   you're getting at.

23   Q.  No complaints that would justify giving the test is what

24   you meant?

25   A.  Correct.

Taylor - Cross                                              420

1   Q.   Okay.  And then you go on to say "I have to make a

2   medical necessity to an insurance company justifying this

3   testing procedure".  Is that what you say?

4   A.   Correct.  That's what I wrote there.

5   Q.   And by that you were complaining about having to make up

6   the letters of medical necessity to an insurance company for

7   a test a patient didn't need when they had no complaints

8   which would justify such a test?

9   A.   I said I didn't understand the test.  Obviously, Doctor

10  Burns disagreed with me.  He was the senior chiropractor and

11  it was his clinic.  He said the tests had validity.

12  Q.   You were complaining to Doctor Burns that you didn't like

13  making up letters of medical necessity about tests that the

14  patients didn't need?

15       MR. HARRIS:  Your Honor, I object.  He didn't say

16  make up.  He said make a letter.  He said make a letter.

17       THE COURT:  Sustained.

18  Q.   You were complaining to Doctor Burns about having to make

19  a letter of medical necessity to the insurance company

20  justifying a test for which the patients didn't need and

21  didn't have any complaints, which would have justified giving

22  such a test.  Is that not true?

23  A.   I was saying there I was uncomfortable writing a medical

24  necessity letter because I didn't understand the test and,

25  again, I didn't say that the test wasn't positive.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                            421

1   Q.  Is it not true that what you were complaining to Doctor

2   Burns was that you did not like having to write letters of

3   medical necessity to an insurance company to justify the

4   testing procedure for a patient who didn't need the test

5   because they had no complaints, which would indicate such a

6   test?

7   A.  I wrote there that I didn't like sending a medical letter

8   for a test that I didn't understand and writing a test to the

9   insurance company.

10  Q.  I'm sorry, Doctor.  I'm not seeing the word understand in

11  this paragraph at all.

12  A.  Again, you're taking it out of context.  I'm explaining

13  to you what I wrote.

14  Q.  I'm taking your words out of context by reading them

15  almost word for word from this paragraph?

16  A.  Correct.  You take little snippets out of each little

17  paragraph, yes.

18  Q.  Okay.  So you didn't use the word understand.  You meant-

19  -instead you wrote the word lying, is that correct?

20  A.  Correct.

21  Q.  And when you used the word no complaints, you meant

22  something other than no complaints, is that right?

23  A.  No, I meant that.

24  Q.  Okay.  And would indicate such a test.  Did you mean

25  something other than would indicate such a test?

Taylor - Cross                                          422

1    A.  Well, again, for example, if you want to use an example--

2    Q.  No, I just want to know, did you mean something other

3    than the words would indicate such a test when you wrote

4    those words?

5    A.  No, I suppose I did not.

6    Q.  Okay.  Did you mean something other than write a letter

7    of medical necessity when you said make a medical necessity?

8    A.  I believe that's what that implied, yes.

9    Q.  Okay.  And did you mean something other than to an

10   insurance company when you wrote the words to an insurance

11   company?

12   A.  No, I wrote it to an insurance company.

13   Q.  Okay.  And did you mean some word other than justify the

14   testing when you wrote the words justify this testing?

15   A.  No.

16   Q.  Go ahead and remove the highlighting and magnification

17   please.  Would you highlight the first part of that sentence

18   please?  You wrote to Doctor Burns, we are told to keep the

19   patients as long as possible?

20   A.  Correct.  That's what it says right there.

21   Q.  And is it not true that that's what the instructions were

22   at the clinic, to keep the patients as long as possible?

23   A.  Through the four phases of care, through wellness.

24   Q.  Through all four phases?

25   A.  If the patient wanted that type of treatment, yes.

Taylor - Cross                                    423

1   Q.   That was the procedure at the clinic, correct?

2   A.   If patients wanted wellness care, yes.

3   Q.   That was the procedure at the clinic, yes?

4   A.   Yes.

5   Q.   Okay.  And that was a procedure that was put in place by

6   Doctor Halstead and Doctor Burns, is that correct?

7   A.   Partially.  Can I elaborate?

8   Q.   No, thank you.  Remove the highlighting please and remove

9   the magnification.  In this letter you're also complaining

10  about working the extra hours, is that right?

11  A.   Yes.

12  Q.   Okay.  But you were willing to work the extra hours if

13  you could be compensated more for it, is that correct?

