FILED   3194

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA   MAR 1 1 2005

UNITED STATES OF AMERICA,      )

                    Plaintiff,  )

      Vs.                      ) CRIMINAL ACTION NO. 1:01CR45

ROBERT B. BURNS. JR., ET AL.,)

                Defendants. )

Day 15 & 16 - February 3-4, 2003

     Proceedings had in the Trial of the above styled action on February 3 and 4, 2003, before Honorable Irene M. Keeley, Chief Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE GOVERNMENT:      ROBERT F. ADAMS, ESQUIRE
                           PATRICK DONLEY, ESQUIRE
                           U.S. Department of Justice
                           1400 New York Avenue, NW
                           Washington, DC   20038
                           202-305-7413

FOR DEFENDANT FILCHECK: JAMES B. ZIMAROWSKI, ESQUIRE
                           265 High Street
                           Morgantown, West Virginia  26505
                           304-292-7492

FOR DEFENDANT TAYLOR:   JEFF HARRIS, ESQUIRE
                           P.O. Box 4522
                           Morgantown, West Virginia   26504
                           (304) 292-4357

FOR DEFENDANT HALSTEAD: RICHARD A. JAFFE, ESQUIRE
                           5 Greenway Plaza - Suite 1710
                           Houston, Texas   77046
                           713-626-3550

Proceedings recorded by stenomask, transcript produced by official court reporter.

---

**LINDA L. BACHMAN, CCR, CVR**
**U.S. COURT REPORTER**
**P.O. BOX 969**
**CLARKSBURG, WEST VIRGINIA   26302-0960**
**(304) 622-0177**

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6513

3195

**INDEX**

Jury Charge                                           Page   3199

Government Closing - Mr. Donley                       Page   3241

Defendant Halstead Closing - Mr. Jaffe               Page   3290

Defendant Taylor Closing - Mr. Harris               Page   3325

Defendant Filcheck Closing - Mr. Zimarowski         Page   3355

Government Closing - Mr. Adams                        Page   3369

Verdict                                              Page   3392


February 4, 2003                                     Page   3391

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3196

P R O C E E D I N G S

(02-03-2003, 8:37 o'clock a.m., defendants present)

THE COURT:  Do you have any issues with the form?

MR. JAFFE:  We're satisfied with respect to the form.

THE COURT: Okay.  I'm sorry to be so late giving you the charge; it's been a little confused back there, but we-- the changes to the deliberate ignorance instruction are-- begin on page forty-four and the only other changes were a modification to the statute on the elements of conspiracy on both mail fraud, health care fraud and also money laundering but they are things we talked about on Friday.  May I have the verdict form, Carole, please?

On the verdict form, you'll note that as to the Counts Two through Fifteen each Count is one page and I think that looks pretty much like what you saw on Friday.  When you get to the Halstead counts on Counts Seventeen through Twenty-Six, we introduced that on the first--page eighteen of the verdict form and each of those following pages, Mr. Jaffe, is just a chart with the opportunity for the verdict.

MR. JAFFE:  I've reviewed it and it's consistent with our earlier discussions.

THE COURT:  Is it okay?

MR. JAFFE:  Yes, Your Honor.

THE COURT:  All right.  Is there any matters--I know

3197

1    you haven't really had a chance to look this final charge

2    over but if you'll just look at that deliberate ignorance one

3    because I think that's where the major change is and that's

4    on page forty-four and what I did, I went and read Mr.

5    Jaffe's case and then we looked at some other cases, I think

6    *Hale* is the one that he cited and there--the element of

7    knowledge of the unlawfulness of the plan or scheme, I think

8    he rightly pointed out needed to be emphasized and I tried to

9    do that in the body of that and then I added a final

10   paragraph.

11        MR. JAFFE:  Judge, I believe and also I think that

12   accurately states what I had in mind.

13        THE COURT:  Okay.  Thank you.  Does the Government

14   have any objection to that amendment to the charge on

15   deliberate ignorance?

16        MR. ADAMS:  No, Your Honor.

17        THE COURT:  Okay.  Are we ready to bring the jury

18   in?

19        MR. HARRIS:  Your Honor, could--just quickly give us

20   a rundown now of how we're going to do this?

21        THE COURT:  Uh-huh.  I'm going to charge them; going

22   to give them a ten-minute recess because that's how long Ted

23   needs with you all to set up for the close; then bring them

24   back in.  We're going to do the Government's opening part of

25   its close and my recollection is that comes with Mr. Jaffe

3198

1    and then we take a ten-minute recess and then we have your

2    close and the rebuttal.

3            MR. JAFFE:  All before lunch, Judge?

4            THE COURT:  Hopefully, but if not--

5            MR. ZIMAROWSKI:  Am I--

6            THE COURT:  I said both of you.  If not, then what

7    we'll do is recess after you, maybe that's what we're going

8    to have to do; otherwise, I'll start and you all will be back

9    on it and then we'll come back and do the two final closes

10   and the rebuttal.  Is that all right?

11           MR. HARRIS:  That's fine, Your Honor.

12           THE COURT:  Okay.  Very good.  We can bring the jury

13   in.

14       (Jury in 8:42 a.m.)

15           THE COURT:  Good morning ladies and gentlemen.

16   Please be seated.  Are your notebooks on your chairs?  That's

17   the beginning of the final charge but I'm going to wait for

18   the notebooks so that if you want to take notes during the

19   charge you can.  We are also supposed to have copies for you.

20       Ladies and gentlemen, what I'm going to do is I'm going

21   to begin the charge with regard to the general information on

22   the case, which will repeat in part some of what I told you

23   at the beginning of the case.  During that time, hopefully,

24   the charge will be copied and then I can provide to you a

25   copy of that charge during just a minute recess and then

3199

1    you'll have it before I give you the substantive law on the

2    case.

3        All right.  Have to wait for Mr. Philyaw, however, for

4    the power point.

5                            JURY CHARGE

6        THE COURT: You have heard the evidence in the case,

7    and I must now instruct you as to the law applicable to this

8    case.  The final arguments of counsel will follow these

9    instructions.

10       As you know, the trial function of the judge is to

11   preside in such manner that proper and relevant evidence is

12   presented, and to instruct the jury as to the law applicable

13   to the case.

14       Your function as the jury, on the other hand, is to

15   determine from the facts from a fair--determine the facts

16   from a fair consideration of the evidence presented in the

17   case and not from anything else.  The evidence should be

18   considered and viewed by you in the light of your own

19   observations and experience in the ordinary affairs of life.

20       You have been chosen and sworn as jurors in this case to

21   try the issues of fact presented by the allegations of the

22   Indictment as to the defendants and the denial made by their

23   "Not Guilty" pleas.  You are to perform this duty without

24   bias or prejudice to any party.  The law does not permit you

25   to be governed by conjecture, suspicion, surmise, sympathy,

3200

1  speculation, prejudice or public opinion.  Nor may your

2  verdict be based on any of these things.  The Government, the

3  defendants, William C. Filcheck, Scott G. Taylor and Ronald

4  L. Halstead, and the public expect that you will carefully

5  and impartially consider all the evidence in the case, and

6  follow the law as stated by the Court.

7      As I earlier indicated to you, an indictment is but a

8  formal method of accusing defendants of a crime.  It is not

9  evidence of any kind against any of the individual

10  defendants.  It does not create any presumption or permit any

11  inference of guilt.  It is merely the formal means by which

12  the Government accuses individuals of a crime in order to

13  bring them to trial.  The defendants have answered the

14  charges in this case by pleading not guilty and you must not

15  be prejudiced against them because an indictment has been

16  filed.

17      There are two types of evidence from which you may find

18  the truth as to the facts of a case -- direct evidence and

19  circumstantial evidence.

20      Direct evidence is the testimony of one who asserts

21  actual knowledge of a fact, such as an eyewitness.

22      Circumstantial evidence is proof of a chain of facts and

23  circumstances indicating some further fact which, in a

24  criminal case, may bear on the guilt or innocence of a

25  defendant.

3201

1       The law makes no distinction between the weight to be

2   given to either direct or circumstantial evidence.  Nor is a

3   greater degree of certainty required of circumstantial

4   evidence than of direct evidence.

5       Unless you are otherwise instructed, the evidence in this

6   case consists of the SWORN and STIPULATED testimony of the

7   witnesses and all exhibits received in evidence.

8       The attorneys for the parties during the trial and in the

9   presence of the defendants can stipulate or agree as to

10  certain matters.  In this trial, you will recall, the parties

11  have stipulated as follows:

12          The last three audiotapes made by Special Agent

13  Robert Muth regarding his participation in an undercover

14  investigation at Priority One are not available.

15      Any evidence as to which an objection was sustained by

16  the Court, and any evidence ordered stricken by the Court,

17  must be entirely disregarded.

18      Unless you are otherwise instructed, anything you may

19  have read, heard, or seen outside the courtroom is not

20  evidence, and must be entirely disregarded.

21      You are to consider only the evidence in the case.  But

22  in your consideration of the evidence, you are not limited to

23  the bald statements of the witnesses.  In other words, you

24  are not limited solely to what you saw and heard as the

25  witnesses testified.  You are permitted to draw, from facts

3202

1    which you find have been proved, such reasonable inferences

2    as you believe are justified in the light of experience.

3         As I have also indicated to you, the statements,

4    questions and argument of counsel are not evidence in the

5    case.  They are intended only to assist the jury in

6    understanding the evidence and the contentions made.

7         Further, no remark, ruling, question, remark or comment

8    which I have made during the course of the trial was intended

9    to indicate my opinion as to how you should decide the case

10   or to influence you in any way in your determination of the

11   facts, nor should you draw any inferences from anything I may

12   have said.  You alone are to judge for yourselves the

13   questions of fact in this case.

14        If any reference by the court or by counsel to matters of

15   testimony or exhibits does not coincide with your own

16   recollection of that evidence, it is your recollection which

17   should control during your deliberations and not the

18   statements of the court or of counsel.

19        You are the sole judges of the evidence received in this

20   case.

21        In resolving the issues in this case, you must bear in

22   mind that, under the law of our land, the defendants, William

23   C. Filcheck, Scott G. Taylor, and Ronald L. Halstead, are

24   presumed to be innocent - and this presumption of innocence

25   remains with them at every stage of the trial.  Thus, each

3203

1    defendant, although accused, begins the trial with a "clean

2    slate" -- with no evidence against him.  The presumption of

3    innocence alone is sufficient to acquit a defendant, unless

4    you are satisfied beyond a reasonable doubt of his guilt

5    after careful and impartial consideration of all the evidence

6    in the case.

7        In this case, as in every criminal case, the burden of

8    proof is upon the Government to establish, first, the fact

9    that the crimes charged were committed and second, that the

10   defendants on trial are guilty of the commission of each of

11   the particular crimes as charged, beyond a reasonable doubt.

12       This burden never shifts to the defendants, but remains

13   upon the Government throughout the trial.

14       A "reasonable doubt" means in law just what the words

15   imply, namely, a doubt based upon reason and common sense.

16   Its meaning is self-evident and I will not attempt to define

17   the term further.

18       You are instructed that it is not necessary to prove the

19   exact location of the commission of an alleged offense.  It

20   is sufficient if the evidence in the case establishes beyond

21   a reasonable doubt that the offense was committed within the

22   Northern District of West Virginia.

23       You will note that the Indictment charges that the

24   offenses were committed "on or about" a certain date.  The

25   proof need not establish with certainty the exact date of the

3204

1    alleged offenses.  It is sufficient if the evidence in the

2    case establishes beyond a reasonable doubt that the offenses

3    were committed on a date reasonably near the date alleged.

4        I will now define a series of terms for you.  Each of

5    these words will be used frequently throughout these

6    instructions and their meaning is important in understanding

7    the law.

8        The word "knowingly" means that a defendant was conscious

9    and aware of his actions, realized what he was doing or what

10   was happening around him, and did not act because of

11   ignorance, mistake, or accident.

12       The word "willfully" means that a defendant committed an

13   act voluntarily and purposely, with the specific intent to do

14   something the law forbids; that is, with bad purpose either

15   to disobey or disregard the law.

16       The word "unlawfully" means contrary to law.  So, to do

17   an act "unlawfully" means to do willfully something which is

18   contrary to law.

19       The word "principal" means the criminal actor; the person

20   who actually commits a crime.

21       The guilt of an accused in a criminal case may be

22   established without proof that he personally did every act

23   constituting the offense alleged.  The law recognizes that,

24   ordinarily, anything a person can do for himself may also be

25   accomplished by him through direction of another person as

3205

1    his "agent," or by acting in concert with, or under the

2    direction of, another person or persons in a joint effort or

3    enterprise.

