3277

1    about the same as I did before.  I have to spend a big part

2    of my day checking to see if the insurance is paid.  So he

3    can make sure he knows how much he's getting.  Remember,

4    these are the guys that are getting paid 6 bucks a bat,

5    piecework, doctors doing piecework.  Six bucks a bat.  That

6    was an important part of this scheme because it helped keep

7    everything moving.  Now go ahead and remove the highlighting.

8       Go back to page 1 of this document.  You are the judge of

9    the credibility of the witness.  You heard Doctor Taylor try

10   to distance himself from his own words in this document.  You

11   need to evaluate whether or not a statement written by one

12   co-conspirator, Taylor to another co-conspirator, Burns,

13   during the course of the conspiracy is more believable as to

14   what he was really thinking and what he was really believing

15   than the testimony he has given before you this week or last

16   week.  You have to think about, when is there a motive to

17   lie?  When is there a motive -- when is there not a motive?

18   You have to think about did he have any idea at the time he

19   was writing this letter, sending it to Burns, it was going to

20   be put in his personnel file and found by the Government many

21   months later.

22      If I could have up Exhibit 1-133.  Things that bother me

23   lately.  You remember this letter too.  Go ahead.  Talk of

24   ethics.  Just testing for money; no other reason.  Testing

25   for money, no other reason.  Taylor's own words.  Same

3278

 1   paragraph.  I understand it's a big facility, testing is

 2   needed but it should be for the right reasons, not because we

 3   have bought an expensive piece of equipment and that we are

 4   told that we can make a lot of money off of it and it must be

 5   paid for.  That tells you exactly what he knew.  He knew that

 6   they were doing this -- all this testing to pay for the

 7   equipment.  As an aside, who sold them that equipment?  The

 8   testimony is a great deal of it came from Halstead.  He

 9   arranged for the purchase of it.  That was part of the

10   scheme.  Get them to buy all this expensive equipment so they

11   can over -- utilize it so they can bill everybody for it.  Go

12   ahead and remove the highlighting please.

13       All right.  Here's where they offered him a twenty-five

14   percent partnership.  Filcheck was apparently offered the

15   same thing, a little less than twenty-five percent so that

16   they would only end up owning forty-nine percent between the

17   two of them.  The problem was they just weren't offered a big

18   enough piece of the pie.  That's why they're a disgruntled

19   employee but a disgruntled member of a criminal enterprise is

20   still a member of a criminal enterprise.

21       Go to the next page.  Let's go right down to the

22   arguments.  I don't like lying to patients why they need a

23   particular test.

24       You are the sole judge of the credibility of these

25   witnesses.  You determine what you believe and what you don't

3279

1    believe.  Was he lying about lying?  Or was he just

2    uncomfortable?

3        All right.  Let's go on.  The same document, last

4    sentence, I didn't go through it.  You're welcome to read it

5    and review it.  This is Exhibit 1-134.  We are told to keep

6    the patients as long as possible.  That was part of the

7    scheme.  Keep them there, keep them rolling, this is what

8    they were required to do.  Keep them there as long as

9    possible so they can get their 6 bucks a bat.  You heard him

10   to rationalize Doctor Taylor in his own words.  You are the--

11   you are the ones who determine the credibility of these

12   witnesses.  Which is more believable, what he wrote to Burns

13   during the course of the conspiracy, what he testified to in

14   this courtroom?  Think about when there was a motive to lie

15   and when there was no motive to lie.

16       You have the admissions of Defendant Filcheck.  Filcheck

17   told the agents, temperature gradient routinely being given

18   of the patients, routinely being billed to the insurance

19   companies, as long as the insurance companies would pay for

20   it.

21       The treatment and testing protocols were established by

22   Halstead and Burns and that his co-schemers, Burns and Twigg

23   had told him that if the insurance companies would cover the

24   test, he should perform them and that they were going to bill

25   for them.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

3280

1     He admitted that the letters of medical necessity that he

2  was involved with eighty to ninety percent of the time were

3  bogus and that means that the tests were bogus because there

4  was no need for them.

5     Okay.  Let's deal with some of the admissions of

6  Defendant Halstead.  Let's go to Burns IOV Number 2.  These

7  directly -- these are quotes from the Burns' IOV's.

8          "Identify all patients that he tested on the

9          neurometer and start testing now.  Losing tremendous

10         income.  Loss each month of almost $80,000.

11         Diagnostic ultrasound not running tests.  Schedule

12         patients, bill; don't wait.  Ask if going to pay,

13         losing" -- next page please.  "Not doing enough

14         diagnostic testing.  Must do more.  Range of motion,

15         ADL, muscle testing, nerve conduction and stay on

16         top of it.  $33,600 loss in revenue in May alone."

17  Next screen.  "Do functional capacity on all patients three

18  times, beginning, middle and end."  Next page please.

19         "It's costing -- let's get on top of diagnostic

20         testing.  It's costing you approximately $120,000 a

21         month in the last month.  You're over a thousand

22         therapies short, only averaging one therapy per

23         patient per visit."

24     He's not telling them how to treat each individual

25  patient because he's telling them how to treat all the

FORM CSR - LASER  REPORTER'S PAPER & MFG. CO.  800-626-6313

3281

1    patients.  This is cookie cutter medicine.  Everybody gets

2    everything.

3        Let's go to what Doctor Halstead said to some of his

4    other IOV clients at about the same time he was talking to

5    Burns.  Can I have Exhibit 1-419 please?  Okay.  You have a

6    major problem that's costing you a fortune.  I repeat, not

7    doing enough therapy.  I told you about this the first visit.

8    You've not corrected it.  It's costing you $10,000 a month.

9    Every patient that can should get three therapies now.  Go

10   through treatment cards and bump a therapy on every active

11   patient you can.  That means to add a therapy on every active

12   patient that you can.  Everybody is going to get added

13   therapy, not because they need it but because you can.

14       Can I have the Burns IOV Number 3 please?  Again, what is

15   Halstead telling Burns.  Many patients have great coverage

16   and you could get paid much more.  Every patient should get

17   three therapies.  Must pay attention to coverage.  Do not do

18   procedures that the insurance company doesn't cover.  It

19   distorts the collection ratio to bill for services that are

20   not chargeable.  That's what he's telling them.  Do it if the

21   insurance company will pay for it.

22       Can I have the next page please?  You really need to

23   clean up these patients that are getting care that have no

24   coverage on their insurance or their insurance has run out or

25   they have a large balance.  Yes, they produce visit numbers

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3282

1    but they're false numbers if you can't or don't get paid.

2    Must clean this up.  This is what Halstead is telling Burns.

3    One co-conspirator to another co-conspirator.  Same time

4    frame, he's also telling -- Halstead is also telling his

5    other clients on Exhibit 1-418, get neurometer up and

6    running.  Do neurometer on all patients who have coverage.

7    Get diagnostic ultrasound up and running.  Do tests on all

8    patients who have coverage.  Down towards the bottom.  Do

9    neurometers.  Need to do more neurometers.  Do on all

10   patients who have coverage.  Start range of motion testing on

11   all patients who have coverage.  No medical necessity.  The

12   word is coverage.  You know what that means.  It means

13   insurance coverage.

14       I was there.  I grabbed 15 EOB, explanation of benefits

15   at random.  People, many of them, had great coverage and only

16   getting two PT's, no rehab, hardly any diagnostic testing.

17   People who have great coverage only coming in two or one time

18   per week.  People who now had a hundred percent coverage

19   dropping out.  I could go on but you saw it.  This is the

20   major problem number two.  You must fix this now.

21       This is what he's telling his clients.  This is what he's

22   telling them, directly on point with what's going on.  Go

23   ahead and remove that, blank the screen please.

24       Halstead was the mastermind behind this, was an integral

25   part of this scheme.  He told you that he was there eleven

3283

1    visits and that's technically true, but actually he was there

2    every day.  He was in that office every single day.  He was

3    there because he was a doing a -- helping them with their

4    marketing, directing their marketing.  He was providing

5    faxes, forms, telephone calls.  Every day he was calling the

6    shots in this clinic.  It was part of his plan to make sure

7    that the cookie cutter medicine was enforced by everybody.

8         Let's go to Exhibit 1-422 please.  This is some of

9    Halstead's words to other IOV clients on the role of a

10   medical doctor.  You need to get an MD up and going

11   especially for Blue Cross/Blue Shield.  It will pay for

12   itself one hundred times over.  You absolutely must get an MD

13   at least four to five hours per week now.  It will help

14   insurance coverage and how much is coming in.

15        Let's go down to this last one.  I've underlined part of

16   it.  It is an absolute must that you bill practically

17   everything under the MD corporation.  The way you are doing

18   it causes a quote "red light" at the insurance company.  It

19   was part of his plan to conceal from the insurance companies

20   exactly what they were doing.  They did not want people to

21   know that these were chiropractors performing these services.

22   By doing it the way they were doing it, billing through some

23   other way then through the medical corporation was creating a

24   red light at the insurance company, letting the insurance

25   company know what these people were really doing.

3284

1      Now there came a time -- go ahead and remove that and

2   bring up the lights.  There came a time during the cross-

3   examination of Halstead when they were talking about meeting

4   Doctor Medina and he said he had never met Doctor Medina and

5   why did you never meet the captain of the ship?  The man

6   directing all the medical care at this facility, the guy who

7   was asleep in his office and reading golf magazines, why did

8   you never meet him?  And Halstead said because Burns told him

9   that Medina didn't speak English very well.  Now Halstead

10   didn't care that the captain of the ship didn't speak

11   English.  He didn't care that the person directing all the

12   medical care didn't speak English well enough to be

13   introduced to him.  He didn't care that the person

14   supervising the medical care at the clinic didn't speak

15   English well enough to be introduced to him.  So what does he

16   do when he finds out that the captain of the ship doesn't

17   speak English very well?  They check to see if the MD is

18   signing the forms and that's it.  And why?  Because it's not

19   important that the MD be able to speak with the patients

20   about their care, about their problems or actually about

21   anything.  What is important is, is the MD signing the case

22   study form because it's important in the Halstead system to

23   paper the file so it looks like the MD is in charge.

24      During cross-examination Halstead told you I always

25   talked about medical necessity.  That's implied in

3285

1    everything.  Read the Burns' IOV's.  The only time you see

2    the words medical necessity is when they're preceded by two

3    words and that is a letter of.  That's when he talks about

4    medical necessity, only when you're trying to justify it to

5    the insurance company.

