3344

1    character witnesses testify.  Play the tapes.  Play the tapes

2    of the statement with Trooper Hudson.  Play the tapes, the

3    complete tapes, of the ten-point examinations, recall what he

4    had to say, evaluate his testimony as you would any other

5    witness.  I'll let Mr. Harris address Mr. Taylor's comments.

6         But we have exhibits.  Let me -- get out your pencils.

7    Let me give you what I -- some of the exhibits just real

8    quickly so you can find them.  Okay?  1-02, 03 and 04 are

9    employment contracts of Taylor and Filcheck, the beginning of

10   the numbers in the 100 series.  01-15, 16 and 17 are also

11   employment contracts.  You need to read the language that's

12   in those contracts.  That's 15, 16 and 17.

13        01-023 is the floor plan.  You may want to look at that.

14   We talked about the floor plan, the security cameras, how

15   things were set up, the security, locked doors, how the

16   organization was run.  Again, filling out some of the Twigg

17   testimony, some of the Filcheck and Taylor testimony.  So 023

18   is the floor plan.

19        1-055 is that infamous letter from the Chiropractic Board

20   you've seen at least a half dozen times.  I want you to read

21   that if you have any hesitation upon something but read it in

22   conjunction with 01-193 because those are the Board

23   regulations and the statutes.  You can't just read one

24   without the other.  One explains the other.  So read 01-193

25   with 01-55.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

3345

1      1-078 is the staff meeting that Mr. Donley made reference

2  to and note that's in June of 1994, I believe, and that is

3  with Bill Filcheck being there for only a couple weeks.

4      01-095 is an interesting letter.  It's an employee

5  reprimand of Medina, where Medina was criticized by Burns and

6  Twigg for giving away certain other collars and other

7  devices.  Why is that significant?  Is there any question in

8  your mind as to who's in charge?  If there is, look at 01-

9  095.

10      And to help you decide this thing, 01-112, I want you to

11  read that.  That is Price's resignation letter to the staff.

12  01-112, in which Price tells the staff that she's leaving,

13  she cares about them all but there's nothing illegal going

14  on, and she puts that in bold print and she gives a copy to

15  Taylor and to Filcheck and to the other staff members.

16      I've asked you to read tapes -- read tapes, listen to

17  tapes.  Let me give you the numbers.  01-256 is the audio

18  tape cassette of Filcheck and Trooper Hudson.  266, 267, 268

19  and 270 is the ten-point exam tapes.  If you're so inclined,

20  look at those.

21      You know, in the opening statements, I think I'm going

22  back here and tie this all together, Mr. Adams said -- put up

23  a bunch of lies.  Remember that?  That was pretty good.  Lie

24  number one is.  Lie number two.  Well, I -- you know, lawyers

25  steal from everybody.  We plagiarize like crazy.  He has a

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

3346

1  good idea, I'll give him credit.  This is Mr. Adams' idea,

2  we'll give him a footnote.  Lie number one:  protocols are

3  unimportant.  I know you're tired of hearing that word, but

4  again, if you are in certain professions, engineering,

5  military, production of engineering, protocols are second

6  nature and to say that they are -- somehow something is wrong

7  with a protocol just kind of defies my thinking.

8      I mean every entity has protocols.  The garage that you

9  take your car into when they take apart -- do a brake job on

10  your car will have a protocol, a set way on how to do things.

11  I could -- I was going to say some protocols are male

12  oriented and female oriented.  My wife tells me there's a

13  protocol to sorting and doing laundry.  My son and I can

14  never master that protocol but there's a separate sheet on

15  how we do that, at least that's what she tells us because we

16  always get it wrong because we can't follow the proper

17  protocol to sorting and doing laundry.  But even housewives

18  have protocols.  To clean a bathroom has a protocol.

19      Protocols are just second nature and as you heard, the

20  State Police have protocols.  When they arrest someone for a

21  DUI, they have a protocol.  Why?  So they won't look like an

22  idiot to figure out.  Protocols are just so common and

23  everywhere that to imply that there is something wrong or

24  inherently suspect with the protocol I think just defies

25  logic.

3347

1      Lie number two.  Context is unimportant.  Context is

2  unimportant.  Context is extremely important.  Taking a

3  sentence or a line from a letter or the excerpt of a tape out

4  of context diminishes it, allows you to mislead.  The bells

5  and whistles and whiz bags of this technology age, I know

6  some of you are older than I am, but I just fear that we're

7  losing a lot of completeness.  Context and completeness, in

8  my mind, are synonymous.  Completeness is important.

9      Chains of authority are important.  I said that protocols

10  are important but chains of authority are important.  Every

11  organization that I've ever been involved with has a chain of

12  authority.  We have a chain of authority in this courtroom.

13  The Judge is at the head of the chain.  Every organization

14  has a chain of authority and that chain of authority must be

15  respected and the protocols must be respected and to ignore

16  saying a chain of authority between a subordinate and a

17  superior is something to be ignored because it's out of

18  context, because it's not important, that the x-ray

19  technician has just as much to say in an organization as the

20  office manager, who has just as much to say as the owner, who

21  has just as much to say as the medical doctor or the

22  chiropractor or the physical therapist.  That's the beauty

23  again of a jury system.  You guys have been in this real

24  world.  You know that there's a hierarchy, there's an

25  authority.  And, again, I'll draw it back to the household.

3348

1    There's a hierarchy of authority in the household.  Okay.  If

2    you've got teenage kids, all right, you certainly don't think

3    they have the same amount of voting power as mom and dad.  If

4    they do then you've got a problem probably in your household.

5    There's a hierarchy of authority there.  There's a chain of

6    command, whether it's in the military, whether it's an

7    industrial organization, whether it's a doctor's organization

8    or whether it's in a mom and dad with teenage kids household.

9    Chains of command are important.

10       Lie number three.  The person as a whole is unimportant.

11   I suggest to you a person as a whole is extremely important.

12   What someone has done with their life is important.  You

13   could say, well, isn't it kind of keen he's an Eagle Scout,

14   Bill Filcheck's an Eagle Scout.  That's an accomplishment.

15   It's an accomplishment as to having served several years in

16   the military.  It's an accomplishment having made a rank of

17   such and such, a keeping for the position level of foreman in

18   an organization.  All of these are important.  Having friends

19   that are priests that will come in there and testify they've

20   known you for almost twenty-five years.  A person as a whole

21   is important.  There's jury instructions on that and I called

22   your attention to them then and I call your attention to them

23   now.  They tend to negate those mental state elements.

24       Number four.  Quantity makes up for lack of quality.  I

25   think that's something that a lot of us could go into.  If

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3349

1   you don't have good quality you got to bury -- bury people in

2   paper.  Now you got thirty-seven volumes or whatever of

3   exhibits so we can bury someone in paper and that -- they'll

4   not look at it and quantity is more important than quality.

5   It's quality that's important, not quantity.  It's what you

6   read rather than what -- there's a taped excerpt and

7   something flashed on a screen or some paragraph out of a

8   statute or some paragraph out of a piece of a report or a

9   piece of paper.  Read the entire thing.  Quality is more

10  important than quantity.

11      Number five.  Billing was easily understood.  I could do

12  a -- that's part A, part B, it's the terms that's easily

13  understood.  Everyone, of course, understands billing and

14  understands the terms.  Those of you that have kids that ever

15  have got those EOB's, explanation of benefits, they come to

16  your house.  I'm sure that everyone of you as a juror can

17  honestly say you understood every EOB that's ever come to my

18  house.

19      All insurance papers, I understand.  I read my

20  homeowner's policy, my auto policy, and gee whiz, I

21  understand that.  No problem at all.  It's not confusing at

22  all.  I once had an insurance law professor who said that the

23  only rule he felt insurance is is compared to a biblical

24  phrase to the big print with it and the small print taketh

25  away and unless you read the entire document, the small print

3350

1   is going to get you every time.

2       Lie number six.  I'm on a roll here.  Complaints and

3   accusations of unethical or unprofessional conduct was sent

4   into some legal company.  But you complain about something

5   and saying it's not useful or you complain about you haven't

6   been tested; therefore, according to the Government that is

7   to say that they're illegal or medically unnecessary.  Not

8   the case.  I don't know how logically it falls from that.

9   Usefulness is not the same as -- used is not the same as

10  necessity.

11      Number seven.  The burden of proof and the burden of

12  production.  I had to step back for a moment and told you

13  what the burden of proof and the burden of protection is.  I

14  think it's highly clear who has the burdens to produce a

15  proof and who has the burdens of production.

16      And my last one I had to -- it's kind of facetious but

17  we're from the insurance company, we're here to help.  I

18  guess the parody of that is, we're from the Government, we're

19  here to help.  But I think you need to -- when you hear the

20  credibility witnesses, look at the context.  Those of you, in

21  your common experience, that have had -- fought the battles

22  with coverage of insurance companies know what I'm talking

23  about.

24      Touch back, the instructions.  I said we have overt act

25  elements and mental state elements.  We have willfulness.  We

3351

1   have knowingly.  We have purposeful intent.  In order for you

2   to find Bill Filcheck guilty of conspiracy you must find

3   agreement.  You must find that he willingly and knowingly

4   joined in this conspiracy with a purpose and intent,

5   purposeful intent to achieve an illegal goal, whatever that

6   goal is you can find under the Government's quantity of

7   production.

8       I would suggest to you that there is no proof of

9   purposeful intent.  There is no agreement.  Burns doesn't --

10  didn't conspire with anybody except Burns.  He looked in the

11  mirror to conspire with himself.  That's the only person he

12  conspired with.  He shared nothing with anyone.  He agreed

13  with no one.  Burns did not conspire with anybody.

14      All the other remaining counts, the two through fifteen,

15  you also need willingness, willfulness and knowingly, but you

16  also need specific intent.  That's why I called your

17  reference to those elements.  You need to find he had the

18  specific intent to aid and abet for this illegal purpose.  If

19  any one of those elements fail, the willingly, the knowingly,

20  the purposeful intent, if any one, don't have to have them

21  all fail, if any one of those fails then you're obligated, it

22  is your duty to return a not guilty verdict.

