## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal Action No. 1:01CR45** |
| | ) | **Civil Action No. 1: 08CV135** |
| | ) | |
| | ) | |
| **V.** | ) | |
| | ) | |
| **RONALD L. HALSTEAD** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO § 2255 PETITION
## TO VACATE MONEY LAUNDERING CONVICTION

HALSTEAD has filed a motion, pursuant to 28 U.S.C. § 2255, seeking to overturn his

conviction for Count 16 charging him with a Conspiracy to Launder Monetary Instruments in

violation of 18 U.S.C. § 1956(h), based upon the recently decided case of *United States v.*

*Santos*, ___ U.S. ___, 128 S.Ct. 2020 (June 2, 2008). In *Santos*, the Supreme Court, in a split

opinion that divided the Court 4 -1- 4, ruled that the term "proceeds" as used in 18 U.S.C. §

1956(a)(1)(A)(i) - the promotion money laundering statute - means "net profits" in some

instances and "gross receipts" in others. Thus, in some cases, the Government will have to prove

beyond a reasonable doubt that the funds involved in a money laundering transaction represented

the profits of the underlying offense and not merely the revenue from the illicit activity. In other

cases, however, the long-standing majority rule that proceeds means gross receipts will continue

to apply.

HALSTEAD's motion must be denied for several reason. First, *Santos* holds that

"proceeds," as used in Section 1956(a)(1), means "profits" only when the SUA charged as the

predicate offense is the operation of an illegal gambling business, in violation of Section 1955.

In this case the underlying SUA was health care fraud not gambling.  Secondly, even if the Court

is not convinced that *Santos* applies only to gambling-based money laundering cases the motion

still must be denied because direct expenses of this SUA are *de minimis*.  Lastly, even if the

Court is not convinced that direct expenses of this SUA are minimal, the motion must still be

denied because the Court based its sentencing calculations on the "net profits" after deducting the

"expenses" by giving the defendant a "credit" for all possible legitimate medical services.  Thus,

the Court has already based it determination of the amount of the funds laundered upon the "net

profits" of the SUA and not the "gross receipts" of the clinic.

## STATEMENT OF THE CASE

On September 7, 2001, defendants Scott G. Taylor, William C. Filcheck, Jr., and

RONALD L. HALSTEAD were charged in a multi-count indictment with conspiracy (18 U.S. C.

§ 371) to commit health care fraud, health care fraud (18 U.S.C. § 1347), and a conspiracy to

launder money in violation of 18 U.S.C. § 1956(h).

Following a jury trial, defendants Filcheck, HALSTEAD, and Taylor were each convicted

on one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371 (Count

1); and 14 counts of health care fraud in violation of 18 U.S.C. § 1347 (Counts 2-15).  In

addition, HALSTEAD was convicted on one count of conspiracy to launder monetary

instruments, in violation of 18 U.S.C. § 1956(h) (Count 16).  The district court initially sentenced

HALSTEAD to 121 months' imprisonment, to be followed by three years of supervised release.

Taylor and Filcheck were each sentenced to 37 months' imprisonment, to be followed by two

years of supervised release.  The defendants were also ordered to forfeit $1.9 million dollars.

2

On February 8, 2006 the Fourth Circuit, in a unpublished opinion, affirmed convictions of all three defendants but vacated each of their sentences and remanded the case for re-sentencing pursuant to *United States v. Booker*. On August 8, 2006 the district court sentenced HALSTEAD to 151 months confinement. Taylor and Filcheck were each sentenced to 24 months' imprisonment. The defendants were ordered to forfeit $1.9 million dollars. On January 9, 2008 the Fourth Circuit affirmed HALSTEAD's re-sentencing.

## FACTS OF THE CASE

This case involves a scheme by chiropractors to deceive insurers into believing that the treatment and services being billed were performed under the direction and supervision of a medical doctor, when they were in fact ordered, performed and supervised by chiropractors. The purpose of this scheme was designed in part to evade the more limited benefits provided under many insurance policies for chiropractic treatment. All of the insurers covered by the indictment strictly limited chiropractic coverage. Medicare limited chiropractic treatment to 12 spinal manipulations per year. The Blue Cross Blue Shield policies and the Accordia National policy charged in the indictment provided no coverage for chiropractic services. The West Virginia Professional Employees Insurance Agency limited chiropractic coverage to $1,000 per year. The Railroad Maintenance and Industrial Health and Welfare Fund policy charged in the indictment limited chiropractic coverage to $500 per year. It was also a part of the scheme to simply increase billing to insurers by providing and billing for medically unnecessary services based primarily on the extent of the patient's insurance coverage.