14  A.   I'm sure most people would, yes.

15          MR. DONLEY:  Could I have just a moment, Your Honor?

16          THE COURT:  Yes.

17          MR. DONLEY:  No further questions, Your Honor.

18          THE COURT:  All right.  Mr. Jaffe?

19          MR. JAFFE:  Thank you, Your Honor.

20                       CROSS EXAMINATION

21  BY MR. JAFFE:

22  Q.   Doctor Taylor, the first area I'd like to inquire is

23  let's continue on these letters that you sent why I'm

24  feeling, I believe you say frustrated or angry.

25  A.   Okay.  Bothering me, stressed, that kind of thing.

Taylor - Cross                                    424

1   Q.   Is it fair to say that you were concerned about the fact

2   that the focus of the clinic was being changed from

3   chiropractic?

4   A.   Yes.

5   Q.   I think that's what you said in your letter?

6   A.   Correct.

7   Q.   You didn't like the fact that it was moving away from

8   chiropractic to medical and multidisciplinary?

9   A.   Right, that was a more broader scope, right.

10  Q.   And you testified that you went to Palmer College?

11  A.   College.

12  Q.   Steeped in tradition?

13  A.   Yes.

14  Q.   And what you went to chiropractic college for was to be a

15  chiropractor?

16  A.   Correct.

17  Q.   Do you recall having a discussion with Doctor Burns about

18  his response to that letter with you?

19  A.   Excuse me?

20  Q.   Did he ever talk to you about your complaint?

21  A.   Yes.  He kind of briefly went through it point by point

22  in a verbal fashion.

23  Q.   And I think what you said in your letter is this is a

24  chiropractic clinic and the medical doctor is getting paid

25  more money and acting like she owns the place?

Taylor - Cross                                         425

1   A.   Correct.

2   Q.   All right.  And didn't Doctor Burns tell you it's not a

3   chiropractic clinic any more?

4   A.   Yes.  He informed me that, again, although it was a

5   chiropractic clinic when it was Mountaineer Chiropractic it

6   was changing over to become a multidisciplinary practice?

7   Q.   Did he tell you that under the multidisciplinary practice

8   as taught by Ron Halstead the chiropractor wasn't in charge

9   any more?

10  A.   Could you say that again?

11  Q.   The chiropractor is not in charge any more?

12  A.   Did he say that?

13  Q.   That the chiropractor--you, as a chiropractor, weren't in

14  charge any more, even of your own patients?

15  A.   Okay.  Right.  Yes.

16  Q.   And the person that would be in charge, or at least in

17  final charge of the patient, would be the medical doctor?

18  A.   Correct.

19  Q.   And if not the medical doctor, Doctor Burns, as the

20  clinic owner?

21  A.   Correct.

22  Q.   And you, under this new theory, were really nothing more,

23  with all due respect, than a physical therapist?

24  A.   Yes, another employee.

25  Q.   Another employee, or an x-ray technician?

Taylor - Cross                                    426

1   A.   Yes.

2   Q.   Or someone filling out insurance forms?

3   A.   Correct.

4   Q.   And you didn't like that, did you?

5   A.   No, I didn't.

6   Q.   That's not why you went to chiropractic college, is it?

7   A.   Correct.

8   Q.   And you voiced that to Doctor Burns, didn't you?

9   A.   Yes, I did.

10  Q.   Told him that you felt that as a chiropractor you should

11  have more say in the treatment of patients?

12  A.   Yes.

13  Q.   So he said it was his clinic, correct?

14  A.   Correct.

15  Q.   He made the rules?

16  A.   Correct.

17  Q.   And it was his decision that he and the medical doctor

18  would be in charge of every single patient in the clinic,

19  isn't that true?

20  A.   Correct.

21  Q.   Now is it fair to say that when you went to Palmer you

22  didn't learn anything about the specific test equipment

23  called the neurometer, correct?

24  A.   No, I did not.

25  Q.   Is it fair to say that except for a brief explanation by

Taylor - Cross                                    427

1    Doctor Burns, you certainly didn't have the information

2    conveyed by Doctor Katims here as you heard him?

3    A.   No, I didn't.   I learned actually quite a lot from his

4    presentation.

5    Q.   And temperature gradient, you heard the testimony of

6    Doctor Risley, right?

7    A.   Correct.

8    Q.   Heard him say that in his opinion it was appropriate that

9    every patient receive a temperature gradient test every

10   single time they come up?

11   A.   Correct.

12   Q.   Now that wasn't your opinion back then, was it?

13   A.   No, it was not.

14   Q.   What kind of seminars did you attend for the temperature

15   gradient testing prior to your talking to

16   Doctor Finkenbinder?

17   A.   Well, at school I had a complete course in chiropractic

18   instrumentation and that dealt with the various heat or

19   temperature differential studies.   One was called a

20   neurocalometer.   You ran the instrument along side of the

21   spine from top to bottom and that would have a little needle

22   that would deflect to the cold side and that would indicate a

23   possible potential subluxation.   You've heard the term

24   subluxation before, the bone being out of place putting

25   pressure on the nerve.