4        To act with "intent to defraud" means to act knowingly

5    and with the intention or the purpose to deceive or to cheat.

6    An "intent to defraud" is accomplished, ordinarily, by a

7    desire or with a purpose to bring about some gain or benefit

8    to oneself or to some other person or by a desire or with a

9    purpose to cause a loss to some person.  Intent ordinarily

10   may not be proved directly, because there is no way of

11   fathoming or scrutinizing the operations of the human mind.

12   But you may infer a defendant's intent from the surrounding

13   circumstances.  You may consider any statement made and done

14   or omitted by that defendant, and all other facts and

15   circumstances in evidence which indicate his state of mind.

16       You may consider it reasonable to draw the inference and

17   find that a person intends the natural and probable

18   consequences of acts knowingly done or knowingly omitted.  As

19   I have said, it is entirely up to you to decide what facts to

20   find from the evidence.

21       A statement or representation is "material" if it has a

22   natural tendency to influence or is capable of influencing a

23   decision or action of the person or group to whom the

24   statement or representation was made.

25       To be "material" it is not necessary that the statement

3206

1    or representation did, in fact, influence or deceive.   In

2    other words, a misrepresentation is material if it relates to

3    an important fact as distinguished from some unimportant or

4    trivial detail.

5        The word "false" means contrary to the truth. As used in

6    the law, the word "false" generally means more than an

7    innocent mistake or a simple error of fact.

8        A statement or representation is "false" or "fraudulent"

9    if it relates to a material fact and is known to be untrue or

10   is made with reckless indifference as to its truth or

11   falsity, and is made or caused--is made or caused to be made

12   with intent to defraud. A statement or representation may

13   also be "false" or "fraudulent" when it constitutes a half

14   truth, or effectively conceals a material fact, with intent

15   to defraud.

16       As used in these instructions, the term "health care

17   benefit program" means any public or private plan or

18   contract, affecting commerce, under which any medical

19   benefit, item, or service is provided to any individual, and

20   includes any individual or entity who is providing a medical

21   benefit, item, or service for which payment may be made under

22   the plan or contract.

23       The phrase "a scheme or artifice to defraud or to obtain

24   money" means any deliberate plan of action or course of

25   conduct by which someone intends to deceive or to cheat

3207

1   another or by which someone intends to deprive another of

2   something of value.

3       The term "false or fraudulent pretenses, representations,

4   or promises" means a statement or an assertion which concerns

5   a material or important fact or a material or important

6   aspect of the matter in question and that was either known to

7   be untrue at the time that it was made or used, or that was

8   made or used with reckless indifference as to whether it was,

9   in fact, true or false, and was made or used with the intent

10  to defraud.  A material fact is a fact that would be of

11  importance to a reasonable person in making a decision about

12  a particular matter or transaction.

13      The term "false or fraudulent pretenses, representations,

14  or promises" includes actual, direct false statements as well

15  as half truths, and includes the knowing concealment of facts

16  that are material or important to the matter in question and

17  that were made or used with the intent to defraud.

18      As you recall from my Preliminary Instructions to you,

19  you as jurors are the sole judges of the credibility of the

20  witnesses and the weight their testimony deserves.

21      You are not required to accept testimony, even though the

22  testimony is uncontradicted and the witness is not impeached.

23      You should carefully consider each witness's

24  intelligence, motive, state of mind, and demeanor and manner

25  while on the stand.  Consider also any relation each witness

3208

1    may bear to either side of the case, the manner in which each

2    witness might be affected by the verdict, and the extent to

3    which, if at all, each witness is either supported or

4    contradicted by other evidence in the case.

5        Inconsistencies or discrepancies in the testimony of a

6    witness, or between the testimony of different witnesses, may

7    or may not cause the jury to discredit such testimony.  Two

8    or more persons witnessing an incident or a transaction may

9    see or hear it differently, and innocent misrecollection,

10   like failure of recollection, is not an uncommon experience.

11   In weighing the effect of a discrepancy, always consider

12   whether it pertains to a matter of importance or an

13   unimportant detail, and whether the discrepancy results from

14   innocent error or intentional falsehood.

15       In addition, the testimony of a witness may be

16   discredited or impeached by showing that he or she previously

17   made statements which are inconsistent with his or her

18   present testimony.  As a general rule, earlier contradictory

19   statements are admissible only to impeach the credibility of

20   the witness, and not to establish the truth of those

21   statements.

22       If a witness is shown to have knowingly testified falsely

23   concerning any material matter, or conducted himself or

24   herself in a manner that indicates a propensity to lie, or

25   involves some element of deceit or untruthfulness, you have a

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3209

1  right to distrust the testimony of that witness in other

2  particulars, and you may reject all the testimony of that

3  witness or give it such credibility as you may think it

4  deserves.

5      In this connection, the weight of the evidence is not

6  necessarily determined by the number of witnesses testifying.

7  Rather, you should consider all the facts and circumstances

8  in evidence to determine which of the witnesses are worthy of

9  greater credence or believability.

10     Evidence of a witness's prior criminal convictions and

11  punishment have been brought to your attention only to help

12  you decide whether to believe what the witness testified to

13  here in court and how much to rely on that testimony, and for

14  no other purpose.

15     The testimony of an immunized witness, someone who has

16  been told either that his crimes will go unpunished in return

17  for testimony or that his testimony will not be used against

18  him in return for that cooperation, must be examined and

19  weighed by the jury with greater care than the testimony of

20  someone who is appearing in court without the need for such

21  an agreement with the Government.

22     Dr. Barry Markson, D.C., may be considered to be an

23  immunized witness in this case.

24     The jury must determine whether the testimony of an

25  immunized witness has been affected by self-interest, or by

3210

1   the agreement he has with the Government, or by his own

2   interest in the outcome of this case, or by prejudice against

3   the defendant.

4        Throughout the course of this trial you have seen some

5   demonstrative exhibits that have been used to help explain

6   the evidence.  That is their only purpose, to help explain

7   the evidence.  Unless they have been admitted into evidence,

8   they are not themselves proof of any facts.

9        The testimony of a law enforcement agent is entitled to

10  no special or exclusive sanctity.  A law enforcement agent

11  who takes the witness stand subjects his or her testimony to

12  the same examination and the same tests that any other

13  witness does.  You should recall their demeanor on the stand,

14  their manner of testifying, the substance of their testimony,

15  and weigh and balance it just as carefully as you would the

16  testimony of any other witness. People employed by the

17  Government, including law enforcement agents, do not stand in

18  any higher station in the community than other persons, and

19  their testimony is not entitled to any greater weight than

20  other witnesses.

21       You have heard several tape recordings.  These tapes were

22  received into evidence and may be considered by you along

23  with all the other evidence in the case. Typewritten

24  transcripts of these tape recorded conversations have been

25  furnished to you solely for your convenience or in

3211

1   identifying the speakers.

2       The tapes themselves, however, are the evidence in the

3   case and the typewritten transcripts are not evidence.  What

4   you hear on the tapes is evidence.  What you read on the

5   transcript is not.  If you perceive any variation between the

6   two, you should be guided solely by the tapes and not by the

7   transcripts.

8       If you cannot, for example, determine from the tape

9   recording that particular words were spoken or if you cannot

10  determine from the tape recording who said a particular word

11  or words, you must disregard the transcripts insofar as those

12  words or that speaker are concerned.

13      Charts or summaries have been prepared by Government

14  witnesses, have been admitted into evidence and have been

15  shown to you during the trial for the purpose of explaining

16  facts that are allegedly contained in books, records, or

17  other documents which are also in evidence in the case.  You

18  may consider the charts and summaries as you would any other

19  evidence admitted during the trial and give them such weight

20  or importance, if any, as you feel that they deserve.

21      As I stated in my Preliminary Instructions to you, the

22  law does not compel a defendant in a criminal case to take

23  the witness stand and testify, and no presumption of guilt

24  may be raised, and no inference of any kind may be drawn,

25  because a defendant does not testify.  The law never imposes

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3212

1    upon any defendant in a criminal case the burden or duty of

2    calling any witnesses or producing any evidence.  However, a

3    defendant who does testify is a competent witness and his

4    testimony is to be judged in the same way that you judge the

5    testimony of other witnesses.

6        You have heard reputation and opinion evidence about

7    defendants William C. Filcheck's and Scott G. Taylor's

8    character for truthfulness, honesty and law-abiding nature.

9        Evidence of a defendant's character, inconsistent with

10   those traits of character ordinarily involved in the

11   commission of the crime charged, may give rise to a

12   reasonable doubt, since you may think it improbable that a

13   person of such good character would commit such a crime.

14       You are to return your verdict upon the basis of the

15   evidence which was presented to you at the trial and in

16   accordance with these instructions that I am in the process

17   of giving to you.  If the evidence in the case convinces you

18   beyond a reasonable doubt that a defendant is guilty of any

19   of the offenses charged in the Indictment, then it will be

20   your duty to find that defendant guilty of those counts.

21       In this regard, a separate crime or offense is charged

22   against the individual defendants with respect to each count

23   of the Indictment in which he is named.  Each offense, and

24   the evidence pertaining to it, should be considered

25   separately.  Also, the case of each of the defendants should

FORM CSR - LASER   REPORTERS PAPER & MFG CO.   800-626-6313

3213

1  be considered separately and individually.  The fact that you

2  may find a defendant guilty or not guilty of any of the

3  offenses charged should not control your verdict as to any

4  other offense.  You must give separate and individual

5  consideration to each charge against each defendant.

6      I caution you, members of the jury, that you are here to

7  determine whether the Government has proved or failed to

8  prove the guilt of the defendants, William C. Filcheck, Scott

9  G. Taylor and Ronald L. Halstead, from the evidence in this

10  case.  The defendants are not on trial for any act or conduct

11  or offense not alleged in the Indictment.  Neither are you

12  called upon to return a verdict as to the guilt or innocence

13  of any other person or persons not on trial as a defendant in

14  this case.

15      As I have previously advised you, the charges against

16  Robert B. Burns have been removed from your consideration and

17  are not before you for decision.

18      Do not concern yourself with this development and do not

19  speculate about it.

20      The removal of this portion of the case must not

21  influence your consideration of those portions of the case

22  which you must decide.

23      Also, the punishment provided by law for the offenses

24  charged in the Indictment is a matter which should never be

25  considered by the jury in any way in arriving at an impartial

3214

1    verdict as to the guilt or innocence of the individual

2    defendants.

3        You, as jurors, are the judges of the facts.  But in

4    determining what actually happened in this case - that is, in

5    reaching your decision as to the facts - it is your sworn

6    duty to follow the law I am now in the process of defining

7    for you.

8        You must follow all of my instructions as a whole.  You

9    have no right to disregard or give special attention to any

10   one instruction, or to question the wisdom or correctness of

11   any rule that I may state to you.  That is, you must not

12   substitute your own notion or opinion as to what the law is

13   or ought to be.  It is your duty to apply the law as I give

14   it to you, regardless of the consequences.

15       By the same token it is also your duty to base your

16   verdict solely upon the testimony and evidence in the case,

17   without prejudice or sympathy.  That was the promise you made

18   and the oath you took before being accepted by the parties as

19   jurors in this case, and they have the right to expect

20   nothing less.

21       All right, ladies and gentlemen, before I instruct you on

22   the specific charges in the case I'll ask Carole and Ted if

23   they would please pass out the copies of the Charge to the

24   jury.  Thank you.

25       (Pause)

3215

1      THE COURT:  I will now provide you specific

2  instructions relating to each of the charges in the

3  Indictment.

4      Count 1 of the Indictment charges that beginning in

5  approximately September 1993, and continuing thereafter

6  through May of 1997, in the Northern District of West

7  Virginia, and elsewhere, defendants, William C. Filcheck,

8  Scott G. Taylor and Ronald L. Halstead, together with others

9  known and unknown to the grand jury, knowingly combined, and

10  conspired, and confederated and agreed together and with each

11  other to commit the following offenses against the United

12  States:

13      a.   To knowingly and willfully devise and intend to

14  devise a scheme and artifice to defraud health care benefit

15  programs, and to obtain by means of materially false and

16  fraudulent pretenses representations, and promises, money

17  owned by and under the custody and control of health care

18  benefit programs, in connection with the delivery of and

19  payment for, health care benefits, items and services, in

20  violation of Title 18 U.S.C. § 1347, and

21      b.   To knowingly and willfully devise and intend to

22  devise a scheme and artifice to defraud, and for obtaining

23  money and property from various health care benefit programs

24  by means of materially fraudulent and misleading pretenses,

25  representations and promises, and to use the United States

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3216

Postal Service and private and commercial interstate

carriers, in violation of Title 18 U.S.C. § 1341.