6        Let's turn to the Price/Burns/Halstead meeting in which

7    she quits.  February 4th.  Halstead, at this point in time,

8    knows from his discussions with Burns that Price is not with

9    the program.  She is not signing the case study forms.  She

10   is not ordering the tests that the chiropractors want ordered

11   and by his own testimony, he has admitted that he knows that

12   because Burns asked him to be there to quote "mediate" this

13   meeting between Price about her not ordering all these tests.

14   Okay.  Now what's important about this is what was getting

15   ready to happen at the Burns clinic.

16       If you will look at Exhibit 1-041, which is the Halstead

17   last IOV dated -- magnify the date at the top for us,

18   February 3 -- 4, which is the last meeting.  We'll go to page

19   5 and magnify number 7 please.  This is important.  Get

20   weight loss program going as soon as possible.  It is

21   fantastic.  They were getting ready to fire up a weight loss

22   program at this clinic.  Halstead was recommending it.  They

23   were getting ready to do it.  It says working on it.  Go

24   ahead and remove that and bring up the lights.

25       Why is this important?  Because the MD needed to be

3286

1    onboard to order blood tests on every patient for this weight

2    loss program and to order a urinalysis on every patient for

3    this weight loss program.  Okay.  They needed her onboard.

4        A fair analysis of what was going on at this point was

5    that Burns and Halstead were going to confront Price.  They

6    were either going to get her onboard with the program; she

7    was going to start signing the case study forms and she was

8    going to start ordering the tests, they're going to get rid

9    of her.  Okay.  Price tells you, the meeting become very --

10   became very tense.  Halstead, on the other hand, says that

11   Price sat mutely through this meeting.  You have to

12   determine, is that reasonable?  You saw the -- you saw Doctor

13   Price on the stand.  Is she the kind of woman who's going to

14   sit there mute through a meeting where people are asking her

15   to do things that she thinks are wrong?  You judge.  You

16   evaluate.

17       Price and Halstead planned to confront -- I mean -- I'm

18   sorry, Burns and Halstead planned to confront Price about her

19   not being with the program.  Get her on the program or get

20   rid of her and that sort of worked because she wouldn't go

21   with the program so they got rid of her.

22       Can I have up 1-111, please?  You've seen this before.

23   This is the Price resignation letter.  She has this meeting

24   with Ron Halstead.  She has this meeting with Burns.  She

25   writes a letter quitting.  She complains that Burns and

3287

1    Halstead asked her to certify as medically necessary tests

2    that she didn't think were medically necessary.  She

3    complained that they were suggesting that they do an

4    ultrasound of the neck on every patient prior to cervical

5    manipulations.  She said that was crazy, ludicrous.  She

6    thought it might -- it was insurance fraud.  Same thing for

7    the weekly urinalysis, to monitor a patient's long term

8    intake.  You heard Doctor Halstead testify, well, you know,

9    you got to check to see the patient is really drinking the

10   water.  Do you think it's medically necessary to test a

11   patient to see if they're drinking water, if they're going

12   along with what you instructed them to drink?  Is that a

13   medically necessary test to bill an insurance company for, to

14   see if your patient is lying to you?  Asked to place orders

15   and prescriptions on charts for tests I neither ordered nor

16   deemed medically necessary.  That's clearly fraud.  That's

17   what she told them.  Does that sound like a woman who sits

18   mute through a meeting?  Go ahead and remove magnification.

19   So their plan sort of worked.  She did resign.  What they

20   miscalculated on was that she then went to the authorities.

21        Go ahead and call up 1-110 please.  Price had it right.

22   This was the four phases of care at Priority One.  In a

23   little while you're going to be asked to get it right.  We're

24   asking you to -- when you do -- after you've deliberated to

25   return guilty verdicts against all defendants on Counts 1

3288

1   through 15 and defendant Halstead guilty verdicts on Counts

2   16 through 26.

3       I thank you for your attention and that ends my comments.

4           THE COURT:  All right.  Ladies and Gentlemen, at

5   this time we'll recess for lunch and I would ask that you be

6   prepared to return at ten till one.  We'll start up in

7   exactly an hour.  During this recess please do not discuss

8   the case among yourselves or with anyone with whom you may

9   have contact.  Please leave your notebooks face down on your

10  chairs, together with the charge.  Do not discuss the case

11  with any third person or party who attempts to approach you

12  to do that and report any contact to the Court Security

13  Officer and, finally, avoid any media coverage of this case,

14  should there be any, while you're out during the noon hour.

15  Thank you for your attention this morning.  We'll see you at

16  ten till one.

17      (Jury out)

18          THE COURT:  All right.  Is there any reason why we

19  can't recess right now for lunch?

20          MR. JAFFE:  I just have a quick note.  By my

21  calculations Mr. Donley started at 10:24 and ended at ten of

22  twelve, that would mean roughly one hour and twenty-six

23  minutes he used.

24          THE COURT:  I had it that he used one hour and

25  twenty-five minutes, which leaves five minutes for rebuttal,

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

3289

1    but I warned you.  This Court stands in recess until ten till

2    one.

3        (Recess at 11:50 a.m., until 12:55 p.m.)

4            THE COURT:  During the noon hour I realized that I

5    had misspoken this morning to the jury about the flow of the

6    closing arguments.  It will be Defendant Filcheck and

7    Defendant -- I'm sorry Defendant Halstead and Defendant

8    Filcheck, break, followed by Defendant Davis and rebuttal.

9    All right.

10           MR. JAFFE:  I'm sorry.  Who's Davis?

11           THE COURT:  That's -- Pardon me?

12           MR. JAFFE:  Davis.

13           THE COURT:  Did I say Davis?  Defendant Taylor,

14   excuse me.

15           MR. ADAMS:  Your Honor, the Government understood

16   when you told us in the charge conference you would give us

17   the amount of time we'd ask for for closing that that was --

18   our original request for an hour and a half in the opening

19   portion and a half hour for the rebuttal portion and we were

20   taken aback by your ruling this morning of only an hour and a

21   half total.

22           THE COURT:  I'm sorry.  I had written down that you

23   wanted an hour and a half total and that the defense counsel

24   were forty-five and forty and forty.

25           MR. ADAMS:  Well, that wasn't our understanding of

3290

1    it.

2         THE COURT:  I'll check on it during the break.

3         MR. ADAMS:  Thank you, Your Honor.

4         THE COURT:  Thank you.  Bring the jury in.

5    (Jury in)

6         THE COURT:  Thank you, Ladies and Gentlemen.  Please

7    be seated.  We're ready to resume the closing argument.  Mr.

8    Jaffe.

9         MR. JAFFE:  Thank you, Your Honor.

10             CLOSING ARGUMENT OF DEFENDANT HALSTEAD

11        MR. JAFFE:  The Government's theory of the case is

12   that Ron Halstead tells his clients to bring in patients who

13   don't need care and then they give them whatever care they

14   don't -- they don't need.  That's the Government's theory.

15        Fortunately we have some facts in this case.  Where are

16   the facts?  These facts are contained in the Government books

17   that the Government has offered.  These are the medical

18   records of the patients who are treated in this case who form

19   the basis of Counts 2 through 14 of the indictment.  Here's

20   the medical records right here.  The Government's theory is

21   all these patients had nothing wrong with them and got

22   unnecessary treatment.  Here are the books.  Find in here one

23   patient that didn't need treatment, one patient.  Find in

24   here one patient that didn't need treatment.  You're going to

25   look at the evidence and what you're going to find is the

3291

1    people who came in in Counts 2 through 14 needed treatment.

2    Why did they need treatment?  They were in pain.  They were

3    in pain.  They came to the clinic.  They were in pain.

4    You'll see all these treatment cards where they list their

5    pain, ten, nine, eight, seven, six.  Every single patient in

6    Count 2 through 15 in this indictment had some issue.  All

7    right.

8         So step number one is, all that other stuff is nonsense.

9    We've heard all this stuff about ten point exams and getting

10   all these patients in that didn't need it, but the evidence

11   in the case will show that every patient in Count -- in this

12   indictment had a complaint, had a reason to come to treatment

13   and got treatment.  That's what the evidence is going to show

14   in these books and I challenge you to find a single patient

15   in the entire case that didn't need treatment.

16        Well, let's think about Muth.  Muth, the first witness in

17   this case.  That's the craziest thing in this case.  Here's

18   the undercover operation for Muth.  Guy walks in who's six

19   five who says he rides a bicycle and is in good shape and

20   needs to get worked out.  All right.  So they're going to

21   sting the clinic and see if they're going to do something to

22   him that's medically unnecessary.  But here's the really

23   nifty thing.  He had something wrong with him.  He had

24   scoliosis.  How do we know he had scoliosis?  He had an x-

25   ray.  All right.  Taylor explains to Muth, aka whatever his

3292

1    name is, Whitten, that he had scoliosis.  So what do they do?

2    If there was no more testing in this case, all right, not the

3    neurometer test, not the surface EMG, not the temperature

4    gradient, the Government could say well, the x-ray is wrong

5    but fortunately we have all kinds of testing here and what

6    does the testing show?  He has a problem.  That's what the

7    testing shows and, indeed, there was one mistake made.  They

8    tested the C-6 instead of C-7 and that showed there was no

9    problem in that nerve because there was no problem in that

10   nerve and that was a mistake.

11       So fortunately for everyone here we have a situation

12   where you have someone who didn't understand that he had a

13   problem because as you remember, Doctor Trent says sometimes

14   you can have scoliosis and not even know about it.  This guy

15   had a problem; he was diagnosed with a problem.  It was

16   confirmed by three separate kinds of tests.  He had received

17   treatment and the Government says that the treatment was

18   medically unnecessary.

19       What expert told you that the treatment for Muth was

20   medically unnecessary?  Do you remember anybody testifying

21   from the Government about -- the Government talk to any

22   scientific person to say that the treatment for Muth was

23   medically unnecessary?  Let's broaden that out a little bit.

24   Do you remember anybody in this case, any expert going over

25   the files and saying that the treatment for any of these

3293

1    patients was medically unnecessary?  How about a single

2    patient?  How about a single patient where the Government has

3    proven that any of the tests given to any patient was

4    medically unnecessary?  Did they prove that?  I don't think

5    so.

6        So what this thing is on this point is that we have all

7    this stuff about the scheme that Halstead devised to treat

8    these patients who don't have conditions except these books

9    show that every patient treated had some condition and needed

10   help.

11       What else did it show?  Well, I don't think the

12   Government wants you to admit it -- understand this, but

13   based on the notes of Price, it also establishes, miracle of

14   miracle, some of the patients got better.  As a matter of

15   fact, all the patients felt better as a result of treatment.