23      And look at the good faith instruction.  The good faith

24  instruction on page thirty-five of the charge -- the good

25  faith instruction addressing the issue of willingly.  If you

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3352

1    feel he operated -- Bill Filcheck operated in good faith,

2    everything is obligated to be returned not guilty.   Why?

3    Because the mental state element of the willingly falls and

4    doesn't address or suggest to you that the Government hasn't

5    proven knowingly and they certainly -- certainly haven't

6    proven no specific intent to join in some sort of illegal

7    enterprise or illegal organization as Mr. Donley pointed

8    reference to several times.

9        I ask you to go back and return a not guilty verdict on

10   Counts 1 through 15 in favor of Bill Filcheck and I thank you

11   very much for your time.

12       THE COURT:  All right, ladies and gentlemen, we'll

13   take the mid-afternoon recess at this time and I'd ask that

14   you be prepared to return to the courtroom at a quarter till

15   three, ten minutes from now.  Thank you very much.  Please

16   don't discuss the case among yourselves during the recess and

17   leave your notebooks and other papers on your desk face down.

18       (Jury out 2:35 p.m.)

19       (Recess at 2:38 p.m., until 2:40 p.m.)

20       (On record in Chambers at 2:40 p.m.)

21       THE COURT:  All right.  I looked at my notes and I

22   asked my law clerk to look at his notes and we both have the

23   same thing, which is a one and a half hour close for the

24   Government, split one hour and ten minutes on the opening

25   part and twenty minutes on the rebuttal and there was forty-

3353

1    five minutes for Mr. Jaffe, forty minutes for Mr. Zimarowski

2    and Mr. Harris said thirty minutes but I think I ruled that

3    if he wanted to take forty he could.  So that's where we are

4    on that.

5         MR. ADAMS:  All right, Your Honor, I may have

6    misunderstood.  I thought we were in -- that response was in

7    the response to Mr. Zimarowski's concern that we not backend

8    the argument and we were making, I think, a representation it

9    was going to be at least an hour and ten or an hour and

10   fifteen on the front-end but if that was not the way it was

11   understood that was --

12        THE COURT:  Well, I didn't understand that.  I do

13   want to say something though.  I do think, in light of your

14   misunderstanding, that it's probably fair to give you some

15   additional time particularly because the two defense closes

16   have gone over by five minutes each, which is not a

17   significant amount of time.

18        MR. JAFFE:  By the way, I think Mr. Harris is going

19   to speak considerably less and maybe that --

20        THE COURT:  That's his choice.  He has forty if he

21   wants it.  And actually I think this is a case in which, upon

22   reflection in listening to the closing arguments, I think you

23   all have done an excellent job of explaining a very

24   complicated set of issues to the jury and I think they're

25   listening very carefully so I'm not too concerned that

3354

1    cutting off is coming because it's become redundant or

2    unimportant.  What I've concluded is that I'll give you the

3    twenty minutes.

4         MR. ADAMS:  That will be fine, Your Honor.

5         THE COURT:  Which I think is probably a gift of an

6    extra five minutes since you would get the five additional on

7    the other two and you had five left over but I will -- I will

8    have to stop you, Mr. Adams, at that twenty minutes.

9         MR. ADAMS:  Okay, Your Honor.

10        THE COURT:  Because it is rebuttal and they don't

11   have a chance to respond to it.

12        MR. ADAMS:  I understand.  I appreciate that.

13        THE COURT:  Okay.  Now I want to say a couple of

14   things.  The golden rule's observed in this courtroom and

15   when you start personally attacking or you start testifying

16   in your closing argument, I mean, there was no objection but

17   had there been objections on several -- many several

18   occasions I would have -- I would have sustained them.  I

19   just want you to be aware of the fact that I listen carefully

20   to closing argument and I -- I have a couple of

21   understandings, which I think are correct, about where the

22   line is and we're almost finished and I don't expect the line

23   to be crossed again and that's that.  I'll see you all in

24   there in five minutes.

25        (Recess from 2:45 p.m., until 2:53 p.m.)

3355

1      (Jury in)

2          THE COURT:  We'll begin the last segment of the

3   closing arguments with Mr. Harris.

4          MR. HARRIS:  Thank you, Your Honor.

5              CLOSING ARGUMENT OF DEFENDANT TAYLOR

6          MR. HARRIS:  I also, Ladies and Gentlemen, want to

7   thank you all for participating.  I know when I went to law

8   school, like a lot of people, I didn't know what to think of

9   the jury system but I became a firm believer, all my heart

10  and soul into it and I think it's the only fair way to decide

11  someone's fate so, again, I thank you.

12      I'm going to do the opposite of everything that Mr.

13  Zimarowski told you.  I'm going to talk loud.  I'm going to

14  talk fast and I'm mostly going to talk to you in the dark

15  because I'm going to be showing you some stuff.

16      I want to get right to the heart of the matter.  Our

17  defense in this case is simple.  Doctor Taylor did not

18  conspire with anyone to defraud anyone.  He did not have any

19  intent to defraud anyone and whatever he did in this case, as

20  Mr. Zimarowski talked about, he did it with -- with good

21  faith to help the patients.

22      Now, you know, how do you determine what someone --

23  what's in someone's mind, what they're thinking?  Now the

24  Government, you know, wants to rely on things that Doctor

25  Taylor said in letters and what he said to people but it's

3356

1   more important, I submit to you, as to what somebody did or

2   did not do.  That's what you want to look at.

3       Now when I was trying to decide how to organize this

4   closing, and I thought what's a good way to do this and I

5   couldn't really come up with anything and I'm sure, like a

6   lot of you all, one night I'm dreaming, can't sleep very

7   well.  I'm thinking of protocols and HCFA forms and ten-point

8   exams and that's when something came to me and I decided to

9   make up my own ten-point list so that's what I want to show

10  to you right now.  I call this Doctor Taylor's "Did Not Did

11  Ten-Point List" and I want to go through it with you.

12      The first one.  He did not create this protocol that

13  we've been talking endlessly about and he did not have any

14  say in the protocol.  You all know from his testimony he was

15  twenty-five years old, just out of school.  It was his first

16  job.  He went to a school that was steeped in straight

17  chiropractic.  He was a big believer in that.  He came to the

18  Burns clinic.  That's the way they did things in the

19  beginning and then somewhere in late '93-'94, they said we

20  got this new idea, this new thing.  We're going to go to a

21  multi-disciplinary clinic.  We're going to be able to cover

22  everything, have a medical doctor do all sorts of things.

23  They never asked Doctor Taylor what he thought, if he liked

24  that or if that was okay with him.  They just said this is

25  the way we're going to do it.

3357

1      Number two.  He did have an employment contract with the

2  clinic.  He had three contracts.  One was in '91.  One was in

3  '95, and that one was for three years and one was in '96 for

4  one year.  Now the '95 contract, as I think Mr. Zimarowski

5  pointed out on his cross-examination of Doctor Taylor, it had

6  a section called duties and supervision and it said his --

7  his performance shall be subject to the ultimate control and

8  supervision of the corporation.  In other words, they could

9  tell him everything to do, what he had to do.  It had a

10 restrictive covenant in there that said that if you leave you

11 can't -- you can't open your own practice within two years

12 and so many miles and then it had an early separation fee.

13 If you leave, you got to pay like a $50,000 penalty.  That's

14 what you got to do, so it wasn't like he could just walk out

15 and say so long.

16     Let me go to number three.  He did not order any tests

17 and he did not have control over the testing.  Now you heard

18 Mr. Twigg say that Burns decided what tests to perform.  He

19 used the Rolodex cards or the Post-It Notes to instruct the

20 chiros on what to do and Jemia Filippine said that Burns

21 ordered all the tests and that Mr. Twigg did what Burns told

22 him to do and I think Doctor Price said all the protocols

23 were determined by Mr. Twigg.

24     Go to number four.  He did complain frequently about the

25 control that Burns had over the treatment plans.  I mean what

3358

1  else was he going to do?  Mr. Twigg said that Doctor Taylor

2  complained frequently to Burns about the tests, about not

3  having control over the tests and Burns said, well, this is

4  just the way it's done.  This is the new concept.  This is

5  the way we do it now.  Price said that Scott frequently

6  complained about control that Burns had over the treatment

7  plan.  She heard him complaining and you know he wrote those

8  memos and letters.  In those letters the Government seems to

9  want to focus on certain things but you got to look at what

10  was the thrust of his letters.  He was complaining that there

11  was too much testing going on.  It was generalized testing.

12  You know, we do all this for each patient, instead of what

13  Doctor Taylor wanted was to more particularize, you know,

14  let's look at each patient and decide what are the

15  appropriate tests for him and that's what he was trying to

16  get.

17      Number five.  He did not follow the ten-point script that

18  you've often heard about and did not tell anyone that they

19  had a severely twisted spine.  Now as you know from what Mr.

20  Donley said and what's gone on through this whole trial, the

21  Government has made a big deal out of this ten-point script

22  and the fact that Scott had some notes when Doctor Halstead

23  came in in which he wrote stuff down but that's not really

24  the answer.  The answer is did they ever produce any evidence

25  that he followed this script?  You know, they said that they

3359

1    had -- they asked Doctor Taylor, I think on cross, didn't

2    there come a time when these ten-point examinations, and I'm

3    talking about the ones with patients, that were tape recorded

4    and he said, yes, they were.  Well, I didn't hear any.  I

5    don't remember hearing one tape recording of Doctor Taylor

6    giving any kind of ten-point exam to anyone and following any

7    kind of script.  And where was the evidence that he ever told

8    anyone they had a severely twisted spine.  Never one time did

9    anybody produce any evidence that Doctor Taylor ever said

10   that.

11       How about with Mr. Muth?  When Mr. Muth, you know, who I

12   think obviously was trying to bait Doctor Taylor by saying,

13   well, I'm really concerned about this.  I had a friend in

14   high school that had it.  I mean, how bad's it going to be?

15   What did he say? He said mild to moderate.  It's not severe.

16   It's not anything to really worry yourself at this time over.

17   I mean, he could say, oh my goodness, it's the worst I've

18   ever seen.  You better come for, you know, fifty visits or

19   come for the next year but he never did that.