For a number of years Robert Burns owned and operated a chiropractic clinic in Morgantown, West Virginia, originally known as the Mountaineer Chiropractic Clinic. In an

3

effort to make his Chiropractic Clinic even more profitable Burns retained HALSTEAD as a billing consultant in late 1993.

In 1994, based upon HALSTEAD's advice, the corporate structure of the clinic changed; West Virginia Health Care Management ("WVHCM") became the mother company for two entities, MCC and Priority One Medical Associates. HALSTEAD claimed that combining a medical clinic with a chiropractic clinic would result in higher insurance reimbursement and therefore more profits for Burns. HALSTEAD also advised Burns that the clinic could increase its income by performing more tests per patient visit.

Priority One was a medical corporation nominally owned by a medical doctor, while WVHCM was a management company owned solely by Burns. HALSTEAD established a schedule of fees that Priority One would pay to WVHCM. The fees were set so that Priority One always owed money to WVHCM. As a result, Priority One paid millions of dollars to WVHCM during the years 1994 through 1997. In turn, WVHCM paid hundreds of thousands of dollars to HALSTEAD and his company, Practice Systems.

The corporate structure, however, was only the beginning of the scheme. The scheme entailed the use of marketing techniques and even telemarketers to lure prospective patients to the clinic with the inducement of a free dinner and offer to perform certain medical services at a reduced rate. On the first visit to the clinic visit, a prospective patient would usually be x-rayed and then examined by either Filcheck or Taylor. According to a script provided by HALSTEAD, Taylor and Filcheck were to tell all prospective patients during this first visit to the clinic that they had a "severely twisted spine." The patients were then encouraged by Taylor and Filcheck to believe that chiropractic treatment would help them, and that their insurance would pay for the

treatment so that it would cost them nothing.  This frequently overcame any qualms the

prospective patient had about the cost and the duration of the chiropractic treatments.  This

process, known as the "conversion of patients," was closely tracked and monitored by Burns and

HALSTEAD.  Taylor and Filcheck's conversion sessions with patients were tape-recorded so

Burns and HALSTEAD could later critique their techniques in overcoming prospective patients'

reluctance or objections to coming under their care.  A system was also established to track the

number of "patient conversions" by each chiropractor with a view to paying Taylor and Filcheck

bonuses based on the number of their successful conversions.

Once a patient agreed to come under their care, whether via the conversion process or

otherwise, their entire treatment plan was then determined by a protocol established by

HALSTEAD.  This treatment protocol, which determine the number of visits, diagnostic tests

and other services which were to be provided to the patient, was based not on the medical needs

of the patient but rather upon the patient's medical insurance coverage.  A patient with "quality

insurance" was usually given a battery of diagnostic tests, high frequency of visits, multiple

modalities and other services because their insurance would more likely to pay for it than

Medicare or  "sub-quality" insurance policies.  Since chiropractic coverage under many of the

insurance policies was insufficient to pay for the services and treatments that were part of the

"HALSTEAD Protocol" these services and treatments were billed in the name of the non-treating

medical doctor.

In order to maximize the clinic's billings it was the office manager's job to see that the

"HALSTEAD Protocol" was carried out by putting notes in the patients' charts directing which

tests or treatments were to be administered.  The typical course of treatment for the patients at the

Burns clinic consisted of 20-30 chiropractic visits combined with various diagnostic tests and treatments modalities ordered by the chiprorator.  The medical doctor neither prescribed nor supervised the treatment ordered and provided by the chiropractors.  In fact, the medical doctor usually saw the patient only a few times, if at all, during their course of treatment.  Much or all of a patient's visit and treatment were medically unnecessary.

HALSTEAD instructed clinic personnel to maintain an "Insurance Bible," which showed, for each type of insurance carried by the clinic's patients, what types of tests and procedures would be reimbursable.  Pursuant to HALSTEAD's instructions, the type and frequency of diagnostic testing for each patient was determined according to the patient's insurance coverage, not the patient's symptoms.  The whole idea behind the HALSTEAD protocol was to retain the patient, "not to cure him."  In the words of the clinic office manager, Ernest Twigg, "If their insurance covered it, you did it."

HALSTEAD further advised Burns to hire medical doctors who would be willing to go along with HALSTEAD's program.  All the medical doctors who worked at this clinic initially believed that they were there to provide physicals to clear patients for chiropractic treatment or rehabilitation, or to treat unrelated medical problems (e.g. sinus infections etc.).  However, eventually they realized that they were being used primarily for billing purposes.  The medical doctors acquiesced in the HALSTEAD program in varying degrees depending on their own ethical standards, the extent of their knowledge of the scheme and their personal involvement.