Taylor - Cross                                    428

1    Q.   Doctor Taylor, let me ask, what kind of training did you

2    receive on the temperature gradient test that you were

3    administering, or you didn't administer, that was being used

4    at the clinic from the time that you were working there?

5    A.   You're talking about that specific machine?

6    Q.   Correct.

7    A.   Just a verbal instruction showing the dermatome sheet.

8    Q.   Did you take any courses on the use of the temperature

9    gradient testing after you left chiropractor college?

10   A.   No, I did not.

11   Q.   Is the same true for diagnostic ultrasound?

12   A.   Correct.

13   Q.   Is it fair to say that you did not have a full

14   understanding of the importance of these tests during the

15   time you were working at Priority One?

16   A.   Definitely.   Those are more medically aligned tests.

17   Q.   More medically aligned?

18   A.   Right.

19   Q.   And you didn't receive testing on medically aligned tests

20   in chiropractic college?

21   A.   Brief overviews on those.

22   Q.   Do you remember the Government showed you an exhibit of

23   your notes from Doctor Halstead's discussion on the ten-point

24   exam?

25   A.   Correct.

Taylor - Cross                                                    429

1   Q.  Do you remember that?

2   A.  Yes.

3   Q.  I think you said that after you took those notes you put

4   them in a binder and probably filed them away somewhere?

5   A.  Correct.

6   Q.  Let me ask you this.  Before you gave a ten-point exam,

7   would you look at that--those notes you took to refresh your

8   recollection of how you give a ten-point exam?

9   A.  No, I would not.

10  Q.  Did you--if you didn't use the notes, then how did you

11  know how to give a ten-point exam?

12  A.  Just by Doctor Halstead's brief introduction to that.

13  Q.  Did you always use the word severely twisted in every

14  single ten-point exam?

15  A.  No.

16  Q.  How about if the patient didn't have a severely twisted

17  vertebra, would you tell them they have a severely twisted

18  vertebra?

19  A.  No, I would not.

20  Q.  Did you tell Mr. Muth that he had a severely twisted

21  vertebra?

22  A.  No.  I told him in my estimation it was mild to moderate.

23  I never used severe at all.

24  Q.  All right.  Did you ever tell patients that they had a

25  moderately twisted or a mildly twisted vertebra?

Taylor - Cross                                    430

1   A.   Yes, definitely.

2   Q.   Even on the ten-point exam?

3   A.   Yes.

4   Q.   Are you saying that Doctor Halstead told you to always

5   use the word severely twisted on every single patient that

6   you ever saw on a ten-point exam?

7   A.   I took that as a learning tool, one example of many how

8   you could do it.

9   Q.   That was your understanding of it?

10  A.   Correct.

11  Q.   Your understanding was not that Halstead was saying on

12  every single patient you have to use the word severely

13  twisted?

14  A.   Exactly.

15  Q.   Okay.  I think you also testified--we had this example--

16  the other handwritten note you had was of your notes from

17  2/4/97 about the protocols.  Do you remember that?

18  A.   The rehab protocols?

19  Q.   The rehab protocols?

20  A.   Correct.

21  Q.   I think you also said you put those in a binder and

22  probably filed them away?

23  A.   Yes, I did.

24  Q.   Before you saw every patient, did you take those notes

25  and look at them and study them and write down what was on

Taylor - Cross                                      431

1    those notes?

2    A.  No, I did not.

3    Q.  You used those as guidelines, didn't you?

4    A.  I used those as guidelines.  I figured that was more of a

5    physical therapist's job.

6    Q.  Now you testified that at the Burns clinic if you didn't

7    do a particular test that someone ordered they would dock

8    your pay the six bucks for the patient, is that correct?

9    A.  Yes, Doctor Burns or Bill Twigg.

10   Q.  Do you have any information that that's Doctor Halstead's

11   idea?

12   A.  No, I do not.

13   Q.  Have any information that Doctor Halstead even knew about

14   that?

15   A.  No.

16   Q.  Now you recall that we showed your transcript from Palmer

17   College?

18   A.  Correct.

19   Q.  All right.  I don't remember seeing any courses on how to

20   operate in an MD/DC environment.  Did you ever take a course

21   about that?

22   A.  There were none.

23   Q.  So you didn't learn that at chiropractor college?

24   A.  No, I did not.

25   Q.  All right.  We've talked a little bit about these

Taylor - Cross                                                              432

1    jurisprudence, I forgot the word, practice--practice

2    something courses, this two-credit course?