Title 18, United States Code, Section 1341, I'm sorry,

Section 371, provides in pertinent part, that:

> If two or more persons conspire ... to commit any
>
> offense against the United States,... and one or
>
> more of such persons does any act to effect the
>
> object of the conspiracy,...[each person shall be
>
> guilty of an offense against the United States].

Count 1 of the Indictment charges Robert B. Burns and the

defendants, William C. Filcheck, Scott G. Taylor and Ronald

L. Halstead, with the crime of conspiracy, in violation of

Title 18, United States Code, Section 371.  This law makes it

a separate federal crime or offense for anyone to conspire or

agree with someone else to do something which, if actually

carried out, would amount to another federal crime or

offense.  So, under this law, a "conspiracy" is an agreement

or a kind of "partnership" in criminal purposes in which each

member becomes the agent or partner of every other member.

In order to establish a conspiracy offense it is not

necessary for the Government to prove that all of the people

named in the Indictment were members of the scheme; or that

those who were members had entered into any formal type of

agreement; or that the members had planned together all of

the details of the scheme or the "overt acts" that the

3217

1   Indictment charges would be carried out in an effort to

2   commit the intended crime.  Also, because the essence of a

3   conspiracy offense is the making of the agreement itself

4   (followed by the commission of any overt act), it is not

5   necessary for the Government to prove that the conspirators

6   actually succeeded in accomplishing their unlawful plan.

7   What the evidence in the case must show beyond a reasonable

8   doubt is:  First:  That a defendant and at least one other

9   person made an agreement to try to accomplish a common and

10  unlawful plan to commit the crimes of health care fraud and

11  mail fraud, as charged in the Indictment;

12     Second:  That a defendant, knowing the unlawful purpose

13  of the plan, willfully joined in it, intending to further the

14  unlawful purpose;

15     Third:  That one of the conspirators during the existence

16  of the conspiracy knowingly committed at least one of the

17  overt acts described in the Indictment;  and

18     Fourth:  That such overt act was knowingly committed in

19  an effort to carry out or accomplish some object of the

20  conspiracy.

21     A person may become a member of a conspiracy without

22  knowing all of the details of the unlawful scheme, and

23  without knowing who all of the other members are.  So, if an

24  individual defendant has a general understanding of the

25  unlawful purpose of the plan and knowingly and willfully

3218

1    joins in that plan on one occasion, that is sufficient to

2    convict that individual defendant of conspiracy even though

3    he did not participate before, and even though he played only

4    a minor part.  Of course, mere presence at the scene of a

5    transaction or event, or the mere fact that certain persons

6    may have associated with each other, and may have assembled

7    together and discussed common aims and interests, does not

8    necessarily establish proof of a conspiracy.  Also, a person

9    who has no knowledge of a conspiracy, but who happens to act

10   in a way which advances some purpose of the conspiracy, does

11   not thereby become a conspirator.

12       In deciding whether a particular defendant was, in fact,

13   a member of the conspiracy, you should consider whether the

14   defendant knew the purpose and the object of the conspiracy,

15   and knowing that, willfully participated in the conspiracy,

16   that is, helped advance or further the unlawful object of the

17   conspiracy, and that he did it deliberately, intentionally

18   and willfully, not inadvertently, negligently or innocently.

19       You may consider proof of a defendant's financial

20   interest in the outcome of the scheme when determining

21   whether or not the defendant was a member of the conspiracy

22   charged in the Indictment.

23       An "overt act" is any transaction or event, even one of

24   which may be entirely innocent when considered alone, but

25   which is knowingly committed by a conspirator in an effort to

3219

1    accomplish some object of the conspiracy.

2         The overt acts charged in this conspiracy are contained

3    in paragraphs 54 through 72 of the Indictment.

4         Count 1 charges the defendants with conspiring to violate

5    both the mail fraud and health care fraud statutes.  The mail

6    fraud statute was effective during the entire time period

7    alleged in the Indictment.  The health care fraud statute was

8    effective beginning on August 21st of 1996.

9         Title 18, United States Code, Section 1347, provides, in

10   part, that:

11            Whoever knowingly and willfully executes, or

12            attempts to execute, a scheme or artifice -

13            (1) to defraud any health care benefit program;

14            or (2) to obtain, by means or false or fraudulent

15            pretenses, representations, or promises, any of the

16            money. . . owned by, or under the custody or control

17            of, any health care benefit program,

18            in connection with the delivery of or payment for

19            health care benefits, items, or services, [shall be

20            guilty of an offense against the United States].

21        In order to sustain its burden of proof for the crime of

22   health care fraud, the Government must prove the following

23   essential elements beyond a reasonable doubt:

24        First: A defendant knowingly and willfully executed or

25   attempted to execute a scheme or artifice to defraud a health

3220

1    care benefit program or to obtain, by means of false or

2    fraudulent pretenses, representations, or promises, any of

3    the money owned by, or under the custody or control of, any

4    health care benefit program in connection with the delivery

5    of or payment for health care benefits, items or services, as

6    detailed in Count 1 of the indictment;

7        Second: The false or fraudulent pretenses,

8    representations, or promises were material; and

9        Third: A defendant did so with intent to defraud.

10       Title 18, United States Code, Section 1341, provides, in

11   part, that:

12            Whoever, having devised or intending to devise any

13            scheme or artifice to defraud, or for obtaining

14            money or property by means of false or fraudulent

15            pretenses, representations, or promises, ... for the

16            purpose of executing such scheme or artifice or

17            attempting to do so, places--or so to do, excuse me,

18            places in any post office or authorized depository

19            for mail matter, any matter or thing whatever to be

20            sent or delivered by the Postal Service, or deposits

21            or causes to be deposited any material or thing

22            whatever to be sent or delivered by any private or

23            commercial interstate carrier, or takes or receives

24            therefrom, any such matter or thing, or knowingly

25            causes to be delivered by mail or such carrier

3221

1      according to the direction thereon, or at the place

2      at which it is directed to be delivered by the

3      person to whom it is addressed, any such matter or

4      thing, [shall be guilty of an offense against the

5      United States].

6  In order to sustain its burden of proof for the crime of

7  mail fraud, the Government must prove the following essential

8  elements beyond a reasonable doubt:

9      First: a scheme, substantially as charged in the

10 Indictment, to defraud;

11     Second: a defendant knowingly and willfully participated

12 in this scheme with the intent to defraud; and

13     Third: the use of the United States mail, on or about the

14 date charged, in furtherance of this scheme.

15     I instruct you that as long as the Government proves

16 these three elements, it is not relevant whether anyone was

17 actually defrauded.  In other words, it is not necessary that

18 the fraud be successful for you to find the defendants

19 conspired to commit this crime--or this offense.

20     The crime of conspiracy to commit mail fraud also does

21 not require proof of an actual mailing.

22     Instead, the crime of conspiracy to commit mail fraud

23 requires, among other things, proof that the persons charged

24 with the conspiracy reasonably contemplated the use of the

25 mail so that the persons charged intended that the mails be

3222

1   used in furtherance of the scheme or that the nature of the

2   scheme was such that the use of the mail was reasonably

3   foreseeable.

4       A conspirator is responsible for substantive offenses

5   committed by his fellow conspirators if (1) he was a member

6   of the conspiracy when the offense was committed, and (2) the

7   offense was committed in furtherance of and as a foreseeable

8   consequence of the conspiracy.

9       Therefore, if you find a defendant guilty of the

10  conspiracy charged in Count 1, and I'm going to divert here

11  from what you're reading; that is the conspiracy to commit

12  health care fraud and to commit mail fraud and if you find

13  beyond a reasonable doubt that, while he was a member of the

14  conspiracy, his fellow conspirators committed the offenses

15  charged in Counts 2 through 15 in furtherance of, and as a

16  foreseeable consequence of that conspiracy, then you may find

17  him guilty of Counts 2 through 15.

18      All right.  That completes the instruction on the

19  conspiracy count.  We now turn our attention to Counts 2

20  through 14, health care fraud and aiding and abetting.

21      Counts 2 through 15 of the Indictment charge Robert B.

22  Burns and the defendants, William C. Filcheck, Scott G.

23  Taylor, and Ronald L. Halstead, with the crimes of (1) health

24  care fraud, a violation of 18, United States Code, Section

25  1347; and (2) aiding and abetting each other in the

3223

1    commission of health care fraud, a violation of Title 18,

2    United States Code, Section 2.

3        Counts 2 through 15 of the Indictment charge that during

4    the period from in or about September 1996 through February

5    1997, in the Northern District of West Virginia, Robert B.

6    Burns, and the defendants, William C. Filcheck, Scott G.

7    Taylor, and Ronald L. Halstead, knowingly and willfully

8    executed and attempted to execute a scheme and artifice to

9    defraud Medicare (that's Counts 2 through 5); Pennsylvania

10   Blue Cross Blue Shield (Counts 6 through 9); West Virginia

11   Public Employees Insurance Agency (Counts 10 through 13);

12   Railroad Maintenance and Industrial Health and Welfare Fund

13   (Count 14); and Accordia National (Count 15), and to obtain,

14   by means of false and fraudulent pretenses, representations

15   and promises, money owned by and under the custody and

16   control of said health care benefit programs, in connection

17   with the delivery of and payment for health care benefits,

18   items and services in violation of Title 18 United States

19   Code §§ 1347 and 2.

20       The general nature of the scheme or plan to defraud and

21   to obtain money by means of false or fraudulent pretenses,

22   representations or promises are as alleged in Count 1 of the

23   Indictment.

24       As I previously instructed you, Title 18, United States

25   Code, Section 1347, provides, in pertinent part, that:

3224

1        Whoever knowingly and willfully executes, or

2        attempts to execute, a scheme or artifice -

3        (1) to defraud any health care benefit program;

4        or (2) to obtain, by means or false or fraudulent

5        pretenses, representations, or promises, any of the

6        money. . . owned by, or under the custody or control

7        of, any health care benefit program,

8        in connection with the delivery of or payment for

9        health care benefits, items, or services, [shall be

10       guilty of an offense against the United States].

11   As I previously instructed you, in order to sustain its

12   burden of proof for the crime of health care fraud, the

13   Government must prove the following essential elements beyond

14   a reasonable doubt:

15   First: A defendant knowingly and willfully executed or

16   attempted to execute a scheme or artifice to defraud a health

17   care benefit program or to obtain, by means of false or

18   fraudulent pretenses, representations, or promises, any of

19   the money owned by, or under the custody or control of, any

20   health care benefit program in connection with the delivery

21   of or payment for health care benefits, items or services, as

22   detailed in Count 1 of the indictment;

23   Second: The false or fraudulent pretenses,

24   representations, or promises were material; and

25   Third: A defendant did so with intent to defraud.

3225

1     Counts 2 through 15 charge the defendants with knowingly

2  and willfully causing fraudulent HCFA 1500 claim forms to be

3  submitted to Medicare, Blue Cross Blue Shield of Western

4  Pennsylvania, PEIA, Accordia National, and Railroad

5  Maintenance and Industrial Health and Welfare Fund.  The HCFA

6  1500 claim forms are alleged to be false because they claimed

7  that:

8     1.  The service had been provided by a specified medical

9  doctor; or

10    2.  The service was medically necessary; or

11    3.  The service was performed in accordance with the CPT

12 Manual.

13    To find a defendant guilty of the charges in Counts 2

14 through 15, you need not find that the charged HCFA 1500 was

15 fraudulent for all three reasons, but you must unanimously

16 agree on at least one of the three reasons set forth above

17 and mark the verdict form accordingly.

18    Title 18, United States Code, Section 2, provides:

19         Whoever commits an offense against the United

20         States, or aids, abets, counsels, commands, induces,

21         or procures its commission, is punishable as a

22         principal.

23         Whoever willfully causes an act to be done, which if

24         directly performed by him or another would be

25         [punishable as] an offense against the United

3226

1     States, is punishable as a principal.

2        In order to be found guilty of aiding and abetting in the

3     commission of health care fraud, the United States must prove

4     beyond a reasonable doubt the following three essential

5     elements:

6        First: A defendant knew that health care fraud was to be

7     committed or was being committed;

8        Second: A defendant willfully did some act for the

9     purpose of aiding or encouraging the commission of health

10    care fraud; and

11       Third: A defendant acted with the intention of causing

12    health care fraud to be committed.