16   Well that's certainly not fraud but -- so how these patients

17   getting treatment, they don't have a problem and their

18   treatment's unnecessary but they're getting better.  Why?  Is

19   it an accident that every single time these patients are

20   treated they're getting better.  Now all of them aren't

21   getting completely better.  I think Filcheck testified that

22   some of these people, they got better in one area but not

23   another area and certainly that's not his fault.  But the

24   point is -- I mean, let's talk about why we're here and why

25   we're not here.  All right.

3294

1    We're not here because of patient complaints.  Right?  No

2    one's coming in and saying they were harmed by the treatment.

3    No one's coming in and saying there was malpractice, we're

4    mistreated, we're under-treated.  We weren't properly

5    diagnosed.  We're not here because of that.  No one's here

6    because of any allegation that a patient was harmed.  Right?

7    We're not here because people are saying the treatment's

8    ineffective.  Right?  No one's saying that.  The evidence

9    shows it was effective.

10   Here's why we're here.  Here's why we've all spent three

11   weeks here in this case and that's because on some occasions

12   the medical doctor didn't see the patient first and the first

13   medical doctor they had was -- we're in the courtroom and we

14   have certain rules of decorum so I can't tell you exactly

15   what I think about any other issue but certainly many of you

16   can infer some of my language.

17   We have a patient -- we have a doctor who, the first

18   doctor, basically all he cared about was money and wasn't too

19   interested in the patients.

20   The second doctor, Doctor Price, well she doesn't work

21   now.  She's not working as a medical doctor and I think the

22   world is a better place for that.

23   You have two doctors who didn't care a great deal about

24   their patients.  They saw the patients, in the case of Price,

25   over and over again but Price's view was she's only there to

3295

1    clear chiropractic care, the first visit, the second visit,

2    the third visit, the twelfth visit.  She's only there to make

3    sure that the chiropractor -- that the patient can get

4    medical care.  I don't think that's reasonable.

5        So what we're here today for three weeks is because the

6    medical doctor didn't see the patient first and in some

7    cases, supposedly, the medical doctor didn't sign off in the

8    treatment or her signing off of the treatment wasn't, I don't

9    know, wasn't with a full understanding of the medical

10   treatment.  That's why we're here.  We're not here really

11   about the medical care and, frankly, I don't think we're here

12   about the medical necessity of the treatment because let me

13   re-emphasize this point, no Government witness testified that

14   there was any medical treatment given in this case that was

15   not medically necessary.  Nobody.  No one in this case.  All

16   right.  No Government witness.

17       What we have here and let's be -- let's be honest.  I

18   want to attack this directly.  We have the statements of

19   these two gentlemen, all right, who basically complained that

20   they didn't feel the testing was ethical or was done too

21   often or wasn't medically necessary.  Well, one of the

22   advantages of a trial is that we can bring evidence and one

23   of the things we tried to do is bring evidence from experts,

24   the experts who, in the case of a neurometer, the man who

25   invented the neurometer and who has been talking all around

3296

1   the world about the uses of it.  We had him and I'm sure he

2   made everyone here feel like an underachiever based on what

3   he has done in his forty-eight years of life.  He explained

4   the need for the test.  One of the issue points that he

5   explained about was that sometimes you have to have -- you

6   need a neurometer to test if you have nerve involvement.

7   Right?  How else do you know if you have nerve involvement

8   and if you don't know that you have nerve involvement how do

9   you present them with a treatment?

10       We had the temperature gradient guy here, Doctor Risley.

11  Doctor Risley said that, in his opinion, in a perfect field

12  you do every -- a test -- a temperature gradient test for

13  every patient, every time.  Why?  To evaluate the patient's

14  progress.  One of the reasons you want to evaluate the

15  patient's progress is so insurance companies can't cut the

16  treatment by saying the patient isn't progressing.  So on one

17  hand, they don't like the testing.  One of the reasons they

18  like the testing is once you have testing and can show

19  something -- someone's improving, you have it black and

20  white.  It's not based on some chart and a note where a

21  patient says nine or ten or twelve or it's subjective.

22  You've got the data right there in black and white and you

23  can go to the insurance company and argue this patient is

24  improving.  They need the care.  They need to continue.  And

25  that -- it seems to me, as Trent said, that's one of the --

3297

1   probably the most fundamental important reason for doing

2   testing.  You have to document progress or no progress and if

3   they're not progressing then you have to do something else.

4   So I would submit that this whole concept of medically

5   unnecessary testing is just all general stuff.  It's

6   theoretical to have it proving anything and in reality people

7   do testing for a lot of reasons, not the least of which is to

8   prove to insurance companies that -- to continue care and

9   also what's called defensive medicine because sometimes if

10  you don't do the testing and you miss something, the patient

11  gets aggravated and sues you for malpractice, which I

12  understand here they're having a crisis about.

13      So there are all kinds of reasons to do medical testing

14  and again you have to think critically and you have to think

15  precisely and in this case what you have to think about is

16  who gave evidence in this case that any test given to any

17  particular patient was not medically necessary.  One

18  particular patient.  Nobody.  There's nobody that's in this

19  case and all this other stuff about the IOV's, that's just a

20  smoke screen to hide the fact there is no evidence in this

21  case about that.

22      Now -- so -- I noticed another interesting thing.  Let me

23  see if I can refresh your recollection.  Does the name Bill

24  Twigg mean anything to you?  Bill Twigg is the most important

25  witness in the case.  How much did the Government talk about

3298

1    Bill Twigg?  Almost nothing.  Why is that?  Bill Twigg was

2    the clinic office manager.  He was really the heart of

3    everything here.  Bill Twigg knew everything and was involved

4    in everything and everything that went on was focused on Bill

5    Twigg telling people what to do because Burns wasn't here at

6    the clinic.

7        Why didn't we hear twenty minutes about Bill Twigg?

8    Well, it seems to me we didn't hear very much about Bill

9    Twigg because if I had to summarize in two words why Ron

10   Halstead isn't guilty I would say Bill Twigg.  Why is that?

11   Bill Twigg established that Ron Halstead did not know what

12   was going on in the clinic.  All right.  Let's replay some

13   testimony because I know it was a long time ago and hopefully

14   some of you have notes.  Bill Twigg established that Doctor

15   Halstead advised the clinic that the medical doctor has to

16   see the patient first in order to bill them.  That's what

17   Bill Twigg said.  Bill Twigg also said that Burns knew this

18   but decided not to do it.  All right.  So, therefore, you

19   remember the Government's chart, I believe it was 290, where

20   they talked about all the -- all the billings that was done

21   before the medical doctor saw -- saw the patient, $458,000 or

22   something.  So Bill Twigg basically established that

23   Halstead's not responsible for that because they were acting

24   against Halstead's advice so I suspect that's one reason they

25   didn't mention that.

3299

1      Twigg was really supposed to inculpate or establish

2    Halstead's liability in this case because Twigg was the

3    person who had the most direct contact with the clinic other

4    than Doctor Burns and he's not here.  I asked you to think

5    about his testimony.  Did Bill Twigg deliver to the

6    Government?  I don't think so.  That's why they're not

7    mentioning it.  Here's the other most single important part

8    of this.  Bill Twigg established that Halstead didn't know

9    that the medical doctor wasn't doing their job.  All right.

10   He established that he and Twigg every day would meet and

11   discuss what treatment would be given to what patient.

12   That's really the heart of the case here.  Who decided what

13   treatment and what testing was to be given to each patient.

14   Bill Twigg established that it was Doctor Burns and him and,

15   by the way, that was confirmed by every other witness in the

16   case.  Sergeant Finkenbinder testified to that, that it was

17   his understanding that Bill Twigg would meet with Doctor

18   Burns or over the phone and they would put sticky notes on

19   these things, didn't matter if they had a case study or

20   Rolodex or anything, he would decide with Doctor Burns every

21   day what patient would get -- would be receiving what test.

22   Finkenbinder testified to that.  These two gentlemen

23   testified to that.  Halstead testified to that.  Every

24   witness in the case basically said the same thing.  Bill

25   Twigg and Doctor Burns decided what treatment to give these

3300

1    patients.  What does that mean?  Well, what it really means

2    is them getting a match.  If Bill Twigg and Burns decided

3    what treatment to give to what patient, then that cuts the

4    causal chain.  Halstead didn't do it and these two guys

5    didn't do it.  Didn't matter one bit what was written on

6    these forms, these guys decided what to do.  That's what Bill

7    Twigg says and that's why you don't hear much about Bill

8    Twigg.

9        The other thing is Doctor Halstead talked about his last

10    conversation with Bill Twigg where Twigg finally admitted

11    after the raid that Burns had been lying to him all along,

12    that they hadn't been following any of the procedures he had

13    set forth and let me ask you this.  You don't have evidence

14    in the record but I think it's not an unfair inference to

15    infer from the fact that from that date on you don't have a

16    single contact between Burns and Halstead.  Do you think that

17    was just an accident?  Not a single form.  Not a single IOV.

18    Think it's fair to infer that once Halstead finally

19    understood what was going on he would have no further contact

20    with Burns or the clinic and that's exactly what happened and

21    I submit that's not -- that's the opposite of criminal

22    intent.

23        In order to find criminal intent here you have to have

24    knowledge and a purposeful intent to effectuate the plan.

25    Here we have just the opposite.  Here what we have is

3301

1    Halstead finds out about this in February and March of 1997,

2    has no further contact with Burns, won't help him in any

3    other fashion.  That's it.  There's no accomplice liability

4    based on those facts.  And that's Twigg.  That's why you

5    didn't hear much about Twigg.

6        Let me give you -- one of the most interesting parts of

7    this case it seems to me is the different ways medical care

8    is delivered.  Let me give you two scenarios and see if I can

9    try to understand it.  You heard Doctor Filcheck talk about

10   how he was trained in chiropractic college.  What he was

11   trained to do was tell the patient when he comes in, tell him

12   look, you know, I'm a chiropractor.  I deal with problems of

13   the spine.  I'm going to give you the most conservative care

14   possible.  I'm going to manipulate your spine and I'll take

15   an x-ray or two to make sure, you know, that you don't have a

16   broken back and I'm going to -- you know, let's treat you for

17   a month or two and let's see what happens and if it doesn't

18   work, if you don't get better then, you know, maybe I'll do a

19   different kind of treatment and I'll just keep on treating

20   you for three, four, five, or six months, if I can't help you

21   maybe you can go to some other practitioner but the good

22   thing is I haven't given you any tests, you know, other than

23   the x-ray, haven't spent the insurance company's money and

24   it's going to be conservative.  It's going to take six months

25   but this is the most conservative care you could get.  All

3302

1    right.  That's one way of doing things and, by the way, I'm

2    going to be treating you by a chiropractor and that means,

3    you know, maybe your insurance company's going to pay for it,

4    maybe it's not.  I don't know because I don't even look at

5    policies to determine whether they pay for it.  That's one

6    method.