20       The next one.  He did spend a lot of time with his

21   patients.  I mean, look at the time that he spent, if you

22   think about it, with Mr. Muth.  I think I asked Mr. Muth how

23   long were you there when you came in there.  Well, he was

24   there on his first visit about an hour and a half.  I mean,

25   that was a good bit of time.  Doctor Taylor went over his

3360

1    medical history, asked him what he did for a living, what

2    kind of work-outs was he starting.  He went over the tests in

3    detail.  When Mr. Muth would come back on a subsequent visit,

4    he would go over the test and try to explain it to him.  He

5    showed Mr. Muth the x-rays.  He discussed the x-rays.  He

6    discussed what the scoliosis was and talked to him about that

7    and you got to remember, there's been evidence, they're

8    saying that Doctor Taylor's getting paid per patient.  Well,

9    if Doctor Taylor's in some kind of scheme to defraud wouldn't

10   he want to run them through.   Well, come on now, let's go.

11   Next patient.  Let's run them in there.

12        But, you know -- and then you also heard that Twigg said,

13   Mr. Twigg, that Doctor Burns criticized Doctor Taylor for

14   spending too much time with patients.  And why do you think

15   he was doing that?  Because he was concerned about them.

16        Now the next ones I sort of lumped together, number seven

17   and eight because they sort of go together and these are from

18   that staff meeting and Mr. Donley talked a lot about that.

19   The first one is that Doctor Taylor did not follow Doctor

20   Burns' recommendation and make sure you don't list anything

21   that's mild.  I mean, first off, Mr. Muth is a prime example

22   of that.  I mean if he was going to do -- if he was going to

23   follow this, you know, he would have said what you have, your

24   scoliosis is terrible.  It's very bad.  Oh, my goodness.  But

25   he didn't do that.  I mean, the Government makes a big deal

3361

1    out of that neither Doctor Taylor or Doctor Filcheck ran out

2    there and said you can't do this.  What is this?  What kind

3    of thing is this?  But really the issue is what did they do?

4    Did they go out and try to do that?  And, certainly, Doctor

5    Taylor didn't.  There's no evidence that he did.

6         Look at the next one.  Did not follow Burns'

7    recommendation to make something up to put in there and I

8    think really Mr. Jaffe covered this and I'm going to cover it

9    a little bit here.  But did you hear any evidence that

10   anybody came in and was treated and there wasn't nothing

11   wrong with him.  I mean, you saw Doctor Taylor got off the

12   stand, and I think I held them up, and we went through the x-

13   rays with Mr. Muth and the Government's never challenged

14   that.  They could have brought in experts or a doctor and

15   said well he doesn't have scoliosis but that's -- there's

16   been no challenge to that.

17        Now, as you know, there's a conspiracy count and then

18   there's what some people call substantive or general counts.

19   Now Doctor Taylor's patients were in Counts 3, 4, 5, 8, 9, 12

20   and 14.  He didn't treat the patients in 2, 6, 7, 10, 11, 13

21   and 15.  Now one thing, and I know I took some time and

22   probably bored you all to tears somewhat, but when I had

23   Doctor Taylor on the stand I tried to go through each patient

24   and what I want to tell you right now is each and every one

25   of those patients in those general counts was treated or seen

FORM CSR · LASER  REPORTERS PAPER & MFG CO  800-626-6313

3362

1    by Doctor Price, every single one of them and I think I asked

2    Doctor Price in there.  I said, Doctor Price, these people

3    had legitimate complaints, didn't they?  She said absolutely.

4        And I'm going to go through them real quick now.  I'm not

5    going to put them up here and waste a lot of time but I want

6    to go through some of them.  In Count 3, a patient H.S.  It

7    says here: "present ailment - 69-years old.  Presents with

8            lower back and hip pain.  Intermittent right

9            shoulder pain" and Doctor Price says:

10           "lumbar degeneration" is her impression.  "Cervical

11           osteoarthritis" and she recommends "spinal

12           manipulation."  She later says on this same patient:

13           "good improvement, continues to improve, much

14           improved, continues to improve" again.  "Doing well.

15           Doing well" again.  "Continue with the current

16           treatment plan.  Continue spinal manipulation."

17   Let's go to Count 4.  Patient N.V.  It says here:

18           "Present ailment.  Long history of neck pain, knee

19           pain, has been in a car accident in 1988.  Remarks:

20           Chronic cervical strain.  Left knee flexion is

21           impaired.  Carpal tunnel.  Recommend spinal

22           manipulation."

23   Count 5.  Patient R.N.  "67-years old.  Long history of

24           complaints about headaches.  Did have a fall on the

25           right shoulder in January.  Wakes up with shoulder

FORM CSR LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3363

1    hurting" and her impression "shoulder tendonitis".

2    She says again, "spinal manipulation".

3    We'll go to Count 8.  Patient P.W. "Present ailment,

4    intermittent leg pain, treated by Doctor Wiley.

5    Complaints of -- with a lumbar brace, muscle

6    relaxants about five years ago."  Her impression,

7    "chronic recurrent lumbar strain" and what does she

8    recommend?  "Spinal manipulation and physical

9    therapy"  On this same patient she later says "lower

10   back pain much improved.  Doing well.  Continue the

11   spinal manipulation."  A little later on, "doing

12   very well.  Spinal manipulation per Doctor Taylor"

13   Let's look at Count 9.  Patient B.L.  "57-years old.

14   Right wrist is swollen, stiff, painful, fingers are

15   numb.  Has neck pain that affects his left shoulder

16   and scapula.  Unable to sleep many nights.  He wakes

17   up in pain" and she says again, "impression is

18   rheumatoid arthritis" and she recommends "spinal

19   manipulation".

20   Count 12.  Patient J.B., a young fellow.  "26-years old.

21   He complains of pain in the T-8 region", that's just to the

22   right of his spine.  "His pain often occurs when he --

23   extreme extension of his neck.  Got much worse on Sunday

24   night"  She says:  "Impressions:  lumbar strain, loss of

25   cervical curvature and recommends spinal

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3364

1    manipulation." Then later on she says: "still has

2    some mid-back pain but the neck and lower back are

3    fine. Continue adjustments."

4    And finally the last one in Count 14. A patient M.M.

5    "Present ailment, hurt back in 1988 when working at

6    hospital, has hurt ever since. Impression: lumbar

7    strain. Recommendation: spinal manipulation" and

8    in the "progress note" she says "continue spinal

9    manipulation".

10   Let's go to number nine. Okay. And here Doctor Taylor

11   did tell Doctor Burns that the clinic had lost focus on

12   chiropractic. You'll see it in one of those memos. He also

13   mentions that our main objective is to get the patient well

14   and that they -- and we should be doing this more to get

15   patients better quicker. Now, you know, does that sound like

16   somebody that's conspiring, that has an intent to defraud or

17   cheat, that he's in on this? I mean, like I said, you'd

18   think he'd be talking about ways they could move patients

19   through faster so he could make more money.

20   Let me go to number ten. Here's my final point. As you

21   know he did not tell anyone to lie on the insurance forms.

22   Now Mr. Twigg got up and testified that he told Mr. Muth to

23   lie on the form that Mr. Muth got from his insurance company

24   and brought down there. He admitted that he told him to lie

25   on that and you'll remember the Judge asked Mr. Muth, when

3365

1   Mr. Muth was up there, was Doctor Taylor anywhere around when

2   you went up there and he said, no, he wasn't there, and

3   Doctor Taylor said he had nothing to do with that.  That was

4   Mr. Twigg that told him to lie.  There's no evidence ever

5   been in this trial that Doctor Taylor told anybody to lie on

6   anything.  He was just trying to do what he could for people.

7       Now I want to talk about one thing in the one form and

8   I'm going to need your help, Laura, on this one, to show you.

9   This is in the memo -- the memo called "Things That Stress Me

10  out", go to exhibit -- go to exhibit 1-131, page 2.  Here's

11  one paragraph that the Government did not point out and I

12  think this paragraph is very, very important to this case and

13  I want to read it to you and tell you to take a look at it.

14  And, again, this is from Doctor Taylor's memo "Things That

15  Stress Me Out", Exhibit 1-131, page 2.  He says here:

16          "We are supposed to have authority, responsibility;

17          however, most of the time we are kept in the dark.

18          We end up being more technicians than doctors."

19  And I'm telling you, that's exactly what was going on in this

20  case.  Doctor Taylor and Doctor Filcheck, for that matter,

21  they weren't really doctors.  There was no difference from

22  them -- with them and anybody else that worked there, Jemia

23  Filippine or Sean or J.B., they were just simply technicians

24  doing what they could.  They had no authority or decision

25  making.

3366

1    Now I want to talk about a few more things and then I'm

2  going to be finished.  You can bring up the lights.  I want

3  to mention for the umpteenth time, I'm sorry, this letter

4  from the Chiropractic Board.  You got to remember, it said in

5  there that you were to perform these tests, not whether you

6  were there when they were going on.  There's never been any

7  evidence that Doctor Taylor performed any of those tests.

8  Where was the evidence?  As you know, when I went through

9  everything with Mr. Muth, it was always Sean or J.B. that

10  were doing all these tests.  It wasn't Doctor Taylor.  He was

11  just doing manipulations and things like that.  He didn't

12  perform any of those tests.

13    Now, secondly, Mr. Donley talks about this March 24th, '97

14  interview with Sergeant Finkenbinder and he said that at this

15  interview Doctor Taylor told them that these tests were

16  medically unnecessary.  Well, when Doctor Taylor was on the

17  stand and he was being cross-examined he said I never told

18  them that.  Now, you say well what do we do, they say he did

19  and he says he didn't.  Well it would have been easy in this

20  case.  All they would have had to do was tape his statement.

21  Why didn't we tape his statement, then we would know what he

22  said but we don't know so there's no reason why you can sit

23  here and say well, I'm not going to believe Doctor Taylor.

24  Why?  He's got as much right to be believed as anybody.

25    And, third, Mr. Donley talks about that Doctor Taylor

3367

1    laughed when Doctor Burns said that Doctor Medina was a gem,

2    he was real pliable.  Well, come on, think about it.  Why do

3    you think that Doctor Taylor laughed?  Because he knew that

4    Doctor Medina wasn't much of a doctor.  I mean, come on, he

5    was sleeping and reading magazines.  You know, that's why he

6    was laughing.  He knew that wasn't much of a doctor there.