HALSTEAD's system required, however, that the medical doctor's name was to be "on everything" sent to the insurance companies.  In accordance with HALSTEAD's instructions all the clinic's diagnostic tests were billed through the medical corporation and in the name of the

6

medical doctor, even though the tests were neither ordered nor supervised by the medical doctor.

Burns and HALSTEAD also conspired to engage in financial transactions, in the proceeds of the specified unlawful activity with the intent to promote and carry on the fraudulent billing scheme. Burns, using the system set up by HALSTEAD, regularly caused the transfer of the proceeds from the fraudulent insurance billing scheme received at Priority One in West Virginia but deposited in Priority One's account at PNC Bank in Pennsylvania and then transferred to the accounts of Health Care Management also at PNC bank.

## THE FACTS IN *UNITED STATES V. SANTOS*

Defendant Efrain Santos ran a gambling operation, and used the receipts of that business to pay winning bettors, labor costs, and other expenses necessary to keeping the business in operation. The Government charged those transactions as promotion money laundering offenses committed in violation of Section 1956(a)(1)(A)(i), and Santos was convicted.

The Seventh Circuit reversed the conviction. *United States v. Santos*, 461 F.3d 886 (7th Cir. 2006). Relying on its earlier decision in *United States v. Scialabba*, 282 F.3d 475, 478 (7th Cir. 2002), the court held that the term "proceeds," as used in Section 1956, means net profits, not gross receipts. Because there are no profits of a business until its expenses are paid, the court reasoned, payments made to defray the necessary expenses of the business cannot themselves be said to involve the profits of the business. Therefore, the court concluded, because a money laundering transaction must involve the profits of a business, Santos' payments of the expenses of his gambling operation could not have constituted violations of the money laundering statute.

Other appellate courts reached a contrary result, holding that "proceeds" means "gross receipts." *See United States v. Grasso*, 381 F.3d 160, 167 (3d Cir. 2004); *United States v.*

*Iacaboni*, 363 F.3d 1, 4 (1st Cir. 2004).  The Supreme Court granted *certiorari* to resolve the split in the circuits.

### The Plurality, Dissenting, and Concurring Opinions

*The plurality opinion*

The lead opinion was written by Justice Scalia on behalf of a four-justice plurality.  He reasoned that the term "proceeds" as used in Section 1956 could mean either profits or receipts, Plurality Opinion of Scalia, J., at 3, and that Congress's failure to specify which meaning was intended rendered the statute "ambiguous."  *Id.* at 5.

Invoking the rule of lenity, the plurality said that it was required to construe the ambiguous statute in the way most favorable to the defendant.  *Id.* at 6.  Accordingly, the plurality would have held that in *all* money laundering cases, "proceeds" means net profits and not gross receipts.

It was clear that the plurality's view was animated by its concern that the Government was abusing the money laundering statute by charging promotion money laundering in cases, like *Santos*, where the alleged money laundering transaction was nothing more than the payment of a necessary expense of the underlying crime.  In such cases, the plurality reasoned, the money laundering charge may be said to merge with the underlying specified unlawful activity (SUA), and a conviction for money laundering would constitute a second conviction for the same offense.

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute
> would also be a violation of the money laundering statute, because paying a
> winning bettor is a transaction involving receipts that the defendant intends to
> promote the carrying on of the lottery.

*Id.* at 8. In the plurality's view, "[i]nterpreting "proceeds" to mean "profits" eliminates the merger

8

problem." *Id.* at 9. "[A] criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money laundering statute," the plurality said, "because by definition profits consist of what remains after expenses are paid. Defraying an activity's costs with its receipts simply will not be covered." *Id.*

Nevertheless, the plurality opinion did not limit its construction of the statute to promotion cases where the act of promotion merged with the underlying SUA. To the contrary, the plurality's reasoning apparently would apply to all money laundering offenses charged under any part of Section 1956. Moreover, Justice Scalia made it clear that his view applied not only to the proceeds element of the money laundering offense, but also to the knowledge element. To obtain a conviction, the Government would have to prove beyond a reasonable doubt not only that the property involved in the transaction represented the profits of an offense, but also that the defendant knew that the property represented such profits. *Id.* at 14.

*The principal dissent*

Another four justices, led by Justice Alito, filed a dissenting opinion sharply disagreeing with the plurality's view. Taking into account the problems the money laundering statute was enacted to address, and the practical difficulties involved in attempting to determine what the "profits" of a criminal offense might be, the four justices would have held that in all money laundering cases, "proceeds" means "the total amount brought in" – *i.e.,* the gross receipts of the underlying crime. The plurality's view, Justice Alito said, "would frustrate Congress' intent and maim a statute that was enacted as an important defense against organized criminal enterprises." Opinion of Alito, J., dissenting, at 1.