3    A.   Right.

4    Q.   Let me--you took three courses on practice management or

5    something?

6    A.   Yeah, very cursor.

7    Q.   Let me ask you this.  Based on these courses, these three

8    courses you took in college, did you feel competent to run a

9    chiropractic practice on your own?

10   A.   No.  That's why I wanted to become an associate doctor.

11   Q.   Is it common for chiropractors out of college--

12   chiropractic school, to associate themselves with a more

13   experienced chiropractor?

14   A.   Yes.

15   Q.   Why do they do that?

16   A.   To learn the ropes essentially.

17   Q.   In fact, you've been a chiropractor for ten years?

18   A.   Yes, since 1991.

19   Q.   Okay.  You went to Palmer?

20   A.   Correct.

21   Q.   Very esteemed school?

22   A.   Yes.

23   Q.   Do you know other chiropractors around the country?

24   A.   Yeah.

25   Q.   Isn't it true that most chiropractors who come out of

Taylor - Cross                                             433

1    chiropractic school work for other people first to learn the

2    ropes, as it were?

3    A.   Yes.

4         MR. DONLEY:   Objection.

5    Q.   Based on your knowledge?   Based on your knowledge and

6    experience, isn't that the way most--

7    A.   Yeah, most of my friends did do that.   Exactly.

8    Q.   Okay.   We had some discussion, I just want to clear up.

9    Something about the electro-diagnostic devices.   I don't

10   think you had an opportunity to explain that.   What is your

11   definition of an electro-diagnostic device?

12   A.   Essentially I thought it meant it plugged into the wall.

13   Q.   Okay.   Now on direct your lawyer took you through some of

14   Rebecca Price's notes.   Do you recall that?

15   A.   Yes, I do.

16   Q.   Do you recall her asking--do you recall him asking you

17   questions under what's called assessment, under the SOAP

18   categories, SOAP assessment?

19   A.   Yes.

20   Q.   Do you recall some, and I'm not going to call up all

21   these things.   Is it fair to say--did you recall from the

22   assessment that Doctor Price wrote on some of the patient

23   forms that the patient was feeling good?

24   A.   Yeah.   Improving, feeling better, yes.

25   Q.   And that was the goal of your treatment, wasn't it?

Taylor - Cross                                    434

1    A.  Correct.

2    Q.  So, at least with respect to the patients who you were

3    treating that we discussed on direct, some of these patients

4    seemed to have some beneficial result from what you're doing?

5    A.  Correct.

6    Q.  I guess that made you feel pretty good?

7    A.  Yes.

8    Q.  Because that's why you became a chiropractor?

9    A.  Exactly.

10   Q.  Do you know whether the Priority One Clinic had a form

11   authorizing medical treatment?

12   A.  I don't believe they did.

13   Q.  All right.  Do you feel that you're responsible for

14   obtaining the patient's consent to see a medical doctor?

15   A.  No.  I don't remember when I went to a medical doctor

16   signing one.

17   Q.  Now on cross-examination they asked you certain questions

18   regarding Workers' Compensation.  Do you recall generally

19   that topic?

20   A.  Yes.

21   Q.  All right.  I believe the substance of your answer was

22   that the Workers' Compensation patients did not receive any

23   neurometers or temperature gradient testing, right?

24   A.  Correct.

25   Q.  Okay.  Let me ask something.  You know a little bit about

FORM CSR- LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Taylor - Cross                                                    435

1   Workers' Compensation in West Virginia, don't you?

2   A.   Yes.

3   Q.   Workers' Compensation puts out what they call treatment

4   guidelines, don't they?

5   A.   Yes, they do.

6   Q.   Workers' Compensation basically tells you, the

7   chiropractor, what treatments and diagnostic tests you have

8   to use, correct?

9           MR. DONLEY:   Objection, Your Honor, can we have a

10  time frame?

11          MR. JAFFE:   Based on his knowledge.

12          THE COURT:   Sustained.

13          MR. JAFFE:   During the period--

14          THE COURT:   Rephrase the question.

15          MR. JAFFE:   Thank you, Judge.

16  BY MR. JAFFE:

17  Q.   During the period, let's focus our attention between 1993

18  and 1997, all right.   You had some familiarity with the

19  Workers' Compensation rules, right?

20  A.   Yes.

21  Q.   All right.   They issued something called, what they call

22  Treatment Guidelines, correct?

23  A.   Correct.

24  Q.   Isn't it true that Workers' Compensation basically tells

25  the chiropractors what treatment and what tests they are

Taylor - Cross                                    436

1    required to do?

2    A.   Yes.

3    Q.   And they--and basically you're not allowed to do tests

4    and therapies that aren't on those guidelines, correct?