13       Before a defendant may be found guilty as an aider or an

14    abettor to the crime, the Government must also prove, beyond

15    a reasonable doubt, that someone, the principal, committed

16    each of the essential elements of health care fraud as

17    detailed for you in these instructions.

18       Merely being present at the scene of the crime or merely

19    knowing that a crime is being committed or is about to be

20    committed is not sufficient conduct for you to find that a

21    defendant aided and abetted the commission of that offense.

22       The Government must prove, beyond a reasonable doubt,

23    that a defendant knowingly associated himself with the crime

24    in some way as a participant--someone who wanted the crime to

25    be committed--not as a mere spectator.

3227

1   The same evidence establishing a defendant's

2   participation in a conspiracy may support a conclusion that a

3   defendant participated in the principal's criminal intent to

4   commit health care fraud.

5   I have previously instructed you that the Government has

6   the burden of proving every element of the offense beyond a

7   reasonable doubt.  A key element of the crimes charged in

8   Counts 1 through 15 against each of the defendants is that

9   each acted willfully, with specific intent to violate the

10  law, as follows:

11  conspiring to commit health care fraud and mail fraud,

12  that's Count 1;

13  committing health care fraud, that's Counts 2 through 15;

14  and

15  aiding and abetting in the commission of health care

16  fraud, again Counts 2 through 15.

17  Specific intent to violate the law is the opposite of

18  good faith.  If a person acts with good faith, then that

19  person cannot have acted with a specific intent to violate

20  the law, just as a person who has a specific intent to

21  violate the law cannot have acted in good faith.  The

22  Government has the burden of proving that each defendant had

23  a specific intent to violate the law, which also means that

24  the Government has the burden of proving beyond a reasonable

25  doubt that each defendant acted willfully and did not act in

3228

1    good faith.

2        Good faith may be an absolute defense to the charges in

3    this case.

4        While the term "good faith" has no precise definition, it

5    generally means an honest belief, a lack of criminal intent.

6    A person who acts on a belief or on an opinion honestly held

7    is not punishable under the law merely because that honest

8    belief turns out to be incorrect or wrong.

9        Thus, if a defendant believed in good faith that he was

10   acting properly, even if he was mistaken in that belief, and

11   even if others were injured by his conduct, there would be no

12   crime.

13       If the evidence in the case leaves you with a reasonable

14   doubt as to whether a defendant acted in good faith or acted

15   willfully, with specific intent, you should acquit that

16   defendant as to those counts in which such reasonable doubt

17   is present.

18       The burden of establishing criminal intent rests upon the

19   Government--I'm sorry, the prosecution.  A defendant is under

20   no burden to prove his good faith; rather, the prosecution

21   must prove bad faith or criminal intent beyond a reasonable

22   doubt.

23       All right, ladies and gentlemen, I'll now turn to Count

24   16, which charges conspiracy to launder money instruments.

25       Count 16 of the Indictment charges that during the period

3229

1  from on or about January 14, 1994, and continuing until at

2  least on or about May 20, 1997 in the Northern District of

3  West Virginia and elsewhere, Robert B. Burns, defendant

4  Ronald L. Halstead, and others known and unknown to the Grand

5  Jury, did unlawfully and knowingly combine, conspire,

6  confederate and agree among themselves and with each other to

7  conduct and cause to be conducted financial transactions,

8  which involved the proceeds of a specified unlawful activity

9  (to wit, mail fraud, in violation of 18 U.S.C. § 1341, and

10  health care fraud, in violation of 18 U.S.C. § 1347) that is,

11  the scheme and artifice to defraud as set forth in paragraphs

12  21 through 52 of the Indictment, and the defendants did so

13  knowing that the money involved in the financial

14  transactions, which affected interstate commerce, represented

15  the proceeds of some form of unlawful activity, and was

16  described to promote the carrying on of the scheme and

17  artifice to fraud; in violation of Title 18, United States

18  Code, Sections 1956(a)(1)(A)(i).

19      The Indictment alleges that defendant Ronald L. Halstead

20  entered into a conspiracy with Robert B. Burns to launder

21  monetary instruments in violation of Title 18, United States

22  Code, Section 1956, which provides, in part, that:

23          Any person who conspires to commit any offense

24          defined in this section ... shall be subject to the

25          same penalties as those prescribed for the offense

3230

1      the commission of which was the object of the

2      conspiracy.

3         As stated previously, a "conspiracy" is an agreement or a

4   kind of "partnership" in criminal purposes in which each

5   member becomes the agent or partner of every other member.

6   Because the essence of a conspiracy offense is the making of

7   the agreement itself (followed by the commission of any overt

8   act), it is not necessary for the Government to prove that

9   the conspirators actually succeeded in accomplishing their

10  unlawful plan.

11        The defendant Ronald L. Halstead is charged with

12  conspiring to launder money.  For you to find the defendant

13  Ronald L. Halstead guilty of conspiracy to launder money, the

14  evidence in the case must establish beyond a reasonable

15  doubt:

16        First: That the defendant and at least one other person

17  made an agreement to try to accomplish a common and unlawful

18  plan to commit the crime of money laundering, as charged in

19  Counts 17 through 26 of the Indictment;

20        Second: That the defendant, knowing the unlawful purpose

21  of the plan, willfully joined in it, intending to further the

22  unlawful purpose;

23        Third: That one of the conspirators during the existence

24  of the conspiracy knowingly committed at least one of the

25  overt acts described in the Indictment; and

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3231

1    Fourth: That such overt act was knowingly committed in an

2    effort to carry out or accomplish some object of the

3    conspiracy.

4        A person may become a member of a conspiracy without

5    knowing all of the details of the unlawful scheme, and

6    without knowing who all of the other members are.  So, if a

7    defendant has a general understanding of the unlawful purpose

8    of the plan and knowingly and willfully joins in that plan on

9    one occasion, that is sufficient to convict that defendant of

10   conspiracy even though the defendant did not participate

11   before, and even though the defendant played only a minor

12   part. Of course, mere presence at the scene of a transaction

13   or event, or the mere fact that certain persons may have

14   associated with each other, and may have assembled together

15   and discussed common aims and interests, does not necessarily

16   establish proof of a conspiracy.  Also, a person who has no

17   knowledge of a conspiracy, but who happens to act in a way

18   which advances some purpose of the conspiracy, does not

19   thereby become a conspirator.

20       In deciding whether defendant Ronald L. Halstead was, in

21   fact, a member of the conspiracy, you should consider whether

22   he knew the purpose and the object of the conspiracy, and

23   knowing that, willfully participated in the conspiracy, that

24   is, helped advance or further the unlawful object of the

25   conspiracy, and that he did it deliberately, intentionally

3232

1   and willfully, not inadvertently, negligently or innocently.

2        You may consider proof of a defendant's financial

3   interest in the outcome of the scheme when determining

4   whether or not the defendant was a member of the conspiracy

5   charged in the Indictment.

6        As previously stated, an "overt act" is any transaction

7   or event, even one of which may be entirely innocent when

8   considered alone, but which is knowingly committed by a

9   conspirator in an effort to accomplish some object of the

10  conspiracy.

11       The overt acts charged in Count 16 are contained in

12  paragraphs 101 through 111 of the Indictment.

13       A conspirator is responsible for offenses committed by

14  his fellow conspirators if (1) he was a member of the

15  conspiracy when the offense was committed and (2) the offense

16  was committed in furtherance of and as a foreseeable

17  consequence of the conspiracy.

18       Therefore, if you find defendant Ronald L. Halstead

19  guilty of a conspiracy charged in Count 16, and if you find

20  beyond a reasonable doubt that, while he was a member of the

21  conspiracy, his fellow conspirator, Robert Burns, committed

22  the offenses of money laundering - promotion charged in

23  Counts 17 through 26 in furtherance of, and as a foreseeable

24  consequence of that conspiracy, then you may find defendant

25  Ronald L. Halstead guilty of Counts 17 through 26.

3233

1    In Counts 17 through 26, Robert B. Burns has been charged

2  with the promotion of money laundering in violation of 18

3  U.S.C. § 1956(a)(1)(A)(i).  The applicable provision of the

4  money laundering statute provides that:

5           Whoever, knowing that the property involved in a

6           financial transaction represents the proceeds of

7           some form of unlawful activity, conducts or attempts

8           to conduct such a financial transaction which in

9           fact involves the proceeds of specified unlawful

10          activity with the intent to promote the carrying on

11          of specified unlawful activity [shall be guilty of

12          an offense against the United States].

13    To prove the charge of money laundering – promotion, the

14  Government must prove the following four elements beyond a

15  reasonable doubt:

16    First: That someone conducted or attempted to conduct a

17  financial transaction having at least a de minimis effect on

18  interstate commerce or involving the use of a financial

19  institution which has at least a de minimis effect on

20  interstate commerce;

21    That term de minimis is not defined but it means minor.

22    Second: That the property that was the subject of the

23  transaction involved the proceeds of specified unlawful

24  activity;

25    Third: That someone knew that the property involved

3234

1  represented the proceeds of some form of unlawful activity.

2      Fourth: That someone engaged in the financial transaction

3  with the intent to promote the carrying on of a specified

4  unlawful activity.

5      Regarding the required "effect on interstate commerce,"

6  the Government must only prove that the transactions affected

7  interstate commerce in some way.  It is not necessary that

8  the effect be adverse or particularly great; a minimal (or

9  "de minimis") effect on interstate commerce is sufficient.

10      In this case, the "specified unlawful activity" is

11  alleged to be mail fraud and health care fraud.  While I

12  express no opinion about whether anyone engaged or intended

13  to engage in this kind of activity, I instruct you that this

14  does fall within the definition of "specified unlawful

15  activity" under the money laundering statute.

16      An element of each crime charged in the Indictment is the

17  defendant's knowledge of the unlawful objectives of the plan

18  or scheme.  The Government may prove that defendants, William

19  C. Filcheck, Scott G. Taylor, and Ronald L. Halstead acted

20  "knowingly," with knowledge of the unlawfulness of the plan

21  or scheme alleged in the Indictment, by proving, beyond a

22  reasonable doubt, that these defendants deliberately closed

23  their eyes to what would otherwise have been obvious to them.

24  No one can avoid responsibility for a crime by deliberately

25  ignoring what is obvious.  A finding beyond a reasonable

3235

1   doubt of an intent of a defendant to avoid knowledge or

2   enlightenment of the unlawfulness of a scheme would permit

3   the jury to infer knowledge.  Stated another way, a

4   defendant's knowledge of a particular fact may be inferred

5   from a deliberate or intentional ignorance or deliberate or

6   intentional blindness to the existence of that fact.

7       It is, of course, entirely up to you as to whether you

8   find any deliberate ignorance or deliberate closing of the

9   eyes by the defendants to the unlawfulness of the scheme

10   alleged in the Indictment and the inferences to be drawn from

11   any such evidence.

12       You may not infer that defendants, William C. Filcheck,

13   Scott G. Taylor, and Ronald L. Halstead had knowledge of the

14   unlawfulness of their acts, however, from proof of a mistake,

15   negligence, carelessness, or a belief in an inaccurate

16   factual or legal proposition.

17       Furthermore, when considering whether a defendant

18   committed the offense of conspiracy charged in Counts 1 and

19   16, you must consider that there are two aspects of knowledge

20   involved in a conspiracy: (1) knowing participation or

21   membership in the scheme charged, and (2) some knowledge of

22   the unlawful aims and objectives of the scheme.  I caution

23   you that participation or membership in a conspiracy cannot

24   be established by deliberate ignorance.  A defendant's

25   knowledge of a scheme's unlawful aims or objectives, however,

3236

1   may be proved by deliberate ignorance.

2       Ladies and gentlemen, that concludes my instructions for

3   you on the law.  The verdict as to each individual defendant

4   must represent the considered judgment of each juror.  In

5   order to return a verdict, it is necessary that each juror

6   agree to it.  Your verdict as to each defendant must be

7   unanimous.

8       It is your duty, as jurors, to consult with one another,

9   and to deliberate with a view to reaching an agreement if you

10  can do so without sacrifice of conscientious conviction.

11  Each of you must decide the case for himself or herself, but

12  do so only after an impartial consideration of the evidence

13  in the case with your fellow jurors.  In the course of your

14  deliberations, do not hesitate to re-examine your own views,

15  and change your opinion, if convinced it is erroneous.  But

16  do not surrender your honest conviction as to the weight or

17  effect of the evidence solely because of the opinion of your

18  fellow jurors, or for the mere purpose of returning a

19  verdict.