7        Let me present to you another method.  Chiropractor works

8    on a multi-disciplinary committee -- clinic.  They come in,

9    they see the patient, the patient explains, well, I'm a

10   chiropractor.  My skills and license are very limited.  The

11   only thing I can tell you is whether you have a spinal

12   problem and particular whether you have a subluxation that's

13   causing some problems.  The chiropractor further explains,

14   look, I've got to tell you, because of my training I can't

15   really talk to you about medical conditions and the fact is

16   often times people that have back problems, the problems are

17   caused by something else then just a subluxation.  Maybe

18   that's the problem many people feel about chiropractors,

19   they're not honest enough about this.

20       So maybe the back pain you have that radiates here or

21   radiates there, maybe it's because of subluxation but maybe

22   it's because of something else and the problem is I'm not the

23   guy to tell you that it's something else 'cause I don't know

24   anything about internal medicine and diseases so what we have

25   here, we have a situation where there's a medical doctor on

3303

1    staff and the medical doctor is also going to be involved in

2    your care.  And why is he going to do that?  For a lot of

3    reasons.  Right?  One of the reasons is to make sure that as

4    I'm treating you for subluxation you're not dying of cancer,

5    that you don't have diabetes, that you don't have a hundred

6    other conditions that might be causing the problem.  The only

7    thing I'm going to be doing is treating this vertebral

8    subluxation of the spine and hope that things get better.  So

9    we're going to have a medical doctor here and she's going to

10   also oversee just to make sure that things are going well and

11   to act as a guide -- a guidance to me because she has a

12   broader scope of license, because while she might not know as

13   much about the back as I do, she knows a great deal more

14   about internal disorders, some of which could cause your

15   problems.  And here's the other thing we're going to do.

16   We're going to give you a whole battery of tests throughout

17   the period of your treatment.  The first thing we need to do

18   is determine whether your problem is a muscular problem.

19   Remember some people come in, they don't just hurt their

20   back, you know, swinging a tennis racket, they got pain over

21   time.  We have to determine whether you have a muscular

22   problem, you have a nerve problem, a medical problem.  One

23   way to do that is through a neurometer test.  Now I know you

24   might not feel there's anything wrong with your nerves but

25   the funny thing about nerves are, according to Doctor Katims,

3304

1    sometimes you don't even feel when you have a problem.  The

2    loss of sensation is not obvious to a person so we're going

3    to test you in the beginning to make sure that your nerves

4    are functioning and depend -- if your nerves are functioning,

5    you'll get one test -- one type treatment and if they're not,

6    you'll get another kind of treatment.

7        And then we're also going to do these temperature

8    gradient tests.  Now we're not going to do them every single

9    time the way Doctor Risley said but we're going to do them

10   pretty frequently just to make sure you're responding to

11   treatment.

12       The third thing we're going to do is a diagnostic

13   ultrasound because you know what, you could have a herniated

14   disc and an x-ray can't -- can't pick that up so we have to

15   rule out -- you remember Doctor Kaliakin talked about the

16   concept of ruling out, probably the most important concept in

17   medicine.  You have to rule out a very serious condition even

18   if you think that what the patient has is not that -- I don't

19   want to say not, but a lesser condition, like a subluxation,

20   the important thing in medicine is to rule out something bad

21   so while you're getting treatment for subluxation you're not

22   dying of something else or have some horrible condition that

23   could have been stopped at the beginning.  So what we're

24   going to do is give you all these tests to rule out that you

25   have a more serious condition and also to monitor, as I said,

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

3305

1    to make sure that you're improving and if the insurance

2    company is going to complain about that we can show them in

3    black and white that you're improving.

4        And the other thing we're going to tell you now is while

5    we were talking to you is we have verified that you have

6    insurance for all this under this plan and you'll only have

7    to pay a co-pay.  Now some of you might feel -- all of you

8    probably have health insurance.  All of you may have it

9    through an employer.  Some of you may be paying for it out of

10   your own pocket.  It might be a benefit.  It's probably

11   taxable.  Some of you might feel you wanted the first

12   approach.  Right.  You want to save the insurance company's

13   money and for you maybe you can wait six months.  Maybe what

14   I'd do I certainly wouldn't do for my -- wouldn't do for

15   children but for you, you might make that decision.  For

16   somebody else in your family, I can't think of too many

17   people who'd go in that group if they had a choice and if

18   they knew about it.

19       Okay.  So we have this latter choice.  Here's what gets

20   interesting.  For a hundred years -- we've talked a little

21   bit about the history of chiropractic and that was really for

22   a reason.  For almost a hundred years the former approach is

23   the way they've been doing it.  They've been doing it for a

24   lot of reasons, not the least of which was because medical

25   doctors wouldn't work with them.  As we learned from Trenton

3306

1    -- learned from Trent, in the late '70's and early '80's

2    doctors were not allowed to do that and now, finally we're

3    getting to the point that medical doctors work with

4    chiropractors sometime.  A lot of medical doctors don't

5    believe the chiropractic issue; they think it's just hokum.

6    They think it's limited and as a result it's very important

7    to find a medical doctor who at least believes in the

8    chiropractic work and that probably explains all these notes

9    about a compliant doctor.  You have to have a medical doctor

10   that at least believes in chiropractic that's willing to, as

11   an integrated part of care prescribed, otherwise you're

12   wasting your time.

13        So we have these two approaches.  Let me suggest to you

14   that science and medicine evolves over time and what we're

15   really doing -- this may be meaningful to some of you, it may

16   not be.  What we're really doing is we're focusing here on a

17   transition front.  I would suggest that the chiropractic

18   model of a hundred years ago up until now is not going to be

19   around another fifty or a hundred years because it's not

20   necessary because spinal care is just one part of broader

21   care and the idea of just going to a chiropractor and not

22   knowing whether you have other things wrong and waiting time

23   when you have all this diagnostic equipment that's come about

24   in the last ten or fifteen years, people are doing it and

25   these guys are still going to do it but that's not the

3307

1    future.  That's kind of the past.  All right.  So -- and

2    that's one thing Halstead does.  Halstead brings this new

3    technology to people and says here, it's there, use it.

4        Now am I still -- I'm not going to -- people aren't going

5    to expect -- you guys aren't going to expect me to come and

6    say Ron Halstead is Albert Swietzer, that he's doing this out

7    of the -- only out of the greater good of mankind.

8    Obviously, a reason -- a main reason for all this is you get

9    paid for it.  There's no question about that.  But it also

10   happens to be beneficial and it also happens to improve

11   patient care and that's what Glenn Trent said, that you do

12   these tests in order to improve patient care and as a side

13   benefit -- and as a big side benefit, you also get paid from

14   it.  There's nothing illegal about it and I think that's one

15   of the fundamental points in this case.  There's nothing

16   illegal about advising a client or a doctor to do more

17   testing as long as it's medically necessary.

18       Let's talk about this medical necessity for a little bit.

19   How many times does someone like Halstead have to say the

20   test is medically necessary.  In this case he did fifty, a

21   hundred.  Would five hundred have been any better?  Filcheck

22   and Taylor -- or at least Filcheck said that he understood

23   from taking his notes that tests have to be medically

24   necessary but he doesn't need Ron Halstead to tell him that.

25   He doesn't need Ron Halstead to give him any of this

3308

1    education about how to treat patients.  What the clinic needs

2    Ron Halstead to tell them is what testing is available and

3    how to use it.  That's his job.  And let me make no bones

4    about it, his job is to tell his clients how to make more

5    money.  That's why he gets paid.  That's why people bring him

6    on board.  That is his job.  If some of you don't like it,

7    I'm sorry, but I'm not going to back away from it.  That's

8    his job.  It's not illegal to do that.

9        I heard testimony that Halstead has two or three hundred

10   clients, has done twenty-five hundred IOV's.  There's fifteen

11   -- fourteen, fifteen hundred of these clinics throughout the

12   country and a couple hours like he was going to meet with the

13   medical doctor and the chiropractors are going to sit around

14   and discuss what treatment and therapy the patients are going

15   to get for the next day.  That conversation has been repeated

16   in the morning in hundreds of other cases of Doctor

17   Halstead's clients and even Barry Markson's clients.  I mean

18   they're all going to do the same thing.  The morning huddle,

19   the weekly meeting, the weekly conference, whatever you call

20   it.  The idea is doctors -- medical doctors and chiropractors

21   get together and they discuss patient care.  There's nothing

22   illegal about that.  There's just nothing illegal about that.

23   If anything, as I've tried to suggest to you, that's the

24   future of health care; that's not the past.  That's what they

25   ought to be doing for the benefit of patients, not have you

3309

1    have to take the -- the risk and just choose between whether

2    you're going to have someone look at your back and see if you

3    have some back problem or have a bunch of people look at your

4    back and see what's causing it.  All right.  That's not

5    illegal and I don't even think the Government is going to

6    suggest that that's illegal.  So I think that's an important

7    point.

8         I want to just make a couple points about just some of

9    these general things that come up, the case study plan.  God

10   knows you don't want to hear about verticals any more.  The

11   bottom line is it's an estimated treatment plan.  Medicare

12   requires it, you know.  Let me give just an aside.  Just

13   because someone raises their voice and has an accusatory tone

14   it doesn't mean it's wrong.  I could say here, do you mean

15   that this carpet is red?  Is that what you're coming here and

16   telling the jury?  This carpet is red.  I can raise my voice

17   and I can have an accusatory tone.  It doesn't mean it's

18   wrong.

19        Case in point.  The case study method.  Halstead calls it

20   the case study and Medicare calls it a treatment plan.

21   What's that phrase?  You call potatoes, I call potatoes, it's

22   the same thing.  Medicare requires the doctor to have a case

23   study or a treatment plan before they initiate care.  You

24   have to say what you're going to do to the patient, what you

25   -- how long you expect to take and what testing you have to

3310

1   do.  That's not Ron Halstead saying that.  Medicare requires

2   that.

3       We even had this exhibit.  I remember one of these

4   exhibits from this company they asked Taylor about, where

5   they asked him some information and among the information,

6   despite what the insurance company says, is what's your

7   treatment plan.  Okay.  Guess what?  Insurance companies want

8   to have treatment plans.  Why do they want to do that?

9   Because they want to make sure that you know what you're

10  doing.  They want to make sure that you -- that you thought

11  about what this patient problem is, what do you expect to

12  happen and how are you going to get there.  All right.  So

13  this whole concept of this case study plan is just nonsense.

14  It's -- Government requires, it's all good medicine.  The

15  SOAP notes is really a case study plan.  S-O-A-P.  The P is

16  plan.  Plan.  You have to say what you plan on the patient.