7    You couldn't count -- he said he wouldn't even rely on him.

8        And, also, Mr. Donley points out that Doctor Taylor said

9    something on there about that he never diagnoses.  Well, I

10   mean, if you think about it, what was Doctor Taylor doing?

11   He was actually complaining about that.  He wanted him to do

12   some diagnosing to help them out, so he could help them with

13   the treatment of patients.  He wasn't like he was agreeing

14   with that.  He was complaining about it.

15       Now, also, the Government sort of suggests, it seems like

16   to me, they never came out and said this but they seem to

17   suggest this that Doctor Taylor, and really Doctor Filcheck

18   too, that well they should have -- they didn't like things

19   and they felt there was too much testing, they should have

20   just quit like Doctor Price did.  Well, you're forgetting

21   that first they had a contract that had a covenant not to

22   compete, that had a penalty if you left early.  And what

23   about their incomes?  Doctor Price was only working like

24   half-time and was making about $80,000 a year.  I mean she

25   could have been making $160,000 if she was working full-time

3368

1    and these guys are making about thirty-some thousand, so

2    they're just going to quit and say, oh, we'll just start

3    over.  And where are you supposed to -- where you supposed to

4    move to?  They got to sell their homes and whatever and

5    leave.  They can't start up.

6         And, finally -- and something that's really not been, I

7    think, brought out enough in this trial and I think it's

8    something -- there's something else that was missing here

9    that nobody's talked about, none of the other lawyers have

10   talked about and I'm going to talk about it.  There's one

11   thing that's really missing and that is let's -- let's face

12   it, the patients.  The patients meant something.  What do you

13   do if you're Doctor Taylor, just say, well, I don't like

14   what's going on here so see you all later, goodbye.  You

15   know, you'll just have to get another doctor.  You know, I

16   just don't like the way they're operating here.  But these

17   people, they relied on Doctor Taylor and Doctor Filcheck to

18   help them.  They came in.  They had real problems.  You

19   remember what Doctor Price said and she -- after all, she was

20   a Government witness.  She wasn't my witness.  What did she

21   say about Doctor Taylor?  He was a caring, sympathetic

22   caregiver.  He was well liked by his patients and I submit to

23   you that meant a lot to Doctor Taylor.  He tried to help

24   these people so you can't overlook and just say let's forget

25   about the patients, they don't mean anything.  We'll just

3369

1    forget about them and leave them on their own.

2        Now I'm getting down near the end and like Mr. Zimarowski

3    did, in the opening I'm going to come back to something.  Mr.

4    Adams got up and came over and pointed to Doctor Taylor and

5    said Doctor Scott Taylor, Doctor of Chiropractic, like that

6    was something that was bad, in and of itself bad, no good and

7    I'll just say yes, Doctor Taylor is a Doctor of Chiropractic

8    and I think the evidence shows he's a good one, one that

9    cared about his patients and tried to help his patients and

10   spent too much time with his patients so it's not a bad

11   thing.  He tried to do what he could to try to make them

12   better and also keep them better.  That was another thing of

13   him was preventative chiropractic, try to keep people good

14   and make sure they don't have problems again.

15       He did not agree with the protocol.  He did not call the

16   shots.  He did not order the tests.  He did not get the money

17   and he's not guilty of conspiracy or health care fraud and I

18   thank you.

19            THE COURT:  Mr. Adams.

20            MR. ADAMS:  Thank you, Your Honor.

21                REBUTTAL CLOSING OF PLAINTIFF

22            MR. ADAMS:  The defendants in this case haven't

23   offered you defenses.  They've given you the same excuses,

24   the same rationalization and after the fact justifications

25   that they gave themselves throughout the entire scheme.  They

3370

1   set up straw men then tried to knock them down and declare

2   victory.

3       The first straw man each of them has set up is that this

4   case is about treatment.  This is a billing case.

5       Mr. Jaffe put up the verdict form that you're going to

6   have to look at on Counts 2 through 15.  Let me tell you

7   right now why each and every one of those counts is

8   fraudulent.

9       Count 2, 4, 7, 8, 9, 11, 12, 13 and 14 all in Rebecca

10  Price's name before she ever saw the patient.  There wasn't

11  one insurance company witness who said they would pay for

12  that had they known that.  Every one of them is fraudulent

13  and every one of these defendants knew it.

14      On Count 10 Price never saw the patient, not at all.  You

15  could look and you'll see the blank Price form in there.

16      Count 15, Doctor Medina, you heard him testify, never saw

17  the patients.

18      Counts 3 and 6, a charged temperature gradient test and

19  if you think at the end of this trial that an instrument

20  that's not for human use is medically necessary then you'll

21  acquit them on Counts 3 and 6.

22      And on Count 5 Price isn't even in the office.

23      That's what's wrong with those counts.

24      Mr. Zimarowski asked, where is the material

25  misrepresentation?  That's it.  That Rebecca Price was in

3371

1    charge of the treatment of those patients.  There is nobody

2    in this room who, after three weeks of trial, can say with

3    straight face that Rebecca Price and Doctor Medina were in

4    charge of the treatment of these patients.  It is beyond --

5    beyond doubt that they are not in charge but their names are

6    going on the bill and these guys know it.

7        Mr. Jaffe says it's irrelevant whose name goes in the

8    box.  Well it wasn't irrelevant to the insurance company.

9    You bill for an office visit and it has Rebecca Price's name

10   there, she's not in the office, she doesn't see the patient,

11   it's relevant to them.  It's relevant to Medicare because

12   Medicare doesn't pay for anything done by a chiropractor

13   except manipulation of the spine.  They won't even pay for

14   the x-ray.  Medicare won't pay for more than twelve visits.

15   You heard that from him.

16       Patients with insurance policies from Blue Cross and Blue

17   Shield had no chiropractic coverage, none, zero.  Had they

18   known it was a chiropractor they would not have paid.  That's

19   why it's material misrepresentation.

20       PEIA, $750, $1000 cap.  The same thing with Railroad

21   Maintenance and Accordia, monetary caps.  You look at the

22   bills.  How quickly were they over those caps?  If it would

23   have been over those caps, the insurance company wouldn't

24   have paid.  That's why it's material.  That's why it's

25   fraudulent and these guys knew it because the one thing that

3372

1   was incredibly aware to every one of them is that the MD is

2   not in charge of this clinic.  They know that as sure as

3   anything.

4        You heard Doctor Halstead say the name in the box has got

5   to be the doctor of record, the one in charge, the one with

6   the highest authority.  He knows that's not going on.  Why

7   does he know that?  Because he knows Doctor Medina doesn't

8   speak enough English even to meet him.  He knows Doctor Price

9   isn't ordering the tests, that's what Burns tells him when

10  they go into the last meeting.

11       But, again, what they've done throughout this case,

12  misdirection, the words don't mean what they say.  Provider

13  doesn't mean provider.  Severely twisted doesn't mean

14  severely twisted, it means something else.

15       The defendants are like the fable hear no evil, see no

16  evil, speak no evil monkeys.  Doctor Halstead sees no evil

17  though he knows that the MD isn't running Priority One

18  because it's not his client.  He meets with Burns.  He knows

19  how the thing is set up.  He knows the management company and

20  Priority One are independent of each other because he's there

21  talking just to Burns.  He's not talking to the MD and he

22  knows the MD isn't directing or supervising the treatment.

23  He knows when he talks to Wilson that it's Burns who's

24  running the show and that the money is being swept out of

25  Medina's company into the management company.  That's the

3373

1    basis for the money laundering.  It's a scam.  They put

2    together the proceeds in Priority One and sweep it in a

3    management company; that's what it's all about.  He sees no

4    evil selling TG's to people when he knows they're not for

5    human use, even after he finds out.  He saw no evil when he

6    didn't get the statistics.  He said he didn't get the

7    statistics on how this place operates.  Wait a second, guys.

8    Doctor Halstead says oh, I only got them for two clients.

9    Well, you must be very lucky because you saw the two clients

10    apparently who said it, Knoderer and Burns.

11        Twigg says I didn't see any patient records.  How did I

12    know they weren't seeing the medical doctor?  Twigg says he

13    comes in and pulls travel cards.  You'll be able to look at

14    the travel cards; you'll be able to tell.  Says he never sees

15    the HCFA-1500.  Well, he gave plenty of advice about how to

16    fill them out, how to split the charges, you saw it in the

17    evidence.

18        Well, Doctor Halstead heard no evil.  He didn't hear

19    Price say she wasn't going to do medically unnecessary

20    treatments in that meeting but, hence, sat mute.  He didn't

21    hear Price say she's not going to go back and sign the

22    document.  He didn't hear any evil.  He didn't see evil as he

23    said -- excuse me.  He knows Burns wanted him to talk to her

24    because she wasn't ordering the tests.  That's what he

25    testified to out of his own mouth but he saw no evil going on

3374

1    for a year.

2          Apparently he saw no evil when Twigg testified that they

3    all complained, Taylor and Filcheck, they all complained to

4    Halstead about unnecessary testing, heard no evil and he

5    spoke no evil in the IOV reports that you've seen over and

6    over again.  You read it.  You see it.  That's your reaction.

7    He spoke -- he said pay attention to coverage.  Don't do

8    procedures if they're not covered.  He didn't speak any evil

9    when he repeatedly told them do more diagnostic testing and

10   therapy because they're losing revenue.  That's the fair

11   thrust of everyone of those comments.  He said, oh, no, I

12   told everyone hundreds and hundreds of times he said that's

13   only if medically necessary.  Did he show you one document,

14   one document where that was shown.  Not a one.

15         He spoke no evil when Twigg testified that he told him

16   well maybe we got rid of the wrong doctor after Taylor

17   complained about medically unnecessary testing.  He knows

18   what's going on at the clinic.  He said he used to talk about

19   possibilities, patient flow, communication.  If he was so

20   concerned about communication why is he not more concerned

21   about the fact Doctor Medina doesn't speak English very well.

22   Because the only thing he cares about Doctor Medina, the only

23   thing he knows about Doctor Medina is that he signed the

24   forms and in his system that's all that matters.