The money laundering statute, Justice Alito said, was enacted to prevent criminals from

9

using illegally-derived funds for a variety of purposes, including the reinvestment of the money to promote the growth of the criminal enterprise and the commission of criminal acts in the future. These concerns exist whether or not the underlying crime has turned a profit at the time the alleged money laundering transaction takes place. Therefore, limiting the definition of proceeds to "net profits," he said, is a pointless exercise.

> Even if a drug or gambling ring was temporarily operating in the red during a particular period, the laundering of money acquired during that time would present the same dangers as the laundering of money acquired during times of profit. It is therefore implausible that Congress wanted to throw up such pointless obstacles.

*Id.* at 12-13.

Moreover, Justice Alito said, requiring the Government to prove that the criminal offense had generated a profit would "introduce pointless and difficult problems of proof." *Id.* at 7. Among other things, the Government would have to show that an illicit enterprise had yielded a profit over the long term, despite the ebb and flow of its fortunes. It was no answer for the plurality to suggest, Justice Alito continued, that the Government could charge money laundering based on isolated events that had proven to be profitable. In many money laundering cases, the Government's only alternative is to establish that the money involved in a financial transaction was derived from a particular type of criminal activity generally, it being impossible to trace the laundered funds back to a particular event. Justice Alito gave the following example of a typical money laundering case involving drug proceeds.

> [T]he prototypical case involves numerous criminal acts that occur over a period of time and the accumulation of funds from all these acts prior to laundering – for example, the organized crime syndicate or drug cartel that amasses large sums before engaging in a laundering transaction. . . . In such cases, it is unrealistic to think the individual dollars can be traced back to individual drug sales – or that Congress wanted to require such tracing.

10

*Id.* at 13.[1]  Later, he said the same problems would apply to gambling cases, fraud cases, and a variety of other crimes that "comprehend[] numerous acts that occurred over a considerable period of time." *Id.* at 15.

Finally, Justice Alito said, in cases where the defendant was a third party and not the person who had committed the underlying crime, the Government would have to prove that the third party knew that the underlying crime had generated a profit – something that Congress could not have intended and that the Government will find almost impossible to do in most cases.

Justice Scalia's response to these practical difficulties was terse.  "We interpret ambiguous criminal statutes in favor of defendants, not prosecutors," he said.  Plurality Opinion at 12.

*Justice Stevens' concurring opinion*

The opinions written by Justice Scalia and Justice Alito left the Court evenly divided between the view that proceeds means profits in all cases (the "profits rule"), and the view that it means gross receipts in all cases (the "receipts rule").  Justice Stevens provided the tie-breaking vote.  Disagreeing with both the plurality and the dissent, he argued that there was no reason the Court had to pick one definition of proceeds that would apply in all cases, regardless of the nature

---

[1] It is well-established that the Government does not have to trace the funds involved in a money laundering transaction to a particular offense. *See, e.g., United States v. Jackson*, 983 F.2d 757, 766 (7th Cir. 1993) (the Government is only required to prove money came from drug dealing; no need to trace laundered proceeds to specific predicate offense); *United States v. Mankarious*, 151 F.3d 694, 702 (7th Cir. 1998) (where SUA is mail fraud, the Government need only show that laundered funds came from a fraudulent scheme and that the use of the mails furthered that scheme; no need to trace proceeds to a particular mailing); *United States v. Habhab*, 132 F.3d 410, 414 (8th Cir. 1997) (evidence that defendant was engaged in fraudulent activity and had received fraud proceeds prior to date of financial transaction charged as money laundering was sufficient to establish money as SUA proceeds); *United States v. Bencs*, 28 F.3d 555, 562 (use of the term *involve* does not impose a tracing requirement) (6th Cir. 1994); *United States v. Carr*, 25 F.3d 1194, 1205 (3d Cir. 1994) (same).

of the underlying unlawful activity. In some cases, one definition might be "incongruous" or lead to "perverse results," he said, while in other cases the same definition might not. Opinion of Stevens, J., concurring, at 2, 5.

For example, he agreed with Justice Alito that "Congress intended the term "proceeds" to include gross revenues from "the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 2-3. "Thus," he said, "I cannot agree with the plurality that the rule of lenity must apply to the definition of 'proceeds" for these types of unlawful activities." *Id.,* at 3 n.3.