5    A.   Correct.

6    Q.   And that's the reason why no patient that you treated for

7    Workers' Compensation at the clinic ever received a

8    neurometer test, isn't it?

9    A.   Correct.

10   Q.   And that's the reason why no patient at your clinic, who

11   was there for Workers' Compensation, ever received a

12   temperature gradient test?

13   A.   Correct.

14   Q.   Because Workers' Compensation Board said not to do it?

15   A.   That is true.

16   Q.   Let's talk a little bit about the ADL, the activity of

17   daily living.  Isn't it true that under the ADL you are

18   required to interview patients?

19   A.   I wasn't aware of that.

20   Q.   Well, what did you do with the patients?  Did you talk to

21   the patients?

22   A.   Oh, yes.

23   Q.   Did you ask them questions?

24   A.   Yes, I did.

25   Q.   Did they give you answers?

Taylor - Cross                                                437

1    A.  Correct.

2    Q.  All right.  And if a patient said they were having

3    difficulty doing certain things, would you respond to them?

4    A.  Yes.  I might make suggestions.

5    Q.  You might make suggestions.  Now, let me ask something.

6    How would you determine if those suggestions were implemented

7    that you made during the first time?

8    A.  I would have to follow up and ask them again.

9    Q.  By doing another ADL?

10   A.  Correct.  Seeing if the same things were restricted and

11   limited.

12   Q.  So it's not really fair to say, as I think the Government

13   is saying, that all you do is the patient fills out this

14   whole form and you do nothing?

15        MR. DONLEY:  Objection.

16        THE COURT:  Sustained.

17        MR. JAFFE:  I understand.  Thank you, Judge.

18   BY MR. JAFFE:

19   Q.  Did you have some role in interviewing the patient and

20   giving some advice to the patient regarding activities of

21   daily living?

22   A.  Yes.

23   Q.  And that would be reflected in the ADL notes?

24   A.  Correct.

25   Q.  Now what happens if a patient said that they didn't have

Taylor - Cross                                                    438

1   any problems adjusting to daily living.  What would you put

2   down then?

3   A.  I would put no restrictions.

4   Q.  All right.  Now if the patient had a restriction, what

5   would you do?

6   A.  I would add that to the note.

7   Q.  That's your understanding of how an ADL works?

8   A.  Correct.

9   Q.  I have to ask you some questions about some documents

10  that I'm a little confused about.  Let's talk about--these

11  are documents that came in evidence--they're now in evidence,

12  the 126.  Can we pull up 126, page one?  Is this your

13  handwriting in this form?

14  A.  Yes, it is.

15  Q.  These are notes that you took and can we go to page two?

16  The whole document's in evidence, I believe, right?  Mr.

17  Government, the whole document's in evidence, this is page

18  two?

19       MR. DONLEY:  Your Honor, I didn't realize he was

20  addressing me.

21       MR. JAFFE:  I'm sorry, Mr. Donley, I apologize.

22       MR. DONLEY:  As I understand, when an exhibit's

23  admitted, it's admitted.

24       THE COURT:  That's correct.

25       MR. JAFFE:  I just wanted to make sure that we're

Taylor - Cross                                           439

1   not publishing something.

2   BY MR. JAFFE:

3   Q.   Is that also your handwriting on page two?

4   A.   Yes, it is.

5   Q.   See where it says "therapeutic 4W" halfway down?

6   A.   Yes, I do.

7   Q.   And it says, what, 15W?

8   A.   Correct.

9   Q.   It says "S" in a circle?

10  A.   Right, that would mean stop.

11  Q.   Stop.  Stop what?

12  A.   Stop the rehab at that time.

13  Q.   Let me ask something.  Let's just take a look at that

14  same thing, therapeutic 4W.  What would happen if the--what's

15  your understanding of what would happen if the first time you

16  run the test it's negative?

17  A.   Well, then we do not certainly need to do rehab.

18  Q.   Okay.  Well, but it's written 4W?

19  A.   Right.

20  Q.   So are you telling this jury that 4W is, maybe it's 4W

21  but if the patient doesn't need it, then they don't do it?

22  A.   Right.  It's a general guideline.

23  Q.   General guideline.  Now if we can go to 127, which I

24  believe is also admitted.  And I think you testified that to

25  the best of your knowledge this is the handwriting of Bill

Taylor - Cross                                              440

1   Twigg?

2   A.  I believe so, yes.

3   Q.  All right.  Was this form--what's the relationship, the

4   time relationship between this form and the first page of

5   126, which is the same form with your notes?  Was that done

6   at the same time?