20      Some of you have taken notes during the course of this

21  trial.  Notes are only an aid to memory and should not be

22  given precedence over your independent recollection of the

23  facts.  A juror who did not take notes should rely on his or

24  her independent recollection of the proceedings and should

25  not be influenced by the notes of other jurors.

3237

1    Remember at all times, you are not partisans.  You are

2    judges of the facts.  Your sole interest is to seek the truth

3    from the evidence in the case.

4        Now ladies and gentlemen, I'm going to stop there and

5    give you the remainder of those instructions after you hear

6    the closing arguments of the parties because they pertain in

7    particular to how to conduct your deliberations.

8        At this time we'll take a ten-minute recess, give you a

9    chance to stretch and when we come back you will the opening

10   of the closing argument by the United States and you will the

11   hear the closing argument of Defendant Halstead.  I'm sorry,

12   at the close of United States, we will probably take--we're

13   going to take an early lunch.  Is that what we discussed,

14   gentlemen, I'm trying to remember.

15       MR. HARRIS:  Yes, Your Honor.

16       THE COURT:  Okay.  We're going to take an early

17   lunch.  So we'll come back in here at ten o'clock and proceed

18   until approximately eleven o'clock, then we'll go to lunch,

19   come back around noon and you'll then hear Defendant

20   Halstead's closing argument.  We'll have a brief recess after

21   that, then we'll have the closing arguments of Defendant

22   Filcheck and Taylor and then we'll have the rebuttal of the

23   United States.  All right.

24       Thank you for your attention to the Charge.  Please

25   follow Court Security and keep in mind, you do not yet have

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3238

1   the case and you must not discuss the case among yourselves

2   during this recess.  Please leave your notebooks and your

3   charge face down on your chair.  We'll see you in ten

4   minutes.

5       (Jury out 9:50 a.m.)

6       THE COURT:  All right.  Does any party wish to place

7   an objection to any aspect of the Charge on the record?

8       MR. JAFFE:  I don't have an objection.  I have a

9   concern that I would like to address as an Officer of the

10  Court in terms of jury completion and it cuts both ways, so I

11  just want to bring it to your consideration.  It has to do

12  Burns.  You gave a missing, what I consider a missing

13  defendant and I understand that, but it struck me as I'm

14  listening to this, we're telling them in the missing

15  defendant charge, the charge against Burns has been removed

16  for your consideration and not before you.  The removal of

17  this portion of the case must not influence your

18  consideration of those portions of the case which you may

19  decide and that the money laundering--the substantive money

20  laundering count, we're specifically asking them, in effect,

21  to decide something, whether Burns committed money laundering

22  is a predicate to finding Halstead guilty of conspiracy.

23      Similarly, while it's certainly true that they shouldn't

24  consider Burns not being here, as it's eminently obvious, our

25  contention is Burns is solely responsible and I think that's

3239

1  an appropriate argument to make, so I think it cuts both ways

2  and I'm wondering--I bring that to the Court's attention.  I

3  didn't realize that before, but I'm afraid that the jury

4  might feel that there's some inconsistency and they have to

5  come back to you for further clarification; are they to

6  consider Burns at all, because clearly in the Charge they

7  have the money laundering and for--I raise that as a question

8  and just see if anybody has any more thoughts.

9        THE COURT:  All right.  Let's come back in a couple

10  minutes before the jury is due back at ten and then we can

11  discuss that and I'll make a ruling on the record.

12        MR. JAFFE:  Thank you.

13     (Recess from 9:55 a.m., until 10:22 a.m., 02-03-2003)

14        THE COURT:  Thank you.  Please be seated.  I'm

15  handing out to you an additional instruction regarding Doctor

16  Burns.  Does the Government have any objection?

17        MR. ADAMS:  No, Your Honor.

18        THE COURT:  Do the defendants have any objection?

19        MR. JAFFE:  I think the one here is perfectly

20  appropriate.  The only concern is in fairness could we allow

21  to specify--I don't know how to do it exactly.  They're

22  relevant in two respects; one is the money laundering, the

23  other is the defense asserted, which is that Burns is solely

24  responsible.

25        THE COURT:  Well, I think I handled that and I've

3240

1  already got the copy on the jury's bench so--

2          MR. JAFFE:  Okay, that's fine.

3          THE COURT:  Just place--if you have an objection,

4  place it on the record, but I think I handled that for you;

5  tried to.

6          MR. JAFFE:  Okay.  That's fine.  I appreciate that.

7          THE COURT:  Okay.  We can bring the jury in.

8      (Jury in 10:25 a.m.)

9          THE COURT:  Good morning, ladies and gentlemen,

10  welcome back and please be seated.  Before you hear the

11  closing argument of the United States, I've asked Carole to

12  place on your chairs an additional instruction and in case

13  there was any confusion, I want to use this instruction to

14  clarify for you how you may consider the actions of Robert B.

15  Burns.

16      As I have previously advised you, the charges against

17  Robert B. Burns have been removed from your consideration and

18  you are not to return a verdict as to his guilt or innocence

19  as to any of the counts in the Indictment.  However, you are

20  allowed to consider the actions of Robert B. Burns, as

21  charged in this Indictment, as a basis for determining the

22  guilt or innocence of the defendant as to other charges.  In

23  particular, you need to consider the actions of Robert B.

24  Burns in determining the guilt or innocence of the Defendant,

25  Ronald L. Halstead as to Counts 17 through 26.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3241

1       All right.  Now at this time, Mr. Adams--or, Mr. Donley,

2  excuse me.  Thank you, Your Honor.

3              CLOSING ARGUMENT BY PLAINTIFF

4       MR. DONLEY:  Good morning Ladies and Gentlemen.  My

5  name is Pat Donley.  I represent the United States.  I would

6  like to thank you for your kind attention that you've given

7  to us over the last couple weeks.  We appreciate your

8  personal sacrifice.  Without you this process would not work

9  but we do recognize that this is a sacrifice that each of you

10  had to make to give from your own personal lives to come here

11  and perform this service.

12       I'm going to be talking to you a little bit about my

13  recollection of the evidence and that's exactly what it is,

14  it's my recollection of the evidence.  The evidence you

15  determine comes from the witness stand, from the documents,

16  from the exhibits and it is your recollection that is

17  important.  Should I say something that does not conform to

18  how you remember the evidence, you are required to go with

19  your recollection and not mine.

20       As we told you at the beginning of this case, this is not

21  a case about whether or not chiropractic care works.  This is

22  a case about billing fraud.  It's good old-fashioned lying

23  and cheating.  It has to do only with that.

24       This was an insurance driven treatment.  You know that

25  this was a scheme that pro -- in which these chiropractors

3242

1   provided health care services based upon the patients'

2   insurance coverage rather than any of the medical needs of

3   the patients.  This scheme deceived the insurance carriers

4   into believing that these services that were performed were

5   actually done by a medical doctor.  In fact, they had been

6   ordered, performed and were supervised by chiropractors.  The

7   scheme included billing for unnecessary medical services.

8       One of the things that you're going -- one of the

9   problems that you're going to have when you go back into your

10  jury room is you're not going to have our computer.  It's not

11  going to be available to you.  Most importantly, you're not

12  going to have Laura back in the jury room that you can say,

13  Laura, please call up this document for me.  You're going to

14  have to find these on your own and, therefore, I need to show

15  you how our numbering system works in the Government's

16  exhibits so that you can find them.

17      You have up on the screen behind me how our numbering

18  system works.  We have divided the exhibits into -- into

19  categories that generally relate to each of the counts.  For

20  example, the first one up, first example on the screen, shows

21  you that the first exhibit there, 001, is that it relates

22  generally to Count 1.  The exhibit number is the second three

23  set of numbers, in this case 013.  That's the exhibit number

24  you will see on the Government's yellow sticker, those six

25  digits.  Down on the bottom corner of each page there is a

3243

page number.  In order to keep these things straight we have
included the first count number, the exhibit number and the
then the last three numbers are the page number.  That page
number changes with each page within the exhibit.  The count
and the exhibit number stay the same within that exhibit.
Count 2 generally relates to Count 2, Count 3 and so on.

All exhibits are -- can be considered by you on any
count.  This is a numbering system that we came up with to
try to help you, guide you on finding things within the
exhibits.  What you're actually going to get are eleven of
these notebooks.  We have -- this one happens to be -- and we
called them out during the trial.  This is 001-001.  It's the
very first exhibit book.  This would have been normally
called out by the attorneys as 1-001, just dropping off the
first two zeros.  This book happens to go through, just for
your information 1-079.  So it's the first 79 exhibits for
Count 1.

This book happens to have the exhibits beginning with the
Count 2 exhibits, Count 2-001 through, in this case 5-015.
This is our numbering system to try to help you find things
within the exhibits.  Hopefully that will be of some
assistance to you.  As I go through this morning, I'm going
to talk about exhibits.  For those of you that like to write
it down, it may be helpful to find those exhibits later on if
you have the numbers.

3244

1    As you know, the indictment charges a conspiracy among

2    other items.  Membership in a conspiracy -- to prove a

3    membership in a conspiracy, it's important to know what we

4    don't have to prove and what we don't have to prove is that

5    there was any formal agreement.  We don't have to show that

6    there was a formal sit down meeting, everybody says, okay,

7    what are we going to do and everybody agrees to it at that

8    point.  We don't have to show that.  We're not required to

9    show that there was a meeting at which they planned together

10   all the details of their scheme.  Okay?  All we're required

11   to prove to you is that the defendant that you are

12   considering had a general understanding of the unlawful plan.

13   There has to be some sort of a mutual understanding as to

14   what was the unlawful plan and this is what -- this is what

15   is oftentimes referred to as a partnership in crime.  That's

16   a conspiracy.  The defendants have to knowingly join the plan

17   at some point in time and at least one of the co-conspirators

18   has to commit one overt act.  Now, we have in the indictment,

19   named many overt acts for your consideration.

20       If you would call up CLS 12 for me, please.  Magnify the

21   top section.  And to help you out, I thought it might be

22   useful if we tell you where to find the overt acts that are

23   in the exhibits.  Exhibit 1-005, these are all corporation,

24   formation type documents.  Exhibit 1-005 is the formation of

25   Priority One.  009 is the formation of West Virginia Health

3245

1  Care.  110 is the real property lease agreement.  013 is the

2  service agreement and 014 is an equipment lease.  All of

3  those are the Count 1 exhibits.  If I can go to the next

4  section please.

5      We've also alleged as overt acts the in-office visits by

6  Doctor Halstead and all of the reports that he generated.

7  Within the exhibits, 1-029 is the IOV Report Cover.  The

8  actual IOV Reports are in 030 to 041.  There's also

9  additional evidence that we have in the exhibits which is 042

10  and 043.  Those are all the IOV Reports.

11      If I can have CLS 13, please.

12      We have alleged as additional overt acts people from

13  Priority One attending various Halstead seminars.  That list

14  of seminars attended by the Priority One employees is at

15  Exhibit 1-288.

16      We have alleged a long list of letters of medical

17  necessity as additional overt acts.  Those are in Exhibit 1-

18  207 through 240.  Again, you only have to find that one of

19  these occurred.

20      May I have CLS 14 please?

21      We have alleged as additional overt acts in the

22  indictment the case study forms from Counts 2 through 15 and

23  they are identified -- these are the specific places within

24  each of those counts where they are.  The case study form is

25  2-008, 7-006, 8-009, 9-009, 10-010, 12-008, 14-012, 15-011.

3246

1    In addition, you may also rely upon the testimony of Doctor

2    Price regarding her signing of the case forms, which is

3    indicated in indictment paragraph 69 and you may also wish to

4    consider Exhibit 1-249, which is related to the testimony and

5    treatment of Mr. Muth.

6        May I have up the CLS 15 please?

7        Additional overt acts we've charged in the indictment

8    include the submission of the actual 1500's that are charged

9    in each of the substantive counts.  Count 1 is the conspiracy

10   count.  Count 2 through 15 are what are known as substantive

11   counts.  Each of the HCFA-1500's that are charged have been

12   identified.  In most cases, as you can see, the charged HCFA

13   is the first exhibit within each count.  Our system failed us

14   on three occasions.  Exhibit 8 doesn't work that way.  The

15   charge HCFA is actually 8-003.  One Exhibit -- on Count 13,

16   the charge HCFA is 13-002 and on Count 15 the charge HCFA is

17   15-002.

18       You can remove that please and blank the screen.

19       The billings for services in Count 2 through 14 are

20   fraudulent because they were billed for services in the name

21   of Doctor Price for days when Doctor Price was not at the

22   clinic, for days before she had seen the patient, for a

23   patient she had never seen and in many cases, for medically

24   unnecessary service.