17      The idea that someone who suggests a course of treatment

18  for a patient -- the idea that that is wrong and criminal is

19  just ludicrous.  I mean it just makes no sense at all.

20      These protocols that Halstead's talking about, we kind of

21  skipped over the fact -- we talked about some names, McQueen,

22  and all that.  They're not just protocols.  These are

23  protocols taught in chiropractic colleges recently and what

24  Halstead does, he comes in and says these are the protocols

25  that they're teaching.  Are they to be done in imitation?  Of

3311

1  course not.  But these are the basic guidelines by which you

2  evaluate treatment.  All right.  Halstead -- we admit, he

3  does it.  That's not good/bad, that's good.  You're supposed

4  to do that.

5      You know, we have this other concept here which has been

6  just bandied about.  Patient comes in, you look at him and

7  you start with a clean slate without any reference to any of

8  your past experience.  Medicine is ultimately -- a detective

9  match or game; talked about ruling out.  When you think about

10 it, medicine is really what's called pattern recognition.

11 You have to recognize a pattern of symptoms, a constellation

12 of symptoms and try to figure out based on your past

13 experience and what's been written, how to treat the patient.

14 That's not a bad thing.  That's a good thing.  No doctor just

15 comes in and starts with his blind slate and says what do I

16 do for the patient.  He talks about -- people have been

17 treating back pain for a hundred, two hundred, five hundred

18 years.  We know certain things.  We know, and I think it's

19 been testified, that someone with whiplash is going to take

20 roughly thirty-six visits.  Some might take fifteen.  Some

21 might take forty.  It's not fraud to suggest that your course

22 of care is going to be thirty-six visits.  We know from

23 history, we know from the documented publications that's

24 roughly what it's going to be.  All right.  There's nothing

25 wrong with that.  That's not fraud.  That's just pattern

3312

1    recognition and based on what's going on here.

2         Now, what I'd like to do briefly is go back to the point

3    that we talked about before about the evidence in the case.

4    You know, sometimes a lawyer's job, for better or worse, is

5    to be very, very precise and split hairs.  You have to be

6    accurate and have to be precise.  That's my job and I would

7    submit to you, people, that's now your job.  This is a

8    criminal case with criminal responsibility so I think you all

9    have to be as precise as all of us lawyers put together and

10   then more so before you impose criminal liability.  In that

11   end let's look at the individual substantive counts in the

12   indictment.  All right.  Let's just take a look at it and

13   let's see what precision gets us.

14        Count Number 2, and this is the jury verdict form that

15   you all are going to get and have to fill out.  Now Count

16   Number 2 says that this patient, P.B., got a service 76536, a

17   guideline for diagnostic ultrasound on 7/13/96.  That's all

18   Count 2 talks about.  One patient got one test on one day.

19   Okay.  Let's put on our thinking caps and think about your

20   notes.  What witness said that this test given to this

21   patient on this day was not medically necessary?  What

22   witness?  Muth?  Finkenbinder?  None of these guys.  Price?

23   She didn't say that.  Nobody in this whole trial said that

24   this service for this patient was not medically necessary.

25   Who said in this trial that this service was not given in

3313

1   accordance to -- or in accordance with the CPT Codes?

2   Anybody remember any evidence about that?  Nobody said that

3   this service was not given in accordance with the CPT Code.

4        Let's go to the final point and here is the biggest just

5   misconception illogical mistake in the whole case.  Service

6   had been provided by a specified medical doctor.  All right?

7   We need to focus very, very carefully.  Here's the point.  On

8   the HCFA-1500 form they never ask you who did the service.

9   You're going to have hundreds of HCFA-1500 forms.  Study

10  them.  Ask yourself where on the form does it ask you who

11  touched the patient.  Nowhere.  It doesn't exist.  Maybe

12  they've done how many hundreds of millions of HCFA-1500

13  forms, printed in the last twenty years.  Do you think if all

14  these geniuses in the insurance company would have wanted to

15  know or felt it was important to know who touched the

16  patient, do you think maybe they could have asked that in a

17  direct way?  They don't ask that.  What they ask, and I'm

18  going to say to you people but I'm afraid that some of you

19  will try to shoot me if I put on even more of this stuff on

20  the screen.  The HCFA-1500 form, the box 31, all it says is

21  who is the medical -- the medical doctor signing this attests

22  to the things on the back of the form.  It doesn't ask, and

23  nowhere in the form does it say who did the service.  Do you

24  know why?  I'll tell you why.  It's irrelevant.  It doesn't

25  matter who does the service.  What matters is who's

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3314

1   overseeing the service and you -- remember you had Ronald

2   Halstead talk about the flip side of the form.  We're not

3   going to go over that now.  What the form says is the service

4   was provided by either a medical doctor or an employee.  All

5   these guys are employees, all right.  It doesn't matter who

6   touches a person and why it doesn't matter is this concept of

7   incident to.

8       We talked about incident to in opening.  Some of the

9   witnesses talked about it.  Even Agent Finkenbinder talked

10  about incident to.  He knew what incident to was.  What's

11  interesting is none of the insurance people, other than the

12  Medicare person, knew what incident to was.  I find that

13  staggering.  Someone who worked in the field for twenty years

14  and not even know what the incident to rules are.  Is it any

15  wonder that sometimes some of us get our insurance claims

16  messed up or they don't pay.  If they don't even know there

17  own rules how do you expect to get paid?  One of these people

18  -- one of these ladies even said specifically that to bill

19  for the service for a doctor, he has to touch the patient.

20  He is the person giving injection and taking the temperature.

21  You all know that's not true.  You don't need any evidence in

22  this case to know that.  You've all been to a doctor.  You

23  know that when you go to the doctor for a physical exam, the

24  doc might only see you for the last five minutes and every --

25  all the other workup is done by some nurse practitioner or

3315

1   physician's assistant and it's still all billed under the

2   doctor's name.  So you implicitly know the concept of

3   incident to.  Now -- so you know that's not right.

4       So here's the point.  In this case, question, be

5   technical, that's my advice to you.  Be very, very technical.

6   This is a criminal case, criminal responsibility.  The

7   Government has to prove their case beyond a reasonable doubt.

8   What did they prove?  Did they prove, and does it matter,

9   whether Doctor Medina or Doctor Price rendered the service?

10  So my point is, they're asking you something here that really

11  doesn't matter.  It doesn't matter who gave the service under

12  the incident to rules.

13      So on the three precise questions that you're going to be

14  asked, right, as a predicate, as a prerequisite to determine

15  whether they're guilty or innocent there's been no evidence

16  that the service was not medically necessary for this

17  patient.  There's been no evidence that the services were not

18  performed in accordance with the CPT Code and it doesn't

19  matter who gave the service because of incident to.

20      Another example, Count 3.  Same thing.  Temperature

21  gradient was given that day and the range of motion was given

22  that day.  Who testified that this test was not medically

23  necessary?  Who?  Taylor and Filcheck didn't.  They just

24  complained generally about tests.  Finkenbinder?  Price?  She

25  didn't say that.  No one testified in this case that these

3316

1   services were not -- that this particular service was not

2   medically necessary; therefore, you can't check that box.  No

3   one testified that the service was not performed in

4   accordance with the CPT Code and it doesn't matter who did

5   the service.  All right.

6       So on this count I would suggest even before we get into

7   this issue of whether someone assisted or knew or acted as an

8   accomplice, you can't find criminal liability here because

9   they haven't met this burden.  You go through every single

10  claim form it's the same thing.  Think about what witness

11  testified about this detailed office visit.  Who said that

12  this visit, 99214, detailed office visit and a focused office

13  visit, wasn't proper?  Anybody say anything about that?  Any

14  of you recall anything?  Nothing.  There's no evidence in

15  this case about that and -- on this count as well.

16      Now, same thing, every single count, limited office

17  visit, other than limited office visit will have a CPT Code

18  but that doesn't require a medical doctor at all.  Matter of

19  fact it says you don't need a medical doctor for that.

20      So every single count is the same thing.  Every single

21  count.  There's no evidence.  We have all this big stuff.

22  Broad.  Broad.  But what we have is irrelevant.  What we just

23  -- what we lack here is evidence of the specifics.  Who did

24  what to whom.  Thank you.  I don't need that any more.

25      Now, so my advice and plea to you is because this is a

3317

1    criminal case be very, very technical and very precise.

2    That's what you have to do here.  On the merits, there's just

3    no basis.

4         I want to talk a little bit about witnesses.  I agree

5    with Mr. Donley and I'll go a step further.  Sometimes people

6    lie.  They come up here and they don't tell the truth and

7    you're going to have to make some credibility determinations.

8    One of the credibility determinations you're going to have to

9    make is about Markson.  I'm not going to go over this

10   extensively because I think you'll have -- I think you all

11   know what's going on with Markson.  He's very competitive.

12   He stole Doctor Halstead's forms, started teaching the same

13   thing he was doing and needless to say he's somewhat

14   disgruntled and will benefit greatly if Doctor Halstead is no

15   longer in circulation.  There's also the little matter of the

16   fact that he's -- he's -- he's nuts, okay.  I think I can go

17   that far.  He's nuts.  I mean, this guy comes up, says one

18   thing, denies something.  There's a big conspiracy about him.

19   It's unfortunate he has some mental problems.  I think it

20   speaks volumes that they brought in a witness like that in

21   the Government's case and that's what they think about this

22   case if Barry Markson is their star and final witness and I

23   just don't think I have to say anything more about that.

24        Price.  Another important witness in some respects and

25   some respects not.  The evidence in the case from Price is

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3318

1    that she avoided Halstead.  Not Halstead's fault.  She heard

2    that Halstead is a jerk.  Now maybe he is, maybe he isn't,

3    who knows, but based on what she heard she just avoided him.

4    The only evidence in the case that she adduces is that -- is

5    that they had this meeting.

6        Now what do we know about Price?  Well, I thought she

7    said on direct that Halstead ran the clinic, he was the

8    clinic's director, because things changed after that.  I was

9    planning on planning the cross-examination on this point when

10   she brought out the knife, said she never said that.  I

11   wonder if any of you have those notes where she said that

12   Halstead was the clinic director.  That's what I have.

13       Her basic view is she was just there to refer patients

14   for chiropractic treatment.  Do you believe that?  Is that

15   logical considering that she saw these patients over and over

16   and over again?  Let me tell you the craziest thing here.

17   She worked with this clinic for fourteen months, three days a

18   week, five days a week, twenty hours a week.  Most days she

19   was there.  Her office, you remember we talked about the

20   chart, right next to the therapeutic testing room -- the

21   testing room, one door down away from billing.  Now with

22   their view she knew nothing about the fact that all these

23   bills were being sent out in her name.  Nothing.  She knew

24   nothing.  Is that fair?  For fourteen months?  Let me ask.