25         What about Scott Taylor?  He saw no evil when he was

3375

1    doing temperature gradient tests when the label on the

2    machine says not for human use.  How many times a week did he

3    do them?  He didn't see any evil, even though he knows Doctor

4    Medina's asleep or reading golf magazines.  He tells you I

5    thought he was the clinic director.  I thought he was the

6    medical director.  I thought he was ordering the tests.

7        He didn't see any evil when he fills out the case study

8    calling for the tests, when he fills out the super-bill

9    saying they've been done knowing that that super-bill's going

10   to result in a HCFA-1500 bill now.  No, he sees no evil in

11   that.  He sees no evil in ordering tests he doesn't

12   understand, he doesn't believe in and beyond the scope of his

13   practice and worst of all, he sees no evil when he writes the

14   insurance company the letter of medical necessity trying to

15   justify it and he sees no evil when, as he says in his

16   letters, I don't like lying to the patients.

17       He saw no evil in treating Muth, a guy who comes in and

18   says I just want to get limbered up for a work-out.  Well,

19   Doctor Taylor maybe speaks the information of wellness care

20   and preventative medicine but most insurance companies did

21   not.  It doesn't pay for that.  If that's the service Muth

22   wanted, he had to tell them, fine, pay cash or go home.

23   Taylor doesn't get it.  He spends an hour trying to prove to

24   you that Muth has scoliosis.  That's not the point.  The

25   point is Muth's insurance didn't cover wellness or

3376

1   preventative care.

2       Taylor saw no evil when he signed up -- re-upped in 1996

3   with another employment contract with Priority One.   They

4   made a lot about these employment contracts.   Look at the

5   dates?   You heard Twigg say that for a period of time

6   Mountaineer Chiropractic and Priority One ran in tandem.   By

7   the end of '95 Mountaineer stopped taking patients that

8   didn't really exist.   January of '96 Taylor signed a brand

9   new contract with Priority One, the only company that's left.

10  Why'd he do that?   If he's so upset, if it is so bad at the

11  clinic and stressed out, all these things bother him, don't

12  sign the contract.   Be a professional.   They've asked you to

13  do stuff you don't like, you think is wrong, walk away.

14  That's what we expect from professionals.

15      Now Doctor Taylor, he didn't even see any evil when the

16  place is raided.   If the place you work at was raided by the

17  FBI wouldn't you be a little concerned?   He sees no evil when

18  Twigg leaves, the guy who's been telling him what to do,

19  never comes back.   Not Taylor, he stays on and he heard no

20  evil.   He heard no evil when Burns tells him in a staff

21  meeting, make stuff up.   He hears no evil when Burns says

22  call everything mild, not -- don't use mild, think severely,

23  aggravated, degenerated.   He hears no evil in that.   Hears no

24  evil when they describe Medina as a gem and pliable.   You saw

25  Medina.   You know exactly what that meant.   And he hears no

3377

1    evil when Halstead tells him, here's the treatment protocol,

2    everybody gets a temperature gradient the first week.  The

3    second week's the neurometer and so on.  He complains about

4    it but he goes with it.  He's willing to stay.  His biggest

5    beef, I'm not -- I'm overworked and I'm not paid enough.  If

6    they were paying him as much as they paid Medina he would

7    have been happy.  He wouldn't have complained about a thing.

8         And he hears no evil when Price tells him when she's

9    resigning, get out of here and he spoke no evil when he wrote

10   the letters of medical necessity to the insurance companies

11   on behalf of a guy who, he says, was asleep and reading golf

12   magazines.  What are you thinking about if you so deluded

13   yourself that that's okay?

14        He spoke no evil when he admitted in his letters he was

15   lying to the patients and he didn't like it.  He spoke no

16   evil when he tried to convert them with the ten-point.  He

17   had it in his notes and he spoke no evil when he went to the

18   marketing dinners to try to hook more patients in, even the

19   marketing dinners after the search.

20        What about Defendant Filcheck?  He saw no evil that

21   Medina wasn't the medical director while he was sleeping or

22   retired in Florida.  He said I thought we were sending them

23   by FedEx to Medina.  The guy was asleep even when he was

24   there.  It's preposterous to believe that Filcheck thought

25   they were sending letters to him to be signed in Florida.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

3378

1      He didn't see any evil when he filled out the case study

2    form calling for the treatments, filled out the super-bill,

3    which he knew was going to end up as a HCFA-1500.  He saw no

4    evil when Burns and Twigg always just upgraded the services

5    and never downgraded them.  He said, oh, I never saw the

6    bills but you heard -- you saw his resume and heard him

7    testify, the exact stuff they were doing in the billing

8    department of Priority One is what he was trained in doing.

9    Data entry.  They just take this order and put it on the

10   HCFA.  Who's name did he think was going on the HCFA-1500?

11     Again, he saw no evil in writing insurance companies.  He

12   saw no evil in being an automaton, described himself as a

13   secretary.  Do you want to be treated by somebody who's

14   trained as a doctor but thinks of himself as a secretary?

15     He saw no evil in taking directions from Twigg who had no

16   medical training and he saw nothing wrong with a system that

17   never provided him the ability on a regular basis to see the

18   MD's notes or even to see his own case study.  Do you recall

19   that?  All he had was a travel card.  No one ever goes to

20   look at the patient file.

21     Saw no evil performing tests he didn't understand, didn't

22   agree with or beyond the scope of his -- his license.  He saw

23   no evil in doing what he called unethical testing, that's

24   apparently okay.  He saw no evil in doing tests that he told

25   the agents were codes that had been abused.

3379

1    He, too, saw no evil when he signed up in 1996 for

2   another contract.  He, too, re-upped.  He could have walked

3   away.  He didn't have to sign it.

4    He saw no evil --

5    THE COURT:  Just a moment, Mr. Adams.  If there is

6   any more reaction from members of the public, I will have you

7   removed.  I don't want to say it again.   Go ahead, Mr.

8   Adams.

9    MR. ADAMS:  Filcheck saw no evil when Price mocked

10   the entire office with her chart.  He saw no evil when the

11   place was searched.  He saw no evil when Twigg quit.  Again,

12   he, too, heard no evil when Burns described Medina as

13   pliable, a gem in that meeting or when they told him just to

14   call everything mild -- not to call anything mild rather but

15   severe.

16    He heard no evil when Halstead comes and says here's the

17   protocol, do it this way.  They all complained about this but

18   they all stayed.

19    You heard him testify about upcoding.  He saw no evil

20   either because oh, we did two lesser visits so I thought it

21   would be okay we billed for a third visit that was at a

22   higher level.  The third visit at the higher level never

23   happened.  He sees no evil in that.

24    And he spoke no evil when he told patients, you heard him

25   on the tape, they had severely twisted spine, three or four

3380

1    in a row, same tape.

2        He spoke no evil when he told the insurance company, sent

3    them these letters of medical necessity he himself admits are

4    eighty to ninety percent bogus.  He spoke no evil when he

5    told the agent he had to justify the tests to the patients.

6    No evil when you have to convince somebody of the value of

7    one of these diagnostic tests if the patients are

8    complaining.  His lawyer said you hadn't heard from the

9    patients.  You have.  You heard from them indirectly because

10   both Taylor and Filcheck said the patients complained all the

11   time.  That's why they had to keep her out.  That's why they

12   had to convince them to stay.  We had to lean them on their

13   backs, make the problem real for them they say.

14       And like Taylor, Filcheck goes to the dinners even after

15   the search, stays on.

16       Mr. Zimarowski spoke of the character witnesses with

17   regard to Filcheck.  It's hard to be an Eagle Scout.  It is

18   an accomplishment.  It's harder still to stay one.  Bill

19   Filcheck rose and soared with the eagles but he chose to

20   wallow with the hogs.  They gave him a white coat but it was

21   way, way too big for him.  He never became Doctor Filcheck

22   and that's very sad.  He couldn't be responsible.  He

23   couldn't be professional.  You heard him say "I was just a

24   secretary".

25       You didn't see many severely twisted vertebrae in this

3381

1    case but you did see three defendants with severely twisted

2    values and severely twisted testimony.

3        Tell them with your verdict that you want doctors to be

4    professionals.  You want doctors to put patient care before

5    their personal compensation.

6        Tell them you don't want your time and your money wasted

7    as a patient on diagnostic testing they don't understand,

8    they don't believe in and they're unlicensed to do and tell

9    Defendant Halstead to stop teaching this scheme to hundreds

10   of chiropractors around the country.  Tell Defendant Halstead

11   that if they're going to have an MD/DC practice make sure the

12   MD's not a sham, make sure the MD is there when a patient's

13   treated.  Make sure the MD is supervising and responsible for

14   the treatment, not somebody else just so you can bill for it.

15       Tell them --

16           THE COURT:  Mr. Adams, you have one minute left.

17           MR. ADAMS:  Thank you.  Tell them you want reality

18   over appearances, you want substance over silly forms, you

19   want recovery over revenue.  Tell them by returning a verdict

20   of guilty on all counts.

21       I thank you for your time, your attention and indeed your

22   endurance.  Do justice.

23       (Rebuttal closing of Plaintiff end at 3:35 p.m.)

24           THE COURT:  Ladies and gentlemen of the jury, as I

25   told you I would have a few brief additional instructions to

3382

1    prepare you for how you should conduct your deliberations.

2    They start on page forty-seven of the Charge, if you care to

3    read along.

4        If it becomes necessary during your deliberations to

5    communicate with me, you may send a note by the court

6    security officer, signed by your foreperson, or by one or

7    more members of the jury.  No person--no member of the jury

8    should attempt to communicate with the Court by any means

9    other than a signed writing, and the Court will not

10   communicate with any member of the jury on any subject

11   touching the merits of the case other than in writing, or

12   orally here in open court.  Also, I have not given you

13   transcripts of the evidence or--I'm sorry.  I will not give

14   you transcripts of the evidence or testimony adduced at

15   trial. You must make your findings from the evidence as you

16   remember it.

17       Bear in mind also that you are never to reveal to any

18   person - not even to the Court - how the jury stands,

19   numerically or otherwise, on the question of the guilt of the

20   defendants, until after you have reached a unanimous verdict,

21   and that's particularly important when you send notes, do not

22   include any numerical breakdown of where you stand if the

23   note, for some reason, pertains to that issue.  The notes

24   become part of the public record.  They are shared with

25   counsel and we should not know how you stand until you have

3383

1    advised me that you've reached a unanimous verdict.