On the other hand, Justice Stevens said, in other cases, defining proceeds to mean gross receipts would have "perverse consequences." Cases where the money laundering statute was applied in connection with a gambling operation such as the one run by Santos, he said, fell into that category. "The consequences of applying a 'gross receipts' definition of 'proceeds' to the gambling operation conducted by respondents are so perverse that I cannot believe they were contemplated by Congress . . . ." *Id.* at 3. He then expanded on this point:

> Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business.

*Id.* at 4. Accordingly, Justice Stevens concluded that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute." *Id.* at 5.

### Analysis

1.   *The holding in Santos is limited to cases in which the SUA charged as the predicate offense is the operation of an illegal gambling business, in violation of Section 1955*

When a decision is rendered by a divided court, with no opinion commanding the vote of five justices, the controlling opinion is the narrowest opinion that supports the judgment of the Court. *See Marks v. United States,* 430 U.S. 188, 193 (1977). In this case, as all nine of the justices appear to recognize, that means that Justice Stevens' concurring opinion is the one that controls.

The only part of the concurring opinion that was necessary to the outcome of the case, and that commanded a five-vote majority, was Justice Stevens' conclusion that the receipts rule does not apply to at least some money laundering cases involving gambling proceeds. This, then, is the holding of the Court. There is also a five-vote majority in support of Justice Stevens' statement that "proceeds" means "gross revenue" in cases involving the proceeds from "the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 2-3. *See* Opinion of Alito, J., dissenting, at 2 n.1. But the precedential value of that position is uncertain, given that it was *dicta* unnecessary to the resolution of this particular case.

The Supreme Court did not adopt any categorical rule regarding the definition of proceeds; rather, it answered the profits versus receipts question only for cases involving the payment of the expenses of an illegal gambling business and, in *dicta*, for cases involving the laundering of the proceeds of the sale of contraband. To be sure, eight justices rejected Justice Stevens' view that the definition of "proceeds" may vary from case to case based on the nature of the underlying crime and the relationship of the money laundering transaction to it; the rest of the Court would have adopted one categorical view or the other. Accordingly, there is no controlling opinion of the Court requiring a profits versus receipts analysis in any money laundering case, and that the pre-*Santos* case law

13

defining proceeds in a given circuit continues to apply, except in cases involving the payment of gambling expenses and the laundering of the proceeds of the sale of contraband.

If the Court determines that it must decide whether to apply the profits rule or the receipts rule to a given application of the money laundering statute, it must designate the criteria for making that choice. Justice Stevens states courts should apply the profits rule in any money laundering case where applying the receipts rule would lead to results "so perverse" that they could not have been contemplated by Congress when it enacted the money laundering statute. Indeed, Justice Stevens uses the phrase "perverse results" or "perverse consequences" no fewer than four times in describing the basis for choosing the profits rule over the receipts rule. Opinion of Stevens, J., concurring, at 3, 5 & n.7.

Unfortunately, Justice Stevens provides only a single illustration of an application of the money laundering statute that, in his view, would lead to perverse results if "proceeds" were defined to mean "receipts," but that illustration is instructive. In discussing his reason for concurring in the judgment of the Court, he said the following regarding the application of the receipts rule to the facts in *Santos*:

> The revenue generated by a gambling business that is used *to pay the essential expenses of operating that business* is not "proceeds" within the meaning of the money laundering statute. As the plurality notes, there is "no explanation for why Congress would have wanted *a transaction that is a normal part of a crime* it had duly considered and appropriately punished elsewhere in the Criminal Code, to radically increase the sentence for that crime." Faced with both a lack of legislative history speaking to the definition of "proceeds" when operating a gambling business is the "specified unlawful activity" and my conviction that Congress could not have intended the perverse result that would obtain in this case under Justice Alito's opinion, the rule of lenity may weigh in the determination. Accordingly, I concur in the judgment.

*Id.* at 5 (emphasis added, internal citation omitted).

Based on this passage, it appears that, in Justice Stevens' view, the application of the receipts rule would lead to "perverse results" if the money laundering transaction consists of nothing more than the payment of an essential expense of the underlying SUA, such that a conviction on the money laundering charge would therefore be "tantamount" to a second conviction for the same crime, and there is no legislative history indicating that Congress intended that result.

It is important to note that Justice Stevens *did not* say that the profits rule would apply to *all* money laundering cases based on the operation of an illegal gambling business. To the contrary, he said that application of the profits rule was necessary to avoid perverse results where the money laundering transaction constituted the payment of an *essential expense* of a crime for which the defendant was already subject to punishment. In other words, the key element to the perverse results test is whether the money laundering offense would merge with the underlying SUA. Accordingly, while the plurality opinion specifically *did not* limit its application of the profits rule to cases involving the merger issue, Justice Stevens appears to have done exactly that.