7   A.  It was probably done during the same meeting.

8   Q.  The same what?

9   A.  Meeting.

10  Q.  At the same meeting.  And so 126--127 is Bill Twigg's

11  notes and 126 is your notes, right, of the same meeting to

12  the best of your knowledge?

13  A.  Yes.

14  Q.  Okay.  Now as I understand it, Doctor Halstead met with

15  you once and talked about the ten-point exam, right?

16  A.  Yes, just maybe a half-hour.

17  Q.  Right.  Because I think you testified that he was on his

18  way to the airport?

19  A.  Correct.

20  Q.  And I know he met with you on 2/4/97, correct, because

21  those are the date for your notes, right?

22  A.  Correct.

23  Q.  Do you recall any other specific meetings with Doctor

24  Halstead?

25  A.  Not that I can recall right now.

Taylor - Cross                                         441

1   Q.  All right.  Let me ask something.  Isn't it true that

2   this was Bill Twigg explaining to you, 127 is Bill Twigg

3   notes, right?

4   A.  Right.

5   Q.  126 are your notes for the same meeting?

6   A.  Correct.

7   Q.  This is Bill Twigg explaining to you things about the

8   protocol, correct?

9   A.  I believe so.

10  Q.  Do you have any evidence or any recollection that Doctor

11  Halstead was even at that meeting that Bill Twigg was

12  explaining to you the protocol?

13  A.  I don't really recall, sorry.

14  Q.  All right.  Now do you recall the testimony of Mr. Twigg

15  saying that the clinic had hid from Doctor Halstead the fact

16  that they weren't collecting co-pay?

17          MR. DONLEY:  Objection.

18          MR. JAFFE:  I'm asking if he recalls testimony in

19  the case.

20          THE COURT:  What's the objection to?

21          MR. DONLEY:  I believe he's misstating the evidence,

22  Your Honor.

23          THE COURT:  Could you rephrase the question?

24          MR. JAFFE:  Yes.

25  BY MR. JAFFE:

Taylor - Cross                                    442

1    Q.   Let me just go this way.  You recall Doctor Halstead's

2    testimony, correct?

3    A.   Correct.

4    Q.   Basically.  Do you recall him testifying about a

5    conversation he had with Bill Twigg where Mr. Twigg said that

6    the clinic, that Burns was lying to him?  Do you remember

7    that testimony?

8    A.   Can you be a little more specific, please?

9    Q.   Do you remember a--you heard Doctor Halstead's testimony?

10   A.   Correct.

11   Q.   All right.  Do you recall him saying that he had a

12   conversation with Bill Twigg after February--after the clinic

13   raid?

14   A.   Correct.

15   Q.   That Twigg--that Burns had been lying to Halstead all

16   along?

17   A.   Yes, I do now.

18   Q.   Let me ask you this.  After February of 1997, did you

19   ever see Doctor Halstead again at the clinic?

20   A.   No, not to my recollection.

21   Q.   Now you don't remember seeing him.  And how about, do you

22   ever remember--do you have any information that the clinic

23   was ever able to purchase forms from Doctor Halstead after

24   that--after that February visit?

25   A.   Could you say that again, please?

Taylor - Cross                                                443

1   Q.   Do you have any--do you have any information about the

2   clinic's attempt to secure forms from Doctor Halstead through

3   the use of clinic employees in Pennsylvania?  Do you know

4   anything about that?

5   A.   No, I wasn't in charge of purchasing forms, no.

6   Q.   Isn't it true that after Doctor Halstead heard from Twigg

7   that Burns was lying about all this stuff, Halstead refused

8   to come to Burns' clinic any more?  That's really what

9   happened, isn't it?

10          MR. DONLEY:   Objection, Your Honor.

11          THE COURT:   Sustained.

12          MR. JAFFE:   One moment, Your Honor.

13   BY MR. JAFFE:

14   Q.   Did you--let me ask you this.  You know you're charged

15   with conspiracy?

16   A.   Correct.

17   Q.   To commit health care fraud?

18   A.   Yes.  Conspiracy count, yes.

19   Q.   Did you conspire with my client to commit health care

20   fraud?

21   A.   No, I did not.

22   Q.   Did you try to give your patients as good as service as

23   you can give?

24   A.   The best possible--the best possible I could give.

25   Q.   Did Doctor Halstead in any way ever impede you from doing

Taylor - Cross                                    444

1   that with your patients?