25       The billing for the service in Count 15 is fraudulent

3247

1   because they are billed in Doctor Medina's name when he never

2   saw that patient.

3       I need to go through with you some charts to show you how

4   to find the various information and make sure you don't get

5   lost when you're back in the jury room.  If I could have up

6   CLS 1 please.  This relates to Counts 2 through 5 of the

7   indictment.  You'll see a chart very similar to this in the

8   indictment.  In your jury verdict form, what you will get is

9   something split off on separate pages for each of these

10  counts.  Your decision about Count 2 will be on one page.

11  You will have a block with the headings across the top and

12  then the count line for that individual one.

13      There are two things that you -- a couple things that you

14  need to be aware of.  The highlighted information is not on

15  your -- is not on the information you will have back in the

16  jury room.  That's information I have added to make it easier

17  for you to try to find it, to try to give you some guidance

18  while we're going through this.

19      If you would, would you -- a couple of dates that you

20  need to be prepared to try to find when you're in the jury

21  room.  The first date is the date of service.  Would you put

22  a red arrow on that for me, please?  As you can see, that's

23  where the date of service is.  That will match with the block

24  that you should be very familiar with on the HCFA-1500's in

25  block 24.  That is not the date of the claim or the date the

3248

1    claim is submitted.  Would you a put a red arrow on that date

2    for me please on Count 2?  You see there, in this case,

3    they're several months apart because of the way they

4    submitted their billing.

5        Now if we could remove that from the screen and let's go

6    to the charge HCFA, which is 2-001 please.  Would you magnify

7    the lower portion of the HCFA?  Thank you.  And if you would

8    put a red arrow on the date of service, please.  Can you see?

9    This date should be very familiar to you.  That's the date of

10   service.  That was the number on the right-hand side of the

11   chart that we were looking at before.

12       The submission date, would you put a red arrow on that

13   please?  You can see the submission date is in the bottom

14   lower left-hand corner in this particular one near where

15   Rebecca Price's name is.  Because of the poor quality of some

16   of the photocopies, you may not always be able to read that

17   number.  If you would remove the magnification, please.

18       There is another place that the submission number appears

19   on it.  Would you magnify that please?  And that's right

20   there in the middle of the form.  This number is much more

21   frequently readable because it's in the center of the copies.

22       Would you remove the magnification?  You can see, if

23   you'll magnify that area again so the Jurors can see it.  You

24   can see that that number, which is 11/23/96, if you remove

25   the magnification and go to the center one, is the same as

3249

1   the number in the middle, 11/23/96.  Would you remove the

2   magnification please?

3       Go back to CLS-1, please.

4       You can see that you'll need to know for the first five

5   Counts the charged HCFA is the first exhibit within each

6   count, 2-001, 3-001, 4-001 and 5-001.

7       Let's go to CLS 2 please.  We see I've identified for you

8   again each of the charged HCFA's.  You can see, as I told you

9   before, the system broke down on Count Number 8, the charge

10  HCFA is 8-003.

11      If I could have up CLS 3 please.

12      And these are broken down, by the way, by insurance

13  companies.  The first one that I brought up, the first five,

14  those were all Medicare submitted claims.  The second group

15  was the Pennsylvania Blue Cross/Blue Shield group.  This is

16  the PEIA group.  Now this one is perhaps a little trickier.

17  You will see that again we're going to have to identify the

18  date the claims were submitted and the first one, I guess,

19  would be useful to note is that it's 12/21/96.  Would you put

20  a red arrow on that please?

21      If you'll remove that document and call up 10-001.  This

22  is -- magnify the bottom half of the page, there we go,

23  that's correct.  As you can see there is -- this was a

24  computer generated copy from the insurance company as they

25  testified to.  This is from the information that they

3250

1    inputted.  There is no date in the block that I had pointed

2    out to you and I'll show you now how to find the date that

3    this claim was submitted.  Would you remove the magnification

4    please?

5        And would you magnify the Julian date at the top?  Okay.

6    If you'll remember the testimony is that these numbers are a

7    Julian date.  The first number you ignore because that's the

8    location the claim is processed.  The second 6 on there,

9    would you put a red arrow on that six.  Thank you.  That 6 is

10    the year.  That tells you that it was 1996.  At the three

11    numbers after the second 6, the 355, that tells you the day

12    of the year.  If my math is right, the 355th day of the year

13    is -- makes that December 21st of 1996, the date the claim was

14    submitted.  If you would remove that please.

15        Let's go to 11-001, charge HCFA in Count 11, magnify the

16    Julian date please.  Again, this would show -- this would

17    have been submitted in 1996, the 316th day of the year makes

18    it November the 12th, 1996

19        Go ahead and remove the -- let's go to 12-01.  Again,

20    this is a 1996 claim submitted on the 299th day.  If my math

21    is right that's October the 26th, 1996 and go ahead and remove

22    the magnification.  We'll go to Exhibit 13-002.  This is one

23    of those ones that did not follow our system.  Magnify that

24    please.  Again, this was submitted in 1996.  The 305th day of

25    the year would make that November 1, 1996, if my math is

3251

1    correct.  All these dates are only required to be on or

2    about.  They don't have to be perfect.

3        If I can have up CLS 4 please.  This shows you where to

4    find the HCFA-1500 for Count 14.  This is a little closer to

5    what your actual verdict form is going to look like.  You'll

6    have one count per page except you won't have the portion

7    that's marked in yellow on yours.  That charge HCFA is 14-

8    001.

9        If I could have up CLS 5 please and this relates to the

10   Accordia claim and you can see the charge HCFA is 15-02.

11   This is the HCFA for which Doctor Medina never saw the

12   patient at all.  If we can bring up the lights now please and

13   remove the -- and blank the screen.

14       Count 16 in the indictment, Doctor Halstead is charged in

15   a money laundering conspiracy.  Their first step in this

16   conspiracy was to create the corporate structure and if you

17   remember the testimony from Mr. Wilson there was a meeting

18   with Halstead, Burns and Wilson in which they talked about

19   how to structure the -- how to structure these corporations,

20   how to form them and how to set them up so that the money

21   would come in to Priority One and it would be sucked out over

22   into the West Virginia Health Care Management Company, the

23   one that Burns owned and then they would distribute the

24   money.  Among the various things that they did with that

25   money, once they got it into the management company, was they

3252

1    used it to promote or to continue their scheme.  They did

2    various things with it.  We have charged a certain number of

3    those checks as the substantive money laundering accounts but

4    that's also part of the conspiracy because this is how they

5    set it up.

6        Now the checks that are involved in the conspiracy and in

7    the substantive money laundering counts are all in one count

8    and that is in Count 16 and those are exhibits -- all of

9    Exhibits 1 through 24.

10       Because this is a conspiracy, it's a money laundering

11   conspiracy, we also have to please the overt act, like we

12   indicated on the first conspiracy.  If I can have up CLS 16

13   please.  I thought it might be useful to show you where you

14   will find those exhibits.  The overt acts, as alleged in the

15   indictment, can be found at Exhibit 1-110, that's a lease; 1-

16   013, the service agreement; 1-014, the equipment lease;

17   Wilson's testimony and then the actual exhibits within Count

18   16 themselves, which is 16-01 through 16-024.

19       The exhibits for the substantive money laundering counts

20   are contained within Count 16 and they go directly -- they

21   just go right down the line beginning at Count 15.

22       For Count 17 -- excuse me, I said that wrong.  For Count

23   17 the exhibit that you need to know about is 16-015, then

24   they continue on through each of the substantive money

25   laundering counts.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3253

1    If I could have up on the screen please, CLS 11.  Would

2    you magnify the bottom third of the screen please?  This is

3    the beginning of the money laundering scheme and the

4    substantive money laundering accounts. You have Priority One

5    Medical Associates.  They submit the fraudulent HCFA-1500's.

6    They submit them in in this case to Medicare, PEIA, Blue

7    Cross, Accordia and railroad maintenance.  Those insurance --

8    those health care companies pay it.  They mail the money

9    back.  The HCFA-1500's are mailed down to -- or mailed to the

10   insurance companies.  The insurance companies mail the checks

11   back to Priority One.  Once that money is received they

12   deposit the money into Priority's One bank account.  If you

13   remember the testimony from Wilson, that that was a P & C

14   bank account.

15       If you'll remove the magnification and magnify the middle

16   third please.  Once the money was in the Priority One bank

17   account, we have charged the transfer from Priority One to

18   West Virginia Health Care Management, of four (4) different

19   checks.  These checks were also included within the

20   conspiracy count of Count 16.

21       But specifically we've charged as Count 17, the issuance

22   of a check for $75,000, a check in Count 18 for $65,000,

23   Count 19 $60,000; Count 20 $80,000.  This money was all

24   transferred on the dates indicated to the West Virginia

25   Health Care Management.

3254

1    Please remove the magnification and we'll take the top

2    third, please.  Once they had the money into the Health Care

3    Management there were an assortment of different places the

4    money went to.  We have charged two different places they

5    went to.  One is they pulled the money out and they

6    transferred the money to Robert Burns himself and he took

7    that -- those money out in three checks that we have charged,

8    in Counts 24, 25 and 26 and in the amounts as indicated,

9    which are for Count 24, $4,376 and some change.  Count 25,

10   $3,525 and Count 26, $16,790.70.  They also issued checks to

11   Doctor Halstead.  We have charged three of those transfers to

12   him in Counts 21, 22 and 23.  Each of those checks were for

13   $3,000.  You can remove that please.

14       Now you will note when you're looking at Counts 17

15   through 26, that Doctor Burns is charged in those counts.

16   Doctor Halstead is criminally responsible for those if you

17   find that while he was a member of the conspiracy a fellow

18   conspirator, Doctor Burns, committed the offenses of money

19   laundering promotion as charged in Counts 17 through 26 in

20   furtherance of that conspiracy and as a foreseeable

21   consequence of that conspiracy.

22       Let's take a moment and turn to the evidence on -- that's

23   been presented to you over the last several weeks.  As you

24   know, in 1993-4 timeframe Doctor Halstead was retained to

25   provide management consulting services to Burns and his

3255

1   various companies and in doing so Halstead established the

2   Halstead program at the Burns' clinic.  As I mentioned to you

3   before, we don't have to prove a formal agreement as to this

4   conspiracy.  We only have to prove a mutual understanding, a

5   partnership in crime so what is -- what is the evidence that

6   there was a conspiracy?

7       One of the things I want to point your attention to is an

8   exhibit that I can't put up on the screen.  It's a tape.

9   It's one of the tapes we played very early on in the trial

10  and it's tape -- the exhibit number is 1-078.  You will have

11  this tape back in the jury room with you.  On this tape --

12  this is the Priority One staff meeting that you've heard

13  about several times in the trial.  If you'll remember back to

14  Twigg's testimony in the first week of the trial, he told you

15  that this meeting -- this was a staff meeting of Priority One

16  in anticipation of a Halstead visit and when you -- if you

17  listen to that tape you will hear the doctors getting

18  together talking about an assortment of things to get ready.

19  It appears like they're talking about a bunch of forms and

20  documents that they need to review and get ready so that they

21  can understand what their meeting with Halstead's going to be

22  about.  You hear that there's -- you hear when they talk they

23  discuss various doctors that have been at the clinic and

24  they're talking about Doctor Medina and it appears like he

25  has been there only a short period of time because they're

3256

1  talking about how much better he is than the last doctor and

2  then they come up to the part where they're talking about

3  Medina being pliable and you can hear the doctors laughing.

4  It's quite evidence that they think this is cute.  Then you

5  can hear Taylor say that Medina should be diagnosing.  He

6  never diagnoses.  Then you hear them talking about how they

7  need to have Halstead work with Medina to get him diagnosing

8  more.  You hear Burns saying that Medina is really good for

9  the practice.  Medina is a real gem and then they go through

10  and they're talking about some other stuff and they bring up

11  some reports that they're obviously looking at while they're

12  talking about it and they're complaining that the insurance

13  company had cut down on the amount of money that they were to

14  receive and they're unhappy about that.  And Burns tells

15  them, make sure you don't list anything as mild.  List as

16  everything as aggravated, severe or badly degenerated.  What

17  you don't hear is anybody saying wait a minute, that is

18  wrong.  We list it as it's supposed to be.

19      This is a conspiratorial meeting.  These people were

20  planning -- their crime had already started.  They were in

21  full force and they knew what they were doing.  They knew

22  that they were going to list everything as aggravated, severe

23  and badly degenerated.