25   Let's say she's telling the truth.  If you're -- in the logic

3319

1    of the Government's position, she's there every day, every

2    other day, twenty, thirty hours a week, she knows nothing.

3    Halstead, who's there eleven days over three and a half

4    years, he's not there for a year, knows everything.  How does

5    that make sense?  In my view that's not consistent.  If she

6    didn't know, how could the consultant know who's there eleven

7    and a half days, when we already know that Twigg and Burns

8    are hiding things from Halstead.  So, in my view, Price's

9    asserted lack of knowledge is directly exculpatory.  It means

10   that there's no way in the world he could have known what was

11   going on.  So she lied or mislead on any number of points.

12        One of the few exhibits we got into evidence is her new

13   resume.  I didn't have a chance to point that out.  She

14   worked from December 14th to January 5th.  On her resume you'll

15   see that she worked 1995, 1996 and 1997 at Priority One.

16   That's an interesting use of the years, the date.  You have

17   to make a determination of that.  In my view, Price is not

18   telling the truth.  What she was trying to do with her letter

19   and everything else is really just to cover herself and make

20   it look like she wasn't -- didn't know and wasn't involved in

21   that and, of course, if she knew and was involved in all this

22   stuff then there was no fraud because a medical doctor was

23   involved so she had -- she had to take that position and I

24   think she did.

25        Knoderer.  I'm not going to say much about Knoderer.

3320

1    It's pretty clear he was pressured into pleading guilty

2    because of his wife and father.  It's -- I have to say I

3    don't believe these gentlemen were any way involved in that.

4    He also testified that he didn't know about the upcoding that

5    his doctors were doing and certainly Halstead couldn't have

6    known.  We didn't get much into this thing about billing for

7    diagnostic codes that should have been chiropractic codes.

8    The only thing is you have the CPT Code book.  There was no

9    chiropractic code in 1997 or 6 or 5 or 4, so whatever he did

10   plead guilty to, it just didn't exist back then.  Because

11   this isn't a case about Knoderer we didn't get into that.  I

12   didn't do much on cross-examination on him because he's in a

13   difficult position.  His wife and his father are still at

14   risk and I just figure you'll get the picture with him and

15   won't need much help.

16       The other thing I'd like to talk about is money

17   laundering.  I'd like to talk about that because the only

18   time we talked about that is a little bit in the opening and

19   closing.  There's been no evidence about money laundering.

20   No one testified about money laundering.  Nothing.  We only

21   have it in the statements.

22       Now, what do we know?  The money laundering supposedly

23   has to do with the formation of these corporations.  By the

24   way, the corporation was formed by a New York lawyer, passed

25   on by a West Virginia law firm and the documents were

3321

1    submitted.  Extensive discussions, according to Wilson, about

2    -- between the lawyers.  Wilson stated if he had thought

3    anything was wrong or illegal he wouldn't have participated

4    with any of this stuff.  I believe him.  I think that's

5    right.

6        So where's the money laundering?  Halstead wasn't

7    involved in the formation of the corporation.  All this stuff

8    about the management company is not illegal.  In different

9    states you achieve in different ways.  It's not illegal to

10   have a matching company.  It's not illegal even to take the

11   money out of the matching company.  In this state, read your

12   notes, the doctors don't make all the money.  They get

13   salaries.  It's the company that makes the money.  Right?

14   There's nothing wrong with having someone other than the

15   medical doctor make the money and having the medical doctor

16   being an employee and the structure is really irrelevant.

17       I don't know much more to say about this money laundering

18   because there's no evidence of it.  The only evidence is that

19   Ron Halstead got paid.  He got a three thousand dollar check.

20   Well, okay.  John Wilson got paid.  Borsody got paid.  These

21   people got paid.  Price got paid.  Everyone got paid.  So the

22   big evidence in this case about money laundering for my

23   client is that he got a three thousand dollar check and in

24   fairness, he got a hundred and fifty thousand dollars over

25   three years, which included equipment, some of which he put

3322

1    back and he got consultant fees and he got his travel -- his
2    travel expenses paid.   That's the evidence of money
3    laundering.
4        Where's the money laundering?   You guys know what money
5    laundering is.   It's -- it's money laundering.   Where -- what
6    have we heard about that?   There's nothing in this case about
7    money laundering and the fact that we're only hearing about
8    all this stuff now in closing is just ridiculous.   If they
9    had a money laundering case and it was specific to Halstead,
10   you would have heard it.   You heard nothing about it.   That
11   charge is just completely nonsense.
12       Now I'm not going to go through all these IOV's again.
13   We had enough about that.   You'll recall from Twigg, it was
14   Halstead.   They -- the Government sort of thinks it's their
15   IOV's and we sort of think that IOV's that said to do less
16   testing, do less testing.   You've heard all that stuff.   Take
17   a look at the IOV's.   You know, I think -- there's all kinds
18   of good things in there.   There's bad things in there.   Even
19   crazy Barry Markson, when I tried to ask him about the IOV's,
20   said well, you're taking it out of context.
21       You know, people say things for a variety of reasons.
22   You heard this one thing about the red flag.   Well, the red
23   flag for this doctor was that he was switching, every --
24   every patient.   One bill was under chiropractic.   The other
25   bill was under the medical doctor.   Back and back.   And

3323

1    Halstead testified about that.  That's not wrong.  So you

2    take a consistent position.  If you're going to take the

3    position that the medical doctor's treating patients, bill

4    under them.  If you're going to take the position that the

5    chiro is the -- doctor is treating, take that position.  Just

6    don't keep on flip-flopping.

7        So what you have to understand, and I think you already

8    do, that in the context of business advice, people give

9    business advice and the IOV is just a ten word compilation of

10   a half hour discussion about a complicated business form and

11   that's all it is.  You can read them.  You can take them out

12   of context.  You can infer anything you want out of anything

13   but that doesn't make it illegal.

14       Let me -- let me close, you may be happy to hear.  Let me

15   close by what I think is the scariest part of this whole case

16   from my perspective and maybe a little bit scary for you.

17   Here's the deal here.  Halstead's a consultant.  He comes in

18   a few times over a course of eleven months.  It's a hundred

19   percent clear that Burns didn't follow his advice.  There's

20   no doubt about it.  The Government's star witness established

21   that.  Time and time again Halstead tells these guys what to

22   do and Burns and Twigg decide not to do it because Burns

23   wants to make more money.  He makes the more money, he puts

24   it in his pocket.  That's what happened in this clinic over

25   and over and over again.

3324

1      Halstead, despite what Price says, and despite what the

2   Government says, has no control.  He can't control the hiring

3   and firing.  He's not there.  He doesn't know what's going

4   on.  He has no blessed control over what Burns does and yet

5   the Government is attempting to seek criminal sanctions

6   against him because of general advice he gives to clients.

7   They're trying to impose criminal sanctions in a case where

8   the defendant can not control the actions of the individual

9   who's committing all these offenses, whatever they are and

10  one of the reasons we have juries, the main reason we have

11  juries, is so that you can apply the law and reflect the

12  values of the community and it seems to me one of the basic

13  values of the community is you do not impose criminal

14  liability on someone who has no control and can not affect a

15  course of action, even if that course of action is right,

16  wrong, criminal, fraudulent or whatever.  Somewhere along the

17  line criminal responsibility has to come down to someone who

18  can influence and control the situation and if it can't, it's

19  not fair to impose criminal liability.  We're not talking

20  about repaying money here; we're talking about criminal

21  liability.

22      And I would suggest that based on all the facts in this

23  case it's just not fair to impose criminal liability on a guy

24  who comes in, sells a bunch of forms, gives general business

25  advice to make more money, and doesn't know and can't control

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3325

1    anything.

2        That's all I got to say.  Please think carefully about

3    the case.  Be critical.  Forms do matter and be very, very

4    technical.  The law demands nothing less.

5        Thank you and thank you, Judge Keeley.

6            THE COURT:  All right.  Mr. Zimarowski.

7            MR. ZIMAROWSKI:  With the Court's permission, I'm

8    going to use that podium.

9            THE COURT:  Thank you.

10           CLOSING ARGUMENT OF DEFENDANT FILCHECK

11           MR. ZIMAROWSKI:  All right.  Well, two things.

12   First off, I'm not going to turn out the lights.  I'm not

13   going to talk as fast as Mr. Jaffe.  Not that I can't.  I

14   think I could talk just as fast as he could.  In fact I could

15   probably talk as fast as Mr. Adams as well but somehow I

16   think that the sixty miles an hour speed you kind of lose

17   lots of stuff.  Just like I did in opening statements, after

18   following Mr. Adams and Mr. Jaffe, I needed to tone down the

19   scale there.  I think I'm going to scale it down here as

20   well.

21       First of all, Mr. Donley thanked you and I want to thank

22   you along with something else.  I want to apologize to you.

23   Sometimes, maybe these lawyers are better than I am.

24   Sometimes I open mouth and insert both feet and if I've said

25   something to offend someone accidentally then I apologize and

3326

     1    what calls me back is when Father Doug was on the stand.   I

     2    stumbled, inserted both feet, both hands and fell on the

     3    floor basically and some people thought it was amusing.

     4    There's two people in the courtroom who did not think it was

     5    amusing.   I was one; Father Doug was the other.   I apologized

     6    to him afterwards and I apologize if anyone on the jury took

     7    offense at that, my stumbling around and my inarticulate

     8    stumbling in that response and there's probably been a couple

     9    other occasions.   I can think of one other one you weren't

    10    privy to but -- that I stumbled on as well.   So if I have

    11    said something inappropriate or offensive, I apologize.

    12        You recall that in my opening remarks -- when I do an

    13    opening statement, I try to give the jury a view of what is

    14    going to happen in the beginning, what's going to happen in

    15    the middle and what's going to happen at the end and if you

    16    recall my opening statement I told you -- I tried to give you

    17    a structure, an analytical structure and I said there were

    18    certain issues to be aware of and one of the major issues was

    19    there was multiple defendants.   There's multiple cases going

    20    on here.   There's the US vs. Halstead.   By the way, that's

    21    something else.   Mr. Donley and Mr. Adams represent the

    22    United States but they're representing the United States

    23    Government.   I would suggest to you that you represent the

    24    United States too.   So does the Judge, so does all the

    25    taxpayers.   We all represent the laws of the United States.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

3327

1   And with that said, don't place too much credence because I'm

2   from the United States.  You all represent the law in this

3   case.  You are the judges, as the Judge said, the judge of

4   the facts.