2        In addition, the local rules of this Court provide that

3    after the conclusion of a trial, no party, his agent or his

4    attorney shall communicate or attempt to communicate

5    concerning the jury's deliberations or verdict with any

6    member of the jury before which the case was tried, without

7    first obtaining an order of the Court granting permission to

8    do so.  This rule does not prevent you, the jury, from

9    communicating with anyone concerning your deliberations or

10   verdict, but merely governs the contact of you by other

11   persons involved in the trial.

12       Upon retiring to the jury room you should first select

13   one of your number to act as your foreperson, who will

14   preside over your deliberations and who will be your

15   spokesperson here in court.

16       When you go to the jury room to consider the evidence

17   presented to you during the trial of this case, you will be

18   furnished with jury verdict forms.  There is one for each

19   defendant and the verdict forms are self-explanatory.  You

20   can only find a defendant either guilty or not guilty as to

21   each count if all agree.

22       Now I'm going to hold up these verdict forms and you'll

23   see what I'm talking about.  There's a set of verdict forms

24   for Doctor Filcheck.  There's a set of verdict forms for

25   Doctor Taylor and there's a set of verdict forms for Doctor

3384

1    Halstead and within these verdict forms are contained each of

2    the counts as to which the defendant has been charged in the

3    Indictment.  You will also have the Indictment in the jury

4    room with you.

5        On these verdict forms, for example, as to Count 1,

6    conspiracy, there's a line where you have to write in the

7    word of your--of how you find your decision on that, either

8    guilty or not guilty.  There's not a check off box; you have

9    to write it in and there's a brief summary of what that count

10   consists of and, of course, you have that information in your

11   instructions.

12       Now when you turn to Count 2, as you saw in some of the

13   closing arguments, there's one segment of the charge that's

14   contained in the Indictment that pertains to this particular

15   count, then there is a space for you to fill in the word

16   again, either guilty or not guilty, followed by a special

17   interrogatory.

18       Now a special interrogatory means a special question.

19   That's what the word interrogatory means.  What you're asked

20   to do there is as follows:  If you have found the guilty not

21   guilty, proceed to the next count.  That means you turn the

22   page and go to the next count.  If you have found the

23   defendant guilty, you must answer the special--the following

24   special interrogatory and you'll notice the word is focused

25   on these three categories.  You have to find unanimously that

3385

1    the United States has proved beyond a reasonable doubt that

2    the HCFA-1500 claim form relevant to Count 2 falsely claims

3    and then you check one of three; either that the service had

4    been provided by a specified medical doctor; in other words,

5    that that was the false claim, or the false claim was the

6    service was medically necessary or the false claim was the

7    service was performed in accordance with the CPT Manual.

8    Now that same format is followed until you get to Count 15--

9    until you finish Count 15.

10       Counts 1 through 15 pertain to Doctor Filcheck and to

11   Doctor Taylor.  So when you don't see any further counts in

12   the verdict packet for each of those defendants, it's not

13   because they're missing.  They are only charged in Counts 1

14   through 15, okay.

15       As to Doctor Halstead, Doctor Halstead has additional

16   counts.  He is charged in Count 16, which is the money

17   laundering conspiracy and it's the same format as the health

18   care and mail fraud conspiracy charge, guilty or not guilty

19   and there is an additional instruction with regard to Count

20   16 and it says:  If you have found the defendant not guilty

21   then skip or pass over Counts 17 through 26 and have the jury

22   foreperson sign and date the last page of the verdict form.

23   If you have found the defendant guilty, proceed to Counts 17

24   through 26 and they are set up in a chart form as well, very

25   similarly to what you saw in Counts 2 through 15.

3386

1    The lawyers and I worked very hard on these verdict forms

2    and hopefully they are self-explanatory and if they are not,

3    I'm sure that we'll hear a question from you and we'll do our

4    very best to answer that question.

5       Now do not begin your deliberations until the Clerk

6    delivers to your jury room the verdict form and the exhibits.

7       Finally, observing that all of the principal jurors are

8    able-bodied and mentally alert, it now becomes my duty to ask

9    the alternate jurors to stand aside and take a seat in the

10    courtroom, and Ms. Berdine and Mr. Williams, could I ask you

11    to step--well, actually you know what, you're going to step

12    aside and I'm going to ask you to stay there because of the

13    congestion in the courtroom right where you are, so just stay

14    there.  When the jury leaves, you just stay in your seat.  I

15    do have a few additional instructions for you.

16       Ladies and gentlemen, the case is now ready for your

17    deliberation and the Court's officer will conduct you to the

18    jury room.

19       (Jury out 3:42 p.m.)

20       THE COURT:  Ms. Berdine and Mr. Williams, this is

21    not the end of your service.  I thank you for your service to

22    date and I'm going to advise you that under the federal rules

23    I am allowed to retain you as jurors the during deliberations

24    of the jury in case any jury becomes ill or is otherwise

25    incapacitated or unable to serve.  I may then replace that

3387

1    juror with one of the alternates.  In order to do that, I

2    have to keep you sequestered during the period of the

3    deliberations.  By that I mean I have to keep you away from

4    the public and for that reason I'm going to ask the Court

5    Security Officers to escort you to the conference room up in

6    the Magistrate Judge's Courtroom.  We will let you know as

7    soon as I hear from the jury what their schedule is so you're

8    not sitting there in the dark.  We'll make sure that you're

9    advised about that and to the extent that you have any

10   questions, you can let Court Security know and they will let

11   me know and I'll ask that you put that in writing, but you

12   take your notebooks with you, take your verdict form--I mean

13   your instructions with you and I'll ask Court Security to

14   lead you upstairs to the conference room.  Thank you very

15   much.

16       Counsel, you're free to stay here in the courtroom.  I

17   would ask that if you do leave the courthouse that you give

18   us a cell phone number or land phone number where we can

19   contact you in case there's a question and also bring you

20   back within five minute's notice.  I assume that if--defense

21   counsel may be going to Mr. Frame's office and if you do

22   that, that's certainly within five minutes and if you're

23   going--if the Government is going down to the Federal

24   Building, that's a little bit more but it's close enough but

25   you're free to stay here in the courtroom.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

3388

1          MR. JAFFE:  I think we're going to stay here until

2     we hear what the jury is going to do.

3          THE COURT:  All right.  Okay.  Is there anything

4     further?  Have counsel all looked at the final exhibit list?

5     Before it goes into the jury would you please do that so that

6     we can take care of that issue.  It's right here and I'll

7     just ask that you take a look at that and then if you have an

8     objection, Carole can let me know or you can make a proffer

9     on the record.

10         This Court stands in recess.  Thank you.

11              (Recess at 3:45 p.m. until 8:40 p.m.)

12         THE COURT:  Ladies and gentlemen, I've received a

13    note from the jury that indicates that they wish to adjourn

14    for the evening and I plan to bring them in in order to do

15    that.  Please bring the jury in.  The note is--Carole has the

16    note if you'd like to see who signed it.

17         (Jury in 8:40 p.m.)

18         THE COURT:  Ladies and gentlemen, please be seated.

19    I've received the note from your foreperson and understand

20    that you wish to adjourn for the evening.  All of us want to

21    thank you for your deliberations today and before I excuse

22    you, I just wanted to caution you that you should not discuss

23    the case with anyone when you get home and please don't allow

24    any third person to approach you or to discuss the matter

25    with you and please avoid any media coverage of the case,

3389

1    should there be any and then I wanted to ask you what time

2    you wish to resume your deliberations tomorrow morning.  I'll

3    ask your foreperson.

4         FOREPERSON SEIBERT:  Yes, ma'am, we will leave that

5    up to you.

6         THE COURT:  Okay.  Would you like to come back at

7    nine o'clock tomorrow morning?  Would that be--or do you want

8    to start earlier at eight-thirty?  I mean it's really up to

9    you.  I don't know.

10        FOREPERSON SEIBERT:  Eight-thirty would be fine.

11        THE COURT:  Eight-thirty it will be then.  So with

12   those admonitions and the fact that you should leave your

13   notes and anything else that you have with you in the jury

14   room where they will be locked up for the evening and will be

15   untouched by anyone else; there won't be any cleaning people

16   in there or anything, then we'll see you tomorrow morning at

17   eight-thirty and if you need anything to continue your

18   deliberations, please let Carole know and we'll provide you

19   with any materials or whatever it may be.  We appreciate your

20   hard work very much and I would like the alternates to know

21   that we appreciate your waiting as well and we'll see you

22   tomorrow morning then at eight-thirty as well.  Is that okay?

23   The weather report is fifty degrees.

24        All right.  Thank you very much.  Give your notes to

25   Carole and she'll put those in envelopes and seal them and

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

3390

1    you'll have them tomorrow morning.   Thank you.

2        (Jury out 8:45 p.m.)

3            THE COURT:   This Court stands adjourned until eight-

4    thirty tomorrow morning.   Thank you.

5        (Proceedings were adjourned at 8:47 p.m., 02-03-2003)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3391

**DAY 16 - FEBRUARY 4, 2003**

P R O C E E D I N G S

(02-04-2003, 8:30 o'clock a.m., defendants present)

(Jury out deliberating)

(Recess from 8:30 a.m., until 2:57 p.m., jury deliberating)

THE COURT: All right. I've received a note from the jury, signed by the Foreperson Lauren Seibert that indicates that the jury has reached a verdict. Bring the jury in, please.

(Jury in 2:57 p.m.)

THE COURT: Good afternoon ladies and gentlemen of the jury, please be seated. I've received Mrs. Seibert's note and I understand that you've reached a verdict. Is that correct?

FOREPERSON SEIBERT: Yes, Your Honor, we have.

THE COURT: Is that as to all counts as to all defendants?

FOREPERSON SEIBERT: Yes, Your Honor, we have.

THE COURT: Thank you. Would you please hand that to the Court Security Officer and I'll ask him to bring it to me. Thank you.

Ladies and gentlemen of the jury, before I publish your verdict here in open court I have to review it to make sure that it is in the correct form and that everything has been signed.