Based on the foregoing, a profits versus receipts analysis turns not on the nature of the *underlying crime,* but on the relationship of the money laundering *transaction* to that crime. The profits rule applies only where the transaction is so essential to the commission of the underlying crime that the money laundering transaction may fairly be said to merge with the underlying crime and not constitute a new and separate offense. This will generally be the case where the money laundering transaction constitutes the payment of an essential expense of an already completed crime. This was the case in *Santos* where the money laundering counts were based payments of commissions to runners who gathered bets from gamblers, kept a portion of the bets(15%-25%) for themselves as their commissions, and delivered the rest to Santos' collectors. Collectors delivered the money to

15

Santos who used some of it to pay the salaries of the collectors, and to pay the winners. It would not include transactions which are intended to promote the continuation of the crime in the future.[2]

Applying this rationale to the HALSTEAD case, the United States submits that there is no reason to apply the profits rationale to establish "proceeds" to support the money laundering count of conviction. The essence of the money laundering count of conviction is the agreement to violate the money laundering statutes. In fact, the defendant was not convicted of making any promotion money laundering payments.

2.    *Only Expenses Directly to the Fraud Are to Be Deducted*

Because the underlying SUA in the instant case is health care fraud, the Court should also deny HALSTEAD'S motion even if the Court is not convinced that *Santos* applies only to gambling-based money laundering cases because only expenses directly and essentially related to defrauding insurers need be deducted before the scheme may be said to be profitable. All other transactions, especially those not directly and essentially related to defrauding insurers, would involve

---

[2] Two decisions of the Fourth Circuit illustrate this distinction. In *United States v. Heaps*, 39 F.3d 479, 485-86 (4th Cir. 1994), the court held that the one-time payment of an essential expense of a completed act, such as paying for drugs that had been received on consignment and later sold to customers, merges with the SUA and therefore does not constitute money laundering. In contrast, in *United States v. Singh*, 518 F.3d 236, 247-48 (4th Cir. 2008), the court held that a prostitute who used the money received from her first customer of the day to pay for her motel room committed a promotion money laundering offense that did not merge with the underlying crime because the payment gave her the right to the use of the room for the rest of the day without further charge, and created goodwill for future transactions. The holding in *Heaps,* the court said, was limited to cases where the payment was a one-time payment on an antecedent debt and there is no evidence it was made to create goodwill for future transactions. *See also United States v. Godwin*, 272 F.3d 659, 669-70 (4th Cir. 2001) (paying interest to the original investors in Ponzi scheme promoted the scheme by quieting the "squeaky wheel" and thus allowing the scheme to continue); *United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998) ("when proceeds are used in a transaction to commit the next step in a scheme to defraud, it is clear that the financial transaction advances and furthers the progress of the next step").

"proceeds" as defined by the Scalia plurality and Justice Stevens.  As Justice Stevens points out:

> The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not "proceeds" within the meaning of the money laundering statute. As the [Scalia] plurality notes, there is "no explanation for why Congress would have wanted *a transaction that is a normal part of a crime* it had duly considered and appropriately punished elsewhere in the Criminal Code, to radically increase the sentence for that crime."

*United States v. Santos*, 128 S. Ct. 2020, 2033 (2008) (Stevens, J., concurring in the judgment; emphasis added).  In addition, as the Scalia plurality notes "[t]ransactions that normally occur during the course of running a lottery are not identifiable uses of profits and thus do not violate the money laundering statute." *Id*. at 2027 (Scalia, J., plurality opinion).  From these statements, one can discern that the only expenses that need be deducted before "proceeds" in the form of "profits" may be said to exist are expenses that are essential, normal and commonplace to the commission of health care fraud against the insurers.  In essence, only the expenses necessary to persuade clients to take the full battery of tests and then to bill the insurers for the medically unnecessary portion of the tests should be deductible under *Santos*.  Once these necessary and essential expenses have been paid the scheme may be said to be profitable and any "down-stream," non-essential expense, transactions involving the profits would be transactions involving SUA proceeds as defined in *Santos*.

Stated differently, what are the "essential expenses" of this the health care fraud SUA?  An "essential expense" is any expense that is ordinarily necessary for the commission of the offense. For example, the payment of prostitutes is an essential expense of a prostitution ring, while the acquisition of inventory is an essential expense of a fraudulent mail order operation.  It is not enough that the commission of a particular SUA could entail expenses or even that it normally entails expenses; the payment of some expense must ordinarily be necessary to commit the crime.  This does not mean that payment of the expense must be an element of the SUA, for the payment of winners

17

and runners in *Santos*, while ordinarily necessary to the conduct of a lottery business, was not an element of the underlying gambling offense.