2   A.  No, he did not.

3           MR. JAFFE:  Thank you.  No further questions.

4           THE COURT:  All right.  Mr. Zimarowski?

5           MR. ZIMAROWSKI:  Yes, Your Honor.  And, Your Honor,

6   I can finish within the next ten minutes.

7           THE COURT:  Thank you.

8           MR. ZIMAROWSKI:  For your scheduling purposes.

9                       CROSS EXAMINATION

10  BY MR. ZIMAROWSKI:

11  Q.  Scott, very briefly, I've only got about a half a dozen

12  questions I want to ask.  First off, you went through a lot

13  of--Mr. Donley asked you about several of the visits by

14  Doctor Halstead, correct?

15  A.  Correct.

16  Q.  Okay.  Was--at any time during any of this period of time

17  when Doctor Halstead was consulting to the clinic, did you go

18  over any of those inter-office visit memos, the IOV's that

19  we've been talking about for three weeks now?

20  A.  No.

21  Q.  Did you ever see them?

22  A.  No.

23  Q.  Burns or Twigg ever share them with you?

24  A.  No.

25  Q.  What about the statistics?  Did Burns and Twigg ever

Taylor - Cross                                                    445

1   share with you any of the statistical information?

2   A.   No, they wouldn't.

3   Q.   What do you mean "they wouldn't"?

4   A.   Well, I guess it would show how much he was making and I

5   think he was uncomfortable with everybody realizing how much

6   he made.

7   Q.   Okay.  Let's--a couple of loose ends here.  Call up

8   Exhibit Number 08-020.  08-020.  Now this is the activities

9   for daily living form that I know have gone over endlessly.

10  Are these the signature areas?

11  A.   Yes, correct.

12  Q.   And there appears to be--can you identify the signature

13  after the word patient?

14  A.   Yes, the patient's name.

15  Q.   That's--Scott, keep back farther.  You've just been

16  killing me, okay.  And the doctor, who's the doctor that

17  signed?

18  A.   Doctor Filcheck signed that one.

19  Q.   Okay.  And this therapist, who's that?

20  A.   Jemia Filippine, the physical therapist.

21  Q.   And she's the young lady that testified here earlier, oh,

22  a week and a half ago?

23  A.   Yes, she was and is.

24  Q.   Okay.  She's a physical therapist?

25  A.   Correct.

Taylor - Cross                                    446

1    Q.   And these are the components of the activities for daily

2    living, are they not?

3    A.   Yes, they are.

4    Q.   The patient input, the chiropractor input and the

5    physical therapist input?

6    A.   Correct.

7    Q.   All right.  Lights up, please.  Thank you.  A couple

8    other quick questions, Scott.  Do you have anything to do

9    with who, meaning which entity bills, whether it's Doctor

10   Price, Doctor Medina, Priority One, Mountaineer Chiropractic,

11   do you have any input in that at all?

12   A.   No, I did not.

13   Q.   Did you have any input into what is billed, whether or

14   not something is written off or billed or waived or just

15   trashed?

16   A.   No input whatsoever.

17   Q.   Okay.  Do you have any input into how things were billed?

18   A.   No, I did not.

19   Q.   Who, what, when--how about when.  Did you have any input

20   into when things were billed?

21   A.   No, I did not.

22   Q.   Okay.  Scott, did you, just so we understand this.  I

23   know you've been rather adamant about this position, but I

24   want to understand and I want the jury to understand.  Has

25   there been any time during the 1993 to '97 period where you

Taylor - Cross                                              447

1   told a patient they had a condition that they didn't have?

2   A.  No.  I always thought that they had legitimate complaints

3   and problems.

4   Q.  They had a treatable condition?

5   A.  A treatable condition, correct.

6   Q.  And if someone walked in with a totally straight spine,

7   have you ever told them they had scoliosis?

8   A.  No, I have not.

9   Q.  If they came in with, I'm getting off in my, out of my

10  area but if they didn't have a treatable condition, would you

11  tell them they had a condition that required treatment?

12  A.  No, I would not.

13  Q.  Do you know if Doctor Filcheck ever said anything like

14  that?

15  A.  I don't believe he ever did.

16  Q.  All right.  Last point, real quick, Scott.  Just as a

17  prerequisite here, Mr. Donley went over some employment

18  contracts with you, did he not?

19  A.  Yes, he did.

20  Q.  Actually there were three, were there not?

21  A.  Correct.

22  Q.  And just for any of the note takers in the jury, it's 01-

23  02 was your first contract.  Don't call that up; I don't need

24  that one.  01-04 was the second contract and 01-16 was the

25  third contract, correct?

Taylor - Cross                                                    448

1    A.   I believe so.

2    Q.   Okay.  Well, let me do it this way.  The first contract

3    was for, I think a one-year contract?

4    A.   The first one was for three years with Mountaineer.

5    Q.   Okay.  And the second one was for a three-year contract,

6    correct?