24      And then they go on a little bit further and Burns says

25  hey, if we don't have it documented, we have to put something

3257

1   in there.  When it comes down to reporting make something up

2   to put in there 'cause if you don't we don't get paid.  Now

3   both Filcheck and Taylor are sitting in this meeting.

4   They've admitted that to you on the stand.  They admit to you

5   that they never protested when Burns said to just make

6   something up so that they could get paid because that's what

7   they were doing, that's what they continued to do.  This

8   meeting was sometime in 1994.  Taylor and Filcheck were there

9   all of 1994.  They stayed there from this meeting forward,

10  the rest of '94.  Taylor and Filcheck were there all of 1995.

11  They were there all of 1996.  They were up there through the

12  raid.  They were there after the raid.

13      This shows you that they knew what was going on in 1994.

14  They were willing participants in this scheme.  They knew

15  exactly what was going on.  In fact, this fits into exactly

16  what Filcheck told Hudson on the day of the search when he

17  was interviewed.  Filcheck said eighty to ninety percent of

18  the letters of medical necessity were bogus, that they were

19  just making stuff up to get paid.  They knew exactly what

20  they were doing.  Make something up to put in there because

21  if you don't we won't get paid.  '94.  '97.

22      I thought it was more than a little telling when asked

23  about why he wasn't protesting.  Filcheck responded by saying

24  Burns said it.  It was not my concern.  He took the position

25  he was just taking orders from the boss.  I mean, I think in

3258

1  fair summary that was his position throughout his cross-

2  examination, I'm just taking orders from the boss.

3      Taylor took the position he was just taking orders from

4  the boss.  In fact, Taylor and Filcheck admitted to the

5  agents that they were ordering testing based upon Halstead's

6  protocol, just taking orders from the boss.

7      Taylor and Filcheck said that the Halstead treatment

8  protocol was based upon the insurance coverage of the

9  patient, not on the medical needs of the patients.

10     What does all this show you?  What's the conclusions that

11 you can draw here?  Well, one, that they knew that there was

12 a plan to base the treatment on the patient's insurance

13 coverage and not on the medical needs of the patient.

14     Two, it shows you that they had agreed to be part of the

15 plan because they were doing it.  It shows you that they were

16 willing to be part of the plan.  They knew exactly what was

17 going on in 1994; they continued all the way through 1997.

18     Ladies and gentlemen, most organizations have leaders;

19 they have underlings and criminal enterprises, criminal

20 partnerships are no different.  In this one Halstead was the

21 mastermind, Burns was the boss, Taylor, Filcheck, Medina,

22 Twigg, they were all underlings.  An underling is just as

23 guilty as the boss.  An underling is just as guilty as the

24 mastermind.

25     Now, admittedly, Taylor and Filcheck were unhappy with

3259

1    their roles in this conspiracy.  They were having to do too

2    much work for too little pay was their complaint.  But you

3    know what, an unhappy underling is still an underling in a

4    criminal enterprise.

5        Additional evidence of this conspiracy can be seen on

6    Exhibit 1-136.  If you'll remember this is the notes of a

7    meeting with Halstead on February 4th, 1997.  I believe that

8    these are Doctor Taylor's notes.  If you look at the

9    highlighted section here -- would you magnify that please?

10   This is from his meeting with Doctor Halstead.  I misspoke.

11   I misspoke.  These are Filcheck's notes.  I apologize to you.

12   These are Filcheck's notes of his meeting on 2/4/97 with

13   Halstead.  Taylor's present at this meeting.  You see the

14   Halstead protocol here.  First week.  TG order.  TG,

15   temperature gradient.  Second week, neurometer.  Third week,

16   down at the bottom, range of motion, rehab, other tests.  If

17   you will remove that please and let's go to 1-044.

18       And this is the first page of the same meeting that we

19   just -- we reviewed Filcheck's notes on.  These are Taylor's

20   notes.  Can we go to the second page please and magnify the

21   yellow at the top.  Again, you can see this tracks exactly

22   with Filcheck's notes.  The first week TG, second week

23   neurometer, third weeks additional treatment.  Highlighted in

24   blue something that I was noticing, diagnosis needs to be

25   pain.  Very interesting quote from their meeting with Doctor

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3260

1   Halstead, clearly instructing them what the diagnosis was to

2   be for these patients before they ever arrived at the place.

3       Both of these exhibits track exactly the statements that

4   they gave to the agents as to what the Halstead protocol was,

5   what they were ordering and how they were doing it.  They

6   knew what it was.  They knew what they were doing and they

7   were doing it.

8       Both of these notes also refer to recording of the ten

9   point exams and we managed to pick up a couple of the ten

10  point exams on tape when we raided the place.  We also picked

11  up some of -- of Halstead's instruction -- one of Halstead's

12  instructional tapes.  That tape is 1-264.  We also picked up

13  the instruction sheet, the training sheet that he gives out

14  which is 1-120.  Will you put that up on the screen please?

15  Would you magnify the highlighted sections?

16      You've seen this several times.  Doctor is talking with

17  the patient, go around sit down beside the patient and say

18  the following:  I think you'll agree with me that we have a

19  serious problem here and then I've underlined for you:  This

20  is to suffice the objection.  Now when I read that I didn't

21  know what the word suffice meant.  I had to go look it up.

22  It means to meet or to overcome so this means this is to meet

23  or overcome the objection.

24      If these people need Medicare -- I mean need medical

25  care, why are you having to meet their objections?  Why are

3261

1    you having to overcome their objections.  I don't want to

2    take these pictures unless you're interested in doing

3    something about this back problem.  Again, to suffice the

4    objection and handle it properly.  Why are you attempting to

5    overcome the patient's objection?  If they don't want the

6    treatment, they don't want the treatment.  Why do you have to

7    overcome them?  Why do you have to overpower them?  Because

8    they don't need the treatment but you need them there in your

9    clinic so you can bill for the services.

10        Can I have page two please?  Magnify the section at the

11   top.  Thank you.  What do you think about these pictures?

12   I'm really glad we took those pictures.  These vertebrae are

13   severely twisted out of position.  You've heard that phrase

14   numerous times throughout.  I have underlined here, this is

15   the only dialogue that should be used.  You've heard Doctor

16   Halstead's explanation on the stand about what those words

17   were -- what he thought those words were supposed to mean and

18   his explanation about why he was instructing the people to

19   use only this dialogue.

20        You are the sole judge of the credibility of the

21   witnesses.  It's your job to determine whether or not he

22   meant the words that are on those paper -- that is on this

23   paper that he was distributing or did he mean something else?

24   It's your job to decide it.  You don't have to accept things

25   that you find to be unbelievable, incredible.  You determine

3262

1    the evidence.

2         The other thing I wanted to point out for you is the --

3    on this is the twenty to thirty treatments, twenty for cash,

4    thirty for quality insurance.  It's very interesting here

5    that cash people seem to get better quicker.  People who have

6    quality insurance seem to need more in care.  It's amazing

7    how that has occurred.  You saw Doctor Halstead attempting to

8    distance himself from this language.

9         Can I have the section at the bottom please?  Again, this

10   is part of the script that the doctors are supposed to be

11   using word for word.  The patient has said to the financial

12   person, I don't want it and the financial person is supposed

13   to get up and go find the doctor and bring the doctor to the

14   little office where they were doing the financial and the

15   doctor is trying to convince the patient to become a patient.

16   Let me ask you a question, do you feel you need the care?

17   Well, I do too.  As you remember those vertebrae are severely

18   twisted out of position.  I hate to see you leave here today

19   not making a commitment to get the treatment you know you

20   need.

21        Why do you have to put that kind of psychological

22   pressure on somebody in a doctor's office?  You either need

23   the care or you don't.  You don't have to be convinced to be

24   a patient.

25        Let's look at the bottom part that we didn't really focus

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3263

1   on with much of the testimony.  I've underlined it.  This

2   procedure will be performed on all patients coming from the

3   educational dinner who have qualified insurance coverage.

4   Okay?  Get these people in for the dinner, they have to have

5   the insurance coverage or it -- it isn't worthwhile doing

6   because why?  Because you need an insurance company so you

7   can bill them.

8       If this script is followed word for word, we should see a

9   large improvement in our ten point conversions.  Word for

10  word.  This is what they were supposed to do.  He was the

11  mastermind behind this plan.  This plan was executed by

12  Burns, by Twigg, by Medina, by Filcheck, by Taylor.  Let's go

13  ahead and remove the magnification please and then blank the

14  screen.

15      Twisted vertebrae.  Now you've heard those words before.

16  Some of the places that you've heard them are the four

17  different patients on the same tape that you heard from

18  Doctor Filcheck's own mouth.  Doctor Filcheck told you I'm

19  really glad we took those x-rays.  He told you, you need to

20  get this taken care of.  You heard him say these are severely

21  twisted bones.  You heard him say to those four patients in a

22  row, on a tape, twenty to twenty-five to thirty visits.  He

23  was following the instructions.  He was participating in this

24  plan.  Exactly what he was taught.  The snippets, for those

25  of you who take notes, the snippets are on page 1-266, 267,

3264

1  268 and 270.  The full tape is 294.  All of those are 1 dash,

2  okay.

3      All right.  Let's call up 1-122.  These are Taylor's

4  notes of his meeting with Halstead discussing the ten point

5  exam.  Here is what he's teaching.  I think you'll agree with

6  me we have a serious problem here.  Just what you saw on the

7  Halstead training sheet.  Read the disclaimer.  I want to get

8  the x-rays only if you're ready to do something about it.

9  Just exactly what Halstead was teaching.  This is what he was

10  writing down.  Let's go to the next page.

11      Here he has the twenty to thirty visits, set up the

12  appointment, make sure you get the people in there, exactly

13  what was being taught.  Remove the highlight.  Do you feel

14  you need the care?  Sound familiar?  Where could he have

15  learned those words from?  Remember bones severely twisted.

16  I something hate to have you leave the office without getting

17  the care you need.  See the word objection written off in the

18  margin.  What can we do to help you get under care?  Why do

19  they need to convince these people to get under care?

20  Because they needed them in to do billing for unnecessary

21  services.

22      The similarity in the language between what Halstead is

23  teaching, what Taylor and Filcheck's notes and tapes say show

24  you that these people were all acting in concert together.

25  They knew what they were doing and they were doing it on

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3265

1   purpose.

2       Halstead had a program.  Had a program that he installed

3   and used through Priority One and I think we should take a

4   moment and talk about the Halstead program as it was at

5   Priority One.

6       Can I have up exhibit 1-110 please?  This was the note or

7   the chart that Doctor Price wrote up after attending a Four

8   Phases of Care meeting at Priority One.  The first phase of

9   care is Hook 'Em.  Let's talk about Hook 'Em for a minute.  I

10  want to direct your attention back to the testimony of

11  Rogers.  Remember he was the telemarketing guy that came in

12  and tested -- testified on I think the second week of trial

13  like Monday or Tuesday of that second week, Monday was a

14  holiday.  He was the one who told you about calling people to

15  schedule them for a steak or chicken dinner.  He told you

16  about this little interest card that they had and about how

17  the people were treated.  There was a distinction, a very

18  bright line.  If you had insurance you got the earliest

19  dinner and you were brought in right away.  No insurance, you

20  were scheduled for a dinner sometime way in the future.  He

21  told you that they sent reminder cards to those who had

22  insurance and no reminder cards to those without insurance.

23      Go ahead and blank the screen please.  Remember the

24  interest card that Rogers talked about, the little card that

25  was supposedly dropped in that plastic box that was passed

3266

1   around that second week a lot.  It had a blank on it to

2   determine if a person had insurance or not, you remember

3   that.  Well that card, that blank is part of the Halstead

4   program because they got to find out about your insurance

5   right away.  They need to know it because they don't want to

6   waste the money on a dinner for somebody who doesn't have

7   insurance because the goal is to get people in with insurance

8   so they can bill for it.  Now that was part of the Halstead

9   program.

10      Carol Stover, okay, one of Halstead's employees, was the

11  marketing person.  You saw her name on some of that exhibit

12  that I put in through Rogers that dealt with the marketing.

13  You saw the practice systems' name.

14      If I can have up Exhibit 1-265 and let's go straight to

15  page 8 please.  If you remember this is the actual card.

16  Name, address, city, state, residence phone, place of

17  employment.  Remember Halstead's testimony about that line

18  that I've got highlighted on this card?  And by the way the

19  highlighting on all of these exhibits, that's my

20  highlighting.  It's for my emphasis.  It's not on the

21  originals and that's throughout all the exhibits that I've

22  been showing you.