5       But there are issues, US vs. Halstead is one case.

6   United States vs. the Clinic, meaning Burns, Twigg, Medina

7   and I think if you were sitting on a jury and you have the

8   case in front of you and the jury verdict forms for the case

9   of United States versus Robert Burns and the Clinic you might

10  have a different view.  There's different evidence.  Those

11  are different cases.  You also have the case United States

12  versus Bill Filcheck.  United States versus Scott Taylor and

13  as the Judge told you in the Charge for the case and I told

14  you in opening statement, each case must be viewed

15  independently and separate and recall a comment I made in

16  opening statement.  I said one of the issues in this case was

17  who is "they"?  Put they in quotes.  I said that.  I think I

18  was very perceptive on that and they is an important issue

19  because the they in this case goes to the heart of the

20  Government's case.  We have evidence coming in, who is the

21  they?  Who's the they that the evidence applies to?  Does it

22  apply to United States versus Halstead?  United States versus

23  Burns or the Clinic?  Or United States versus Taylor or

24  Filcheck?  So the they is important.

25      I also said there's going to be a lot of blending of the

3328

1    issues.  They try to scoop everything up and push it all

2    forward as one.  They blend issues, blend responsibility,

3    blend accountability.  And I also identified you distinguish

4    between the unprofessional and the unethical versus the

5    illegal.

6        Also opening statement and periods of references to this,

7    I said that the beauty of a jury is that you bring with you

8    different types of lenses on how to view things and lenses

9    from the legal standard.  Jurors and witnesses all view

10   things from their own personal perspective, sometimes an

11   analytical perspective, sometimes an emotional perspective.

12   What's the beauty of a jury system is that you blend it all

13   together, to use a term, and you come up with what I think is

14   a just -- a justice and conclusion.

15       So the lens of your analytical basis is important.  When

16   you draw those inferences, draw from your own basis, your own

17   lens, how you view things.  I tend to view things rather than

18   analytical, rather structurally, which is why Mr. Jaffe

19   jumped into a whole lot of facts.  Mr. Donley did jump in the

20   facts but he was a different structure but I tend to think

21   that structure is important.  It's all part of my lens in my

22   back.  I do things as an engineer and as military.  That's

23   directly how everything is viewed by me, everything is

24   analytical, step by step by step, logical organization.  You

25   get to the top beginning from the bottom.  I cited you some

3329

1    Arthur Conan Doyle Sherlock Holmes and those are the kind of

2    deductive and inductive reasoning approaches that I think are

3    useful and important.

4        We have, in this case, a jury charge.  You have a copy of

5    it.  I think everyone has a copy of it.  The Judge read it to

6    you and you read along and you recall that I said in opening

7    statements that criminal law is structured, it's analytical.

8    It has two general components.  It has mental state

9    components and overt act components and there's no such

10   thing, by the way, as common law crimes.  Every criminal law

11   is by statute.  Congress has enacted this particular piece of

12   legislation and then specified certain elements which must be

13   satisfied.

14       There's no such thing as common law crimes, absolutely

15   none.  In fact in this case you might recall the reference

16   that one of the statutes, health care fraud, was not enacted

17   until August of 1996.  In other words, at the beginning of

18   this conspiracy such a criminal statute did not even exist,

19   which is why the Government is making an allegation of mail

20   fraud, a different type fraud.

21       Anyway, the bottom line is that everything is structured.

22   Everything has structured elements, overt act elements,

23   mental state elements.  I gave to you illustrations in my

24   opening statement that having one without the other you

25   simply have no crime.

3330

1        There are certain terms -- I'm going to kind of flip

2    through this real quickly.  On page seven of the jury charge,

3    and by the way, before I go through this let me remind you of

4    a passage in the charge that you must view the charge as a

5    whole.  I'm just going to point out certain provisions for

6    your reference but when you reference, you reference the

7    entire charge as a whole.  Reading on page seven is

8    definition of terms and definition of terms give you some of

9    the elements we talked about and some of those mental state

10   elements I talked about had terms like knowingly and

11   willingly and several other terms and those terms appear --

12   again there's no such thing as common law crime.  All

13   criminal statutes are structured and those terms appear and

14   those terms have to be satisfied; those definitions have to

15   be satisfied.

16       Look for those terms, willingly, knowingly.  There's

17   principal and agent, which is a very common constant.

18   Principal and agent for authority of an employee.  Simply

19   look at those terms and think about those terms not only as

20   you apply to the statutes but also apply to organizational

21   structures.  Principal, agent, employer, employee simply

22   means that one person can do for another, such as writing a

23   letter of medical necessity as an agent for a doctor who's

24   the principal.

25       On page twelve is the credibility of witnesses and

3331

 1    certain rules or -- I don't think -- rules is too strong a

 2    term, certain advice that the Court gives you -- instruction

 3    that the Court gives you on how to analyze the credibility of

 4    particular witnesses.

 5        On page seventeen there is a passage called character

 6    evidence.  In character evidence you have heard the

 7    reputation and opinion evidence about defendants William

 8    Filcheck and Scott Taylor's character for truthfulness,

 9    honesty and law-abiding nature.  You heard Father George and

10    Father Doug testifying about that.  And you also heard, of

11    course, the individuals themselves and how character evidence

12    is significant and important in your deliberations and

13    determinations.

14        When I talk about elements of an offense, we have

15    elements of conspiracy on page twenty-three; elements of

16    health care fraud on page twenty-six; elements of mail fraud

17    on page twenty-seven; elements of aiding and abetting on page

18    thirty-three and then on page thirty-five there's what I

19    would consider to be a highly significant instruction on

20    what's called a good faith defense and how someone's good

21    faith and someone's character evidence can be based with

22    criminal intent and the good faith defense goes to negate

23    mental state element of the willingness -- willfulness and

24    you need to factor those in when you do your analytical

25    structures.

3332

1    The charge also talks about what we call presumption of

2    innocence, which I'm sure you all know from watching all

3    those TV legal shows.  It's called a burden of proof and a

4    burden of production.  The burden of proof and the burden of

5    production lies with the Government.  As the Judge told you

6    someone charged with a crime starts with a clean slate.

7    There's no evidence against him.  The Government has the

8    burden of producing evidence, that's the burden of production

9    and they have a burden of proof meaning they have to make the

10   evidence reach a high level and that level they have to reach

11   is a level called reasonable doubt.

12       And if you note the charge says well, we're not going to

13   define that; we're going to allow you to simply just use your

14   common sense on that.  You've watched enough lawyer shows to

15   know that reasonable doubt basically is doubt that gives one

16   pause, gives one hesitation.  It's more than -- do we have a

17   scales of justice in this room?  I guess not.  Usually do.

18   It's more than just fifty-one percent, forty-nine percent.

19   Reasonable doubt to most of you is like ninety/ten.   The

20   Government has a significant burden of proof beyond a

21   reasonable doubt that will give one pause or hesitation.  If

22   there's pause or hesitation then you have reasonable doubt.

23       Let's get into some of the substantive issues here.

24   Fraud.  I disagree with Mr. Donley's characterization of this

25   case as far as the easiness of the fraud.  Mr. Donley said

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3333

1   well this is easy fraud.  No, this isn't easy fraud at all.

2   Fraud by definition is a material misrepresentation of a fact

3   which signs are indeed an intent to deceive; you have to show

4   damages.

5       An easy fraud would be a doctor billing for services he

6   didn't perform and he took the temperature gradient test and

7   he billed for it but they never performed it.  That's the

8   easy fraud.  A test that no one performed.

9       This fraud is anything but easy.  This fraud is an

10  allegation, as Mr. Jaffe went through, that the test wasn't

11  medically required and medically necessary and it wasn't in

12  compliance with a CPT Code, whatever that is and I sat

13  through two weeks of trial and outside of knowing what CPT

14  means, that's about all I know about CPT Codes and then the

15  doctor that had the bills submitted under the corporate name

16  was not the proper doctor.

17      Well, is there any allegation that somehow the treatment

18  performed by Doctor Filcheck was not performed by Doctor

19  Filcheck?  Every piece of paper that's submitted in this case

20  that Doctor Filcheck performed has Doctor Filcheck's name on

21  it, including the infamous letters of medical necessity which

22  have his initials on.  There's no misrepresentation.  There's

23  certainly no material misrepresentation of a fact.

24  Everything is up and up, above board as far as Filcheck and

25  Taylor are concerned.  Now it may be different in the case of

3334

1    United States versus Burns and United States versus the

2    Clinic but as far as Taylor and Filcheck are concerned, show

3    me a material misrepresentation with them, an intent to

4    deceive.

5        Everything that Bill Filcheck did has his name on it.

6    Every back he cracked.  Every patient he saw has his name on

7    it.  There's nothing that doesn't have his name on it that he

8    didn't do.

9        And by the way these tests the Government likes to point

10   out, I kind of thought they'd back off from that after they

11   were confronted with the statutes but apparently they chose

12   not to.

13       Doctor Filcheck testified that he didn't perform any of

14   those tests except a couple temperature gradient tests; never

15   performed any other tests.  Has there been any document

16   produced or did a witness testify that Doctor Filcheck

17   performed the tests and they were submitted under someone

18   else's name?  He did what he did and the record so reflects

19   and the patient records so reflect.

20       All right.  I was trying to think of how I could fit this

21   thing together knowing that Mr. Jaffe was going to do parts

22   of this and wondering what the Government was going to do and

23   I kind of broke it down into truth, lies, statistics and

24   Government exhibits.  And there was -- I want to take a

25   minute to go over something here.

3335

1    The Government cited to you and showed you a lot of

2    exhibits, compilations of information, which I considered to

3    be statistics and somewhat, at least incomplete or misleading

4    and I want to share this with you.  As Mr. Jaffe made

5    reference, and I'm sure most of you haven't had your head in

6    the sand for a while, you know that there's debates in this

7    state over malpractice insurance.  One of my little less

8    reputable colleagues sent me this, said think about this.

9         "The number of physicians in the United States is

10        seven hundred thousand.  The number of accidental

11        deaths caused by physicians per year is a hundred

12        and twenty thousand.  The number of accidental

13        deaths per physician is zero point one seven one."

14   That's a statistic from the United States Department of

15   Health and Human Services.  Then he says think about this.

16        "The number of gun owners in the United States is

17        eight hundred million -- eighty million.  The number

18        of accidental deaths per year for all age groups is

19        fifteen hundred.  The number of accidental deaths

20        per gun owner is point zero zero zero zero one eight

21        eight.  Statistically then doctors are approximately

22        nine thousand times more dangerous than gun owners.

23        In fact not everyone has a gun but almost everyone

24        has at least one doctor.  Please alert your friends

25        to this alarming threat.  We must ban doctors before

3336

1        this gets out of hand."