3392

1        (Pause)

2                    (PUBLICATION OF VERDICT)

3        THE COURT:  Finding the verdict form to be correctly

4   submitted to the Court, I will now publish the verdict here

5   in open court and I would ask that the Defendant, William C.

6   Filcheck, stand.  I'm going to go through this in the order

7   in which the defendants are listed in the Indictment.

8        In the case of *United States of America versus William c.*

9   *Filcheck, Jr.,* Count 1, Conspiracy.  As to Count 1, we, the

10  jury, on the issues joined, find that the Defendant, William

11  C. Filcheck, Jr., is guilty.

12       Counts 2 through 15, Health Care Fraud.  As to Count 2,

13  we, the jury, on the issues joined, find that the Defendant,

14  William C. Filcheck, Jr., is guilty.

15       The service had been--the false claim was that the

16  service had been provided by a specified medical doctor.

17       Count 3, we, the jury, on the issues joined, find that

18  the Defendant, William C. Filcheck, Jr., is guilty.

19       The service--the false claim was the service was

20  medically necessary.

21       We, the jury, on the issues joined, find that the

22  Defendant, William C. Filcheck, Jr., is guilty as to Count 4.

23       The false claim was the service was performed in

24  accordance with the CPT Manual.

25       Count 5, we, the jury, on the issues joined, find that

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3393

1       the Defendant, William C. Filcheck, Jr., is guilty.

2           The false claim was the service was performed in

3       accordance with the CPT Manual.

4           Count 6, we, the jury, on the issues joined, find that

5       the Defendant, William C. Filcheck, Jr., is guilty.

6           The false claim is the service was medically necessary.

7           As to Count 7, we, the jury, on the issues joined, find

8       that the Defendant, William C. Filcheck, Jr., is guilty.

9           The false claim is the service had been provided by a

10      specified medical doctor.

11          As to Count 8, we, the jury, on the issues joined, find

12      that the Defendant, William C. Filcheck, Jr., is guilty.

13          As to the false claim the service had been provided by a

14      specified medical doctor.

15          As to Count 9, we, the jury, on the issues joined, find

16      that the Defendant, William C. Filcheck, Jr., is guilty.

17          The false claim is the service had been provided by a

18      specified medical doctor.

19          As to Count 10, we, the jury, on the issues joined, find

20      that the Defendant, William C. Filcheck, Jr., is guilty.

21          As to Count 10, the false claim is the service had been

22      provided by a specified medical doctor.

23          As to Count 11, we, the jury, on the issues joined, find

24      that the Defendant, William C. Filcheck, Jr., is guilty.

25          The false claim, the service has been provided by a

3394

1    specified medical doctor.

2         As to Count 12, we, the jury, on the issues joined, find

3    that the Defendant, William C. Filcheck, Jr., is guilty.

4         The false claim, the service had been provided by a

5    specified medical doctor.

6         As to Count 13, we, the jury, on the issues joined, find

7    that the Defendant, William C. Filcheck, Jr., is guilty.

8         The false claim is the service had been provided by a

9    specified medical doctor.

10        As to Count 14, we, the jury, on the issues joined, find

11   that the Defendant, William C. Filcheck, Jr., is guilty.

12        The false claim, the service had been provided by a

13   specified medical doctor.

14        As to Count 15, we, the jury, on the issues joined, find

15   that the Defendant, William C. Filcheck, Jr., is guilty.

16        The false claim, the service had been provided by a

17   specified medical doctor.

18        The verdict was signed by Lauren Seibert on behalf of the

19   jury as Foreperson and dated 2/4/2003.

20        Doctor Filcheck, you may be seated.

21        Would the Defendant, Scott G. Taylor, please stand?

22        As to Count 1, the Conspiracy Count, we, the jury, on the

23   issues joined, find that the Defendant, Scott G. Taylor, is

24   guilty.

25        As to Count 2, we, the jury, find that the Defendant,

3395

1    Scott G. Taylor, is guilty.

2        The false claim, the service had been provided by a

3    specified medical doctor.

4        As to Count 3, we, the jury, on the issues joined, find

5    that the Defendant, Scott G. Taylor, is guilty.

6        The false claim, is the service was medically necessary.

7        As to Count 4, we, the jury, find the Defendant, Scott G.

8    Taylor, guilty.

9        The false claim is that the service was performed in

10   accordance with the CPT Manual.

11       As to Count 5, we, the jury, find that the Defendant,

12   Scott G. Taylor is guilty and the false claim is that the

13   service was performed in accordance with the CPT Manual.

14       As to Count 6, we, the jury, on the issues joined, find

15   that the Defendant, Scott G. Taylor is guilty.

16       The false claim is the service was medically necessary.

17       As to Count 7, we, the jury, find that the Defendant,

18   Scott G. Taylor, is guilty.

19       The false claim, that the service had been provided by a

20   specified medical doctor.

21       As to Count 8, we, the defendant, find the Defendant,

22   Scott G. Taylor, guilty.

23       The false claim, that the service had been provided by a

24   specified medical doctor.

25       As to Count 9, we, the jury, find that the Defendant,

3396

1    Scott G. Taylor, is guilty.

2        The false claim, that the service had been provided by a

3    specified medical doctor.

4        As to Count 10, we, the jury, find that the Defendant,

5    Scott G. Taylor is guilty.

6        The false claim, that the service had been provided by a

7    specified medical doctor.

8        As to Count 11, we, the jury, find that the Defendant,

9    Scott G. Taylor is guilty.

10       The false claim, that the service had been provided by a

11   specified medical doctor.

12       As to Count 12, we, the jury, on the issues joined, find

13   that the Defendant, Scott G. Taylor is guilty.

14       The false claim is that the service had been provided by

15   a specified medical doctor.

16       As to Count 13, we, the jury, find that the Defendant,

17   Scott G. Taylor, is guilty.

18       The false claim is that the service had been provided by

19   a specified medical doctor.

20       As to Count 14, we, the jury, find that the Defendant,

21   Scott G. Taylor is guilty.

22       The false claim is that the service had been provided by

23   a specified medical doctor.

24       As to Count 15, we, the jury, find that the Defendant,

25   Scott G. Taylor, is guilty.

3397

1    The false claim is that the service had been provided by

2    a specified medical doctor.

3    And the verdict is signed by the Foreperson Lauren

4    Seibert and it's dated February 4th, 2003.

5    Doctor Taylor, you may be seated.

6    Would the Defendant, Ronald L. Halstead, please stand?

7    On Count 1, the Conspiracy, we, the jury, find that the

8    Defendant, Ronald L. Halstead, is guilty.

9    On Count 2, we, the jury, on the issues joined, find that

10   the Defendant, Ronald L. Halstead, is guilty.

11   The false claim, that the service had been provided by a

12   specified medical doctor.

13   On Count 3, we, the jury, find that the Defendant, Ronald

14   L. Halstead, is guilty.

15   The false claim is that the service had been provided by

16   a specified medical doctor.

17   On Count 4, we, the jury, find that the Defendant, Ronald

18   L. Halstead, is guilty.

19   The false claim, that the service had been provided by a

20   specified medical doctor.

21   As to Count 5, we, the jury, find that the Defendant,

22   Ronald L. Halstead, is guilty.

23   The false claim is that the service had been provided by

24   a specified medical doctor.

25   As to Count 6, we, the jury, find that the Defendant,

3398

1   Ronald L. Halstead, is guilty.

2       The false claim is that the service had been provided by

3   a specified medical doctor.

4       As to Count 7, we, the jury, on the issues joined, find

5   that the Defendant, Ronald L. Halstead, is guilty.

6       The false claim, that the service had been provided by a

7   specified medical doctor.

8       As to Count 8, we, the jury, find that the Defendant,

9   Ronald L. Halstead, is guilty.

10      The false claim is that the service had been provided by

11  a specified medical doctor.

12      As to Count 9, we, the jury, on the issues joined, find

13  that the Defendant, Ronald L. Halstead, is guilty.

14      The false claim is that the service had been provided by

15  a specified medical doctor.

16      As to Count 10, we, the jury, find that the Defendant,

17  Ronald L. Halstead, is guilty.

18      The false claim is that the service had been provided by

19  a specified medical doctor.

20      As to Count 11, we, the jury, find that the Defendant,

21  Ronald L. Halstead, is guilty.

22      The false claim is that the service had been provided by

23  a specified medical doctor.

24      As to Count 12, we, the jury, on the issues joined, find

25  that the Defendant, Ronald L. Halstead, is guilty.

3399

1     The false claim is that the service had been provided by

2     a specified medical doctor.

3         As to Count 13, we, the jury, find that the Defendant,

4     Ronald L. Halstead, is guilty.

5         The false claim is that the service had been provided by

6     a specified medical doctor.

7         As to Count 14, we, the jury, find that the Defendant,

8     Ronald L. Halstead, is guilty.

9         The false claim, that the service had been provided by a

10    specified medical doctor.

11        As to Count 15, we, the jury, find that the Defendant,

12    Ronald L. Halstead, is guilty.

13        The false claim is that the service had been provided by

14    a specified medical doctor.

15        As to Count 16, we, the jury, on the issues joined, find

16    that the Defendant, Ronald L. Halstead, is guilty of

17    conspiracy to launder money instruments.

18        As to Count 17, we, the jury, on the issues joined, find

19    that the Defendant, Ronald L. Halstead, is guilty.

20        As to Count 18, we, the jury, find that the Defendant,

21    Ronald L. Halstead, is guilty.

22        As to Count 19, we, the jury, find that the Defendant,

23    Ronald L. Halstead, is guilty.

24        As to Count 20, we, the jury, find that the Defendant,

25    Ronald L. Halstead, is guilty.

3400

1        As to Count 21, we, the jury, find that the Defendant,

2    Ronald L. Halstead, is guilty.

3        As to Count 22, we, the jury, find that the Defendant,

4    Ronald L. Halstead, is guilty.

5        As to Count 23, we, the jury, find that the Defendant,

6    Ronald L. Halstead, is guilty.

7        As to Count 24, we, the jury, find that the Defendant,

8    Ronald L. Halstead, is guilty.

9        As to Count 25, we, the jury, find that the Defendant,

10   Ronald L. Halstead, is guilty.

11       As to Count 26, we, the jury, find that the Defendant,

12   Ronald L. Halstead, is guilty.

13       The verdict is signed by Lauren Seibert, Foreperson and

14   is dated February 3rd, 2003.