Here the essential and normal expenses of defrauding the insurers were truly *de minimis*, consisting, at most, of costs of conducting more tests on a patient than medically necessary and adding to the bills being sent to the insurers the additional, medically-unnecessary tests. As with the other office expenses, the $65,000 yearly salary of Dr. Medina (GX 001-008 pages 001 and 005) and the $75 per hour paid to Dr. Price (GX 001-015 pages 001 and 005) are not part of the expenses of the SUA since the doctors were not actually ordering the unnecessary testing or involved in the billing. Once these expenses (or the portion allocable to the medically-unnecessary tests) were paid from gross receipts of the fraud scheme, all that remained constituted profits and therefore "proceeds" of the SUA. For example, the industrial thermometer, which was used as a "temperature gradient machine," cost only $164 ($112 for the thermometer plus $52 for the probe) (GX 001-277-003) yet the clinic billed $67 for each time they touched the patient's nerve with the "temperature gradient machine." Each test normally consisted of the patient being touched 6 or 8 times so that the clinic normally billed $402 (6 x $67) or $536 (8 x $67) for this test. See GX 003-001-001 (the HCFA 1500) and GX 003-003-001 (the clinic's superbill) as an example of the billing for this procedure.[3] Using the clinic's billed to received ratio of 61% means that the first time the clinic billed for this test it produced a real profit of $83 ($402 x .61 - $162).[4] Each subsequent billing would produce a profit of $245.00 since the machine had paid for itself the first time it was used.

_____

[3]The Temperature Gradient test was billed with the CPT code of 93740.

[4]At the sentencing hearing the Court found 61% to be the billed to collected ratio based upon GX 001-073, 001-038, 001-039, 001-040, 001-041, and 001-058-008. GX 001-038-003 is attached as an example.

Any transaction involving at least some of these criminal profits would be fair game for money laundering assuming the other elements of 1956 were satisfied for the transaction. In this regard, it should be noted that only part of the funds – any part of the funds – in a charged transaction need be SUA proceeds before the transaction may be charged as 1956 money laundering and a conviction on such a charge sustained.[5]

*Santos* requires the Court to focus narrowly on the SUA offense itself and the expenses that were essential, ordinary and necessary to committing the health care fraud scheme. The court should NOT consider expenses associated with other activities conducted by the defendant, specifically the expenses of running the legitimate part of the chiropractic business. As the Scalia plurality opinion suggests, for purposes of determining whether an SUA was profitable, "[w]hat counts is whether the receipts from the charged [SUA] exceeded the costs fairly attributable to it." 128 S. Ct. at 2029

---

[5]See *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds); *United States v. Bieganowski*, 313 F.3d 264, 379-80 (5th Cir. 2002) (even if some of health care provider's income was legitimate, transfer of commingled funds would satisfy the proceeds element of section 1956(a)(1)); *United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002) (jury was free to convict alien smuggler of money laundering despite evidence that he used commingled funds to conduct his financial transactions); *United States v. McGauley*, 279 F.3d 62, 71 (1st Cir. 2002) (transfer of $49,000, of which only $155 is fraud proceeds, is a money laundering offense; there is no *de minimus* rule requiring proof that a given fraction of the funds be SUA proceeds); *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1353-55 (D.C. Cir. 2002) (sufficient for Government to show defendant withdrew funds from commingled account; strict tracing would be impossible given the fungible nature of money, and requiring such tracing would lead to nonsensical results); *United States v. Abbell*, 271 F.3d 1286, 1296 (11th Cir. 2001) (evidence that defendant had some legitimate income showed, at best, that his money laundering transactions involved commingled funds, which was sufficient for conviction); *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) ("there is no requirement that a 'substantial portion' of the funds be derived from an SUA"; "the government must prove only that the tainted proceeds were commingled with other funds"); *United States v. Wilkinson*, 137 F.3d 214, 222 (4th Cir. 1998) (where money is drawn on a commingled account, the Government is entitled to presume that funds "up to the full amount originally derived from crime" were involved in the transaction).

19

(plurality opinion, footnote omitted, emphasis added). *In this case the expenses "fairly attributable" to the health care fraud SUA are limited to direct costs of committing the SUA per se and not unrelated costs, indirect costs or overhead.* Suppose, for example, that the government charges as the SUA a half dozen discrete instances of the sale of an item in furtherance of a fraudulent mail order operation. The direct expenses of the SUA would include the cost of the sold items to the operation, mailing costs associated with soliciting the sale and shipping the items, and a pro rated portion of the salary of the employee of the operation who handled the sale. But costs associated with maintaining the operation's office, such as rent and utilities, or with storing the operation's inventory would not be counted. By the same token, the cost associated with the "legitimate" medical services conducted by the operation should not be considered.