7    A.   I believe so.

8    Q.   And the last one, as Mr. Donley brought up, was for a

9    one-year contract?

10   A.   One-year with renewal thereafter one year.

11   Q.   And, again, I don't want to turn the lights off, but all

12   those contracts, particularly the first ones, had what we

13   call restrictive covenants where you could not, if you left

14   employment, could not practice within a geographical area or

15   time frame, did they not?

16   A.   Yes, they did.

17   Q.   And they also had financial penalties, did they not?

18   A.   Yes, they did.

19   Q.   I think your first one had a sixty thousand dollar

20   financial penalty?

21   A.   Correct.

22   Q.   Sixty thousand dollars?

23   A.   Correct.

24   Q.   All right.  Let's call up 01-004, if we could, at page

25   two.  Scott, we've identified this as the second contract

Taylor - Cross                                                                    449

1   already.  This is the second contract that you signed, second

2   three-year contract.

3   A.   Okay.

4   Q.   I believe in 1995, May of '95.

5   A.   Okay.

6   Q.   According to the exhibit.  Look at paragraph number five.

7   That was the paragraph that Mr. Donley showed you, correct?

8   A.   Correct.

9   Q.   Where you had six dollars per patient, seven dollars per

10  patient, things of this nature?

11  A.   Yes.

12  Q.   Okay.  Let's blowup the paragraph right above it,

13  paragraph number four in its entirety, please and blow it up.

14  Scott, is this a clause in your contract?

15  A.   Yes, it is.

16  Q.   By the way, you're not a lawyer are you?

17  A.   No, I'm not.

18  Q.   Okay.  And you just have to read language as it's just

19  simply printed, right?

20  A.   Correct.

21  Q.   Will you read this paragraph to the jury please?

22  A.   Yes.  "4.  Duties and supervision.  The corporation

23       shall assign to the chiropractic practitioner

24       various of its patients for chiropractic treatment.

25       The chiropractic practitioner shall perform such

Taylor - Cross                                           450

1          diagnosis and treatment of said patients assigned to

2          him to the best of his ability in accordance with

3          the standards of the profession and consistent with

4          any rules and regulations promulgated by the

5          corporation dealing with the general treatment of

6          patients provided; however, that the chiropractic

7          practitioner's performance shall be subject to the

8          ultimate control and supervision of the corporation.

9          Chiropractic practitioner understands and

10         acknowledges that if he or she fails to perform

11         diagnosis and treatment of any patient to the best

12         of his or her ability or fails to adhere to any

13         promulgated by the corporation, that he may be in

14         the--well it says discretional but I assume that

15         means discretion "of the corporation be reviewed

16         from treating such patient."

17    Q.   Thank you. Lights up.  Scott, is there any doubt in your

18    mind as to who's in charge?

19    A.   None whatsoever.

20    Q.   And who was in charge?  Who's the corporation that was

21    made reference to in those duties and responsibilities?

22    A.   Doctor Burns.

23    Q.   Okay.  And Mr. Twigg?

24    A.   And Mr. Twigg and Doctor Medina.

25    Q.   And they talked about procedures.  Actually they made

Taylor - Cross                                            451

1    reference even to protocols in this thing, another term for

2    what was called protocol standard, right?

3    A.   Correct.

4    Q.   All right.  And those were what you're required to adhere

5    to by contract, were you not?

6    A.   Correct.

7    Q.   And, again, Burns and Twigg were in charge and they

8    called all the shots, they ordered the tests, they ordered

9    the protocols and you and Doctor Filcheck simply implemented

10   the plans, the protocols, pursuant to the terms and

11   conditions of your contract, correct?

12   A.   Correct.

13   Q.   Did you conspire with these guys to make up these

14   protocols and terms and conditions?

15   A.   No, I did not.

16        MR. ZIMAROWSKI:  Your Honor, let me--can I just have

17   one minute?  I may not have any more questions.

18        (Pause)

19        MR. ZIMAROWSKI:  Your Honor, I'm told the Government

20   is going to object to my using of a document so I'm not going

21   to even go there.

22        THE COURT:  All right.  Mr. Harris, do you have any

23   redirect?

24        MR. HARRIS:  No, Your Honor.

25        THE COURT:  All right.  Thank you.  Doctor Taylor,

Taylor - Cross                                    452

1    you may step down and return to your seat.

2         (Witness excused)

CERTIFICATE


I, Linda L. Bachman, Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct partial transcript of the proceedings had in the above-styled action on January 28-30, 2003 as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 9th day of March, 2004.


*Linda L. Bachman*
LINDA L. BACHMAN, CCR, CVR
Official Reporter, United States
District Court for the Northern
District of West Virginia