23      Remember how Halstead tried to distance himself from his

24  own employee.  He told you that, well, I mean that was

25  something Carol Stover did.  I had nothing to do with that

3267

1   'cause I didn't agree with it.   Okay.

2      I thought it was particularly interesting Trent's

3   testimony about that same blank.   Remember he was being asked

4   why would you put a blank like that on the card and he told

5   you that was because they wanted to make sure that the people

6   coming to the dinner were local.   Do you remember the next

7   question?   Couldn't he figure out they're local from the

8   address on the card?   They had this on there because they

9   wanted to know what the people's insurance was and they could

10  figure that out from your job and that's all that it was

11  there for.

12     Let's go back to Exhibit 1-110 please.   The second phase

13  of care at Priority One was the Reel 'Em In.   Reel 'Em in.

14  The Halstead system included the establishment of specific

15  treatment protocols based upon the patient's insurance

16  coverage and not on any medical.   One of the first steps in

17  reeling 'em in was that ten point exam that we've already

18  talked about a little bit.   According to the Halstead ten

19  point exam script, Taylor and Filcheck were to tell the

20  perspective patients this information exactly on his script

21  during the patient's first visit to that clinic.   These

22  vertebrae are twisted severely out of position.   This is the

23  only language that was to be used and why?   Because it was

24  designed to scare people into agreeing to accept treatment so

25  that they could bill the insurance company.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3268

1     Now Halstead himself tried to distance himself from his

2   own language in his testimony.  He had to admit, because it

3   was printed down there, it was on the tape, that he had used

4   the words these vertebrae are severely twisted out of

5   position and that this is the only dialogue that was to be

6   used.  He finally admitted that this may have been a poor

7   choice of words, particularly since it's been up on the

8   screen so many times throughout this trial.

9     You can go ahead and raise the lights please, remove that

10  from the screen, please.

11    The patients were encouraged by both Taylor and Filcheck

12  to believe that the chiropractic treatment would actually

13  help them and that their insurance would pay for the

14  treatments so it was going to cost them nothing or next to

15  nothing.  This often overcame the patients' objections, i.e.,

16  it sufficed the objection.  This process, okay, was known

17  within the clinic, known by the terms that Halstead used, as

18  the conversion of the patients.  The conversion of a patient

19  meant taking the person who didn't need the service and

20  making them a patient by converting them into a patient.

21  This was a figure that was closely tracked at Priority One.

22  It was closely tracked and monitored by Burns and Halstead

23  through Twigg and it was closely tracked by Filcheck and

24  Taylor because they got bonuses based on it.  This was where

25  they got money.  Now Taylor and Filcheck's conversion

3269

1    sessions were actually tape-recorded.  That's what you heard.

2    You heard those complaints asked.  You heard them over --

3    trying to overcome patient's objections.  You heard them

4    telling people, four in a row, Filcheck's case, that they had

5    severely twisted bones.

6        What does Halstead say about the reel 'em in phase of the

7    care.  Let's go to Halstead's own words in the Burns in-

8    office visit reports and we'll look -- I've pulled up several

9    selections.  These are clips from the various IOV Reports to

10   the Burns clinic.  Each of these IOV's are in evidence.

11   These are clips that I've taken from them.

12           "Don't worry about the patient's balance

13            if the insurance pays well."

14   What does that tell you about it?  We're in this for the

15   money.  We want to get paid well, want it from the insurance

16   company.  If the patient is being done for the patient's

17   balance, if they're billing the patient, the patient's less

18   likely to come back.  They don't want that.  They want the

19   flow of money to continue so don't worry about it as long as

20   you're getting your money from the insurance company.

21       Okay.  Next slide please.  Here's where they're talking

22   about the ten point conversions.  Work more with doctors on

23   ten point conversion.  One associate is not doing well, work

24   with him.  Give more ten points to new associate.  He's doing

25   much better on the conversion.  Let's look at that date.

3270

1    11/30/94.  Who was the new doctor?  By the evidence presented

2    to you, you know that is Doctor Filcheck because he had just

3    joined the practice in 1994.

4        Next page please.  Work on insurance verification book so

5    we can find more -- find out more about qualified insurance.

6    Get your insurance bible up to date.

7        Next screen please.  You have one associate who's fairly

8    good at the conversions.  Let him do three-fourths of all ten

9    points.  The other associate needs to be worked with more.

10   Both doctors need to learn how to overcome objections.  Why

11   do you have to overcome the patients' objections?  Both

12   associates need to learn how to ask questions.  Let the

13   patient come into their own conclusions and accept care.

14   This needs to be really worked on.

15       May I have up Exhibit 1-110 please?  Okay.  The third

16   phrase of care at Priority One clinic, keep them on the line.

17   They had an assortment of ways they kept them on the line.

18   Okay.  The first thing that they did to keep them on the

19   line, first tool that they used to keep them on the line,

20   were the case study forms.  Okay.  This was an integral part

21   of the Halstead system.  In this way the chiropractors were

22   directing and ordering the treatment that was to be given to

23   the patient right from day one.  The interesting thing about

24   this was once this form was cycled around, it was stuck in a

25   file and never went back for any changes to it.

3271

1    Could I have up 1-126 please?  Could you magnify the top

2    section, please?  You remember this is the case study that

3    was found on Taylor's desk at the time of the search.  If

4    you'll remove the magnification, we'll go down to the section

5    in the middle.  This is where he is ordering.  This is where

6    you can order the various tests and services.  This is a go

7    by.  It was on his desk at the time of the search.

8        If I could have up Exhibit 1-127.  This is another go by

9    that was also found on Taylor's desk, according to the

10   testimony that this is in Twigg's handwriting.  This is

11   another co-conspirator writing down notes he learned from

12   Halstead as to what was going on, how to build these -- I

13   mean how to hoard services so they could eventually end up

14   billing for them.

15       Let's go to page 2 of this exhibit please.  Magnify

16   please.  This is an area that we didn't really focus on

17   during the trial.  This is page 2 of the Twigg case study go

18   by.  Assume every test is positive and they are under care

19   for a year.  This is what they were doing at this time.  Go

20   ahead and remove the magnification please.

21       In addition to the case study form, before they got to

22   that, they had the treatment protocol.  Now this was designed

23   by Halstead, implemented through Burns and Twigg, used by

24   Taylor and Filcheck.  We know this because we have notes of

25   the meetings with both Taylor and Filcheck meeting with

3272

1    Halstead about what the treatment protocol was to be.

2        If I could have up 1-044 and go to page 2.  Remember

3    this, we just had this up a couple minutes ago.  This -- this

4    is the notes of the meeting between Taylor, Filcheck,

5    Halstead and Burns, laying out their treatment protocols.

6        Go ahead and remove that and I'll go to 1-136 please,

7    page 2.  Again, same notes -- I mean, this is Taylor's notes.

8    The first were Filcheck's.  Same meeting.  Laying out the

9    protocol, making sure that everybody knows what the program

10   is, the Halstead program.  Go ahead and remove that.  Blank

11   the screen please.

12       In addition to the case study form, the treatment

13   protocol, they also used a couple other tools.  They called

14   them the Rolodex system and they called them the non-

15   compliance form.  The Rolodex system was a unique feature of

16   this program that Halstead was instituting because it was

17   necessary to have.  If you're performing services that the

18   patients don't really need, there's a tendency to forget to

19   do them so you got to write them down and you got to have a

20   system of enforcing them to make sure that these services

21   that the people don't need actually happen.  That's why you

22   got to have such a detailed tickler system.  So much is

23   involved with making sure that you paper these files, make

24   sure the things are done just exactly the way Halstead wants

25   because otherwise you're going to forget it.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3273

1    Now the non-compliance form was a form used to make sure

2    that the patient got everything that was on the check-off

3    list because if you didn't you couldn't bill for it and

4    therefore they'd have to have special permission, a really

5    good reason not to do something.

6    All these forms came from Halstead.  They were all an

7    important part of the scheme because they enforced the

8    system, they papered the file.  The treatment wasn't

9    important.  What was important was papering that file to make

10   it look like the MD was doing all this.  Okay.

11   Another way they kept the patients on the line was

12   through the use of medically unnecessary tests.  Could I have

13   up Exhibit 1-055?  Ms. Johnson from the West Virginia Board

14   of Chiropractic Examiners testified that this letter was sent

15   to all the West Virginia chiropractors and that among those

16   people that this would have been sent to were Taylor and

17   Filcheck.  Now, she also testified that neither Taylor nor

18   Filcheck were certified to perform any of the diagnostic

19   tests listed on this letter.

20   Now I want you to think back to the testimony of both

21   Taylor and Filcheck because they admitted to you that they

22   were not properly trained in their chiropractic colleges on

23   how to use these diagnostic tests.  Now you got to kind of

24   put yourself in the position that they were in at Priority

25   One, remove the magnification and magnify the date please, on

3274

1    May 24, 1996 or thereabouts when this letter came in.  They

2    were at full speed.  They were running diagnostic tests on

3    all these patients, running -- this letter comes in, what are

4    they going to do?  They'd been running this scheme for two

5    years at this point when this letter comes in.  Go ahead and

6    remove the magnification please.

7         Well, the thinking must have been something along the

8    lines of we'd better check with the man behind the program,

9    better check with the man behind the plan.  Better check with

10   the man with all the answers.  And you know that was Doctor

11   Halstead.  Let's go ahead and see what Doctor Halstead's

12   response was to these folks.  Okay.

13        What's probably most interesting about his response is

14   what's not in his response.  He doesn't say get those

15   chiropractors trained, right now, get them trained.  If

16   they're not licensed to do this, get them trained.  He

17   doesn't say that.  What does he say?  If this is billed

18   through MedicalCorp. And ordered by MD and supervised by MD

19   then the chiro isn't doing it.

20        Part of the Halstead system is to conceal from the

21   insurance companies what they were really doing in this

22   claim.  What he is saying here is bill it through the

23   corporation, the medical corporation, in the name of the MD

24   and you won't get caught.  You're not going to get caught if

25   you do it this way.  I think you do get caught.  Go ahead and

3275

1    remove the magnification and go to the other handwriting.

2    Thank you.

3        If you do get caught, the Chiro Board has absolutely no

4    sanctions.  That's what he was saying.  Hide it; conceal it;

5    don't worry about it, but if you do get caught, no big deal.

6    Who cares?  The Chiro Board can't do anything to you for

7    violating West Virginia statutes.  Okay.  Go ahead and remove

8    the magnification and blank the screen please.

9        Now we have other evidence in the case that they were

10   performing medically unnecessary services at this point.  We

11   have the admissions of Defendant Taylor.  In his March 24th

12   interview Taylor admitted that each patient's treatment

13   varied by their insurance coverage.  He admitted that the

14   tests at the clinic were ordered based upon a protocol set up

15   by Halstead and that if the insurance -- the patient's

16   insurance would not pay for a particular service, they would

17   do a different service that the insurance company would pay

18   for.  Taylor admitted that he knew all of that.  He also

19   admitted that he knew that Twigg was ordering medically

20   unnecessary tests in order to get additional money from the

21   insurance companies.  Now why is that important to you?

22       THE COURT:  Mr. Donley, I just wanted you to know

23   you're beyond the one hour and you can continue but it cuts

24   off on the time for rebuttal, however you want to handle it.

25       MR. DONLEY:  Yes, Your Honor.  Moving right along.

3276

1   May I have Exhibit 1-131 please?  Recognize this letter?  It

2   was up on the screen several times.  Things that stress me

3   out.  You know this is from Doctor Taylor.  You know from the

4   highlighting his words "looking for testing, otherwise I lose

5   an office visit".  This is a clear indication Doctor Taylor

6   knew they were performing medically unnecessary testing.

7   They were looking for reasons to test these people,

8   otherwise, they were going to lose an office visit.  Okay.

9   Go ahead and remove the magnification.

10      It's not good enough to get the patient well.  I get

11  penalized when they don't stay the 36 visits.  He's a

12  disgruntled employee.  He's unhappy with -- he's having to do

13  a lot of the work and not getting paid much.  He wants a

14  bigger slice of the pie.  He's willing to stay there and do

15  it.  He just wants a bigger slice of the pie.

16      Okay.  Go ahead to -- go ahead and magnify the top

17  section.  People don't come back because they see the prices

18  on their bill, I get penalized because they didn't follow

19  through with the 36 program.  He's complaining.  He's not

20  getting his bonus program because the prices are too high.

21  He wants the prices dropped so the patients won't see them,

22  so they'll come back so he can get the bonus program.  He's

23  going along with the program.  He knows what it is.  Go ahead

24  and remove the highlight please.

25      Stressed out.  I'm working more hours and making just