2    And then he added a postscript.

3        "As a public health measure I have withheld the

4        statistics on lawyers for fear that the shock could

5        cause people to seek medical attention."

6    Which gives you my Mark Twain the truth of it was you got

7    statistics.  Really it's what do they mean.  What do these

8    stats mean?  A lot of them, I would suggest to you, were

9    incomplete and misleading.  Some were down right, call it ---

10   intent to deceive.

11       We had exhibits from the Government as to Halstead's

12   seminars attended and we had a big long list.  Do you recall

13   who looked at that or what was said?  I don't care about all

14   these seminars.  These are the seminars I attended.  Okay.

15   Well, it might be an actual list of --- it's kind of

16   misleading, isn't it?  Are you trying to imply that someone

17   else outside of Bill Twigg attended those seminars?

18       And some of those other statistics with the big color

19   charts and bar charts and all that, what do they mean?  Some

20   of the coverage issues.  The charts that said these are the

21   days that Doctor Price was not present.  So what?  Okay.  You

22   know what's missing from those charts, and again, keep in

23   mind the burden of production and the burden of proof rests

24   with the Government.  What is missing on those charts is what

25   kind of insurance claim is it.  Is it a chiropractic

3337

 1   insurance claim or is it a medical insurance claim?  The

 2   Government says why do you care about that?  Why do you care

 3   about it?  You don't need to know about it.  What do you mean

 4   we don't need to know about that?  Wouldn't you think all

 5   this debate over when you treat people if they have

 6   chiropractic insurance with chiropractic care and you treat

 7   people if they have medical insurance with medical care?

 8   Don't we want to make a distinction on those statistics, on

 9   all those charts, with the type of coverage and what the

10   insurance claim is?  And, again, the burden of proof and the

11   burden of production lies with the Government.

12       And I think one of the best pieces of evidence, and you

13   could have heard Mr. Donley's jaw hit the floor, when the

14   Medicare representative testified that all the Medicare

15   claims were what?  They were batched under chiropractic care.

16   They were batched under chiropractic -- they were

17   chiropractic care.  Let's see.  Wait a minute.  Let's follow

18   some logic here.  They were chiropractic care, which was

19   filed for chiropractic care to go with that chiropractor.

20   Show me the material misrepresentation of the facts, ladies

21   and gentlemen.  Show me where that's wrong somewhere.

22       Am I the only one that is not thick enough or big enough

23   or smart enough to figure that out?  There isn't any material

24   misrepresentation of fact when you submit a chiropractic bill

25   for chiropractic treatment performed by the chiropractor

3338

1   under chiropractor care.  That's at least five of their

2   substantive counts right there.

3       We also have in law what's called the best evidence rule

4   and some of the best evidence is original recordings and you

5   have a lot of paper.  I'm going to go through some of those

6   just like Mr. Donley.  Mr. Donley did an excellent job of

7   going through some of the exhibits.  I want to do that too.

8   I'm going to do that in about five or ten minutes so I'm

9   going to tell you where some of the exhibits are too.

10      Some of the best evidence is these tapes and these tapes

11  are the best evidence.  Why?  Because you can hear the

12  voices.  Particularly when Mr. Donley says Mr. Filcheck ---

13  Doctor Filcheck said this and Doctor Filcheck said that, play

14  the tape.  Play the tape of the ten-point exams.  Play the

15  tape of his statement that he gave to Trooper Hudson.  Hear

16  his voice.  Listen to what he's saying and more important

17  listen to how he's saying it.

18      I've always maintained that sometimes it's just as

19  important how you say something as what you say.  Mr. Jaffe

20  said about the intonations of raising one's voice or lowering

21  one's voice.  Listen to the tape.  Listen to the tapes.

22  You're going to have a recorder back there.  You'll have the

23  tapes back there and by the way, don't listen to part of the

24  tape.  Don't rest on any snippet of tape; play the entire

25  damn tape.  It's so damaging ---

FORM CSR - LASER  REPORTERS PAPER & MFG CO.  800-626-6313

3339

1        THE COURT:  I don't think you realized what you just

2   said, Mr. Zimarowski, but I caution you on your language.

3        MR. ZIMAROWSKI:  I'm sorry, Your Honor.  Play the

4   entire tape.  I apologize, Your Honor.  Again, I did

5   something wrong and I apologize.  Play the tape.  Play the

6   tape in its entirety.

7        I gave you a quote from Sir Arthur Conan Doyle and I want

8   to repeat it and that's on the train ride back from the

9   countryside, Doctor Watson's saying to Holmes, "Is there any

10   other point to which you would wish -- you wish to draw my

11   attention?".  Holmes replies, "to the curious incident of the

12   dog in the nighttime".  To which Doctor Watson replies, "but

13   the dog did nothing in the nighttime."  Holmes says, "that's

14   the curious incident.

15        Mr. Jaffe went into the absence of certain witnesses and,

16   again, you need to view the absence of witness always in the

17   context of the burden of proof and the burden of production.

18   If the Government had witnesses they could have, should have,

19   would have produced them.  Okay.  What's the first category

20   that the Government is conspicuous in it's absence?  The

21   first category of witnesses is the patients.  Think about it.

22   How many patients testified?  How many patients testified

23   there was nothing wrong with them?  How many patients

24   testified they were defrauded?  How many patients testified

25   they got unnecessary treatment?  No patient testified.  No

3340

1    patient.  Conspicuous in its absence.

2         Number two.  Billing witnesses.  You heard reference made

3    to Alma Parkinson.  She was head of billing and her name was

4    being mentioned by several witnesses.  There's an absence of

5    witnesses on billing witnesses.  Why?  Well, you had Twigg.

6    And you had everyone else, Filcheck, Taylor, virtually every

7    other party said that billing was controlled by Twigg and

8    Burns.  Price.  Everyone said that.  You had Filcheck and

9    Taylor who said they were run out of the billing office.

10   They knew nothing about billing.  They were not responsible

11   for whose name was on the forms or how the forms were filled

12   out.  There's no billing witnesses; none whatsoever.  What

13   can you infer circumstantially from that?  That the

14   Government had no witnesses that would say that Doctor

15   Filcheck and/or Doctor Taylor had anything whatsoever to do

16   with billing and no knowledge, which is the essence of that

17   rather complex pattern.

18        Staff and tech witnesses.  We've heard a Sean name

19   mentioned, E.J. name being mentioned, several other witnesses

20   who performed the tests, who did the temperature gradient

21   tests, who performed the ultrasounds, who performed a lot of

22   these other tests.  Did any of them ever testify as to who

23   ordered them to do the tests?  I didn't hear any of them

24   testify.  Why?  Well, because is it contradicted that Bill

25   Twigg and Robert Burns ordered the tests?  Is that anywhere?

3341

1   Do you have any hesitation or pause about who ordered the

2   tests?  Twigg or Burns.

3       So no staff.  No tech witnesses.  Physical therapist.

4   Well, she's about the only one that testified.  She testified

5   she performed some of the tests.  I think her main purpose

6   though was mainly trying to do some sort of circumstantial

7   inference that Halstead was trying to get her fired.  You can

8   address that issue.  But the physical therapist performed

9   some of these tests.  She so testified.  She testified that

10  Bill Twigg ordered them.  Bill Twigg ordered the tests, along

11  with Burns.

12      Picking up on what Mr. Jaffe said, there were no experts

13  that testified in the case on behalf of the Government.  No

14  experts that testified that the temperature gradient test,

15  the ultrasound, any of these tests were improper or unsound

16  or a doctor to go through all the patient files, as Mr. Jaffe

17  pointed out, and said, you know, I've gone through every one

18  of these patient files and every one of these tests was

19  uncalled for.  There's been no witnesses, conspicuous in its

20  absence.

21      And my last category about absent witnesses, though I

22  think some of them took the stand, I think they're absent

23  between the ears and that is the insurance witnesses.  They

24  were, as a group, pretty absent as far as any of the details

25  of their policies and procedures and how things work, even

3342

1    what some of the definitions and terms were.  They were

2    absent between the ears.  Intentionally or unintentionally,

3    that's for you to decide.

4         All right.  What did they actually say is my next

5    category as I was flipping through this.  What did Twigg

6    actually say?  Now Mr. Jaffe was quite correct in pointing

7    out to you, you know, Mr. Twigg was on the stand for, I think

8    it was part of Monday, a whole day and part of another day.

9    I don't know, ten hours and I bet Mr. Donley spent maybe

10   about five sentences with him.  Why?  What did Mr. Twigg

11   establish?  Mr. Twigg established that him and Burns ran the

12   clinic and the chiropractors had nothing to do with any of

13   the decision making process.  Look to Twigg.  Twigg

14   exonerates Bill Filcheck and Scott Taylor.

15        What about Doctor Price?  Doctor Price testified right

16   after that.  Well does she inculpate Bill Filcheck, Scott

17   Taylor?  Absolutely not.  Just the opposite.  She says the

18   same thing.  They complained about: A) working conditions.

19   They also complained about testing and they complained about

20   testing to Doctor Price.

21        What would give rise to any type of circumstance to think

22   if you were Bill Filcheck or Scott Taylor that Doctor Price

23   has not approved a test if you complain to her about the test

24   and she just says that's the way Burns wants -- Burns and

25   Twigg want it to be run and she agrees with it.  Is she

3343

1    charged?  I must have missed that in the name of the

2    indictment about Rebecca Price.  She must have been dropped

3    off of the indictment, I guess along with the physical

4    therapist and along with some of the other staff members of

5    the clinic.  None of those are here charged.

6         Medina.  What did Medina say?  Medina said the same

7    thing.  Medina basically said that he agreed with and signed

8    everything in compliance with Doctor Burns.  Well, I don't

9    think -- I'm not sure that it was testified to but let's

10   assume that Filcheck or Taylor went to Doctor Medina and said

11   what about this particular test that you signed.  What do you

12   think Medina would say?  Well, that's fine with me.  That's

13   what his honor does, it's fine with me.  Filcheck and Taylor

14   can't rely upon that?  After all, Medina's a doctor.

15        And regarding Medina's "retirement", and put that in

16   quotes, down in Florida, well we all know he was still

17   medical director and he was still getting stuff sent down to

18   him and it was coming back and who was that from, by the way?

19   Well, that was not only from Twigg and from Filcheck and from

20   Taylor but also from Price.  Price said that too.

21        Again, what Mr. Donley said as well.  What I remember

22   from the testimony, what Mr. Donley remembers from the

23   testimony is not evidence.  It's what you remember the

24   testimony is the appropriate evidence.

25        You had Bill Filcheck testify and you had Bill Filcheck's