15       Doctor Halstead, you may be seated.

16       Ladies and gentlemen of the jury, at this time, I am

17   going to conduct a poll of each of you to determine if the

18   verdict that I have published is your verdict in every

19   respect as to each of these defendants.

20       (Jury Polled - all affirmative answers)

21         THE COURT:  Ladies and gentlemen of the jury, that

22   concludes your jury service.  Would you, please, together

23   with the alternates, return to your jury room for a moment.

24   I would like to come in in just a couple of minutes to thank

25   you for your jury service.  Would you mind waiting for me in

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3401

1    there?

2         (Jury out 3:25 p.m.)

3         THE COURT: All right.  Please be seated.  At this

4    time I order the verdict forms filed and adjudge each of the

5    defendants guilty on all the Counts as charged in accordance

6    with the jury's verdict.

7       At this time are there any motions with regard to the

8    forfeiture issue, Mr. Zimarowski?

9         MR. ZIMAROWSKI: Your Honor, we--Mr. Adams and I have

10   discussed it.  I think he has a position on that and I think

11   the Court may want to hear from Mr. Adams first.

12        THE COURT:  All right.  Mr. Adams.

13        MR. ADAMS:  I believe that, with respect to these

14   defendants, there is no specified property named in the

15   forfeiture count; it's simply a money judgment; therefore, I

16   don't know that we need a hearing to show nexus between a

17   particular property.  In that regard, I think the defendants,

18   unless they have some reason that we haven't heard, Your

19   Honor, I don't see that there's a forfeiture.

20        MR. ZIMAROWSKI:  Your Honor, if Mr. Adams' position

21   is legally correct and the Court rules that it's correct,

22   then obviously we don't have any nexus issue to place before

23   the jury.  And, again, I'm--we'll let the Court make the

24   ruling on whether there is or is not a nexus issue to be

25   decided.  If there is a nexus issue, we would obviously

3402

1    request a jury.

2          THE COURT:  As to these specific pieces of property

3    that are alleged in Count B of paragraph a hundred and

4    twenty, Mr. Adams, your position is what now?

5          MR. ADAMS:  Those are all properties associated with

6    Defendant, Robert Burns.

7          THE COURT:  Okay.  From my review of what I've just

8    read and what response I just got, I agree with that.  Do you

9    have any--

10         MR. ZIMAROWSKI:  No, I do not dispute that, Your

11   Honor.  Again, that's why I let Mr. Adams speak to that.

12         THE COURT:  All right.  Thank you very much.  In

13   that vein then, I don't believe that it's necessary for me to

14   hold the jury over or to return them for a forfeiture hearing

15   and I will permit them to leave.

16      Now with regard to post-trial motions, Mr. Jaffe, Mr.

17   Zimarowski and Mr. Harris, did you wish to address the time

18   frames and other matters at this time?

19         MR. JAFFE:  Yes, pursuant to Rule 29-C, I believe

20   the Court has discretion to extend the seven-day deadline.

21   During that seven-day period, which I believe that's taken, I

22   would say that we would like twenty-one days, because I think

23   the seven day means you have around nine or at least, because

24   of weekends.  I think Mr. Harris has a scheduling issue with

25   a brief that he has to have filed.

Case 1:01-cr-00045-IMK-JSK   Document 397-4   Filed 03/11/05   Page 60 of 66   PageID #: 11075

3403

1        THE COURT:  Yes.

2        MR. HARRIS:  Yes, Your Honor, I have a brief in the

3   Fourth Circuit due on the 13th, which I think the Court's

4   aware of and I've worked on it some obviously been it's been,

5   what a month or so, I haven't touched it and I'm going to

6   start work on that immediately and that will tie me up until,

7   what is that, next--Thursday of next week.

8        THE COURT:  Does the Government have any objection

9   to my granting the defendants until Monday, the 24th of March

10  for the submission of any post-trial motions.

11       MR. ADAMS:  No, Your Honor, no objection.

12       THE COURT:  Is that sufficient time for counsel?

13       MR. JAFFE:  Yes, Your Honor.

14       MR. HARRIS:  Yes, Your Honor, that's fine.

15       THE COURT:  Then the Court will provide leave to

16  extend the time frame for the filing of motions, after

17  discharge of the jury, until the close of business on Monday,

18  March 24th.

19     Are there any other motions to come before the Court at

20  this time, specifically with regard to bond?

21       MR. HARRIS:  Your Honor, I would move that my client

22  be allowed to continue on the bond that he has.  I think it

23  was a personal recognizance.

24       MR. ZIMAROWSKI:  Likewise for Doctor Filcheck, Your

25  Honor.

FORM CSR - LASER   REPORTER'S PAPER & MFG CO.  800-626-6313

3404

1          MR. JAFFE:  We've actually posted a bond, two

2     houses; Doctor Halstead's brother's house and the house of

3     his ex-wife and children, as well as a cash bond for the

4     amount of a hundred and fifty thousand dollars.  We haven't

5     moved to exonerate.  We'd move to keep that.

6          THE COURT:  All right.

7          MR. JAFFE:  He doesn't have his passport.

8          THE COURT:  He doesn't have his passport?

9          MR. JAFFE:  He does not have a passport, no

10    connection.  Two hearings in Atlanta.

11         THE COURT:  Have the other defendants turned in any

12    passports if they have.

13         MR. HARRIS:  Doctor Taylor doesn't have a passport.

14         MR. ZIMAROWSKI:  And Doctor Filcheck turned in his

15    passport.

16         THE COURT:  Does the Government have any objection

17    to the defendants remaining on bond, pending sentencing?

18         MR. ADAMS:  Your Honor, I think with respect to

19    Defendant Halstead, I think bond needs to be reviewed in

20    light of the nature of the convictions and his prior

21    convictions.  I think he's a potential flight risk because--

22    so to the ability you would ascertain what his assets are.

23    Also he is currently continuing to teach the MD seminars

24    around the country and that, as a person who is doing that is

25    in constant travel.  Also I believe the Court saw during--it

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

3405

1    wasn't admitted into evidence, but a number of documents that

2    the Government offered with respect to prior false statements

3    in legal proceedings at various times, and that for those

4    reasons we believe that bond needs to be increased.

5              THE COURT:  In what respect?

6              MR. ADAMS:  I think it's at a hundred and fifty now.

7    The Government would ask for five hundred thousand.

8              THE COURT:  Mr. Jaffe.

9              MR. JAFFE:  Well, he's been in constant travel

10   throughout this period of time; it's only in America.

11   There's just no way in the world that he's going to be able

12   to come up with anything close to that.  It took us a week to

13   get these two houses.  That's what he got, between legal fees

14   and his business and that's what he has.

15             THE COURT:  Does Doctor Halstead--let me ask this to

16   the Government.  To your knowledge, does Doctor Halstead have

17   any business ties or family connections anywhere out of the

18   United States?

19             MR. ADAMS:  Your Honor, we--I believe when Mr.

20   Markson testified, he provided an interview to Special Agent

21   James regarding conversations he had in the past with Doctor

22   Halstead with respect to off-shore accounts and we would note

23   that some of the false statements that he had some property,

24   dealt with the concealment of assets and indeed we feel with

25   respect to Doctor Knoderer and with respect to the prior

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3406

1    proceedings.

2         THE COURT:  But Doctor Halstead has met every

3    requirement of his bond conditions during the pendency of

4    this litigation as far as I'm aware.  Correct?

5         MR. ADAMS:  I'm not aware that anything has not been

6    met.

7         THE COURT:  Okay.  Is there any new evidence, other

8    than the convictions here today, which would support an

9    argument that he is a flight risk?

10        MR. ADAMS:  I think only the recent confirmation of

11   the amount of outstanding tax liability he has for, I think,

12   for the years 1991 forward, just shy three million dollars.

13        THE COURT:  Is that in the information that's before

14   me?

15        MR. ADAMS:  Not at this time, no.

16        THE COURT:  No.

17        MR. ADAMS:  But it does, I think, go to risk of

18   flight, Your Honor, given the amount of restitution that may

19   be involved with this case plus his tax liability.

20        THE COURT:  Here's what I'm going to do.  I'm going

21   to continue Doctor Halstead on the current bond.  I'm going

22   to give the Government seven days within which to file any

23   information that they want me to consider that would suggest

24   that Doctor Halstead's risk of flight has increased and that

25   the bond--the amount of bond should be increased and that

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3407

1    would be due on Monday, the 10th and then I would give Doctor

2    Halstead until Monday the 17th to file a response indicating

3    the grounds in support of maintaining--retaining the bond at

4    the amount it is and under the same terms and conditions and

5    after that, I'll issue a ruling.  I don't feel I have the

6    information in front of me to properly judge that at this

7    time.

8        I will, therefore, unless otherwise specified, continue

9    the defendants on the same bond conditions as previously set

10   by the Magistrate Judge and there will be an order entered

11   setting a schedule for the submission of a pre-trial report

12   or presentence report and then setting a sentencing date.  My

13   estimate of sentencing in this case would be that the

14   sentencing date would be sometime in late April or early May

15   and we will get you a specific date within the next week,

16   once the judgment order is entered and the scheduling order

17   goes out.

18       Are there any other matters for the Court to take up

19   before we adjourn?

20       MR. HARRIS:  Well, Your Honor, I just want to

21   inquire if you were going to--you said something about

22   speaking to the jury and I know in the past you've come back

23   out to talk to us a little bit.

24       THE COURT:  If you request, I will do that.

25       MR. HARRIS:  Yes, Your Honor.

3408

1          THE COURT:  All right.  Thank you very much.

2          MR. JAFFE:  Nothing from us.

3          THE COURT:  All right.  Thank you.

4          MR. ADAMS:  Nothing further from the Government,

5    Your Honor.

6          THE COURT:  Court stands adjourned.  Thank you very

7    much.

8       (The trial was concluded at 3:45 p.m., 02-04-2003)

CERTIFICATE

I, Linda L. Bachman, Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on February 3 and 4, 2004 as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 10th day of March, 2005.

Linda L. Bachman, CCR, CVR
Official Reporter, United States
District Court for the Northern
District of West Virginia