Since the billings simply added medically-unnecessary tests to the medically-necessary tests on the same bill, the direct expenses of the health care fraud scheme is truly marginal and *de minimis*. Thus, it would have been easy for a jury to infer beyond a reasonable doubt that the vast majority of insurance payments received from targeted insurers constituted profits to the defendants. Moreover GX 001-073 is clear proof of the profitability of this scheme. In 1994 the Burns clinic, using the HALSTEAD protocol for only a half of the year, billed $757,000. While in 1995 the same clinic using the HALSTEAD protocol for the full year billed $1.366 million and in 1996 the clinic's billing jumped to over $3 million dollars. Clearly once the defendants embarked upon the health care fraud scheme the lion's share of payments by the targeted insurers were pure profit or "gravy" to the defendants in the form of criminal profits.

3.      *The expenses from the operation of the clinic have already been deducted since the Court based its determination of the amount of the funds laundered upon the "net profits" not the "gross receipts" by giving the defendant a "credit" for all possible legitimate medical services.*

The Court here need not decide which analysis, gross proceeds or profits, is correct, because, as if the prosecution had an advance copy of the principal plurality opinion's road map and driving instructions, the government limited the money laundering prosecution to a single count of Money Laundering Conspiracy and presented evidence of the profitability of the underlying SUA.  In fact, *at the time of the sentencing the Court deducted all costs and profits associated with medically necessary tests and services leaving only the criminal proceeds.*  In late 1993 when Burns hired HALSTEAD to be his billing consultant Burns had been in business for a number of years.  He had, *inter alia*, an office and numerous employees including an office manager, billing clerks, technicians and staff chiropractors.  All of these employee positions remained throughout the scheme.

At sentencing the Court reduced the gross receipts of the clinic ($7,384,521) by first giving the defendant a credit, in the amount of $3,541,736, for all possible legitimate chiropractic and medical doctor services.  This credit removed all the expenses of operating the Burns clinic and any legitimate profits from the calculations.  Next the amount was reduced further by additional credits for uncollected billings and cash payments.  Thus, the $1,916,234 that was left after all the credits had been given was the pure net profit from this illegal scheme.  Attachment A is a chart summarizing all the expenses taken to reduce the clinic's gross receipts to just the criminal profits.

## CONCLUSION

For each of the foregoing reasons, the United States submits that HALSTEAD's petition should be denied

                     Respectfully submitted,

                     SHARON L. POTTER
                     UNITED STATES ATTORNEY

                     S/ Patrick M. Donley
                     PATRICK M. DONLEY
                     SENIOR LITIGATION COUNSEL
                     Department of Justice
                     1400 New York Avenue, Room 4418
                     Washington, DC
                     Tel: (202) 514-0840
                     Fax: (202) 514-7021
                     Email: patrick.donley2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been served electronically via the Northern District of West Virginia's Electronic Filing System upon the following parties:

Brian J. Kornbrath
Federal Public Defender
230 West Pike Street; Suite 360
Clarksburg, West Virginia 26301
Tel. (304) 622-3823
Fax. (304) 622-4631
Brian_Kornbrath@fd.org
        Attorney for Petitioner Ronald Halstead

Richard Jaffe
3200 Southwest Frwy. Suite 3200
Houston Texas, 77027
713-626-3550
713-626-9420
Richard A. Jaffe rickjaffeesq@aol.com
        Attorney for Petitioner Ronald Halstead

Also served

Robert H. McWilliams, Jr
Rob.McWilliams@usdoj.gov,
Chris.zumpetta@usdoj.gov
Michael D. Stein michael.stein@usdoj.gov, USAWVN.ECFCRIMINAL@usdoj.gov,
david.hacker@usdoj.gov, joyce.sizemore@usdoj.gov, ricki.dalesio@usdoj.gov
David W. Frame dwframe@framelaw.com
James B. Zimarowski zimarows@access.mountain.net
Timothy J. Manchin tmanchin@manchin-aloi.com, abrammer@manchin-aloi.com
alanna_burnside@fd.org, lisa_coleman@fd.org
Stephen G. Jory jory@jorysmith.com
Alan G. McGonigal alan.mcgonigal@usdoj.gov, USAWVN.ECFCivil@usdoj.gov,
USAWVN.ECFFlu@usdoj.gov, judy.malek@usdoj.gov
Jeff Harris jeffharris@juno.com
Steven L. Kessler stevenkessler@msn.com

This the 20th day of August, 2008.

S/ Patrick M. Donley
PATRICK M. DONLEY

23